IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT NOCK, an individual, on his own behalf and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>SPRING ENERGY RRH, LLC d/b/a SPRING POWER & GAS, RRH ENERGY SERVICES, LLC and RICHMOND ROAD HOLDINGS, LLC, Delaware limited liability companies,<br><br>        Defendants. | No. 1:23-cv-01042<br><br>**DECLARATION OF ETHAN PRESTON** |

    1.    My name is Ethan Preston. I am an attorney at law licensed to practice before all of the courts of the State of Texas. I am counsel of record for Plaintiff Robert Nock ("Nock"), I have personal knowledge of all of the facts set forth in this declaration and could testify thereto if called to do so.

    2.    **Nock's 2023 Subpoena to AnswerNet:** On October 4, 2023, Nock served a subpoena on TPV, LLC and Cerida Investment Corp. (together with AnswerNet, Inc. and Cerida Investment Corp., "AnswerNet"), which sought the following documents:

        4.    After bifurcation, all documents verifying enrollment with Defendants during the class period.

        5.    After bifurcation, all communications with Defendants during the class period.

        6.    After bifurcation, all communications with sales agents (including telemarketers, verifiers, and/or door-to-door vendors) who enrolled consumers with Defendants during the class period.

(A true and correct copy of the 2023 subpoena with proof of service is attached to this Declaration as Exhibit A.) AnswerNet never served formal objections to the October 4 subpoena, and did not timely serve objections of any sort. (Nock granted an extension on producing

responsive documents until November 3, but AnswerNet only served a certificate of compliance on that date that it found "No documents or data relating to plaintiff Robert Nock.")

3. **Nock's 2024 Subpoenas to AnswerNet:** On May 7, 2024, AnswerNet agreed to accept service of subpoenas by email, which Nock emailed to AnswerNet on June 11. True and correct excerpts of the relevant parts of AnswerNet's May 7 email and Nock's June 11 subpoena are attached to this Declaration as Exhibits B and C, respectively.

4. Nock served amended subpoenas on AnswerNet on June 25 and August 16, 2024. Exhibit 150 to the AnswerNet deposition is a true and correct copy of the August 16, 2024 subpoena Nock served on AnswerNet. These 2024 subpoena sought essentially the documents. The relevant document requests in the August 2024 subpoena are set forth below:

> 4. All documents concerning any policy, plan, procedure, or practice under which AnswerNet provides services (including access to any enrollment records created prior to July 1, 2021) to Defendants under any contract with TPV.com or Sales Verification LLC which predate their acquisition. []
>
> 6. To the extent not otherwise produced in response to prior Requests, all documents containing data collected by AnswerNet via the Internet or by telephone from the Sales Agents, while the Sales Agents enrolled consumers with Defendants via EZTPV or other website at tpvhub.com.
>
> 7. To the extent not otherwise produced in response to prior Requests, documents concerning communications with Mohsin Abdul Jabbar and/or any person using [] the telephone number (215) 914-9702.
>
> 8. All documents concerning the operation and maintenance of any information system (including, by way of example, but without limitation, instruction manuals, operation manuals, training manuals, sales brochures, marketing materials, licensing agreements, the written policies and procedures regarding the operation of such system, and/or communications reflecting unwritten policies and procedures regarding the operation of such systems) which are used or made available to Defendants or their agents while the Sales Agents enrolled consumers with Defendants via EZTPV or other website at tpvhub.com, and/or to verify such enrollment (including, by way of example, but without limitation, telephone systems used to make verification calls, audio recordings of verification calls, browser data collected via EZTPV or other website at tpvhub.com, Focus Location Services and/or other GPS data).

(Ex. 150 to Pudles Depo. at 10.) The August subpoena also contained Nock's notice of AnswerNet's Rule 30(b)(6) deposition, which covered the following topics:

> 2.  Services that AnswerNet (including AnswerNet, Inc., TPV, LLC, Sales Verification LLC, and/or Cerida Investment Corp.) provided with respect to enrollments by the "Sales Agents" (meaning Endurance Sales & Marketing LLC [] or other vendors for energy suppliers whose enrollments were verified by AnswerNet between March 2021 and July 2022), including []
>
> b.  Defendants' requirements for AnswerNet, and negotiations (or re-negotiations) about the services AnswerNet provided or which Defendants sought between March 2021 and July 2022 []
>
> d.  TPV, LLC's enrollment system at https://clients.tpvhub.com []
>
> f.  the information AnswerNet collected from the Sales Agents in the course of generating a confirmation code or TPV ID, including [] enrollment data, and other data collected from the Sales Agents via the Internet, and information provided by the Sales Agents over the telephone [] and http server log files []
>
> h.  verification calls made to Defendants' prospective customers to verify the Sales Agents' enrollments, [] and the collection, preservation, and organization of those call records;
>
> i.  the countermeasures AnswerNet and/or Defendants used to detect and/or prevent fraud in enrollments or attempted enrollments by the Sales Agents []; and
>
> j.  the networks, servers, and devices used by AnswerNet, Inc., TPV, LLC, Sales Verification LLC, and/or Cerida Investment Corp. to collect and store any of the foregoing information and/or communications with Defendants, and any preservation or retention policies applicable to such information and/or communications.

(*Id*. at 12-15.) On June 26, AnswerNet responded to the subpoena by email that suggested document production would be conditioned on Nock's payment of AnswerNet's costs, but did not otherwise object to the production of documents. (A true and correct copy excerpt of the relevant part of AnswerNet's email is attached to this Declaration as Exhibit D.) Excluding its response to Nock's motion to compel a deposition, AnswerNet never served formal objections to

any of the 2024 subpoenas. (*Cf.* ECF Nos. 114, 119.) AnswerNet did not timely serve objections to the production of documents under Nock's subpoenas.

5.  **AnswerNet's 2023 Costs:** In November 2023, Nock began to meet and confer with AnswerNet about omissions from its production. (True and correct excerpts of email chains containing the relevant parts of the November and December 2023 emails discussed below are attached to this Declaration as Exhibits E and F.) In a November 10 email, Nock specifically told AnswerNet he sought narrow its initial production to various *non-audio* data, including "the enrollment data provided by the sales agents (including GPS data), verification call records, and QA scoring or other post-verification documents." (Ex. E at 1.)

6.  On December 5, 2023, Nock had a call with AnswerNet in which AnswerNet indicated that certain non-audio recording documents might exist, and Nock indicated that he preferred to obtain the non-audio documents before the audio files. (*See* Ex. F at 5.) On December 11, Nock sent another follow-up email about "TPV's production, especially progress on the non-recordings documents." On December 13, AnswerNet demanded $1,000 for "ten (10) hours of tech time" for producing "approximately 100 recordings related to Endurance within the period of 3/1/2021 to 5/31/2021." (*Id.*) Nock responded by reminding AnswerNet that he previously sought non-audio data, and indicating that he wanted "to confirm the non-audio documents are still available, and inspect them," before making "payment arrangements" for AnswerNet's recordings. (*Id.*) AnswerNet responded:

> I will continue investigating the availability of non-audio materials, but my understanding is that whereas the audio data was indexed in a manner that could be pulled specifically for the parameters you provided--Endurance project from 3/1/2021 to 5/31/2021--non-audio data is not. [] For non-audio documents, my suggestion is to consult Spring Energy directly, as they may have a more efficient means of production where they can identify specific transactions that we cannot.

(*Id.* at 4.) When Nock asked AnswerNet for information about how it found the audio recordings

and confirm that they recordings were related to this case, AnswerNet responded:

> From what I understand the recordings are in buckets (i.e. folders) which makes them identifiable and non-audio are not.[ ]Beyond that I'm not a technical person and frankly, we've spent a lot of billable time (both tech and legal) on this matter for discover[y] that should be obtained by a party. I'm happy to transfer what we have but I'm not interested in a prolonged discussion of our company's processes.

(*Id*. at 3.) AnswerNet subsequently confirmed that it "seeks ten hours of billable time to produce 100 audio files, but has not and will not offer any information about how it located and selected these 100 audio files (even the number of other audio files located)." (*Id*. at 2-3.) Subsequently, Nock objected to AnswerNet's costs: "On this record, Nock disputes that the costs AnswerNet claims are reasonable. AnswerNet is not justified to any compensation without an accounting of the database queries which are the basis for its costs, while refusing Nock's input about what files to produce when." (*Id*. at 1.)

7.  **AnswerNet's 2024 Costs:** On August 26, 2024, Nock took AnswerNet's deposition. Nock promptly followed up with AnswerNet by email about the documents which are the subject of the attached motion. (True and correct excerpts of September 2024 email chains containing the relevant parts of the emails discussed below are attached to this Declaration as Exhibits G, H, and I.) On August, 28, AnswerNet demanded payment of $5,400 in costs, including

(1)   $1,000 for "Technical Services" (labeled as "2023 discounted rate");

(2)   $2,400 for 12 hours of "In-House Counsel" time; and

(3)   $2,000 for 4 hours of time by the AnswerNet's CEO.

(Ex. G at 3.) In response, Nock asked for "billing records for the claimed costs, and any substantiation of the hourly rates of the professionals involved." (*Id*. at 2.) AnswerNet clarified it sought $150 per hour of technical services "to search and extract data related to post-deposition

requests" in 2024. (*Id*.)

8.  On September 3, 2024, AnswerNet demanded the costs sought in the instant application, including "$300 for two hours of tech time" to search for specific recordings of calls between it and one of Endurance's telemarketers (discussed *infra*, ¶¶9-10) and that its "outstanding costs be covered." (Ex. H at 3.) Nock agreed to pay $300 "to pay for the search costs associated with that search," but reminded AnswerNet that he had previously "object[ed] to [its] prior costs and asked billing records and other substantiation [] Nock is willing to pay $300 to narrow and/or defer the dispute over costs as to" those recordings, and reserved the right to seek relief from the Court. (*Id*. at 2.) AnswerNet replied that it would "not participate in further discovery until the Company is compensated for all efforts to date." (*Id*. at 1.)

9.  **TextNow Subpoena:** Nock has identified (215) 914-9702 as the telephone number used by Mohsin Abdul Jabbar, one of the telemarketers working with Neil St. Louis on Defendants' campaign. (*See* Preston Decl., ECF No. 105-1 ¶9.) On or about March 14, 2024, Nock served a subpoena on the telecommunications carrier for (215) 914-9702, TextNow, Inc. ("TextNow"), for certain call records and other documents. On July 16, TextNow certified its production in response to the subpoena. Exhibit 46 to the Gary Pudles deposition is a true and correct copy of TextNow's certificate of authenticity and email, and screenshots of relevant portions of TextNow's production. (*See* Ex. 46 to Pudles Depo. at 5-7.)

10. **AnswerNet Recorded Calls with Jabbar:** These records show Jabbar made approximately 25 calls to two toll-free numbers, (833) 513-7075 and (844) 943-2767, between March 27 and May 3, 2021 (i.e., during the Endurance campaign). (*Id*., rows 686, 702, 706, 707, 719, 751, 760-61, 762-64, 767, 774, 778, 783-86, 791-92, 806.) These toll-free numbers are listed in Exhibit 154 to the Gary Pudles deposition. AnswerNet testified the telephone numbers

"were used for TPV purposes," and calls to these numbers were recorded. (Pudles Depo. Tr. 88:13-90:12.) The TextNow records also show (1) a call to Defendants' training session for Endurance (at (408) 650-3123 on March 26, 2021) and (2) an *incoming* call from (844) 943-2767 to Jabbar for nearly four minutes on April 27, 2021. (*Id.*, row 685, 736.)

11. After the AnswerNet deposition, Nock requested that AnswerNet produce various documents, including the recordings of the calls with Jabbar. On September 5, AnswerNet responded that all recordings for third-party verification telephone calls performed by TPV.com are available to Defendants in their client portal[.]" (Ex. G at 1.) Nock then requested that Defendants produce those recordings, but expressed doubt that Defendants had access to those recordings:

> Can Defendants access call recordings to the TPV.com telephone numbers at issue, 8335137075, 8444161174, 8449432767, and 8339701303? Its not clear to me that those are "verification" calls, per se.

(Ex. I at 2.) On September 11, 2024, Defendants indicated that they could not locate those recordings. (*Id.* at 1, 4-7.)

12. **Documents Concerning Defendants' "Customer Needs Clarification" Rule:** Exhibits 155 and 156 to the Gary Pudles deposition are true and correct copies of SPRING-000551.MP3 and SPRING-000584.MP3, respectively, which are recordings of calls AnswerNet verifiers made to consumers enrolled by Endurance sales agents for Defendants. In its deposition, AnswerNet testified about a call in which one of its verifiers asked the consumer whether she had met with Defendants' sales agent, and the consumer responded "nope, they weren't here." (Pudles Depo. Tr. 101:18-24.) The verifier then stated she would mark the call as "Customer Needs Clarification," based on a "rule" that Defendants provided:

> Q Why did she mark it as customer needs clarification?

>A Because that would've been the rule that the client told us to do when a door-to-door client said that [] the door-to-door person wasn't there.

(*Id*. 102:15-24.) AnswerNet then testified about a different call which the verifier marked as "Customer Needs Clarification" after the consumer indicated Defendants' sales agent had called him, rather than met him:

>Q Okay. Did you hear the customer indicate that he didn't meet with anybody but he was called on the phone?
>
>A Yes. [] That's what I heard.
>
>Q [] All objections preserved, did you hear the customer say that he didn't meet with anybody but there was a call on his telephone?
>
>A Yes.
>
>Q Okay. And the verifier responded, we will mark this as customer needs clarification; correct?
>
>A Correct.

(*Id*. 106:13-107:7.)[1]

    13. Nock requested documents concerning Defendants' rule for "Customer Needs Clarification" dispositions after the deposition. On September 13, 2024, AnswerNet emailed "a client script document, as attached, is the documentation which would set forth the dispositions." (A true and correct copy of the September 24 email and the client script document itself, an Excel spreadsheet called "Spring Digital-RES-DTD-MD_PA_NJ (11-16-2021) (1).xlsx" is attached to this Declaration as Exhibit J.) As Nock advised AnswerNet, this script does indeed include several verification call dispositions—including "Customer Needs Clarification"—but its

---

[1] During the deposition, AnswerNet floated the possibility that the caller might have only said the call was marked as "customer needs clarification" but actually marked the call correctly. (Pudles Depo. Tr. 104:7-19.) The recording at issue (Exhibit 155 SPRING-000551) incorporated a customer's confirmation code (11151713021), and the TPV.com data produced by Defendants (Exhibit 105 SPRING-033223) indicates that the "disposition" value for that confirmation code is, in fact, "Customer Needs Clarification." (*Id*. 104:22-106:2.)

description for that disposition ("Customer does not understand or is unable to complete the verification without questions being addressed") would not cover situations in which the consumer indicates the sales person did not meet with the consumer. (Ex. H at 1; Ex. J at 4, Code 000004.) Moreover, the "Customer Needs Clarification" disposition does not trigger a "Fraud Indicator" (while several other dispositions, like "Sales Rep Did Not Leave Premises" and "Sales Rep Acted as Customer," do). (*Cf. id*., Codes 000001, 000020.)

14.     On September 13, 2024, Nock asked AnswerNet to search again for documents concerning Defendants' rule for "Customer Needs Clarification" dispositions. (Ex. H at 1.) AnswerNet responded that it had "provided the [responsive] document we have," and did "not have other documentation responsive to this request." (*Id*.) Because AnswerNet did not provide any email with "Spring Digital-RES-DTD-MD_PA_NJ (11-16-2021) (1).xlsx," the author of the document is not clear. Below is true and correct screenshot of that Excel file's metadata:

[Screenshot of Excel file properties dialog showing:
Spring Digital-RES-DTD-MD_PA_NJ (11-16-2...)
Tabs: General | Summary | Statistics | Contents | Custom
Created: Tuesday, July 20, 2021 6:14:04 AM
Modified: Friday, September 20, 2024 1:10:05 PM
Accessed: Friday, September 20, 2024 1:10:13 PM
Printed:
Last saved by: Shay Horn
Revision number:
Total editing time:
OK  Cancel]

Based on my review of the documents produced by Defendants in discovery, "Shay Horn" is not

one of Defendants' employees. This metadata and the file name indicate the "Spring Digital-RES-DTD-MD_PA_NJ (11-16-2021) (1).xlsx" file was created in July 2021—after Endurance's March-May 2021 campaign. Moreover, "Spring Digital-RES-DTD-MD_PA_NJ (11-16-2021) (1).xlsx" contains a sheet called "Change History" which reflect that there were prior versions of this document, including the "Initial Version" dated August 5, 2019. (The next change is dated July 26, 2021.) (Ex. K at 5.) In short, AnswerNet's production is from the wrong time, and does not address actually address Defendants' decision to apply the "Customer Needs Clarification" disposition to verification calls in which the consumer stated the sales agent was not present (and even if it did, there is no attached email showing who transmitted the spreadsheet or when). To the extent the metadata and content show that AnswerNet generated this document, it is inconsistent with AnswerNet's testimony that *Defendants*—not AnswerNet—made the decision to apply the "Customer Needs Clarification" disposition to such calls. (Pudles Depo. Tr. 102:21-22 ("the rule that *the client told us* to do," italics added).)

15. **Server Logs for clients.tpvhub.com:** At the start of the verification process, Endurance's sales agents uploaded enrollment data with AnswerNet's http servers at client.tpvhub.com. (*See* ECF Nos. 105-11, 105-20.) AnswerNet testified client.tpvhub.com is currently "an AWS server," and were "cloud-based servers likely in AWS" in 2021. (Pudles Depo. Tr. 75:2-76:6.)

16. Shortly after AnswerNet's deposition, Nock asked for "http logs" for Defendants' enrollments at client.tpvhub.com by Endurance and MBM, but AnswerNet later responded "There is no report or data specifically named 'http logs,' a term which you have seemingly coined." (Ex. H at 2.) However, AnswerNet's position remains that it will "not participate in further discovery until the Company is compensated for all efforts to date." (*Id.*)

17.     **AnswerNet's Communications with Defendants About this Case:** In its deposition, AnswerNet testified it has communicated with Defendants about this case. (Pudles Depo. Tr. 38.25-41:7.) While AnswerNet instructed its deponent not to answer questions about these communications based on privilege, there is no joint defense agreement between AnswerNet and Defendants. (*Id.*) After Nock followed up with AnswerNet about these communications after the deposition, AnswerNet responded "Without waiving any available objections to a formal document request, including but not limited to the objection that this request seeks information or materials protected by the attorney-client privilege and/or work-product doctrine, AnswerNet is not aware of any written communications with Defendants regarding this case." (Ex. G at 1.) Defendants have indicated that they were "conferring with AnswerNet to attempt to obtain the requested http logs." (Ex. I at 2.)

18.     **Certification:** Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 7, 2024      By:    s/Ethan Preston
                                          Ethan Preston