```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3    _____

 4    ROBERT NOCK, an individual, on

 5    his own behalf and on behalf of

 6    all others similarly situated,

 7           Plaintiff,

 8       v.                          Civil Action No.

 9    SPRING ENERGY RRH, LLC d/b/a     1:23-cv-01042-

10    SPRING POWER & GAS; RRH ENERGY   JHR

11    SERVICES, LLC d/b/a RICHMOND ROAD

12    HOLDINGS, LLC; and RICHMOND ROAD

13    HOLDINGS, LLC, Delaware limited

14    liability companies,

15           Defendants.

16    _____

17         VIDEOCONFERENCE DEPOSITION OF GARY PUDLES

18    DATE:          Monday, August 26, 2024

19    TIME:          10:03 a.m.

20    LOCATION:      Remote Proceeding

21                   AnswerNet

22                   3930 Commerce Avenue

23                   Willow Grove, PA 19090

24    REPORTED BY:   James Bekman

25    JOB NO.:       6872872
```

Page 1

```
 1        A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFF ROBERT NOCK:
 3     ETHAN PRESTON, ESQUIRE (by videoconference)
 4     Preston Law Offices
 5     4054 McKinney Avenue, Suite 310
 6     Dallas, TX 75209
 7     ep@eplaw.com
 8     (972) 842-4666
 9
10     JEREMY WILSON, ESQUIRE (by videoconference)
11     Biles Wilson
12     457 Laurence Drive, Suite 195
13     Heath, TX 75032
14     jeremy@bileswilson.com
15     (214) 662-8456
16
17
18
19
20
21
22
23
24
25
                                          Page 2
```

```
 1                I N D E X
 2  EXAMINATION:                       PAGE
 3     By Mr. Preston            9
 4
 5            E X H I B I T S
 6  NO.      DESCRIPTION              PAGE
 7  Exhibit 20   Email Dated 5/11/21       55
 8  Exhibit 21   Endurance Enrollment GPS Data 92
 9  Exhibit 23   Endurance Enrollment GPS Data 93
10  Exhibit 46   TextNow US Certification    91
11  Exhibit 68   Spring Power Signature Page  70
12  Exhibit 105  TPV.com Data         104
13  Exhibit 107  Parties and Witnesses     29
14  Exhibit 113  TPV.com Services Agreement  34
15  Exhibit 149  Spring Power Response     44
16  Exhibit 150  AnswerNet Amended Subpoena  15
17  Exhibit 151  AnswerNet Response Letter   25
18  Exhibit 152  Cerida Subpoena        27
19  Exhibit 153  Email Dated 3/26/21      76
20  Exhibit 154  Servers           88
21  Exhibit 155  Audio Recording      100
22  Exhibit 156  Audio Exhibit       106
23  Exhibit 157  Audio Exhibit       110
24  Exhibit 158  Audio Exhibit       113
25  Exhibit 159  Audio Exhibit       113
                                          Page 4
```

```
 1        A P P E A R A N C E S (cont'd)
 2  ON BEHALF OF DEFENDANTS SPRING ENERGY RRH, LLC D/B/A
 3  SPRING POWER & GAS, RRH ENERGY SERVICES LLC D/B/A
 4  RICHMOND ROAD HOLDINGS, LLC, AND RICHMOND ROAD
 5  HOLDINGS, LLC, DELAWARE LIMITED LIABILITY COMPANIES:
 6     ELLIOT A. HALLAK, ESQUIRE (by videoconference)
 7     Harris Beach PLLC
 8     677 Broadway, Suite 1101
 9     Albany, NY 12207
10     ehallak@harrisbeach.com
11     (518) 427-9700
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 3
```

```
 1     D O C U M E N T S   R E Q U E S T E D
 2  NO.      DESCRIPTION              PAGE
 3  1        URL Tpvhub.com Record       74
 4
 5     I N F O R M A T I O N   R E Q U E S T E D
 6  NO.      DESCRIPTION              PAGE
 7  1        TPV.com Hiatus Date      38
 8
 9     QUESTIONS INSTRUCTED NOT TO ANSWER
10        PAGE    LINE
11          65      6
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 5
```

2 (Pages 2 - 5)

G. Pudles

1  THE REPORTER:  Good morning.  My name
2  is James Bekman.  I'm the reporter
3  assigned by Veritext to take the record of
4  this proceeding.  We are now on the record
5  at 10:03 a.m.
6  This is the deposition of Gary Pudles
7  taken in the matter of Robert Nock, an
8  individual on his own behalf and on behalf
9  of all others similarly situated v. Spring
10 Energy RRH, LLC doing business as Spring
11 Power & Gas, RRH Energy Services, LLC
12 doing business as Richmond Road Holdings,
13 LLC, and Richmond Road Holdings, LLC,
14 Delaware Limited Liability Companies on
15 Monday, August 26, 2024, at 390 Commerce
16 Avenue, Willow Grove, Pennsylvania 19090.
17 I'm a notary authorized to take
18 acknowledgements and administer oaths in
19 New York.  Parties agree I will swear in
20 the witness remotely.
21 Absent an objection on the record
22 before the witness is sworn, all parties
23 and the witness understand and agree that
24 any certified transcript produced from the

Page 6

G. Pudles

1  recording of this proceeding:
2  - is intended for all uses
3  permitted under
4  applicable procedural
5  and evidentiary rules
6  and laws in the same
7  manner as a deposition
8  recorded by stenographic
9  means; and
10 - shall constitute written
11 stipulation of such.
12 Now, at this time, will everybody in
13 attendance please identify themselves for
14 the record?
15 It looks like Counsel Wilson is
16 joining us now.  So before I swear in the
17 witness, I will let him in and let him
18 know we're at appearances.  I'll take a
19 quick pause here.
20 Counsel Wilson, we're about to do
21 appearances if you're -- could hear us;
22 okay?  So feel free to join.
23 MR. WILSON:  I can.  Okay, thank you.
24 THE REPORTER:  Okay, thank you.

Page 7

G. Pudles

1  Okay.  So at this time, could everybody in
2  attendance please identify themselves for
3  the record?
4  MR. PRESTON:  My name is
5  Ethan Preston.  I'm appearing on behalf of
6  Plaintiff Robert Nock.
7  MR. WILSON:  Jeremy Wilson on behalf
8  of Plaintiff Robert Nock.
9  MR. HALLAK:  Elliot Hallak from the
10 law firm of Harris Beach here for the
11 defendants.
12 MR. MURDZA:  David Murdza, general
13 counsel for AnswerNet appearing for
14 AnswerNet witness Gary Pudles.
15 THE REPORTER:  And if the witness
16 could just state his first and last name.
17 MR. PUDLES:  My name is Gary Pudles.
18 THE REPORTER:  Thank you.
19 MR. PUDLES:  P-U-D-L-E-S.
20 THE REPORTER:  Thank you.  Okay.
21 Hearing no objection, I will now swear in
22 the witness.
23 If you could please raise your right
24 hand.  Thank you.

Page 8

G. Pudles

1  WHEREUPON,
2  GARY PUDLES,
3  called as a witness and having been first
4  duly sworn to tell the truth, the whole
5  truth, and nothing but the truth, was
6  examined and testified as follows:
7  THE REPORTER:  Okay.  Counsel, please
8  proceed.
9  EXAMINATION
10 BY MR. PRESTON:
11 Q   Good morning, Mr. Pudles.  I
12 just want to make sure, are you impaired,
13 or ill, or taking medication and it would
14 cause you not to be able to give truthful
15 testimony today?
16 A   No.
17 Q   Have you been -- had your
18 deposition taken before?
19 A   Yes.
20 Q   Okay.  So I'm going to remind
21 you and go over some of the ground rules.
22 Court reporter can't see gestures.  It's
23 really a transcribed interview.  And so
24 everything -- all your answers have to be

Page 9

3 (Pages 6 - 9)

G. Pudles

1  G. Pudles
2  verbal. We can't talk over each other.
3  And you should ask me if you can't --
4  don't hear or understand a question. Does
5  that -- do those rules sound amenable to
6  you?
7     A.  Yes.
8     Q.  Okay. So this is a deposition -
9  - a Rule 30(b)(6) deposition of AnswerNet
10  and some affiliates to get their side of
11  the story on some events that are relevant
12  to the underlying lawsuit. I wanted to
13  ask before we go, what function does
14  AnswerNet or its affiliates play in the
15  third party verification processes of the
16  defendants?
17     A.  For -- we -- we provide third
18  party verification. We provide that
19  service.
20     Q.  Okay. And what does that
21  involve?
22     A.  That involves either with an
23  electronic or a live script where we
24  confirm with the consumer that they know
25  what they're buying and that they -- that
Page 10

1  G. Pudles
2  they want to make the purchase.
3     Q.  Okay. So that's the
4  verification call --
5     A.  Correct.
6     Q.  -- that is made in the course of
7  the third party verification? One of the
8  critical features that AnswerNet and its
9  affiliates play in this litigation is the
10  collection of GPS data. Does that change
11  your answer at all in terms of what
12  services AnswerNet provides?
13     A.  No, it doesn't change my answer
14  at all.
15     Q.  Okay. So you guys -- does the
16  AnswerNet and its affiliates collect GPS
17  coordinates for the sales agent?
18     A.  For -- sorry, I interrupted.
19  You want to finish your question?
20     Q.  For the sales agents that were
21  working on behalf of the defendants.
22     A.  Well, first of all, we don't
23  work on behalf of the sales agents. We
24  work on behalf of the seller. And
25  depending on what channel the seller is
Page 11

1  G. Pudles
2  selling in, we will capture coordinates
3  related to the seller. Related to the
4  sales --
5     Q.  Okay. Do you --
6     A.  I'm sorry. Related to the sales
7  agent. I apologize.
8     Q.  Thank you. Do you capture any
9  other information?
10     A.  Certainly. We record the
11  entirety generally of the transaction and
12  all of the data being requested in the
13  particular script by a client. We capture
14  all of that data either electronically or
15  -- either electronically or by an agent
16  collecting that data and putting it into a
17  database.
18     Q.  Okay. And what is your personal
19  involvement? This is a case that's going
20  to focus on TPV.com. Do you know who I'm
21  talking about when I say TPV.com?
22     A.  I'm sorry. I do know who
23  TPV.com is, yes.
24     Q.  Okay. What information does
25  TPV.com capture about door-to-door sales
Page 12

1  G. Pudles
2  agents?
3     A.  They capture the -- the details
4  of a transaction. It really depends on
5  the client, and each client has their own
6  scripts and their own data that they
7  determine that we should capture for them.
8  So, you know, we do capture, you know,
9  transaction information, consumer
10  information, the terms of the -- of the
11  offer and the acceptance, and as you
12  pointed out, the GPS coordinates at
13  certain parts of the transaction.
14     Q.  Okay. Do you capture anything
15  else like IP addresses, or user agents, or
16  other data that's transmitted over an HTTP
17  protocol?
18     A.  Yes. I -- I would -- it depends
19  on the client. Or if you have one of our
20  reports, you can show it to me and I'm
21  happy to point out what the -- what those
22  data points are.
23     Q.  Okay. Do you understand that
24  there's a court case involving the
25  defendants and my client?
Page 13

G. Pudles

1  G. Pudles
2    A   I understand that there's, if
3  I'm not mistaken, a TCPA action between
4  your client and my client.
5    Q   Okay.  And when did you come to
6  that understanding?
7    A   I have no idea.  Well, sometime
8  -- one -- most likely at a meeting after
9  you reached out or after the client
10  reached out to my general counsel who's
11  very diligent in making sure I know
12  things.
13    Q   Okay.  I'm going to upload
14  another exhibit to the drive.  You should
15  have access to a Google Drive.
16    A   Well, I do, but I -- I would
17  prefer if you would share documents,
18  because I would rather make sure that I'm
19  not searching for something and we're not
20  talking about the same thing.  So if you
21  don't mind bringing up and sharing the
22  document, that would be appreciated,
23  because I don't want to -- I -- I want to
24  make sure that I'm looking at the right
25  document at the right time.

Page 14

1  G. Pudles
2    Q   Okay.  We might not always be
3  able to do that, but I will try.
4        MR. PRESTON:  Mr. Bekman, can we --
5  I'm going to try to share the screen.
6        THE REPORTER:  Yes.  You're -- you're
7  set up, Counsel.  Oh, I'm just trying to --
8  this is the same Google Drive from
9  previous?
10        MR. PRESTON:  Yeah.  Yeah.  It's a
11  little bit different.  Actually, it might
12  -- the URL might be different.
13        THE REPORTER:  Okay.
14        MR. HALLAK:  Ethan, can you just let
15  us know what exhibit you're referring to
16  when you bring up documents --
17        MR. PRESTON:  This is Exhibit 150.
18        (Exhibit 150 was marked for
19        identification.)
20        MR. HALLAK:  Okay.  Thank you.
21  BY MR. PRESTON:
22    Q   All right.  So this is a
23  subpoena.  It is a subpoena for a Rule
24  30(b)6 deposition of AnswerNet and some
25  affiliated companies.  There go.  Do

Page 15

1  G. Pudles
2  you see AnswerNet, TPV, LLC, Sales
3  Verification, and Cerida Investment
4  Corp --
5    A   I do.
6    Q   -- Mr. Pudles?
7    A   I do.
8    Q   Okay.  And have you seen this
9  document before?
10    A   I have not.
11    Q   You have not seen this document
12  before?
13    A   No.
14    Q   Okay.  Did you prepare for a
15  deposition?  Did you prepare for this
16  deposition?
17    A   I did.
18    Q   Okay.  How did you prepare?
19    A   With counsel and with -- with
20  counsel and a couple of other people, but
21  mostly with counsel.
22    Q   Okay.  Without involving
23  discussions with your counsel, who did you
24  speak with?
25    A   I spoke with Eduardo Flores who

Page 16

1  G. Pudles
2  is our Vice President of TPV,
3  Lauren Hinote, who is our -- who is our
4  salesperson, and counsel.
5    Q   Okay.  And how long has
6  Mr. Flores been at TPV.com?
7    A   I don't know how long he's been
8  at TPV.com, but he -- he's been with
9  TPV.com since I acquired that company --
10  or since Cerida Investment Corp acquired
11  the LLC.
12    Q   Okay.  Did he have a position
13  TPV.com prior to that acquisition?
14    A   He did.  He did.
15    Q   Okay.  And when did that
16  acquisition take place, if you don't mind
17  my asking?
18    A   I believe it was 2021.
19    Q   Okay.  What did you speak with
20  Mr. Flores about?
21    A   About making sure that I knew
22  the things I thought you would ask about.
23    Q   Okay.  How did you do that
24  without looking at the deposition notice?
25    A   Because it -- the -- the prep

Page 17

5 (Pages 14 - 17)

G. Pudles

1  work was prepped by my attorneys.
2  
3      Q    Okay.
4      A    So -- so anything I needed to
5  see was prepared for me by my attorneys.
6      Q    Okay.  And what specifically did
7  you discuss with Mr. Flores?
8      A    What did I specifically discuss
9  with Mr. Flores?  Well, with the group and
10 -- and there was no private conversation,
11 so I'm not really sure where the attorney
12 privilege lies, but we went over the -- a
13 couple of sheets that you had sent over, a
14 couple of reports from ours to make sure
15 that I was correctly identifying those.
16 And we talked about -- about what we
17 thought you might ask and -- and how we
18 might answer that -- how I might answer
19 that.  And my attorneys gave me advice as
20 to, you know, as to some of the ways I was
21 going to answer or not answer depending on
22 the nature of the question.
23     Q    Okay.  And there was another
24 person, Laura [sic] Hinote?  Did I --
25     A    Correct.

Page 18

G. Pudles

1      Q    Okay.  And what's her position?
2  
3      A    She's in sales.
4      Q    Which entity?
5      A    She sells for the TPV companies.
6  She works -- she works -- I -- I'm not
7  sure which company she actually works for.
8  I have a few.  But she's --
9      Q    Yeah.
10     A    -- she's the salesperson
11 dedicated to the TPV business.  She also
12 came from TPV.com and was very
13 knowledgeable about the focus platform,
14 which I believe you're going to ask about.
15     Q    I am going to ask about that.
16 That is -- I'm grateful that we're on the
17 same page about that.  Is there any
18 information that you sought in preparation
19 for your deposition that you were not able
20 to obtain?
21     A    Not that I can think of.
22     Q    Okay.
23     A    No.  In fact, I know there
24 was -- I got everything I -- I needed --
25 at least what we thought we needed.

Page 19

G. Pudles

1      Q    Okay.  Are there any other
2  
3  employees who would have more information
4  about what you assumed we were going to
5  ask about in the deposition?
6      A    No.
7      Q    Okay.  How do you know that?
8      A    Well, because I just do.  I
9  mean, I'm not sure how to even answer
10 that, so I'll just say that nobody would
11 know more than Lauren and Eduardo.
12     Q    Okay.  Very good.  What happened
13 after the acquisition of TPV.com and I
14 think there's another entity that's sort
15 of involved in this called TrustedTPV --
16 does that sound like an affiliate --
17     A    It is.
18     Q    -- of AnswerNet?
19     A    We -- we -- yes.  TrustedTPV was
20 a business whose assets we acquired.
21     Q    Okay.  What happened to TPV.com
22 and TrustedTPV?  Are those entities -- do
23 they still exist?
24     A    TPV.com, LLC exists.  Trusted --
25 Trusted may exist.  I've never bought -- I

Page 20

G. Pudles

1  didn't buy the entity -- I only bought the
2  assets.
3  
4      Q    Okay.  Who's the most senior
5  employee at Cerida Investment?
6      A    Me.
7      Q    Okay.  Who's the most senior
8  employee at AnswerNet?
9      A    Well, AnswerNet, Inc. is me, but
10 AnswerNet is a brand, it's not an -- it's
11 not a corporation.
12     Q    Okay.  What's the relationship
13 between AnswerNet, Inc. and AnswerNet the
14 brand?
15     A    AnswerNet the brand covers a
16 number of corporations.  AnswerNet, Inc.
17 was the first company created that -- that
18 is now part of AnswerNet.
19     Q    Okay.  And so TPV.com, those --
20 the verification records that were created
21 during the course of defendant's business
22 with TPV.com, who owns those assets?  Who
23 operates that business?
24     A    Well, TPV.com, LLC is owned by
25 Cerida Investment Corp.

Page 21

Veritext Legal Solutions
800-336-4000

G. Pudles

1             G. Pudles
2    Q  Okay.
3    A  Cerida Investment Corp is owned
4  by me.
5    Q  Okay.  Who's the most senior
6  person at TPV.com?
7    A  Well, if it's not me, it's
8  Eduardo Flores.
9    Q  Okay.
10    A  Actually -- actually, yeah -- or
11  it -- it would be Cori Bartlett, who is my
12  COO.
13    Q  Okay.  Okay.  And what about
14  TrustedTPV?
15    A  Well, the assets of TrustedTPV
16  were folded into -- I believe folded into
17  TPV.com.
18    Q  Okay.  Okay.  So TrustedTPV sort
19  of merged into what used to be TPV.com,
20  but that's really now AnswerNet.  Is that
21  -- do I have that right?
22       MR. MURDZA:  Objection.  Doesn't
23     classify his testimony accurately, but you
24     can answer.
25       THE WITNESS:  All right.  So

Page 22

G. Pudles

1  AnswerNet is brand.  So to the extent that
2  all of these brands are now part of
3  AnswerNet and operate under the brand
4  AnswerNet TPV, we bought the member
5  interests of -- of TPV.com, LLC.  So
6  Cerida owns a 100 percent of the member
7  interests.  And Cerida also bought the
8  operating assets of Sales Verification,
9  LLC, which, you know, as Trusted.
10  BY MR. PRESTON:
11    Q  TrustedTPV?
12    A  Correct.
13    Q  Okay.
14    A  So they're operated -- they're
15  operated as one business under the
16  AnswerNet brand.
17    Q  How then does AnswerNet
18  distinguish between the different
19  affiliates?
20    A  Wow, I'm not really sure.  We --
21  we work very hard to keep our various
22  affiliates separate, so I'm not really
23  sure what you are trying to ask.
24    Q  Well, what are the steps that

Page 23

G. Pudles

1  they maintain -- sorry.  What are the
2  steps that they take to maintain that
3  separation?
4       MR. MURDZA:  Objection on the grounds
5     of relevance.  Are we going to talk about
6     Focus and TPV?
7       MR. PRESTON:  We are.  I just -- but
8     who's running focus, Mr. Murdza?  It's
9     not --
10       MR. MURDZA:  I'm not here to answer
11     questions.
12       MR. PRESTON:  -- clear.
13       THE WITNESS:  Well, so going back to
14     your -- could you reread the open
15     question, please?
16  BY MR. PRESTON:
17    Q  Sure.  What steps does AnswerNet
18  take to maintain the separation between
19  different affiliates?
20    A  And if you're asking me what we
21  do to keep our companies different --
22  separated, they have separate payrolls,
23  they have separate bank accounts.  They
24  have -- they have separate, you know --

Page 24

G. Pudles

1  you know, they have separate existences.
2  We have separate, you know, registrations
3  in separate states.
4    Q  Okay.  Okay.  See if I can get
5  this in front of me.  So I'm going to
6  upload another exhibit.  I'm going to try
7  to share it again with y'all.  Share
8  another one.  All right.  So this is a
9  letter I received from Ashly McGarity.
10       (Exhibit 151 was marked for
11     identification.)
12       Have you ever seen this letter
13  before?
14    A  No.
15    Q  Okay.  So there's a -- I'm going
16  to highlight a paragraph.
17    A  Mm-hmm.
18    Q  Is this a correct statement?
19  This --
20    A  It is.
21    Q  Okay.  So by way of background,
22  on June 18, 2021, Cerida acquired the
23  member interest of TPV.com, a transaction
24  which did not involve AnswerNet.  All

Page 25

7 (Pages 22 - 25)

G. Pudles

1 right.
2    A    Which did not involve AnswerNet,
3 Inc.
4    Q    Right.  Okay.  Do you know how
5 TPV.com's procedures changed after this
6 acquisition?
7    A    Wow.  Which procedures
8 specifically are you talking about?
9    Q    Fair enough.  Their verification
10 of enrollments for defendants and their
11 communication policies with respect to
12 communications with the defendants.
13    A    They did not change.  They did
14 not change.
15    Q    Okay.  We're going to roll out
16 of that.  Does Ms. McGarity have any
17 technical background?
18    A    I wouldn't know --
19        MR. MURDZA:  Objection, relevance,
20    but you can answer.
21 BY MR. PRESTON:
22    Q    Let me rephrase that.  Does she
23 have any involvement in the technical or
24 database side of AnswerNet?

G. Pudles

1    A    No.
2    Q    Or any of the affiliates?
3    A    No.
4    Q    Okay.  Add another.  I'm going
5 to add another exhibit.  Going to save
6 that with y'all.  Try to get it up on the
7 screen.  All right.  So this is a subpoena
8 duces tecum that was served on TPV, LLC
9 and Cerida Investment.
10        (Exhibit 152 was marked for
11        identification.)
12        I want to scroll down to
13 requests one, five, and six.  One involves
14 documents concerning Nock, and I don't
15 want to belabor that point, but five and
16 six involve communications with defendants
17 during the class period and communications
18 with sales agents who enrolled consumers
19 with the defendants during the class
20 period.  And I want to ask who controls
21 these documents?
22    A    I believe you've been working
23 with our attorneys.
24    Q    No, no.  Sorry.  That question

G. Pudles

1 was not clear.  Which entity -- which
2 AnswerNet affiliate controls the documents
3 responsive to requests five and six in
4 Exhibit 152.  Is that Cerida or TPV, LLC?
5    A    I would say that that's TPV.  I
6 would say that's TPV.  TPV controls the --
7 the documents.  They might get support
8 from some of the other entities, but the
9 control of the documents -- would be in
10 TPV.
11    Q    Okay.
12    A    But to be very clear, 'cause I
13 don't want to be unclear, I believe
14 that -- I -- I believe you would say that
15 much of -- many of the documents are --
16 are -- the infrastructure for holding
17 those documents are not -- are not
18 controlled by TPV.  So we have an
19 infrastructure -- an internal
20 infrastructure that stuff -- but the
21 documents themselves and the knowledge in
22 them would be controlled by TPV.
23    Q    So when you say TPV in your
24 answer, you're referring to TPV.com, the

G. Pudles

1 TPV, LLC entity --
2    A    Correct.
3    Q    -- becuase TPV is an acronym
4 that you guys use in your industry;
5 correct?
6    A    TPV is an acronym stands for
7 third party verification.
8    Q    Right.  And your prior answer
9 just now concerning who controls things,
10 what you're really talking about is
11 TPV.com, which is a specific LLC?
12    A    Correct.
13    Q    Correct?  Okay.  So I'm going to
14 upload another document, and this is
15 Exhibit 107.  Get rid of that.
16        (Exhibit 107 was marked for
17        identification.)
18        All right.  Mr. Pudles, you
19 should have -- you should be able to see
20 another exhibit that we've prepared and it
21 lists the full names of some of the
22 defendants.  Do you see that?
23    A    I do.
24    Q    Okay.  And this is Exhibit 107.

G. Pudles

1 G. Pudles
2 And I want to ask, do you know who these
3 companies are?
4    A   I do.
5    Q   Okay.  And how do you
6 distinguish between these three companies?
7    A   How do I distinguish between
8 those three companies?  I'm not sure what
9 you mean.
10    Q   Well, there are three different
11 companies somewhat similar to AnswerNet's
12 different affiliates.  I'd like to
13 understand, you know, from AnswerNet's
14 perspective how these three companies are
15 different.
16       MR. HALLAK:  Objection to the form of
17    the question.
18    A   The -- I don't know the legal
19 underpinnings of RRH.  What I know is that
20 when they sign up for a particular service
21 in a particular state -- when they sign up
22 for TPV service in a particular state or
23 in a particular -- with a particular
24 product, they will tell us the legal
25 entity that operates that product in that

Page 30

1 G. Pudles
2 an objection.
3    Q   Sure.  But he's not being
4 deposed.  You are.
5       MR. HALLAK:  So, Ethan, as long as
6    that's just how you're referring to them
7    for purposes of this deposition, that's
8    fine.
9 BY MR. PRESTON:
10    Q   Okay.  We'll take that under
11 advisement.  Get rid of that exhibit.  And
12 do you recognize -- sorry.  I got rid of
13 that too soon.  Do you recognize this?
14 Can you still see that last exhibit -- the
15 107?
16    A   I -- I'm looking at the list of
17 names where the first three names are,
18 Spring Energy RRH, RRH Energy Services,
19 and Richmond Road Holdings.
20    Q   All right.  And I also want to
21 ask, do you recognize some of the other
22 names that I've just highlighted?
23 Endurance Sales, Lone Star Marketing --
24    A   I can't -- I can't see anything
25 other than the line up to Retail Energy

Page 32

1 G. Pudles
2 state.  And that's all we need to know.
3    Q   Okay.
4    A   For me -- for me, it's -- for
5 me, it's one guy.  And when that guy
6 calls, I jump.
7    Q   Okay.  And who is that guy?
8    A   Greg Hasiak.
9    Q   Okay.  Okay.  And so as far as
10 you're concerned, Mr. Hasiak, when he's
11 calling you, he's calling -- it could be
12 on behalf of any of those entities?
13    A   Or any other entity that he
14 might have an interest in.
15    Q   Okay.  And your relationship
16 with him would be sort of defined at the
17 level of whatever contractor arrangement
18 you are operating under at that time?
19    A   Correct.
20    Q   Okay.  Go back.  So can I talk
21 about these defendants as a group?  Can I
22 just refer to them as RRH or as
23 defendants?  Would that be okay with you?
24    A   I'm -- I'm here for you.  I
25 guess that would be Mr. Hallak, if he had

Page 31

1 G. Pudles
2 Solutions.
3    Q   Okay.  I'm going to restart it.
4 How about now?
5    A   I recognize the name Endurance
6 Sales and Marketing, and I don't recognize
7 any of the other names.
8    Q   Okay.  And what about these
9 names?  NSL Marketing, Neil St. Louis?
10 No?
11    A   No.  Don't know those either.
12    Q   Okay.  What do you know about
13 Endurance Sales?
14    A   They -- they were a seller for
15 RRH and RRH has sued them because RRH
16 believes that -- well, whatever is in the
17 lawsuit.  I -- what I know is that they
18 were a seller for RRH and that they are
19 now engaged in a lawsuit that RRH has
20 initiated.
21    Q   Okay.  Going to upload some more
22 exhibits, make sure that you have
23 everything.  All right.  So this is a
24 contract between TPV and the defendants.
25 //

Page 33

9 (Pages 30 - 33)

G. Pudles

1
2      (Exhibit 113 was marked for
3      identification.)
4      Can you see this, Mr. Pudles --
5   this exhibit --
6      A   I can.
7      Q   Okay.  And so my question is,
8   why did Richmond Road Holdings sign this
9   agreement?
10      MR. HALLAK:  Objection to form.
11      A   Because they wanted to acquire
12   services from TPV.com.
13      Q   Sure.
14      A   By the way, that's pure
15   speculation, but that's usually why
16   somebody signs a contract.
17      Q   Sure.  I guess that's not the
18   nub of my question.  The defendants have a
19   number of affiliates like AnswerNet, but
20   in this case they signed with the holding
21   company.  And so they have been unable to
22   tell me why they signed with the holding
23   company.  And so I assume -- presume that
24   this is a requirement of TPV.com.  And I
25   wanted to ask why did TPV.com want to have

Page 34

G. Pudles

1   an agreement with the holding company for
2   defendants?
3
4      A   I don't --
5      MR. HALLAK:  Objection -- hold on,
6   Gary.  Let me just put an objection on the
7   record.  Objection to the form of the
8   question and to the characterization of
9   the any defendant's testimony in this
10   matter.  Okay.  You can continue, Gary --
11      MR. MURDZA:  I object on the grounds
12   that that assumes a conclusion and also
13   calls for speculation.  Mr. Pudles can
14   answer if he understands.
15      THE WITNESS:  So I have no idea why
16   the parties entered into the agreement
17   using the name Richmond Road Holdings.
18   BY MR. PRESTON:
19      Q   Okay.  And we're getting into
20   closer to the heartland of this
21   deposition.  I don't know if you guys want
22   to take a break.  We've been going for
23   40 minutes.  You want want to keep
24   trucking?
25      A   Trucking, yeah.  Let's keep

Page 35

G. Pudles

1   trucking, and I'll stop singing The
2   Grateful Dead.
3      Q   Yeah, that's great.  All right.
4   So when did TPV.com start collecting GPS
5   data for the defendant's enrollments?
6      A   Sometime prior to my ownership.
7      Q   Okay.  And do you know -- did
8   that not come up with Mr. Flores or
9   Ms. Hinote?
10      A   No, I -- it -- it is my
11   understanding that that's been a part of
12   the system since the TPV.com system was
13   launched prior to my ownership.
14      Q   Okay.
15      A   I know that it was done prior,
16   because when we acquired it, it was
17   already being done.
18      Q   Okay.  How does the defendant's
19   business compare to other AnswerNet
20   customers who are in the retail energy
21   space?
22      MR. MURDZA:  Objection to form --
23      A   I'm not -- I'm not sure what you
24   mean, but other than --

Page 36

G. Pudles

1      Q   Is there anything --
2      THE REPORTER:  Counsel, that --
3   Counsel Hallak, that was an objection as
4   well to form?
5      MR. HALLAK:  Yeah, yeah.  Same
6   objection to form.
7      THE REPORTER:  Yeah, it was just --
8   just garbled.  Thank you.
9   BY MR. PRESTON:
10      Q   Is there anything unusual or
11   distinctive about their business, or is it
12   pretty much consistent with other retail
13   energy suppliers?
14      A   It's pretty much consistent --
15      THE REPORTER:  Counsel Hallak, you
16   broke up again.  That was objection to the
17   form of the question?
18      MR. HALLAK:  Objection to the form of
19   the question.  Yes.  Thank you.
20      THE REPORTER:  Thank -- thank you,
21   Counsel.
22      THE WITNESS:  And the -- the work
23   that we do is pretty much consistent
24   across our TPV customer base.

Page 37

G. Pudles
1 BY MR. PRESTON:
3   Q   Okay.  Does TPV.com still
4 provide services to defendants today?
5   A   I believe we -- we may have a
6 little, but I -- I also -- part of me
7 believes that they may be on hiatus right
8 now.  I believe they are on hiatus.
9   Q   Okay.  And --
10   A   And so I don't believe -- I
11 don't believe they're currently selling.
12   Q   Okay.  Do you know when they
13 went on the hiatus?
14   A   I don't.  I don't, but if it's
15 relevant or important, I'm certain I can
16 get that back to you.
17   Q   Okay.  I think it would -- it
18 probably might be useful.  So in your
19 business --
20   A   Sorry -- David make a note,
21 please.
22      MR. MURDZA:  I'm doing that now.
23      THE WITNESS:  Okay.
24 BY MR. PRESTON:
25   Q   Has AnswerNet communicated with

Page 38

G. Pudles
1
2 counsel and with some folks, and I don't
3 remember who over at -- other than I know
4 Greg wasn't on the call, and I think it
5 was all lawyers and maybe somebody
6 internally about the lawsuit generally.
7 BY MR. PRESTON:
8   Q   Okay.  And what was the content
9 of that conversation?
10      MR. MURDZA:  Objection, privilege.
11      MR. PRESTON:  Sorry.  You say
12 privilege, but I'm confused.  I'm talking
13 about communications between AnswerNet,
14 and the affiliates, and the defendants,
15 and so I'm not sure how that would be
16 privileged.
17      MR. MURDZA:  I'm not sure what type
18 of conversations you're asking --
19      THE WITNESS:  I'm talking about the
20 one conversation we had as a group, you,
21 me, and some folks over there.  I don't
22 remember who was on it from their side.
23 We had one conversation.
24      MR. MURDZA:  I don't remember who --
25 if any defendants were involved in that.

Page 40

G. Pudles
1
2 the defendants about this subpoena?
3      MR. MURDZA:  Objection.
4 BY MR. PRESTON:
5   Q   About this case?
6      MR. MURDZA:  Objection, privilege.
7 There's been lots of communications by
8 answering that, Counsel, with yourself and
9 other counsel, including calls that you
10 were on relative to this matter.  So he
11 can answer as to AnswerNet the operating
12 entity, but I do want to be clear that
13 when it involves discussions with myself
14 or Ashly McGarity, of which there's been
15 several, those are privileged.
16      MR. PRESTON:  Sure.  But I'm talking
17 about communications between AnswerNet or
18 its affiliates and defendants.
19      THE WITNESS:  I can only speak to my
20 conversations.  I know there have been
21 conversations between the attorneys.
22 Nobody else in the company would talk to
23 anybody at RRH to my knowledge about
24 anything with the lawsuit.  I had one
25 conversation regarding the lawsuit with my

Page 39

G. Pudles
1
2 BY MR. PRESTON:
3   Q   Is there a joint defense
4 agreement between AnswerNet and the
5 defendants?
6   A   There is not.  Not to my
7 knowledge.
8   Q   Okay.  Okay.  So, and this gets
9 back to our -- kind of core of this
10 deposition.  Your business involves
11 verifying enrollments of door-to-door
12 salespeople; correct?
13   A   That's part of it, yes.
14   Q   Do you have a sense of how much
15 travel -- let me rephrase.  How much does
16 the average door-to-door salesperson
17 travel in a typical day?
18   A   I wouldn't know.  I'm not in
19 a -- I'm not a -- in the door-to-door
20 business.
21   Q   But you're measuring in --
22 you're verifying their enrollments and
23 you're taking their GPS data as part of
24 that verification.
25   A   Okay.

Page 41

11 (Pages 38 - 41)

G. Pudles

1         Q   So you would have some data
2    about how much they're traveling from
3    enrollment to enrollment; correct?
4         A   The system -- that data would
5    live on the system, yes.
6         Q   Okay.  And does AnswerNet ever
7    look at that GPS data to assess, you know,
8    how much travel a typical door-to-door
9    salesperson would do in a typical day?
10        A   No.
11        Q   Okay.  So there's no baseline --
12   AnswerNet does not have any baseline to
13   evaluate whether or not a door-to-door
14   salesperson has traveled an unusual
15   distance and to evaluate their
16   enrollments?  Does that -- so if the
17   typical door-to-door salesperson travels
18   five miles in a day and one particular
19   door-to-door salesperson travels a hundred
20   miles in a day, that would not create any
21   red flags over at AnswerNet or TPV.com?
22            MR. MURDZA:  Objection to form --
23            MR. HALLAK:  -- form the question.
24        A   Correct.

Page 42

G. Pudles

1         Q   Okay.  Is that not part of the
2    job for AnswerNet or TPV.com?
3         A   No.  It is not part of the job
4    unless the client asks us to make it part
5    of the job.
6         Q   Okay.  And do you have any sense
7    of how long a typical door-to-door
8    enrollment takes?
9             MR. HALLAK:  Objection to the form of
10   the question.
11        A   Yeah.  I -- I don't particularly
12   have a sense of how long an enrollment
13   takes -- the average enrollment takes --
14   not one that I could give across multiple
15   -- not one that I could give across the
16   business as a whole.  I can tell you maybe
17   how long an average TPV might take, but
18   not the enrollment itself.  We're not
19   involved -- we're -- we're generally only
20   involved in part of the enrollment
21   process, and that's the part that drives
22   the TPV.
23        Q   Okay.  So I'm going to share
24   another document.  This is also uploaded,

Page 43

G. Pudles

1    this is Exhibit, shoot, 149.  Yeah.
2    Exhibit 149.  All right.  Have you ever
3    seen this document before?
4             (Exhibit 149 was marked for
5             identification.)
6         A   Nope.
7         Q   Okay.  So this is an
8    interrogatory answer that defendants
9    served on plaintiffs.  I'm going to read
10   the last sentence here.  "Defendants state
11   that the GPS coordinates contained in
12   defendant's enrollment records were
13   obtained through a platform created by
14   TPV.com that utilized Google Location
15   Services to attempt to capture the GPS
16   coordinates of sales agents, customers,
17   and service addresses."  Is that -- I'm
18   going to state that defendants have
19   indicated that they rely on TPV.com to
20   collect GPS data; is that correct?
21        A   Yes.
22        Q   Okay.  And that TPV.com used
23   Google Location Services; is that correct?
24        A   Yes.

Page 44

G. Pudles

1         Q   Okay.  And is it fair for
2    plaintiff or anyone else in this case to
3    rely on Google Maps data to review the GPS
4    coordinates from the defendant's
5    enrollment records?  Is that a valid way
6    of analyzing those records?
7             MR. MURDZA:  Objection.  Calls for
8             speculation.
9             MR. HALLAK:  Objection to the
10            question as well.
11            THE WITNESS:  So if you're asking
12            we're using Google data, so is it fair to
13            say that you can use Google Data to look
14            up things on Google -- on Google Maps?  I
15            would say that would seem to make sense to
16            me.
17   BY MR. PRESTON:
18        Q   Right.  And so another way of
19   perhaps asking the same question that
20   won't draw an objection is would you
21   expect AnswerNet's GPS coordinates to
22   generally be consistent with Google Maps?
23        A   Yes.
24        Q   Okay.  When did TPV.com start --

Page 45

12 (Pages 42 - 45)

G. Pudles

1    I've answered this already.  Was
2    collecting GPS coordinates for TPV --
3    sorry, excuse me.  Did defendants require
4    TPV.com to collect GPS coordinates of
5    these sales enrollments as part of the
6    contract between TPV.com and Richmond Road
7    Holdings?
8        A   Yes.
9        Q   Okay.
10       A   Well, let me just say we did it,
11   I'm assuming it's part of the contract,
12   but the contract itself would speak for
13   itself.
14       Q   Okay.
15       A   I don't -- I don't want to speak
16   to the contract, because I certainly
17   haven't reviewed it and I certainly don't
18   have it memorized.
19       Q   Okay.  So I'm going to scroll
20   down in the same contract and there's a
21   document called Focus Location Services
22   overview.  Do you recognize this document?
23       A   I do.
24       Q   Okay.  Whose document is this?

*Page 46*

G. Pudles

1    Is this defendant's document, or
2    AnswerNet's document, or TPV.com's
3    document?
4        A   This is an Answer -- so I'm
5    going call it -- AnswerNet is the brand
6    upon which TPV.com operates.
7        Q   Sure.
8        A   So asking if it's an AnswerNet
9    document or TPV.com, it is an AnswerNet
10   document that -- that was created outside
11   of the time period of this lawsuit.
12       Q   Well, it says created
13   July 13, 2023 --
14       A   Correct.
15       Q   -- which is while this lawsuit
16   was pending.  Do you see that?
17       A   I do.
18       Q   Okay.  And so I want to ask,
19   there's a line here that I hope you can
20   see, the Focus platform utilized Google
21   Location Services to capture GPS
22   coordinates?
23       A   Correct.
24       Q   Is that correct?  Okay.

*Page 47*

G. Pudles

1        A   Yep.  Yes, it is.
2        Q   Is the past tense correct?
3        A   It is.
4        Q   Okay.  So what does the Focus
5    platform use now?
6        A   I believe it still uses Google
7    Location Services.
8        Q   Okay.  And this would've been
9    correct in 2021?
10       A   I believe so, yes.
11       Q   Okay.  How does the Focus
12   platform collect Google Location Services
13   GPS coordinates?
14       A   Generally, by, you know, using
15   the GPS data from the mobile device as it
16   says in the next part.
17       Q   Okay.  And so how are those GPS
18   coordinates transmitted to TPV.com?
19       A   So when the Focus application is
20   open on the mobile device from different
21   parts of the workflow of focus, it will
22   grab the coordinates from the mobile
23   device.
24       Q   So is there a separate mobile

*Page 48*

G. Pudles

1    application called Focus, or is this done
2    via HTTP?
3        A   Focus is a SaaS platform.  And
4    so it's not a -- it's a native mobile, but
5    it's not a mobile platform and in terms of
6    the way you're describing it.  So what it
7    is is it's a SaaS platform that looks on
8    the device that it's been launched on to
9    find the GPS coordinates that are showing
10   on the device.  Those coordinates are then
11   -- are then converted some way I guess to
12   -- to -- through the Google Location
13   Services.  So the Google Location Services
14   are part of the -- are part of the SaaS
15   platform, and it triggers a look up into
16   the coordinates being shown on the device
17   at the time of the workflow in which we
18   are checking for those coordinates.
19       Q   Okay.  It -- I guess I'm a
20   little bit confused.  You say it's a SaaS
21   platform.  Is that Software as a Service?
22       A   It is.
23       Q   Okay.  And then, how is the
24   Software as a Service accessed?

*Page 49*

Veritext Legal Solutions
800-336-4000

G. Pudles

1             G. Pudles
2    A   The agent would bring it up
3 either on their mobile device or on their
4 computer depending on which channel
5 they're working in.
6    Q   Okay. So they bring it up on
7 their computer. What application would
8 they use to bring it up and access the
9 Focus platform?
10    A   They would bring up Focus like
11 they would bring up any SaaS platform like
12 Facebook, or Yahoo, or any other, you
13 know, web-based platform.
14    Q   So they would be using some kind
15 of browser to interact with Focus?
16    A   Correct.
17    Q   Okay. And the GPS coordinates
18 would be transmitted via Google -- or
19 sorry, excuse me. The GPS coordinates
20 would be transmitted via the browser?
21    A   Yes.
22    Q   Okay. Do you know how the
23 browser collects the GPS coordinates?
24       MR. MURDZA: Objection, calls for
25      speculation.

Page 50

1             G. Pudles
2       THE WITNESS: I don't -- I'm not a
3      technician, so I don't know the technical
4      aspects of -- of grabbing the GPS.
5 BY MR. PRESTON:
6    Q   Okay. It's, so you don't know
7 if it's like a JavaScript function or some
8 other internal --
9    A   I believe the -- I believe
10 that's what we use Google -- Google
11 Location Services to do.
12    Q   Okay.
13    A   So I believe Google Location
14 Services will grab that data and -- and
15 bring it into the program.
16    Q   Do you know if that data can be
17 falsified?
18    A   I do.
19    Q   Can it?
20    A   Yes.
21    Q   Okay. And do you know how it
22 can be falsified?
23    A   There are a number of programs
24 which -- which will provide what's called
25 GPS -- GPS spoofing. So it will --

Page 51

1             G. Pudles
2    Q   Okay.
3    A   -- it will make the data on --
4 it'll make it appear that the data on the
5 phone is correct when it's not.
6    Q   Okay. Is the -- at what points
7 in the transaction are GPS coordinates
8 collected?
9    A   Generally, they're collected at
10 the start of the enrollment, at the -- at
11 the end of the enrollment, you know,
12 during the signature. I believe those
13 are, you know, the -- and it may also be
14 at the beginning of the enrollment. So at
15 the beginning of the enrollment, then it's
16 the -- I know it's the beginning of the --
17 the contract, and then it's at the signing
18 of the contract process.
19    Q   Okay.
20    A   To the extent they're using
21 Focus for -- for the contract.
22    Q   How long have you --
23    A   Go ahead.
24    Q   How long have you known that GPS
25 coordinates could be spoofed?

Page 52

1             G. Pudles
2    A   How long have I known? Since
3 approximately 1985 -- I'm sorry, 1995.
4    Q   Okay. Okay. Was this a
5 well-known vulnerability in GPF -- excuse
6 me -- in GPS authentication?
7    A   It's become a well-known -- it's
8 become a well-known vulnerability. It
9 wasn't back then.
10    Q   How did you come to be aware of
11 it?
12    A   Because I was part of a team
13 that won a pioneer preference from the FCC
14 to build one of the first all digital
15 wireless networks in the United States.
16    Q   Okay.
17    A   I was -- I was in the
18 engineering department of that effort.
19    Q   Okay. Why -- when did it become
20 well known that GPS spoofing was a
21 vulnerability of GPS authentication
22 systems?
23    A   I can't answer that, because I
24 left wireless -- you know, I left wireless
25 in 1996. No, I left wireless in -- yeah,

Page 53

14 (Pages 50 - 53)

G. Pudles

1  1996, and so I couldn't tell you that.
2  But I can tell you that when I got into
3  the -- when I acquired TPV.com, it was
4  something that -- that was known and -- it
5  was something that was known.
6      Q   Okay.  I'm going to scroll down
7  a little bit more.  In Exhibit 149, you
8  can see a sentence, "The GPS location for
9  a customer is captured after accepting our
10  terms and privacy on the landing page of
11  our digital link."  And a little bit
12  further, "Additionally, we capture
13  customer GPS location for signature
14  capture.  All GPS locations are captured
15  and displayed on the event", and the event
16  is capitalized.  Can you tell me what an
17  event is?
18      A   Yes.  An event is the signature
19  capture.  The event is the -- the
20  beginning, you know, whatever the event --
21  event is defined as one of the parts of
22  the workflow --
23      Q   Okay.
24      A   -- that requires the GPS
25                                          Page 54

G. Pudles

1  location to be captured.
2      Q   Okay.  So I'm going to get
3  another document in front of you.  So this
4  is a document called Exhibit 20.  It's an
5  email chain between defendants and
6  Endurance.  I want to ask, we provided
7  this document before your deposition.
8  Have you looked at this document
9  previously?
10         (Exhibit 20 was marked for
11          identification.)
12      A   No.
13      Q   Okay.  I want to scroll down,
14  and I'm going to highlight a few sentences
15  from this document.  "Our quality
16  assurance team has escalated this agent,
17  Neil St. Louis.  After review of recent
18  sales activities, the agent has been
19  deactivated.  Two different customers have
20  TPV entries, which showed GPS locational
21  tracking, placing the agent in a city in
22  Pakistan.  Customer Cecil Jerome was
23  enrolled yesterday, similarly, showed the
24  agent in a different country.  The
25                                          Page 55

G. Pudles

1  customer did complete a verification call,
2  but when contacted with a follow-up call
3  indicated that he did not recall a recent
4  door-to-door visit, but did recall a phone
5  call.  This is only one customer claim and
6  we understand it may not provide us a full
7  picture, but with the information
8  provided, it seems clear that at least
9  some of this agent's door-to-door activity
10  is not being conducted at the customer
11  residence.  And as a result, his badge is
12  now deactivated."  Do you see all that?
13      A   I see it.
14      Q   Okay.  So I'd like to ask, what
15  is AnswerNet's understanding of what
16  happened with respect to those enrollments
17  by that agent?
18      A   Well, what this shows me is how
19  -- how integrity filled are -- Richmond
20  Holdings is, because it appears that they
21  made a determination that something may
22  not have been right and they took solid
23  action.  That's what I read here.  But I
24  -- I have no opinion, because this is not
25                                          Page 56

G. Pudles

1  -- this is not having anything to do with
2  AnswerNet, and I -- my opinion is
3  irrelevant to the -- to this matter.
4      Q   Well, but defendant's action is
5  based on GPS coordinates that AnswerNet
6  collected.
7      A   Okay.
8      Q   Isn't that right?
9      MR. HALLAK:  Objection to form.
10      A   It would -- it would appear they
11  got this information from -- from our TPV
12  platform.  So that's what, you know --
13  that's what this letter says.  I have no
14  independent understanding of any of it
15  other than the letter says that they did
16  what I would consider to be the right
17  thing.
18      Q   Okay.  So in -- sorry.
19  AnswerNet made this verification call to
20  Cecil Jerome.  Is that -- do you see where
21  it says that?
22      A   I do.
23      Q   Okay.
24      A   Well, hold -- hold on one
25                                          Page 57

15 (Pages 54 - 57)

G. Pudles

1  second. Let me -- let me -- it doesn't --
2  it -- it -- but it doesn't say that
3  AnswerNet did the follow-up call. So I
4  don't --
5      Q   No. I don't think -- did the
6  follow-up call.
7      A   We -- we completed the
8  verification call, but it doesn't say that
9  we completed the follow-up call. So I
10  want to be very careful about -- about my
11  testimony, which is that I -- I believe
12  that I know through counsel that we did do
13  the -- the verification call that you --
14  that you are referencing, but I don't
15  believe -- I don't know whether we did the
16  follow-up call. So I want to be very
17  careful not to say we did, because I don't
18  know -- I don't know that.
19      Q   I'm going to represent to you --
20      A   I'm -- I'm confused. Why are we
21  talking door-to-door for a TCPA claim?
22  But that's I guess none of my business.
23  That doesn't make any sense at all. And
24  by the way, that's -- that still doesn't

Page 58

G. Pudles

1  make any sense, but let's keep going.
2      Q   Well, the claim is that these
3  people were making telemarketing calls and
4  then convincing consumers to say that
5  somebody met with them in person when in
6  fact that was not the case.
7      A   Okay. Okay I guess. Okay, now
8  I'll stop, because I'm a -- I go -- go
9  ahead. It still doesn't make sense. But
10  it -- but go ahead.
11      Q   Do -- has this situation where
12  the customer -- the sales agent is not
13  present with the customer ever happened
14  previously?
15      A   Yes.
16      Q   Okay.
17      A   Yes.
18      Q   Does it happen a lot?
19      A   Does it happen a lot?
20      MR. MURDZA: Objection to form. Who
21  are you talking --
22      THE WITNESS: Yeah, I -- I mean, it
23  is a problem. It is a known problem in
24  the industry that the industry is now all

Page 59

G. Pudles

1  working on locking down.
2  BY MR. PRESTON:
3      Q   When did it become a known
4  problem?
5      A   It -- it's been a known problem
6  since I was introduced to the industry a
7  couple years ago.
8      Q   By 2021?
9      A   I first learned about the bigger
10  problem at one of the conferences that I
11  attended, and somebody got up and talked
12  about the issues, and that's when it was
13  brought to my attention.
14      Q   2022?
15      A   I would say sometime in '22.
16      Q   Okay. Does AnswerNet do
17  anything to detect or prevent these
18  situations?
19      A   We have -- we recently deployed
20  a couple of things to -- to hopes -- to --
21  to try and put a stop to it.
22      Q   You mentioned a bigger problem
23  that was discussed at a conference you
24  attended. Can you explain what that

Page 60

G. Pudles

1  bigger problem is?
2      A   Well, GPS spoofing as a whole is
3  a -- has been a problem for the
4  industry -- has been a problem for the
5  industry.
6      Q   Okay. Do you have a sense of
7  how long it's been a problem for the
8  industry?
9      A   No, I don't.
10      Q   Okay. And so you indicated that
11  you were -- AnswerNet had recently created
12  procedures to stop this kind of problem.
13  Can you tell me exactly what they're
14  trying to stop?
15      MR. MURDZA: Objection, misstates his
16  testimony, but you can answer.
17      THE WITNESS: We're trying to stop
18  the ability of people to -- people to use
19  spoof coordinates as part of the TPV
20  process.
21  BY MR. PRESTON:
22      Q   Okay. And how are you trying to
23  stop it?
24      A   That's confidential business

Page 61

G. Pudles

1  information. I'm not going to reply to
2  that. We're using technology in different
3  forms of technology to stop that, but
4  that's confidential to our business,
5  because what we're about to --
6     Q   Okay.
7     A   -- what -- what we're about to
8  launch is going to be revolutionary.
9     Q   Okay. So these are procedures
10 that are not yet on the market?
11    A   Some are and some are not.
12    Q   When the procedures -- let's
13 just talk about the procedures that are
14 now on the market. I don't think I need
15 to inquire into your, you know, future
16 business plans. But stuff that's already
17 on the market, when did it go on the
18 market?
19    A   For us it was earlier this year.
20 I don't remember exactly.
21    Q   Okay. Okay. Was AnswerNet
22 involved in any quality assurance process
23 with defendants with respect to any of the
24 customers identified in this email at

Page 62

G. Pudles

1  call, that's something that would be
2  relayed to the client?
3     MR. MURDZA: Objection to form.
4     MR. HALLAK: Same.
5     A   In this case, we weren't asked
6  to do this. Spring Energy never asked us
7  to do this. So the answer to that is we
8  didn't do it for this client.
9     Q   Okay. Is that something that
10 AnswerNet ever does?
11    MR. MURDZA: Objection. Relevance.
12 We're here to talk about Spring Energy.
13    A   Yeah, I -- I'm -- unless I'm an
14 -- I'm being asked to be an expert in TPV,
15 you know, again, I'm --
16    Q   Well --
17    A   -- I didn't want to be here for
18 the entire three hours. As you know, I
19 really didn't want to be here at all. So
20 let's -- let's stick to the facts that I
21 can give you and about the system, but I'm
22 not here --
23    A   Sure.
24    A   -- TPV police.

Page 64

G. Pudles

1  Exhibit 20?
2     A   No.
3     Q   Does AnswerNet ever get involved
4  in quality assurance processes with its
5  clients?
6     A   Some clients have us do some
7  analysis, but generally that -- they do it
8  themselves, because this is obviously an
9  important issue to our clients. They hire
10 us because they want to be compliant and
11 they want to get the best information.
12 And so most of them will take that data
13 themselves and -- and react the way you
14 saw this client react, which is when
15 brought -- somehow when -- when --
16 whatever -- however they figured it out,
17 they took immediate and very decisive
18 action.
19    Q   Okay. And so if AnswerNet
20 discovered in a verification call that a
21 customer -- sorry. If AnswerNet
22 discovered in a verification call that the
23 sales agent was not physically present
24 with the customer, but said it was a phone

Page 63

G. Pudles

1     Q   I understand. It goes to what
2  options and countermeasures were available
3  to the defendants at the time of these
4  events?
5     MR. MURDZA: Objection to relevance.
6  I mean, there's other TPV vendors, so the
7  whole universe is what's available to
8  Spring Energy. We'll talk about --
9     MR. PRESTON: Are you instructing him
10 not to answer?
11    MR. MURDZA: I am.
12    MR. PRESTON: On relevance?
13    MR. MURDZA: On relevance.
14 BY MR. PRESTON:
15    Q   Okay. Outside of collecting
16 enrollment data, was AnswerNet involved in
17 hiring, vetting, or monitoring any of
18 defendant's sales agents?
19    A   No.
20    Q   Okay. Does AnswerNet make a
21 verification call for every enrollment?
22    A   That we wouldn't -- I couldn't
23 tell you, because we only make
24 verification calls on enrollments that

Page 65

Veritext Legal Solutions
800-336-4000

## Page 66

G. Pudles

1  
2 come through our system or that are
3 presented to us.
4    Q  Sure. Let me rephrase that.
5 Does AnswerNet make verification calls for
6 every enrollment that is made through the
7 TPV.com process?
8    A  No.
9    Q  When do they not make calls?
10    A  When the call comes into us.
11    Q  Oh. Okay. Okay. Is there a
12 script that AnswerNet uses for these
13 calls?
14    A  When it -- when it requires an
15 agent, there is a script, yes.
16    Q  Okay. And who provides those
17 scripts?
18    A  In general terms, they're
19 jointly created between the customer and
20 our client solutions team.
21    Q  Okay. So AnswerNet does make
22 calls -- outgoing verification -- excuse
23 me. AnswerNet does make outgoing
24 verification calls to potential enrollees;
25 correct?

## Page 67

G. Pudles

1  
2    A  Correct.
3    Q  Okay. Do you know the caller ID
4 that is used for those calls?
5    A  Caller ID that is used in those?
6 No. I don't actually.
7    Q  Let me ask another question that
8 might be a little bit more to the point --
9    A  But I believe it's our -- it's
10 our caller ID, not the clients.
11    Q  Okay. Does AnswerNet use Twilio
12 to make those calls?
13    A  Sometimes.
14    Q  Okay. Is there -- are there any
15 other platforms that are used to make
16 verification calls?
17    A  Yes.
18    Q  What are those platforms?
19    A  The other platform we use is
20 called VCC, Virtual Call Center.
21 Sometimes we make calls on that platform
22 as well.
23    Q  Is there a reason why you would
24 make a call on one platform versus the
25 other?

## Page 68

G. Pudles

1  
2    A  Yes.
3    Q  What is that reason?
4    A  If -- it depends on what -- what
5 platform you're using at the time. Again,
6 I'm not going to sit here and explain my
7 business. If you want to talk about the
8 platform that was in use at the time of
9 your complaint, I'm happy to talk -- and
10 -- and what we use for -- for the time in
11 your complaint. But -- but seriously, we
12 -- we're an hour twenty into this and now
13 you're asking me to teach you about my
14 business, which is really not my purpose
15 here, please.
16    Q  Sure. During the time of the
17 events in the complaint, what platforms
18 were used?
19    A  By -- by the TPV.com group, it
20 was the Twilio platform.
21    Q  Okay, perfect. Thank you. Did
22 AnswerNet do anything to detect or prevent
23 enrollments which are made by telephone
24 but where the sales agent coached the
25 customer to say they met the salesperson

## Page 69

G. Pudles

1  
2 in person?
3    MR. MURDZA: Objection to form.
4    MR. HALLAK: Objection to the form of
5   the question.
6    THE REPORTER: A double? Two
7   objections, Counsel? Thank you.
8    THE WITNESS: Stereo objections. So,
9   I'm sorry, could you ask the question
10   again with understanding there -- both --
11   both counsel object?
12 BY MR. PRESTON:
13    Q  Sure. Yeah, yeah, yeah. Does
14 AnswerNet -- excuse me, let me back up.
15 Did AnswerNet do anything to detect or
16 prevent enrollments, which were -- were
17 made over the telephone, but where the
18 sales agent coached the customer to say
19 that they met with the sales agent in
20 person?
21    MR. HALLAK: I'll renew that
22   objection to the form of the question.
23    A  And that's -- that's a question
24 that is -- that -- that assumes -- that
25 assumes something that I can't testify to.

G. Pudles

1 So I'm going to say this, there are
2 certain, there were at the time certain
3 things that -- that the system looks for
4 certainly that would create alerts, and I
5 believe you have the alerts.  So -- so
6 there are things that created alerts, but
7 in terms of what was done and how that was
8 done, our job was to collect data and
9 deliver it to the client.  It was the
10 client -- and it -- and that was the
11 extent of what we were hired to do.
12    Q   Okay.  I think I have -- I
13 understand the position and what was done.
14 Make sure.  68.  So I'm going to put an
15 exhibit in front of you.  All right.  So
16 I'm putting an exhibit in front of you.
17 Do you recognize the form of this exhibit?
18        (Exhibit 68 was marked for
19        identification.)
20    A   No.
21    Q   This does not look like a TPV
22 record?
23    A   I -- I don't know that -- I
24 don't know what the document is.

Page 70

---

G. Pudles

1    MR. MURDZA:  Take a minute to --
2    THE WITNESS:  Well --
3 BY MR. PRESTON:
4    Q   So at the very bottom, there's
5 a --
6    A   Hold on.  Hold on.  Hold on one
7 second.  Could -- yeah, this is -- this
8 comes out of Focus.  This is a document
9 that comes out of Focus.  I've never seen
10 the letter, but I know that it comes from
11 Focus.
12    Q   Okay.
13    A   I'm not familiar with the form,
14 but I do -- I do say that assuming this
15 document hasn't been altered, and I'm
16 assuming it hasn't, that this is a Focus
17 document.
18    Q   Okay.  This is the -- I'll
19 represent to you that this is the document
20 that -- as it was produced to us by
21 defendants.
22    A   I -- I --
23    Q   I want to ask you, this IP
24 address, do you know whose IP address this

Page 71

---

G. Pudles

1 is?
2    A   This -- I -- I would -- I would
3 be guessing, but it's -- I would guess
4 that it's a service address.  In fact, I'm
5 fairly certain that is the IP address of
6 the service address.
7    Q   Okay.  So it's the customer --
8    A   No, no, no.  I'm sorry.  The IP
9 address -- yeah, IP address of -- of where
10 the contract was signed.  That's what I
11 would say.  That's -- that's the IP
12 address of where the -- where the sale was
13 consummate.
14    Q   So this is the --
15    A   And the -- right.  So that's the
16 IP address of where -- where the signature
17 would've occurred and the GPS coordinates
18 would be I believe the service address.
19    Q   Okay.  So it's the customer's IP
20 address?
21    A   Well, it -- it depends on
22 whether -- yes, if the customer came in
23 and did a TPV, but I -- I would venture to
24 say that it's the IP address of the device

Page 72

---

G. Pudles

1 that the customer would have signed if
2 it's a door-to-door activity.
3    Q   Okay.  Do you see this URL that
4 I've highlighted?
5    A   You -- I'm an old dude.  You're
6 going to have to make it much bigger than
7 that
8    Q   Here.
9    A   Yes.
10    Q   Do you see it now?
11    A   I do.
12    Q   Okay.  Do you know if this
13 document is still available on tpvhub.com?
14    A   I -- I don't know when --
15 what -- 'cause I don't know when it's from
16 and I don't know what our record retention
17 agreement is with regard to the client
18 specifically, but I would say that -- but
19 I would say that the client would have it
20 if, you know -- it would've gone to the
21 client if -- if this -- and it's been
22 produced.  So obviously it still exists,
23 but I don't know that it exists on the
24 system because we have very specific data

Page 73

---

19 (Pages 70 - 73)

G. Pudles

1       G. Pudles
2   retention agreements with our clients.
3       Q   Is it possible for you to copy
4   that URL and see if you can find that
5   record?
6       A   Well, I'm -- I'm -- if you will
7   email it to counsel, I will double check
8   for that. I can't look it up myself right
9   now, but I'm -- I'm going to ask before I
10  agree to do that, you know, A, who's
11  paying for my time to do that? And B, you
12  have a document. If there's a -- a
13  purpose for me to -- to say yes or no that
14  it's there -- that it's still somewhere
15  you have it, and if you have it, then it
16  was given to you by counsel. So the
17  answer is I'm not going to go chasing
18  around.
19      I, you know -- I -- I agreed to
20  three hours, and we've already -- we've
21  already over -- overspent time. So the
22  answer is I could see it, but I'm not
23  going to offer to do that unless you're
24  going to offer to pay my team for my time
25  to do that.

Page 74

1       G. Pudles
2       Q   Okay. I mean, the issue of
3   payment is still open, and I've sent the
4   URL around, but you know -- what kind of
5   server is that client.tpvhub.com?
6       A   What kind of server is that
7   today? Quite frankly --
8       Q   For your business --
9       A   -- but I would say it's an AWS
10  server. But -- but quite frankly, I'm
11  getting really tired. I really am. I'm
12  getting really tired of you showing me
13  things, 'cause I looked at the date of
14  this and that date -- that date is after
15  the time -- it's maybe inside of the
16  lawsuit, but it's outside of the time of
17  your complaint. We're going round and
18  round on a TCPA question that has nothing
19  to do with door-to-door.
20      Q   Sir, you're --
21      A   I'm -- I'm really -- I -- I have
22  to tell you I'm -- I'm getting frustrated.
23  So the answer is -- the answer is it's --
24  today we have servers that were different
25  than then, and let's move on.

Page 75

1       G. Pudles
2       Q   Can you tell me what kind of
3   servers were in place in 2021?
4       A   No. Other than just say
5   cloud-based servers likely in AWS. That's
6   all I can tell you.
7       Q   Okay. All right. So I've
8   uploaded another document. And I'll share
9   it. So this is a -- it's an email, but it
10  has attached a bunch of garbage of how
11  that happened.
12      (Exhibit 153 was marked for
13      identification.)
14      But get to the relevant point
15  very quickly. So this is the Spring
16  door-to-door easy TPV user guide. Do you
17  recognize this document?
18      A   I do.
19      Q   Okay. Did AnswerNet have any
20  involvement in creating this document?
21      A   Depends on what the date of this
22  document is.
23      Q   Well, it would be in 2021. So I
24  guess my question is probably better
25  framed as did TPV.com have any role in

Page 76

1       G. Pudles
2   creating this document?
3       A   I would believe that TPV --
4   again, not knowing what -- not knowing
5   when it was created, it is likely -- it --
6   it appears to be a TPV.com document.
7       Q   Okay. This sentence, it says,
8   "Yes, it is optimized for your mobile
9   device. What does optimized mean here?
10      A   Optimized means that when you
11  use the right technology, it will show up
12  on a mobile device properly so that it is
13  readable on a mobile device, it is usable
14  on a mobile device. So if you don't use
15  the right technology, then when you bring
16  it up on a mobile device, it will have bad
17  margins, the pictures might not render
18  properly, et cetera. It was always
19  contemplated that this would be mobile and
20  mobile optimized.
21      Q   Okay. So what do you mean by
22  the right technology?
23      A   There are many ways to build
24  websites and -- and sites visible on the
25  web with data, pictures, et cetera. And

Page 77

20 (Pages 74 - 77)

G. Pudles

1 some of those technologies allow you to --
2 do not -- do not render well on a mobile
3 device, and some of them do allow you to
4 render well on a mobile device. So for
5 example, traditional HTML doesn't always
6 come out well on a mobile device, but if
7 you use a framework like Ruby on Rails or
8 certain higher end HTML type platforms,
9 you're able to -- you're able to grab
10 that, and when somebody opens it on a
11 mobile device, it renders properly so the
12 information can be read, you can go from
13 page to page, and -- and the -- the kinds
14 of features that well running websites
15 have, will be -- will be available to you
16 on the mobile device.
17 Q And I think I know the answer,
18 but you know, it's a deposition, I got to
19 get the record right. Why is it important
20 that it renders well on a mobile device?
21 A So that it makes it easier for
22 both the sales agent and the consumer to
23 see what they're doing, what they're
24 signing, what they're agreeing to, to make

Page 78

G. Pudles

1 be placed to the customer to complete
2 verbal confirmation with a live agent
3 confirming enrollment. Upon successful
4 completion of a live TPV call, the
5 customer will receive a copy of their
6 digital contract and transcript of their
7 digital form via email or text." How
8 often was this post verification call,
9 text, or email sent by TPV.com?
10 MR. MURDZA: Objection, form.
11 A During the -- to my knowledge,
12 every time a successful TPV call was
13 completed, it was sent.
14 Q Okay.
15 A We got -- we got consent of the
16 consumer to send it, and we sent it.
17 Q Okay. And did you keep records
18 of what kind of consent was given?
19 Because -- well, let me back up. So when
20 the consumer gets a text, the text has a
21 link to where they're supposed to sign; is
22 that correct?
23 A If you want me to talk about
24 specifically the -- the issue -- you know,

Page 80

G. Pudles

1 sure that things can't be hidden because
2 of the way the -- the way the -- the
3 platform operates on the mobile device.
4 Q All right. Because it's
5 essential that they're looking at -- it's
6 likely that the sales agent is looking at
7 it via a mobile device, and it's important
8 that if the customer is that they can see
9 everything; is that accurate?
10 MR. MURDZA: Objection. Objection,
11 form.
12 MR. HALLAK: Same objection.
13 A Yes.
14 Q So is there a dashboard for
15 enrollments -- enrollment records on
16 tpvhub.com?
17 A There is a portal where
18 enrollment records can be accessed during
19 the time that this lawsuit -- the
20 activities of this lawsuit are around,
21 yes.
22 Q Okay. Let's scroll down.
23 Customer summary. So there's -- you'll
24 see I'm highlighting a "outbound call will

Page 79

G. Pudles

1 the -- the transactions at issue, I'm
2 happy to, but --
3 Q Yes.
4 A -- what I'll tell you is that
5 sometimes, you know, that -- that -- the
6 -- they would get a text or we would make
7 an outbound call to run through what they
8 had. By the time we ran -- we made the
9 outbound call, they would have generally
10 already signed the enrollment.
11 Q Oh, okay. That's an important
12 distinction that I didn't understand. How
13 were those signatures collected during
14 this time period?
15 A By the sales rep in the Focus
16 application.
17 Q So the sales rep would hand them
18 the document and they would sign -- hand
19 them the mobile device and they would
20 sign?
21 A Or -- or if they were -- or if
22 they were telemarketing, they would've
23 sent them a link.
24 Q Okay. So this -- the link in

Page 81

21 (Pages 78 - 81)

G. Pudles

1           G. Pudles
2  the email is really for telemarketing, not
3  for door-to-door sales?
4      MR. MURDZA: No --
5      MR. HALLAK: Objection, form.
6      THE WITNESS: Sorry.
7      MR. PRESTON: Okay.
8      THE WITNESS: Did you -- you get the
9  objection, Mr. Court Reporter?
10      MR. PRESTON: Always --
11      THE REPORTER: Thank you. I was
12  going to interrupt after. I appreciate
13  that. That -- was that both?
14      MR. MURDZA: Yes.
15      THE REPORTER: Thank you. Two
16  objections.
17      MR. MURDZA: Yeah.
18      THE REPORTER:
19      THE WITNESS: Stereo -- stereo
20  objections, and it's both. It's -- it's
21  both. The transaction always happens -- in a
22  way, the transaction always happens over
23  the web.
24  BY MR. PRESTON:
25   Q  Okay.

Page 82

1           G. Pudles
2   A  The transaction's always
3  happening over the web, because it's a
4  SaaS application that's capturing the data
5  and do -- and managing the workflow.
6   Q  Okay. Is there a situation
7  where a door-to-door sales agent would be
8  using a desktop computer to do either the
9  enrollment or any of the follow-up work
10  that's involved in the process?
11      MR. MURDZA: I'm going to object,
12  because it calls for speculation. He's
13  already testified that AnswerNet doesn't
14  employ or direct the door-to-door sales --
15   A  Yeah. We're not in the door to todo
16  business, Counsel. And again, I can
17  testify to what -- what I know and what I
18  believe, but, you know, I'm --
19   Q  Okay. Does AnswerNet screen for
20  non-fixed VoIP numbers that are used in
21  the enrollment process?
22   A  Yes.
23   Q  Okay. And why does it do that?
24   A  Because the use of a VoIP number
25  can often indicate fraud.

Page 83

1           G. Pudles
2   Q  Okay. So there is some
3  screening that AnswerNet does to avoid
4  fraud; correct?
5   A  There are some screening that
6  AnswerNet does that does -- yes, that is
7  correct.
8   Q  Okay. So what data is screened
9  to detect fraud by AnswerNet during this
10  time -- during, you know, spring of 2021?
11   A  Without -- without having
12  something in front of me, I know that we
13  do VoIP numbers. I -- I know that -- I
14  know that there's a few, and I -- and I
15  can't tell you -- I don't have the
16  entirety of the process memorized, but
17  there were things that -- that the client
18  will say, if this is -- so, for example,
19  one of the things that we would do for a
20  door-to-door person is if they -- and --
21  and I don't know the numbers -- but if we
22  saw a door-to-door sales agent making
23  sales -- sales too rapidly, that would
24  lead you to believe that they're
25  potentially a problem. And -- these

Page 84

1           G. Pudles
2  are the things on the -- what you have on
3  the -- on the alerts.
4      So if you look on the alerts and
5  if you -- if you'd like -- if you'd like
6  to bring up the alert page that I know you
7  have or a document about the alerts, I'm
8  happy to go through them, and tell -- and
9  -- and testify as to the alerts.
10   Q  Okay. I'm going to tell you I'm
11  not sure exactly which alerts you're
12  talking to, but -- talking about rather,
13  but my next question is does TPV.com
14  screen for VPNs?
15   A  Yes, we do. We didn't then. We
16  do now.
17   Q  Okay. When did it start
18  screening for VPNs?
19   A  Earlier this year.
20   Q  I see. Was there a reason why
21  AnswerNet did not screen for VPN use prior
22  to 2024?
23   A  Yes.
24   Q  What was that reason?
25   A  Wasn't part of our technology

Page 85

22 (Pages 82 - 85)

G. Pudles

1 stack.
2 Q   Okay.  Can sales agents access
3 Easy TPV in the desktop mode?
4    A   Yes.
5    Q   I mean, is that a possibility?
6 They can?
7    A   Yes.
8    Q   Okay.  Can door-to-door sales
9 agents access Easy TPV in the desktop
10 mode?
11   A   I couldn't tell you, because I
12 don't know about door -- you know, where
13 -- how door-to-door agents access and what
14 they use to access.
15   Q   Okay.  Does AnswerNet keep track
16 of the user agent that's transmitted over
17 HTTP?
18   A   I have no idea what you just
19 said.
20   Q   So part of what's collected over
21 HTTP can be a set of data that's generally
22 referred to as user agent, which involves
23 the kind of browser and then some
24 information about the -- you know, maybe

Page 86

G. Pudles

1 the computer that they're using, and it
2 might also include whether or not it's a
3 desktop or a mobile.  And so my question
4 is, does AnswerNet collect that kind of
5 information regarding door-to-door sales
6 agents?
7    A   You have a -- a report that you
8 actually I believe attached to -- I was
9 told, I did not see it -- that you
10 attached to the -- some -- some legal
11 document that shows you what we collect --
12 or what we collected during that period.
13 If you want to bring that document up, we
14 can go through what the -- what the
15 columns mean, if that's -- if that's
16 helpful to you.
17   Q   Okay.  Let's --
18      MR. PRESTON:  Mr. Bekman, can you
19 read that last question back?
20      THE REPORTER:  Oh, yes, Counsel.
21 Counsel, give me one second.
22      (The reporter repeated the
23      record as requested.)
24 //

Page 87

G. Pudles

1 BY MR. PRESTON:
2    Q   I think you indicated -- you
3 referred me to a different document,
4 Mr. Pudles, and I appreciate that and
5 we'll probably get to that document a
6 little bit later.  But I wanted to ask
7 whether or not sitting here as you are
8 today, do you know if AnswerNet collected
9 that information in 2021?
10   A   Not without seeing the documents
11 that I referenced earlier.
12   Q   Okay.  So I've placed another
13 exhibit online, and I'm displaying it,
14 it's Exhibit 154.  There's a list of
15 telephone numbers that I've highlighted.
16 Do you see those telephone numbers?
17      (Exhibit 154 was marked for
18      identification.)
19   A   I do.
20   Q   What are these telephone numbers
21 used for?
22   A   I -- I believe they are -- I
23 don't know every telephone number we use
24 for TPV, so I -- I would have to see

Page 88

G. Pudles

1 something else.  I believe they are phone
2 numbers that we use for doing TPV, but you
3 know, without seeing something else, we
4 have -- we have literally tens of
5 thousands of phone numbers that we operate
6 across all my companies, and I don't have
7 personal knowledge of any one of them.
8    Q   Sure.  Are there telephone
9 numbers that sales agents use to call
10 TPV.com?
11   A   Yeah, during the time there were
12 certainly telephone numbers that sales
13 agents used to call TPV.com.
14   Q   Okay.  And what were those
15 telephone numbers -- what did they call
16 about?  What was the purpose of those
17 telephone numbers?
18   A   Generally, for a TPV or --
19 generally, they were either a TPV or they
20 were to -- to start a conference call to
21 bring the -- the consumer in.  So there
22 are -- there are a number of things that
23 we do, but you know, either they were for
24 a sales agent to call in and then we would

Page 89

dial out to the consumer and bring them into a call or -- or something like that throughout the process.
Q So they were used for enrollment purposes?
A They were used for TPV purposes.
Q Sorry. They were used to initiate a verification call?
A Correct.
Q Okay. Are those calls recorded?
A Yes.
Q Do you know roughly how long those calls -- recorded calls are kept?
A I don't.
Q Okay. I'm going to add another document. So document 46 -- Exhibit 46 is a certificate of authenticity, and it's essentially the response to a subpoena that we served on TextNow for call records associated with one of the sales agents involved in this case. And if you'll scroll down, you can see there's calls to some of these TPV numbers in May, also in March. And there's a -- in fact an

outgoing call from AnswerNet or TPV.com to this telephone number that was used by the sales agent here. Is it possible to get these documents -- these recordings?
(Exhibit 46 was marked for identification.)
A First of all, I don't know who TextNow is.
Q Sure.
A And -- and again, any documents or recordings that we had were turned over to Spring, and they would've delivered -- if they exist, they would've delivered them to you, because this document doesn't look like anything I've seen. It's also prior to when I purchased the company, and it -- which, yeah. So on almost every level, I can't testify to this document or the authenticity of any part of it.
Q Okay. I understand that. But it does show calls from a sales agent to AnswerNet, and that's my question is --
MR. MURDZA: Objection --
A No. No, it -- no, it doesn't.

It shows a -- a series of numbers. I don't know what it shows. And this was -- again, this was prior to the time of AnswerNet acquiring TPV.com, LLC. So it doesn't show any calls to AnswerNet. It shows calls to tpvllc.com -- TPV.com, LLC before AnswerNet acquired the company. And I don't even know what they are, because quite frankly, I don't know who TextNow is.
Q Okay. So prior to this deposition, we served some exhibits on your counsel. There was an Exhibit 21 and exhibit 23. Did you look at any of those documents?
A I looked at some documents prior to this deposition, yes.
Q Okay. All right. Is this one of the documents you looked at?
(Exhibit 21 was marked for identification.)
A No, but I looked at -- I looked at some raw data that could certainly -- it certainly -- this -- I'm trying to

remember if I saw this particular one, but I did look at some raw data that -- that looks very similar in terms of some of the stuff that's here.
Q Okay. So this is -- I want to be clear, this is Exhibit 21, and it's a list of confirmation codes where there's distances involved between various GPS coordinates, which were identified to be problematic by the defendants. And I'm going to show you another document. Exhibit 23. All right. So this is another list of documents -- another list of confirmation codes which show similar distances, but they occurred earlier than the confirmation codes listed in Exhibit 21. Do you see that?
(Exhibit 23 was marked for identification.)
A I -- I see -- I see these documents, and they are -- they say they are -- you know, they are what they are.
Q Okay.
MR. HALLAK: Just objection to the

Veritext Legal Solutions
800-336-4000

|  |  |
|---|---|
| G. Pudles | G. Pudles |

G. Pudles

1  form of the question and any
2  characterization of the defendants within
3  the question you had.
4      MR. PRESTON:  Okay.  I mean, I guess
5  we can go back to Exhibit 50.  I think
6  what I'd like to do is go off the record
7  for about five minutes to give Mr. Pudles
8  some time to look through two other
9  exhibits which are uploaded to the Google
10  Drive.  Those are Exhibits 104 and in
11  particular Exhibit 105.  And I think those
12  are the distance reports that you've been
13  referencing.  And if you could, you know,
14  take a look at those spreadsheets and
15  confirm to yourself that the distances
16  involved and the other GPS data is
17  truthful and a correct representation of
18  what's in -- that Exhibits 21 and 23 are a
19  truthful representation of the GPS data
20  that's in Exhibits 105.  Does that sound
21  fair?
22      MR. MURDZA:  Well, I'm going to --
23  no, I want to object.  We're not going to
24  go off the record.  If there's going to be

Page 94

G. Pudles

1  here, because again, none of this has
2  anything to do with a TCPA claim.  Okay.
3  Now, to the extent that what you want me
4  to testify to is that there's -- there is
5  7,145 miles between the customer and --
6  and an activity done by the sales agent, I
7  -- so far that I know of, Mr. Preston, you
8  haven't lied to me yet, so if you tell me
9  that that document -- I can't testify to
10  it.  If you tell me that document
11  represents a summary of the raw data and
12  you want me to see that there's a 7,100
13  distance, I can tell you that if that's
14  what I see on that record, and if it was
15  based on records out of Focus, it's
16  probably correct.
17  BY MR. PRESTON:
18      Q    Okay.  I'm going to ask you to
19  turn to Exhibit 79 that's in the Google
20  Drive.
21      MR. MURDZA:  Are you able to share
22  this exhibit, or can someone -- so we're
23  all looking at the same part of the
24  exhibit, please?

Page 96

G. Pudles

1  questions about the documents, we can put
2  them in front of Mr. Pudles and he can
3  answer questions, but we're not going to
4  endeavor to do some sort of work
5  reconciling the raw data to these reports.
6  And again, I want to represent at least
7  this report, the one you currently have on
8  the screen has creation dates prior to
9  Cerida's purchase of TPV.com.
10      So again, the records speak for
11  themselves.  We can talk to the records if
12  they're up on the screen, but we're not
13  going to undertake a process whereby he
14  goes off the record and performs work to
15  reconcile the numbers here.  And
16  furthermore, we're two hours in to the
17  three hour deposition.  We have a hard
18  stop at 1.  So I just want to point that
19  out as well.
20      MR. PRESTON:  And you're taking time
21  with these objections, so, but go on.
22      THE WITNESS:  I -- I -- okay.  I --
23  I'm going to -- I -- I -- I'm really --
24  I'm -- I'm really trying to be patient

Page 95

G. Pudles

1      MR. PRESTON:  I can.
2      THE WITNESS:  And -- and let me say
3  three hours is three hours.  I -- I, you
4  know -- and I'm going to need a -- a
5  nature break.  Three hours is three hours.
6  Objections are a natural part of a
7  deposition.  So please keep that in mind
8  as you consider the -- the remaining hour
9  and at least the 10 minutes I'm going to
10  need --
11  BY MR. PRESTON:
12      Q    I'm grateful for -- but let's
13  focus on this exhibit.  As you point out
14  time is of the essence.  All right.  So
15  this is an exhibit that reflects a series
16  of confirmation codes and GPS data, which
17  is from Exhibit 104.  And there are one,
18  two, four pairs of confirmation codes.
19  And the four pairs show confirmations or
20  enrollments within close proximity to each
21  other by time.  And then, we're going to
22  scroll and you can see there's a
23  confirmation, the next page of --
24  paragraph of Exhibit 79 shows enrollments

Page 97

25 (Pages 94 - 97)

G. Pudles

1 that are about 15 minutes apart, but
2 they're also 170 -- sorry -- 137 miles
3 apart. Do you see that?
4     A   I do.
5     Q   And I'll represent that the rest
6 of the Google Maps in these exhibits
7 present similar pairs of enrollments where
8 there's probably not enough time to get
9 between these two confirmation codes --
10 the service addresses for these two
11 confirmation codes. Do you see that?
12     A   I do.
13     Q   Okay. Do you have a sense of
14 how this enrollment activity was done
15 given the distances and the times
16 involved?
17     A   I -- I don't have a -- I -- I
18 don't have a sense. I don't --
19         MR. HALLAK: Objection to the form of
20     the question as well. Thank you.
21         THE WITNESS: Yeah, I don't have a
22     sense of -- I know that the system grabbed
23     the data that it had available to it, and
24     the data is the data.

Page 98

G. Pudles

1 some more documents. So I'm going to
2 start -- I'm going to upload a audio file.
3 It's a verification call recording,
4 Exhibit 155, and we're going to play it.
5 And I'm going to ask some questions about
6 TPV.com's verification processes. They're
7 pretty short.
8         (Exhibit 155 was marked for
9         identification.)
10         (Audio played.)
11         I'm going to cut it off there.
12 So did you hear the verifier asked
13 Ms. ████ to confirm that she met with a
14 Spring Power & Gas representative that
15 day? Did you hear that?
16     A   I did.
17         MR. HALLAK: Object to the form of
18     the question.
19 BY MR. PRESTON:
20     Q   Okay. And Ms. ████ responded
21 that they weren't there. Did you hear
22 that?
23         MR. HALLAK: Same objection, and then
24     mischaracterization of the content of the

Page 100

G. Pudles

1 BY MR. PRESTON:
2     Q   Okay. So given that answer, do
3 you have a sense of whether or not the
4 data is accurate?
5     A   If you're asking me my opinion,
6 my opinion is irrelevant. I'm not an
7 expert. I can tell you the data is the
8 data. I have faith that the data
9 collected was -- was collected by the
10 system. My job's not to give you an
11 opinion or -- of -- of the data that we --
12 that -- that the -- that my client has
13 provided you from our system.
14     Q   Okay. If the data is accurate,
15 how did these sales agents appear at these
16 two different sales addresses in such
17 short period of time?
18         MR. MURDZA: Objection. If you know,
19     you can answer, but --
20         THE WITNESS: I wouldn't -- I
21     wouldn't know.
22 BY MR. PRESTON:
23     Q   Okay. I have just a few more
24 questions. I'm going to start producing

Page 99

G. Pudles

1     recording.
2     A   I -- I heard -- I heard the --
3 the question and answer.
4     Q   Okay. What was the answer?
5     A   I couldn't hear it well, but I'm
6 -- I -- I think it was some sort of
7 negative.
8     Q   Okay. And then did you hear
9 what the verifier said next?
10     A   I -- something -- she ended the
11 call because -- because it -- it -- they
12 weren't -- the -- the consumer -- she
13 ended the call.
14     Q   Okay. Let's go back and listen
15 to this again.
16         (Audio played.)
17         So you heard the verifier ask if
18 she met with a representative of Spring
19 Power; correct?
20     A   I -- I did.
21     Q   Okay. And you heard the
22 customer say, "nope, they weren't here";
23 correct?
24     A   It sounded like that. It was

Page 101

26 (Pages 98 - 101)

G. Pudles

1  really hard to hear, and I'm not just
2  being a knucklehead.  I -- I just -- it
3  was really hard to hear on this speaker,
4  but I -- it sounded some -- sounded like
5  that, yes, Mr. Preston.
6      Q   Well, if --
7          MR. HALLAK:  I'll note my objection,
8      so hold on one sec, Ethan, that the
9      recording speaks for itself.
10 BY MR. PRESTON:
11     Q   Okay.  Then we're going to
12 listen to the last part of the call.
13         (Audio played.)
14         So the verifier response by
15 saying we will mark this call as customer
16 needs clarification.  Did you hear that?
17     A   I did.
18     Q   Okay.  Why did she mark it as
19 customer needs clarification?
20     A   Because that would've been the
21 rule that the client told us to do when a
22 door-to-door client said that the -- the
23 door-to-door person wasn't there.
24     Q   Okay.  How would that rule have

Page 102

G. Pudles

1  been communicated to TPV.com?
2      A   Any number of ways.  So I -- I
3  can't tell you how this one was, but it
4  would've been -- it -- it would've been at
5  any time during the process, because the
6  relationship with the -- with Spring
7  Energy is an iterative one.  It is one in
8  which as things come up and as -- as their
9  business and their compliance team hears
10 things and does things.  So if it's a
11 door-to-door situation and the person --
12 the consumer says, no, I didn't do it, you
13 know, Spring Energy has no -- has no
14 interest, and I know this for a fact --
15 has no interest in -- in slamming clients.
16 So that's -- so in this case -- I know
17 that in that case, their instructions to
18 us were stop the verification, because
19 it's not a good sale.
20     Q   Sure.  But then she says it
21 marks the call as needs clarification,
22 which might just generate another
23 enrollment.  And so I guess my question is
24 why is it marked as needs clarification as

Page 103

G. Pudles

1  opposed to, you know, sales agent not
2  present?
3          MR. HALLAK:  Objection to the form of
4      the question.
5          MR. MURDZA:  Objection to the form.
6      A   So what the agent said and what
7  the system takes down and delivers may not
8  be exactly the same.  So there may be
9  language in a script that is different
10 from the activity in the word processing
11 system.  So that must have been in the
12 script as a response should she -- should
13 a -- should a TPV agent get the response
14 that they need.  Right?  So if the TPV
15 agent gets the response that she got, that
16 would be the verbal response, but that
17 doesn't mean that that's what she wrote
18 down or how she dispositioned the TPV.
19     Q   Okay.  I am going to open
20 Exhibit 105.
21         (Exhibit 105 was marked for
22         identification.)
23     A   While you're opening exhibits,
24 I'd like to take five.  I need to -- a

Page 104

G. Pudles

1  nature break, please.
2          MR. PRESTON:  Okay.  We can go off
3      the record.
4          THE REPORTER:  Okay.  The time is
5      12:13 p.m.  Off the record.
6          (Off the record.)
7          THE REPORTER:  All right.  The time
8      is 12:20 p.m.  On the record.
9  BY MR. PRESTON:
10     Q   All right.  So we just listened
11 to a recording that was -- get it in front
12 of me -- marked as Exhibit 155.  I'm going
13 to go back to Exhibit 105, which is some
14 TPV.com data.  I'm going to highlight to
15 you the confirmation call associated with
16 the recording at Exhibit 155.  Can you see
17 my screen?
18     A   I can --
19     Q   Okay.  Can you see it has the
20 name that was used in the recording?
21     A   Yes.
22     Q   Okay.  And can you see it was
23 marked as no sale, customer needs
24 clarification?

Page 105

27 (Pages 102 - 105)

G. Pudles

1    G. Pudles
2    A  Yes.
3    Q  Okay.  Going to play another
4  recording, and we're actually almost,
5  almost done.  This is another recording
6  from that time period.  Play this as well.
7       (Exhibit 156 was marked for
8       identification.)
9       (Audio played.)
10      All right.  Did you hear that
11  recording?
12   A  I did.
13   Q  Okay.  Did you hear the customer
14  indicate that he didn't meet with anybody
15  but he was called on the phone?
16   A  Yes.
17      MR. HALLAK:  Objection to the form of
18   the question.  The recording speaks for
19   itself.
20   A  That's what I heard.
21   Q  Okay.  Just there was an
22  objection.  I want to clean up the record
23  a little bit.  All objections preserved,
24  did you hear the customer say that he
25  didn't meet with anybody but there was a

Page 106

1    G. Pudles
2  call on his telephone?
3    A  Yes.
4    Q  Okay.  And the verifier
5  responded, we will mark this as customer
6  needs clarification; correct?
7    A  Correct.
8       MR. HALLAK:  Same objection.
9       THE WITNESS:  Same answer.  Correct.
10  BY MR. PRESTON:
11   Q  Okay.  And so this also would
12  have been the response dictated by a rule
13  set by defendants; correct?
14   A  Correct.
15   Q  Okay.  And sitting here as you
16  are today, you don't know where that rule
17  would've been communicated or how it
18  would've been communicated?
19   A  Correct.
20   Q  Okay.  That's all fair.  I have
21  one more.  Should that have triggered an
22  investigation by defendants?
23      MR. HALLAK:  Objection to form.
24      MR. MURDZA:  Objection to relevance,
25   your konwledge.

Page 107

1    G. Pudles
2    A  I'm going to go back and say
3  that recording -- since you're asking, and
4  normally I haven't done this, but that
5  recording shows the best of everything.
6  And so what you've shown is showed the
7  best of everything.  That --
8    Q  Sure.
9    A  -- TPV agent heard something
10  that wasn't -- she wasn't sure of.  And on
11  behalf of Spring Energy, she -- she
12  confirmed what she was -- she thought she
13  heard, and then she marked it as a no
14  sale, which is their instructions because
15  their goal is to only sell to people who
16  want to buy from them.  So to me that --
17  that recording demonstrated the integrity
18  that I spoke of earlier of Spring Energy
19  in their dealings with -- with consumers.
20   Q  Sure.  But she also marks it as
21  needs clarification.
22   A  And there's 101 reasons why you
23  might do that.  But again, you're ignoring
24  that it said no sale.  That any one of --
25  and I looked at that form you brought up,

Page 108

1    G. Pudles
2  and everyone said no sale.  Any one that
3  said need clarification, which would --
4  which, you know, as we hear now, what that
5  means said no sale.  So their rule was
6  that if -- if the -- if you put in needs
7  clarification, that means no sale.
8    Q  Because, and I think your point
9  is this, that defendants would not enroll
10  anybody unless there was a recorded call
11  in which the customer said, no, they met
12  me in person; isn't that right?
13   A  That's right.
14   Q  Okay.  And so they're waiting
15  for that call to ascertain whether or not
16  that they can enroll that person -- they
17  need the recorded call before they enroll
18  any of their customers; correct?
19      MR. HALLAK:  Objection to form.
20      MR. MURDZA:  Objection to form.
21   A  And -- and you're asking me to
22  make a legal opinion about what they need
23  versus what -- what I can tell you is that
24  in the examples that you gave me -- the --
25  where the consumer indicated that they

Page 109

28 (Pages 106 - 109)

G. Pudles

1    G. Pudles
2  didn't meet with somebody, that by rules
3  set by Spring Energy, they didn't accept
4  the enrollment from the sales agent,
5  because they don't want -- they're not
6  dancing on the lines.  They're being an
7  integrity filled provider of -- of energy
8  services.
9    Q   Okay, I understand.  I think
10 there's another recording that I'd like to
11 listen to.
12   A   Okay.
13   Q   So this is -- I'm going to mark
14 this as Exhibit 157.
15        (Exhibit 157 was marked for
16        identification.)
17        (Audio played.)
18        I just want to pause there for a
19 second.  He's talking about ███████
20 ███████ correct?  That's the name that
21 he's discussing with --
22   A   That's the name -- that's the
23 name he said, but I don't know who he is.
24   Q   Fair enough.
25        (Audio played.)

Page 110

1    G. Pudles
2        So he's talking about getting a
3  verification call; is that correct?
4    A   That's what it sounded like.
5        (Audio played.)
6    Q   So I want to pause there again.
7  He directed her to state during the
8  verification call that they met in person.
9  Did you hear that?
10       MR. MURDZA:  Objection, form.  Speaks
11 for itself.  You can answer.
12   A   -- right?  I mean, the thing
13 speaks for itself.  He said what he said.
14   Q   That's not actually an objection
15 in a deposition.  Can you answer whether
16 or not he --
17   A   Well, I -- I said I -- the --
18 the call speaks for itself, that you heard
19 what he said.  I heard him say what you --
20 you repeated in different words what he
21 said.
22   Q   Okay.
23        (Audio played.)
24        So I want to pause there.  Is it
25 true that the verifiers are not allowed to

Page 111

1    G. Pudles
2  ask any questions outside of the script
3  that's provided by the defendants?
4    A   That's approved by the
5  defendants, yes.
6    Q   Okay.
7        (Audio played.)
8        So it sounds to me like he
9  instructed her not to tell the truth
10 during the verification and to state that
11 she had met with the sales agent at her
12 door.  Did you hear that?
13   A   I heard the same recording you
14 did, and that's what it sounded like, yes.
15   Q   Okay.
16   A   But my -- but my reading or
17 hearing of that means nothing.
18   Q   And it says he already has her
19 information put into the electronic
20 authorization portal.  Did you hear that?
21   A   I did.
22   Q   Okay.  I would presume that that
23 is TPV.com's electric authorization
24 portal?  This person was enrolled later on
25 by the defendants?

Page 112

1    G. Pudles
2    A   Again, I'm just going to simply
3  say that he said what he said.  I don't
4  know what he was talking about, and I'm
5  not going to guess.  That's not my --
6    Q   Sure.
7    A   -- my job isn't to guess, but my
8  job is to testify as to the -- the
9  details, and I don't have any details
10 about what he was meaning.
11   Q   All right.  I have one -- two
12 more things, and we are almost out of
13 here.
14   A   You made that promise before.
15   Q   That's true.  That's true.
16 You've got me.  Hold on.  Let me find
17 this.  All right.  So there's Exhibit 158
18 that I'm introducing.  It's another
19 recording from a little bit later in time.
20 Oh, not that one.  Yeah.  Excuse me.
21 Ignore Exhibit 158 for the moment.  We're
22 going to -- I'm introducing a new exhibit,
23 Exhibit 159.
24       (Exhibit 158 and Exhibit 159
25       were marked for identification.)

Page 113

29 (Pages 110 - 113)

G. Pudles

1    G. Pudles
2  (Audio played.)
3    All right.  So I listened to
4 that.  It sounds like a verification call
5 to Robert T. Koch, K-O-C-H.  Did you hear
6 that?
7  A It's -- I heard what you heard,
8 yes.
9  Q Okay.  And she asked -- the
10 verifier asked if he would confirm if he
11 met with a Spring Power & Gas
12 representative, and he said no.  Did you
13 hear that?
14  A Yes.
15  Q Okay.  And then she said, "we'll
16 mark this call as customer needs
17 clarification."  Did you hear that?
18  A I did.
19  Q Okay.  So this call's from a
20 little bit later in time and I want to
21 confirm with you that defendant's rules
22 for marking calls as needs clarification
23 did not change from 2021 to a later point
24 in time.  Is that your understanding as
25 well based on that call?

G. Pudles

1    G. Pudles
2  A What was the date of that call?
3  Q That call was March 18, 2022.
4  A Then it appears to be the
5 same -- same process.
6  Q Okay.  Did AnswerNet ever alert
7 defendants to these calls, or would they
8 have alerted defendants to the content of
9 these calls?
10  MR. MURDZA:  Objection, form.
11  A We provided reports on these
12 calls and their dispositions, and the --
13 the stuff that you already saw on the
14 reports you've already shown to the -- to
15 the client.
16  Q Okay.  So, but --
17  THE REPORTER:  I'm sorry, Counsel.
18 Sorry, Counsel.  Counsel Hallak, did you
19 join on -- in on -- in on the objection?
20 I think you're muted.  I saw you -- your
21 lips moving?
22  MR. HALLAK:  Yes, I did.  Sorry.
23  THE REPORTER:  Sorry about that,
24 Counsel.  Sorry, Counsel.  Thank you
25 everybody.

G. Pudles

1    G. Pudles
2 BY MR. PRESTON:
3  Q So was there any communication
4 from AnswerNet to the defendants outside
5 of what's shown in, you know, the distance
6 reports at Exhibit 104 and 105?
7  A There are alert reports which
8 that -- which the -- I believe there are
9 alerts that go to clients, but I don't
10 know if these particular calls were in the
11 alerts or not.  But otherwise if they
12 weren't in the alert, then we would have
13 no way of -- we would not necessarily --
14 to my knowledge.  Now, I'm not saying we
15 didn't, but I'm saying to the best of my
16 knowledge, we did not communicate
17 otherwise directly to Spring other than
18 providing them with the call data, which
19 based on what we've seen would've said no
20 sale because they don't want sales that
21 are improper.
22  Q Sure.  Does AnswerNet use any do
23 not contact lists before making
24 verification calls?
25  A No.

G. Pudles

1    G. Pudles
2  Q Okay.  Do AnswerNet verifiers
3 get instructions on recognizing or
4 addressing cognitive decline in elderly
5 adults.
6  A I have no idea what you are --
7 what you are asking.  And besides that,
8 are you suggesting that that was something
9 that an -- that a verifier should have
10 seen during that period for one of your
11 class members?
12  Q No, it's just literally --
13  A -- there's something specific,
14 then by all means speak up, but -- but,
15 you know, asking me if --
16  Q No, no.  It's just a question
17 I'm --
18  A -- read minds, no, they don't
19 read minds.
20  MR. PRESTON:  Okay.  I think that's
21 it.  I don't have any other questions.  I
22 don't know if Mr. Murdza or Mr. Hallak do.
23  MR. HALLAK:  No questions from the
24 defendants.
25  THE REPORTER:  Okay.  We'll go -- all

Veritext Legal Solutions
800-336-4000

G. Pudles

1  right. Since this is federal, we'll do
2  orders on the record before we go off the
3  record. So Counsel Hallak, will you --
4  will you be ordering today?
5  MR. HALLAK: Yes, please. I just
6  need an electronic copy for now. Thank
7  you.
8  THE REPORTER: Okay. E-copy,
9  standard ten day?
10  MR. HALLAK: Sure.
11  THE REPORTER: Okay. And -- and
12  Counsel Murdza, will we be ordering a -- a
13  copy of the transcript today?
14  MR. MURDZA: No, we won't.
15  THE REPORTER: All right. Thank you
16  so much. The time is 12:42 p.m. Off the
17  record.
18  (Signature reserved.)
19  (Whereupon, at 12:42 p.m., the
20  proceeding was concluded.)

Page 118

---

CERTIFICATE OF TRANSCRIBER

1  I, PATRICIA EDMONDS, do hereby certify that this
2  transcript was prepared from the digital audio recording of
3  the foregoing proceeding, that said transcript is a true
4  and accurate record of the proceedings to the best of my
5  knowledge, skills, and ability; that I am neither counsel
6  for, related to, nor employed by any of the parties to the
7  action in which this was taken; and, further, that I am not
8  a relative or employee of any counsel or attorney employed
9  by the parties hereto, nor financially or otherwise
10  interested in the outcome of this action.
11  September 3, 2024

*Patricia Edmonds*
PATRICIA EDMONDS

Page 120

---

CERTIFICATE OF DEPOSITION OFFICER

1  I, JAMES BEKMAN, the officer before whom the
2  foregoing proceedings were taken, do hereby certify that
3  any witness(es) in the foregoing proceedings, prior to
4  testifying, were duly sworn; that the proceedings were
5  recorded by me and thereafter reduced to typewriting by a
6  qualified transcriptionist; that said digital audio
7  recording of said proceedings are a true and accurate
8  record to the best of my knowledge, skills, and ability;
9  that I am neither counsel for, related to, nor employed by
10  any of the parties to the action in which this was taken;
11  and, further, that I am not a relative or employee of any
12  counsel or attorney empl                    or
13  financially or otherwise i                  this
14  action. September 3, 20

JAMES BEKMAN
Notary Public in and for the
State of New York

[X] Review of the transcript was requested.

Page 119

---

1  David.Murdza
2  david.murdza@answernet.com
3  September 3, 2024
4  RE:  Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
5  8/26/2024, Gary Pudles (#6872872)
6  The above-referenced transcript is available for
   review.
7  Within the applicable timeframe, the witness should
8  read the testimony to verify its accuracy. If there are
9  any changes, the witness should note those with the
10  reason, on the attached Errata Sheet.
11  The witness should sign the Acknowledgment of
12  Deponent and Errata and return to the deposing attorney.
13  Copies should be sent to all counsel, and to Veritext at
14  (division email).
15  Return completed errata within 30 days from
16  receipt of testimony.
17  If the witness fails to do so within the time
18  allotted, the transcript may be used as if signed.

22  Yours,
23  Veritext Legal Solutions

Page 121

---

31 (Pages 118 - 121)

```
 1  Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
 2  Gary Pudles (#6872872)
 3          E R R A T A   S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Gary Pudles                 Date
25
                                          Page 122
```

```
 1  Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
 2  Gary Pudles (#6872872)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4    I, Gary Pudles, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____   _____
12  Gary Pudles                 Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
                                          Page 123
```