CONFIDENTIAL

1           UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3    _____

4    ROBERT NOCK, an individual, on

5    his own behalf and on behalf of

6    all others similarly situated,

7            Plaintiff,

8        v.                          Civil Action No.

9    SPRING ENERGY RRH, LLC d/b/a       1:23-01042-JHR

10   SPRING POWER & GAS, RRH ENERGY

11   SERVICES, LLC and RICHMOND ROAD

12   HOLDINGS, LLC, Delaware limited

13   liability companies,

14            Defendants.

15   _____

16            VIDEOTAPED DEPOSITION OF

              ***CONFIDENTIAL***

17              GREGORY HASIAK

18   DATE:       Thursday, October 24, 2024

19   TIME:       10:07 a.m.

20   LOCATION:   Remote Proceeding

21              Houston, TX 77080

22   OFFICIATED BY: Amsale Maxwell

23   JOB NO.:    6957255

24

25

                                        Page 1

1      A P P E A R A N C E S
2 ON BEHALF OF PLAINTIFF ROBERT NOCK:
3      ETHAN PRESTON, ESQUIRE (by videoconference)
4      Preston Law Offices (TX)
5      4054 McKinney Avenue, Suite 310
6      Dallas, TX 75209
7      ep@eplaw.us
8      (972) 564-8340
9
10      JEREMY R. WILSON, ESQUIRE (by videoconference)
11      Pro Hac Vice, Biles Wilson, PLLC
12      457 Laurence Drive, Suite 195
13      Heath, TX 75032
14      jeremy@bileswilson.com
15      (214) 662-8456
16
17 ON BEHALF OF DEFENDANTS SPRING ENERGY RRH, LLC D/B/A
18 SPRING POWER & GAS, RRH ENERGY SERVICES, LLC, AND
19 RICHMOND ROAD HOLDINGS, LLC:
20      DANIEL LECOURS, ESQUIRE (by videoconference)
21      Harris Beach PLLC
22      677 Broadway, Suite 1101
23      Albany, NY 12207
24      dlecours@harrisbeach.com
25      (518) 701-2749

Page 2

---

1      A P P E A R A N C E S (Cont'd)
2 ALSO PRESENT:
3      Lindsay Kreppel, Esquire, In-House Counsel,
4      Spring Energy RRH, LLC d/b/a Spring Power & Gas,
5      RRH Energy Services, LLC, and Richmond Road
6      Holdings, LLC (by videoconference)
7      Jason Hopkins, Videographer (by videoconference)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

---

1          I N D E X
2 EXAMINATION:            PAGE
3    By Mr. Preston          8
4    By Mr. LeCours        115
5    By Mr. Preston        143
6    By Mr. LeCours        145
7
8          E X H I B I T S
9 NO.      DESCRIPTION         PAGE
10 Exhibit 206   AnswerNet Email and Spreadsheet    81
11 Exhibit 207   Ekata/Pro Insight Historical
12        Webpage          104
13 Exhibit 208   Defendants' Internal Do Not Call
14        List           110
15 Exhibit 209   DAT File Entry Relating to
16        Exhibit 208       112
17
18
19
20
21
22
23
24
25

Page 4

---

1          P R O C E E D I N G S
2      THE OFFICER:  Good morning.  My name is
3 Amsale Maxwell; I am the reporter assigned by Veritext
4 to take the record of this proceeding.  We are now on
5 the record at 10:07 a.m. Central Time.
6      This is the deposition of Gregory
7 Hasiak taken in the matter of Robert Nock, et al. vs.
8 Spring Energy RRH, LLC d/b/a Spring Power & Gas, et
9 al., on Thursday, October 24, 2024.
10      The reporter is located in New
11 Braunfels, Texas, and the witness is located in
12 Houston, Texas.
13      I am a notary authorized to take
14 acknowledgments and administer oaths in Texas.
15 Parties agree that I will swear in the witness
16 remotely.
17      Additionally, absent an objection on
18 the record before the witness is sworn, all parties
19 and the witness understand and agree that any
20 certified transcript produced from the recording
21 virtually of this proceeding:
22      - is intended for all uses permitted
23      under applicable procedural and
24      evidentiary rules and laws in the
25      same manner as a deposition recorded

Page 5

---

2 (Pages 2 - 5)

CONFIDENTIAL

| | |
|---|---|
| 1      by stenographic means; and | 1      MR. LECOURS: Go ahead, Ethan. |

1        by stenographic means; and
2    - shall constitute written stipulation
3     of such.
4        This proceeding will be recorded via
5   video technology by Mr. Jason Hopkins.
6        At this time will everyone in
7   attendance please identify yourselves for the record.
8        MR. HASIAK: Gregory Hasiak --
9        MR. PRESTON: My name is Ethan --
10       MR. HASIAK: Sorry.
11       MR. PRESTON: Go.
12       MR. HASIAK: Gregory Hasiak, witness.
13   I guess that's it.
14       MR. PRESTON: My name is Ethan Preston,
15   Preston Law Offices. I'm appearing on behalf of the
16   plaintiff.
17       MR. WILSON: My name is Jeremy Wilson,
18   with Biles Wilson, PLLC, and I am also appearing on
19   behalf of the plaintiff.
20       MR. LECOURS: Daniel LeCours from
21   Harris Beach PLLC, on behalf of the defendants.
22       MS. KREPPEL: Lindsay Kreppel, in-house
23   counsel for Spring -- defendants.
24       THE OFFICER: Thank you. Hearing no
25   objection, I will now swear in the witness.

Page 6

1        Please raise your right hand.
2   WHEREUPON,
3        GREGORY HASIAK,
4   called as a witness and having been first duly sworn
5   to tell the truth, the whole truth, and nothing but
6   the truth, was examined and testified as follows:
7        THE OFFICER: Thank you.
8        You may proceed, Counsel.
9        MR. LECOURS: Before we get started,
10   let me just make a statement on the record on behalf
11   of the defendants. Defendants are asserting and not
12   waiving their attorney-client privilege, which
13   includes communications with Mr. Hasiak when he was an
14   employee of Defendants. And I'll just instruct the
15   witness not to reveal any attorney-client
16   communications as those matters are privileged.
17       THE WITNESS: Just for clarification, I
18   believe that Lindsay has been working for the
19   defendant in the capacity of regulatory manager not
20   inside counsel, so when did that change? I'm not
21   sure. Just for my own clarification.
22       MS. KREPPEL: -- my official title is
23   director of regulatory compliance.
24       MR. PRESTON: Okay. Is everybody
25   caught up? Can I proceed?

Page 7

1        MR. LECOURS: Go ahead, Ethan.
2        MR. PRESTON: All right.
3            EXAMINATION
4   BY MR. PRESTON:
5    Q   Just a few matters of clarification.
6   Earlier you gave an address in New York where you
7   could receive communications.
8    A   Correct.
9    Q   Could you give that address again?
10   A   Sure. 191 Kent, K-E-N-T, Street, Brooklyn,
11   New York, 11222.
12   Q   Mr. Hasiak, do you plan to leave the country
13   any time soon?
14   A   Yes.
15   Q   Okay. When do you plan to leave the
16   country?
17   A   Around the 6th of November -- I'm sorry, of
18   this year.
19   Q   Okay. Great. And after you leave the
20   country is that address still going to be a good place
21   to send you mail?
22   A   Correct.
23   Q   Okay. All right. And so you'll still get
24   communications at that address after you're outside
25   the country?

Page 8

1    A   Yes.
2    Q   Okay.
3        I'd like you to take a look and open up the
4   Google Drive and look at Exhibit 187.
5    A   One second. Exhibit 187. Okay, I have it.
6    Q   All right. Do you recognize this document?
7    A   I do.
8    Q   Where did you first see this document?
9    A   I believe it was emailed to me.
10   Q   Okay. Do you remember by whom?
11   A   I don't remember. This is -- this is while
12   I was still an employee of Kiwi Managing [ph].
13   Q   Okay. So this is a Rule 30(b)(6) deposition
14   notice. Do you see that?
15   A   I do.
16   Q   Okay. Do you recall if you were ever
17   designated as the person who was going to have your
18   deposition taken with respect to this deposition
19   notice?
20   A   Richard Booth designated me as -- for this
21   proceeding.
22   Q   Okay. Do you remember about when that
23   happened?
24   A   I don't remember.
25   Q   So the deposition date, if you look at the

Page 9

3 (Pages 6 - 9)

1 last page, is August 14th. Does that help your
2 recollection of when you were designated?
3     A   So I was asked to -- I was told by Richard
4 Booth and others that I -- at some point I will
5 be -- I will be deposed. But I would say not around
6 this date. I was told that I will be deposed under
7 the 30(b)(6) rule.
8     Q   Sorry. So was this -- were you told that
9 you were going to be deposed with respect to the
10 deposition notice that we're looking at now, this
11 Exhibit 187?
12     A   So at around this date I was told that I
13 will be deposed under the 36 -- sorry --
14     Q   It's 30(b)(6).
15     A   30(b)(6). Prior to that I -- I was under
16 the -- always under the impression that I would be
17 deposed as a witness.
18     Q   Right. And so did you prepare for this
19 deposition?
20     A   I have started to.
21     Q   And did you speak with anybody in the course
22 of preparing for this deposition?
23     A   Yes, I have.
24     Q   Who did you speak with?
25     A   Richard Booth, Lindsay Kreppel, Spring's

Page 10

1 counsel, Donald Cheesman, Lisa Hawkins, Konrad
2 Kozieja -- one of the employees, and Norval
3 Gayle -- another one of the employees.
4     Q   Okay. And do you remember what you spoke
5 about? Did you ever go through this document and talk
6 about the topics or subject matter that was likely to
7 come up during this deposition?
8        MR. LECOURS: Objection to the extent
9 this question is seeking any communications that
10 involve counsel. On behalf of Defendants we'll assert
11 privilege over that and instruct the witness not to
12 reveal the content of any privileged communications.
13        THE WITNESS: Privileged communication
14 is between the attorney and myself. So Dan, yes, we
15 have discussed this document, but I'm not going to
16 discuss the details of it. Plus I don't think I
17 remember now.
18        But there were other discussions in
19 regards to this document with Richard Booth. Lindsay,
20 again, I didn't think was a counsel, just a regulatory
21 manager, as that was made clear on times and times
22 again before this proceeding.
23        MR. LECOURS: over --
24 communications -- she serves as an attorney for the
25 defendants --

Page 11

1        THE WITNESS: First I hear, Dan.
2 BY MR. PRESTON:
3     Q   Okay. That's fine. Let's limit your answer
4 to information and discussions that did not involve
5 either Mr. LeCours or Ms. Kreppel. Do I have the name
6 right? I don't want to misspeak -- mispronounce her
7 name.
8        MS. KREPPEL: That is correct.
9        MR. PRESTON: Okay. Great.
10 BY MR. PRESTON:
11     Q   So excluding those two people, did you ever
12 talk about -- go through this -- you know, there's
13 paragraphs -- so, like, look at page 2. It says a
14 schedule of deposition topics. Do you see that?
15     A   I do.
16     Q   Okay. And do you -- did you ever go through
17 those topics with people besides Mr. LeCours and
18 Ms. Kreppel?
19     A   No.
20     Q   So they were always present during all of
21 your conversations with any of these --
22     A   The answer is yes. And any other
23 conversation that might have happened were just
24 general discussions without any -- you know, without
25 any -- going into details.

Page 12

1     Q   Well, okay.
2        Did you ever discuss -- did you ever prepare
3 for this deposition by discussing the relationship of
4 the defendants with TIPS? Let me rephrase.
5        Do you know who TIPS is?
6     A   Yes.
7     Q   Okay. What is -- who is TIPS? What is
8 TIPS?
9     A   TIPS is a telemarketing sales channel
10 operating out of India or Pakistan -- somewhere in
11 Asia.
12     Q   Okay.
13        THE OFFICER: Mr. Preston, you lost
14 your audio and video.
15        THE VIDEOGRAPHER: We need to go off
16 the record. Time is 10:19 a.m. We are off the
17 record.
18        (Off the record.)
19        THE VIDEOGRAPHER: We're back on the
20 record. Time is 10:20 a.m.
21 BY MR. PRESTON:
22     Q   All right. Mr. Hasiak, did you ever discuss
23 TIPS in the course of preparing for the 30(b)(6)
24 deposition?
25     A   Yes.

Page 13

4 (Pages 10 - 13)

1    Q    Who did you discuss TIPS with?
2    A    Aside from the counsel, I discussed it with
3    Richard Booth, again, Norval Gayle, Konrad Kozieja,
4    Donald Cheesman, and Lisa Hawkins.
5    Q    Okay.  And what were the nature of those
6    discussions?  What were the pertinent facts that you
7    needed to understand in terms of preparing for the
8    deposition?
9    A    My concern was always how are we going to
10   approach TIPS, as they were clearly a telemarketing
11   channel.  And particularly Richard Booth was very
12   adamant about saying that they were not a
13   telemarketing channel, that they were supposed to
14   provide cross-selling services, and that we didn't
15   have any evidence they were doing something else.  And
16   he wanted me to attest to something that wasn't true.
17   Q    Let's unpack that a little bit.  So from my
18   perspective and my understanding, TIPS was sort of
19   clearly a telemarketing company that made outbound
20   calls.
21   A    Correct.
22        MR. LECOURS:  Objection to form.
23   BY MR. PRESTON:
24   Q    But TIPS told the defendants at various
25   times that they had consent to make those outbound

Page 14

1    calls.  Is that correct?
2    A    Yes.  Yes.
3    Q    Okay.  And my understanding is that TIPS
4    indicated -- they told Defendants, "Look, we have
5    consent.  The consent is gained -- we provide customer
6    service -- you know, inbound customer service
7    representatives for a variety of companies, including
8    AT&T, and during the course of those customer service
9    calls we will cross-sell and ask the AT&T customers if
10   they'd like to switch their energy provider."
11        Is that also your understanding?
12   A    Yes.  Yes.
13   Q    Okay.  And so it's -- TIPS essentially said,
14   "Look, we have consent because all of these people
15   made inbound calls that we answered, and during those
16   calls we essentially got their consent to call them
17   back to switch them up to the defendants' services."
18        Am I understanding that situation correctly?
19   A    Yes.  Yes.
20   Q    Okay.  And Mr. Booth had asked you to
21   testify to facts that were not true with respect to
22   that -- with respect to TIPS and its cross-selling.
23   A    Yes.
24   Q    Can you tell us what exactly he wanted to
25   say that was not true?

Page 15

1        MR. LECOURS:  Objection to form.
2    A    He had -- he was concerned that TIPS would
3    open up another can of worms.  So he wanted to -- for
4    me to say that we've received consent for those
5    customers, that we were able to verify it, that it
6    was -- that we've employed QA processes -- which none
7    of it was true.  And I refused to -- to do that.
8        MR. PRESTON:  So are we on the record?
9        THE VIDEOGRAPHER:  We are.
10       MR. PRESTON:  Okay.  I lost that last
11   answer.  Can you read it back to me?
12       THE OFFICER:  Yes, sir.  Please stand
13   by.
14       (The officer repeated the record as
15       requested.)
16   BY MR. PRESTON:
17   Q    So he knew that TIPS did not have consent to
18   make these outbound telephone calls.  How do you know
19   that?
20       MR. LECOURS:  Objection to form.  Lacks
21   foundation.
22   A    Richard Booth was part of every QA call,
23   every discussion about pretty much every sales channel
24   that we've onboarded.  So it was impossible for him
25   not to know.  Every contract that was negotiated had

Page 16

1    to go through -- had to go for Richard to review.
2    Q    Did Mr. Booth approve all the commissions
3    that went out to the various vendors?
4    A    So we had a -- a process where first the
5    commission was prepared by our transactions team.
6    Then it was reviewed by them.  Then it was sent over
7    to accounting team, after which it came to me for
8    approval.  And then the final approval would be either
9    Richard Booth or Lisa Hawkins.
10   Q    Okay.  So either Lisa Hawkins or Richard
11   Booth was approving all of these -- the commission
12   payments for vendors.  Okay.
13   A    Correct.
14   Q    So let's go back to TIPS.  So TIPS -- it
15   became evident that there's just no way that TIPS had
16   these cross-selling -- did TIPS have a cross-selling
17   arrangement with AT&T?
18   A    I don't know.
19   Q    Did you ever investigate whether or not
20   there was any sort of cross-selling arrangement --
21   A    We did -- we tried to.  We tried to get
22   additional informations from TIPS, but they would not
23   share or provide additional information.
24       But knowing of what was happening in the
25   industry, we were under the assumption that they may

Page 17

5 (Pages 14 - 17)

1  be problematic, as they probably don't have a
2  relationship with anybody else, and they're just cold
3  calling like everybody else.
4      Q   So sure, but did anybody at Defendants ever
5  ask AT&T if there was a cross-selling arrangement?
6      A   No.  Not to my knowledge.
7      Q   How long were the defendants aware that TIPS
8  did not have this cross-selling arrangement with AT&T
9  or anybody else?
10     A   I would say almost from very beginning of
11 the contract.
12     Q   So TIPS -- do you know who Roland Camunas
13 is?
14     A   Yes.
15     Q   Okay.  Who is Roland Camunas?
16     A   One of the customers that was enrolled by
17 TIPS, and then later enrolled by MBM, which is another
18 sales channel.  And Roland Camunas filed complaints
19 with us threatening us, legal action if we didn't
20 settle with him.  Something along those lines.
21     Q   Okay.  Did TIPS provide an audio recording in
22 response to Roland Camunas's complaint?
23     A   I believe TIPS did not, but we had some
24 limited records in our possession that we have
25 identified that -- that -- Roland Camunas was called
Page 18

1      A   Sorry -- 78, then just scrolling it down --
2      Q   Yeah, it takes a little bit of time to load.
3      A   You said Exhibit 78?
4      Q   No, 92.
5      A   Oh, 92.  Sorry.  I have it.
6      Q   Okay.  Who made the decision to keep TIPS
7  around after it became apparent that they weren't
8  really cross-selling, they were just making, you know,
9  outbound telemarketing calls?
10         MR. LECOURS:  Objection to form.
11     A   That would be Richard Booth.
12     Q   Okay.  Did anybody else make that decision?
13     A   I --
14     Q   Did it go further up?
15     A   I don't know.  Ultimately it would have been
16 Richard Booth.
17     Q   Okay.  So let's go back to Exhibit 92.  This
18 is an email chain between TIPS and the defendants,
19 including Amanda Miranda.  Do you see that?
20     A   Yes.
21     Q   Okay.  And I'm going to represent to you
22 there -- in the subject line there is a telephone
23 number, a 215 telephone number.  Do you see that?
24     A   Yes.
25     Q   Okay.  I'm going to represent to you that
Page 20

1  by someone from TIPS.
2      Q   All right.  Let me -- relationship with
3  TIPS -- how long did -- well, let me back up.  What
4  were the --
5          THE OFFICER:  I'm sorry to interrupt.
6  Can you hear me?
7          MR. LECOURS:  You keep breaking up.
8          MR. PRESTON:  Yeah.
9          THE WITNESS:  Yes, you're breaking up.
10 If you could repeat --
11         MR. PRESTON:  Oh, god.
12 BY MR. PRESTON:
13     Q   When did TIPS --
14         THE OFFICER:  Sorry, can we go off the
15 record to address the audio issue, sir?  It's cutting
16 out bad.
17         MR. PRESTON:  Okay.  Sure.
18         THE VIDEOGRAPHER:  All right.  Time
19 is 10:32 a.m.
20         (Off the record.)
21         THE VIDEOGRAPHER:  We're back on the
22 record.  Time is 10:34 a.m.
23 BY MR. PRESTON:
24     Q   All right.  If you don't mind, let's go to
25 Exhibit 92.  Do you have that in front of you?
Page 19

1  that telephone number is Mr. Camunas's number.
2      A   Okay.
3      Q   And so this is an exchange where they're
4  trying to find the consent to call Mr. Camunas that
5  TIPS claimed it had.  Do you see that?
6      A   I do.
7      Q   Is that a fair description of that email?
8      A   Yes.
9      Q   Okay.
10     A   Yes.
11     Q   All right.  So let's go to Exhibit 93, which
12 is a -- this is a -- the email -- sorry, this is the
13 voice recording that they -- was attached to
14 Exhibit 92.  Does that make sense?
15     A   Yes.
16         (Audio played.)
17     Q   All right.  So in that call it sounded
18 like --
19         MR. LECOURS:  I think we lost him
20 again.
21         THE WITNESS:  Yeah.
22         THE VIDEOGRAPHER:  Just a second.
23         All right.  Time is 10:38 a.m.  We are
24 off the record.
25         (Off the record.)
Page 21

6 (Pages 18 - 21)

CONFIDENTIAL

1    THE VIDEOGRAPHER: We're back on the
2  record. Time is 11:01 a.m.
3    MR. PRESTON: Okay. Are we back on the
4  record?
5    THE VIDEOGRAPHER: We are.
6    MR. PRESTON: Okay.
7  BY MR. PRESTON:
8    Q  So Mr. Hasiak, we listened to Exhibit 93,
9  which is a audio recording that TIPS provided
10  Defendants. Is that right?
11    A  It's part of the recording that TIPS
12  provided the defendant, yes.
13    Q  Okay. And that audio recording is supposed
14  to evidence consent for TIPS to call Mr. Camunas;
15  correct?
16    A  Yes.
17    Q  Okay. And TIPS business with the defendants
18  that provided a lot of these recordings whenever there
19  was a need to demonstrate that they had consent to
20  make the call?
21    A  They provided some, yes, recordings.
22    Q  Okay. So there were some calls or
23  complaints where they did not provide recordings?
24    A  Yes.
25    Q  What happened in those situations?

Page 22

1    A  It has been a while. So I may not have -- I
2  may not remember all of it. But I believe the last
3  time we received a complaint and we requested for
4  recordings, they just stopped responding to us. And
5  at that point in time it became blatantly obvious that
6  what they are doing is a pure telemarketing.
7    Q  Okay. So they were telemarketing
8  the -- this cross-selling relationship with AT&T was
9  fictitious?
10    MR. LECOURS: Objection to form.
11    You can answer.
12    THE WITNESS: Certainly we all believe
13  that this was a front or it was a fake, there was no
14  such thing as a relationship with AT&T or anybody
15  else.
16  BY MR. PRESTON:
17    Q  But the --
18    A  But since there was no -- since there was no
19  major complaints, you know, we were asked to ignore it
20  and continue a sales relationship with TIPS.
21    Q  But the recordings provide a pretext or a
22  plausible deniability; correct?
23    A  Yes.
24    Q  Did anybody ask you to testify about the
25  recordings that Defendants had collected from TIPS?

Page 23

1    A  Yes.
2    Q  Okay. Who asked you to do that?
3    A  That would be Richard Booth.
4    Q  Okay. And what did he ask you to do,
5  specifically?
6    A  He asked me to say that -- that to collect
7  these recordings would be too difficult as they are in
8  different databases. Which that wasn't true because
9  they are in one place, unless they moved in now since
10  I'm no longer there.
11    Q  Okay. You said it was too difficult. Would
12  it be too difficult to produce to the plaintiff in
13  this case?
14    A  The idea was it would be too difficult to
15  produce to the plaintiff. I can only assume that
16  Richard's reasoning was that these calls would be too
17  damaging to the case.
18    Q  Okay. And where were all these calls stored
19  when you were employed with the defendants?
20    A  These calls, if I'm not mistaken, were
21  stored on all shared drive, which is environment
22  hosted by our IT providers, and they would be stored
23  under the TIPS folder.
24    Q  Okay. So they would have been accessible
25  under TIPS? When did Defendants -- so they would have

Page 24

1  all been stored under a TIPS folder; correct?
2    A  Yes.
3    Q  And --
4    A  Except for -- except for the third-party
5  verification calls. But the so-called consent calls
6  would have been stored in -- in the TIPS folder.
7    Q  Okay. Do you have a rough sense of how many
8  of those consent recordings exist?
9    A  Difficult to guess, but I'd say less than a
10  thousand.
11    Q  Okay. Do they all correspond to situations
12  in which there had been a complaint or an inquiry or
13  some need to have evidence of consent?
14    A  No. The -- TIPS were required to send
15  these -- at the bare minimum were required to send all
16  of these consent calls to us on a weekly basis. In
17  the very, very beginning they were doing that. But
18  later on they stopped.
19    Q  Okay. So the problem with TIPS was they
20  stopped providing the evidence of consent that was
21  required?
22    A  Yes.
23    Q  By Defendants.
24    A  Yes.
25    Q  Okay. Was the evidence of consent only

Page 25

7 (Pages 22 - 25)

1 required for enrollments?
2    A   Only for enrollments, yes.  At the bare
3 minimum.
4    Q   Okay.  And so they're all stored in a
5 folder, but you were told that you should testify that
6 it would be too difficult to locate all of the TIPS
7 recordings?
8    A   Yes.
9    Q   Okay.  And how would that have been -- like,
10 what -- were you told to testify that all these
11 recordings were scattered in different area, and you
12 couldn't located them?  Do I understand that
13 correctly?
14    A   That is correct.
15    Q   Okay.  And who told you to do that?
16    A   Richard Booth.
17    Q   Did anybody else know that Richard Booth was
18 telling you to testify that TIPS had genuine consent?
19    A   Well, there were others.  But it's my
20 understanding, as of today, that Lindsay serves as a
21 in-house counsel, so I can't really -- you know,
22 mention anything else.
23    Q   Okay.  I'm going to pause here because I
24 think that there's a need, to the extent that people
25 were attempting to suborn perjury -- that would be a

Page 26

1    MR. LECOURS:  Based on -- well, I
2 certainly can only speak for the conversations I've
3 been party to.
4    THE WITNESS:  Exactly.
5    MR. LECOURS:  I can only testify
6 to -- I can only attest to those.  But as to those I
7 can represent that no such representations were made
8 at the -- on the conversations I was party to.
9    MR. PRESTON:  That fills me with great
10 confidence.
11 BY MR. PRESTON:
12    Q   Okay, so when did the relationship with TIPS
13 start?
14    A   Again, I don't have any of the information
15 that I have been preparing for so -- since my access
16 was -- to all of that information was cancelled.  I'd
17 say sometimes in 2021.
18    Q   Does, sort of, September 2021 sound like it
19 could be right?
20    A   That sounds right, yeah.
21    Q   And do you have a sense of when it ended?
22    A   It continued for roughly about a year, year-
23 plus, maybe.  On and off with some --
24    Q   So during that year, roughly the entire
25 time, the duration of the TIPS relationship,

Page 28

1 crime -- fraud exception, and you would be able to
2 testify about who else knew that you had been asked to
3 testify falsely about TIPS.
4    A   So who else knew that I was asked -- just
5 could you repeat the question?  I'm sorry.
6    Q   Yes.  I guess, really, who else knew that
7 you had been asked to testify falsely about TIPS?
8    MR. LECOURS:  Foundation.  Objection,
9 foundation.  We reassert our privilege.
10    To the extent you can support the
11 foundation for the allegation you're making then
12 perhaps we could, you know, allow the inquiry.  But I
13 don't think there's been any sort of foundation for
14 the privilege waiver you're just suggesting.
15    MR. PRESTON:  Dan, he's just said that
16 he was asked to testify falsely.  What other
17 foundation do you think you need?
18    MR. LECOURS:  Well, besides the fact
19 that I believe that statement was false and therefore
20 would not constitute any sort of applicable waiver, to
21 the extent you're going to inquire into this subject I
22 believe you're going to need a court order if your
23 team --
24    MR. PRESTON:  What's your -- for saying
25 that Mr. Hasiak's testimony is false?

Page 27

1 Defendants knew that TIPS was telemarketing without
2 consent for outgoing calls?
3    A   Yes.
4    Q   Okay.  And they made a conscious decision to
5 keep the customers that TIPS enrolled for the
6 defendants.  Is that right?
7    A   Yes.
8    Q   Okay.  And they -- Defendants retained the
9 money from the customers derived from the TIPS
10 enrollment; correct?
11    A   Yes.
12    Q   Okay.  Did TIPS -- did Defendants receive
13 any complaints about TIPS telemarketing besides
14 Mr. Camunas?
15    A   Yes.  There were several other complaints.
16 What we called customer complaints -- so they were a
17 low -- I mean, we called it a low-level complaint
18 where a customer calls into customer service line and
19 complains, "Hey, I never enrolled."  So at that point
20 in time -- or "I never gave authorization."
21    All of that would have been
22 documented -- should have been documented in
23 customer's account.  And only at that point in time we
24 would cancel those accounts.
25    Q   Okay.  Did TIPS calls -- or did you have any

Page 29

CONFIDENTIAL

1  complaints that TIPS called telephone numbers on the
2  Do Not Call list?
3     A   Yes.
4     Q   Besides Mr. Camunas?
5     A   Yes.
6     Q   Okay.  And who knew about those complaints?
7     A   The entire QA team at the time, customer
8  service team, Richard Booth.  Also these items would
9  be discussed in biweekly or -- I don't remember if we
10 still had a weekly or biweekly management calls.
11    Q   Okay.  Were these management calls ever
12 recorded or were there ever minutes prepared?
13    A   Not to my knowledge.
14    Q   Okay.  So this was almost off the record?
15    A   Correct.  Whenever there were issues raised
16 it was a very -- we had a very clear directive from
17 Richard Booth not to put anything in writing.
18    Q   Okay.  Was management -- was the defendants'
19 management concerned with plausible deniability?
20    A   No.  The going joke was, "Well, let Greg
21 sign it this way, you know, we'll deny
22 everything."
23    Q   That sounds really frustrating.
24    A   Very frustrating.
25    Q   Okay.  So some of these conversations

Page 30

1     A   Tuesday the 23rd of September after I
2  replied -- after I voiced my frustration through an
3  email.
4     Q   Okay.  And you don't have access to that
5  email today?
6     A   I might have it, but it's going to take me a
7  little while to find it.
8     Q   No, we're not -- Mr. Booth testified
9  previously, I think on October 2nd, that you resigned.
10    A   That is --
11    Q   Is that --
12    A   So we have been discussing my exit because I
13 wasn't happy.  I wasn't happy with how things were
14 going, and I wasn't happy with the fact that the
15 company had been hiding information from me.  And you
16 know, they simply have stopped communicating with me.
17 So you know, I would sit at home and do absolutely
18 nothing all day because there was very little to do at
19 the time.
20        And so I've sent them, I'd say, a very hot
21 email saying that if someone doesn't get back to me,
22 today's going to be my last day.  So against all of
23 our internal policy when it comes to HR, they decided
24 to shut off my access and terminate me immediately
25 within five minutes of sending that email.

Page 32

1  occurred during the preparation of your deposition.
2  Is that right?
3     A   Yes.
4     Q   Okay.  You are no longer an employee of any
5  of the defendants; correct?
6     A   Yes.
7     Q   Okay.  What happened?  Why are you no longer
8  an employee?
9     A   There was a combination of issues.  About
10 six to eight months ago I started voicing my concerns
11 with Richard Booth and Lisa Hawkins.  There were
12 several disagreements on many different issues.
13        One of the issues were Nock vs. Spring, and
14 that disagreement was about me staying away, not
15 saying anything, and potentially lying about the
16 relationship of Spring and TIPS.
17    Q   Okay.  And you essentially -- so you told
18 Defendants that you were not going to lie during your
19 deposition?
20    A   Yes.
21    Q   And because of that you got terminated?  In
22 addition to other things?
23    A   In addition to other things, yes.  My
24 termination was inevitable.
25    Q   When did Defendants terminate you?

Page 31

Page 33

Veritext Legal Solutions
800-336-4000

CONFIDENTIAL

13        MR. LECOURS:  Just in case I didn't
14  already say it, and I may have, we're just
15  designating, on behalf of Defendants, this entire
16  transcript as confidential pursuant to the protective
17  order.
18        I believe the witness has signed on to
19  the addendum to the protective order, but in case he
20  has not I'll just remind him that he is bound by that.
21  BY MR. PRESTON:
22    Q   Greg, do you --
23        THE WITNESS:  I'm not sure what that
24  means, Dan, but I'll send it over to my attorney and
25  see if he can put some thoughts into it.

Page 34

1        MR. LECOURS:  I was provided a copy of
2  a signed addendum to the confidentiality agreement by
3  Mr. Preston.  And if you didn't sign that I guess I
4  need to know that.  Is that --
5        THE WITNESS:  No, I did sign it.  But
6  you know, again, I mean there's a lot of legal mumbo
7  jumbo that you guys are throwing here, so I don't
8  necessarily know since I'm not an attorney.  So yes, I
9  will have an attorney review this.
10        MR. LECOURS:  Okay.  So you have signed
11  it, and you'll, you know, agree that whatever you've
12  signed you're bound by that; correct?
13        THE WITNESS:  Yeah.
14        MR. LECOURS:  Okay.  Thank you.
15        MR. PRESTON:  Okay.
16  BY MR. PRESTON:
17    Q   Yeah, I just want to clarify, before we had
18  any discussions substantively that you did sign the
19  NDA that's attached to that -- the court's stipulated
20  protective order?
21    A   Yes.
22    Q   Do you recall?  Okay.  Excellent.
23        So it seems like TIPS provided, sort of, an
24  integrated service.  It provided both telemarketing the
25  potential customers, and a pretext based on which the

Page 35

1  defendants could deny knowing that there were calls to
2  Do Not Call listed numbers.
3    A   Yes.
4        MR. LECOURS:  Objection to form.
5  BY MR. PRESTON:
6    Q   So providing both things; right?
7    A   Yes.
8    Q   Okay.  And so this -- in effect TIPS
9  provided Defendants plausible deniability, except the
10  deniability stopped being plausible at some point?
11    A   Yes.  We, from the very beginning, once we
12  started receiving these quote-unquote consent calls,
13  we already knew that these consent calls have
14  been -- are not the entire phone calls, they're just
15  part of a phone call, as they have been tampered with
16  or, you know, cut here and there.
17        And yes, it takes quite a bit of time to,
18  you know, to edit these phone calls, but it's not
19  impossible to understand why TIPS would say this was
20  difficult, you know, for them to provide consent for
21  every phone call.
22        Now, also, keep in mind that around the same
23  time it was very popular in our industry, in the
24  energy industry, and maybe even a few others,
25  that -- that at least three phone calls before the

Page 36

1  customer is being switched.
2        First is the cold call telemarketing phone
3  call, then there is the -- you know, once the customer
4  has heard the -- the -- some sort of a pitch, they
5  transfer them -- other, they say some random stuff.
6  The customer never pays any attention.
7        So the whole process is designed to mislead
8  the customer and create a plausible deniability to us
9  saying, like, "Oh yeah, we've had a call that was
10  kosher."  That's the term that we used in the office.
11  And the truth was it was not.
12    Q   Okay.
13    A   So as long as we did the bare minimum to
14  cover our behinds, Richard and Lisa, and I guess the
15  shareholders in New Zealand, were very happy.
16    Q   Okay.  So did management ever discuss
17  plausible deniability?
18    A   Yes.  As I mentioned earlier, there was
19  actually a going joke in our management meetings from
20  time to time.
21    Q   Okay.  I want to direct your attention to
22  Exhibit 113.
23        THE OFFICER:  And Mr. Preston, if I may
24  ask, are these exhibits being marked or are you just
25  referencing them?

Page 37

10 (Pages 34 - 37)

CONFIDENTIAL

1       MR. PRESTON: So they're already marked
2   that -- we're reusing some exhibits. We're just
3   keeping a sequential order so it's easier during
4   summary judgment or trial to locate different
5   exhibits. But they're all in the Google Drive.
6       THE WITNESS: Okay. So Exhibit -- hold
7   on one second -- so this is the TPV.com contract?
8   BY MR. PRESTON:
9   Q   Yes, sir.
10  A   Okay. With Richmond Road Holdings? Yes, I
11  have it.
12  Q   So does the TPV process protect Defendants
13  from liability?
14  A   Somewhat.
15  Q   So it doesn't protect it from all liability?
16      MR. LECOURS: Objection to form. Also,
17  interpose an objection as to the prior question.
18      You can answer.
19      THE WITNESS: Yes.
20  BY MR. PRESTON:
21  Q   And the intent is to have -- to use the TPV
22  process to have an independent record that there was
23  consent to be enrolled with the defendants; right?
24  A   Right. So the TPV process is only to
25  establish customers' authorization to enroll with

Page 38

1   A   Yes.
2   Q   Okay.
3   A   Because I was allowed to -- for most if not
4   all contracts, agreements.
5   Q   Does the TPV contract protect Richmond Road
6   Holdings from liability for slamming?
7       MR. LECOURS: Objection to form.
8   A   I believe yes, in a way.
9   Q   Okay. Does it protect all the affiliates
10  involved in enrolling for defendants?
11      MR. LECOURS: Objection to form.
12  A   That was my understanding.
13  Q   Okay.
14      Can we look at Exhibit 82?
15  A   One second. I have it.
16  Q   Okay. So this is an email chain between you
17  and some other people inside RRH concerning an MBM
18  sales agent named Wendell Freeman. Do you see that?
19  A   Yes.
20  Q   Okay. And so first email at the bottom you
21  have Konrad -- how do you say his last name?
22  A   Kozieja.
23  Q   Kozieja -- it's Polish; yeah?
24  A   Yes.
25  Q   Okay. Mr. Kozieja says "I strongly believe

Page 40

1   services. Not to, you know -- whether the customer,
2   you know, authorized the, you know, the company, or in
3   this case Spring Power, to call them in the first
4   place.
5   Q   Right. It doesn't eliminate all other kinds
6   of fraud; it just protects against slamming. Is that
7   right?
8   A   Yes.
9   Q   Okay. Who decided to use TPV.com and why?
10  A   From time to time -- well, the -- the
11  company that we were using at that time, which was
12  Trusted TPV -- I believe they were completely
13  outdated, and they were not providing any safeguards
14  against slamming.
15      And the other one -- oh man, I don't
16  remember the name of the other company -- out of
17  Nevada -- AGR -- there was a company affiliated with
18  AGR -- I can't remember the name of it. I believe
19  that they were also struggling with the technology.
20      So we decided -- meaning we -- myself,
21  Richard Booth -- that we're going to enter into a new
22  agreement with TPV.com, as their platform was
23  reasonably up to date.
24  Q   Okay. And so the -- you'll see that you
25  signed it on behalf of Richmond Road Holdings?

Page 39

1   that re-activating this account came prematurely."
2   And then it talks about it. It says "Outside of the
3   four sales that the rep admitted of being
4   fraudulent" -- do you know what he's talking about
5   there?
6   A   Yes. He's talking about the fact that
7   Wendell Freeman or his associates, were -- were
8   obtaining these sales from a call center somewhere in
9   Asia. So you know, pretending to be door-to-door
10  agents.
11  Q   Oh, okay. So this was not slamming; this
12  was a situation in which they -- the door-to-
13  door -- enrollments were done under a door-to-door
14  channel?
15  A   I believe so, yes.
16  Q   Okay. And it says he admitted that?
17  A   Yes. He admitted that on the phone call.
18  But because of the personal relationship that Richard
19  Booth has with that particular sales channel, at
20  Richard's direction we gave this guy another chance.
21  Q   Okay. Your email in response, this same
22  document, says "I'm allowing this rep to conditionally
23  return to this campaign, he has been retained by the
24  channel and has received clear instructions ... I
25  would be happy to give you more background. If you

Page 41

11 (Pages 38 - 41)

1  need additional information on this please contact
2  David or me directly."
3     A   Yes.
4     Q   Why did you permit this person to be
5  retained?  At Richard's direction?
6     A   At -- you know, after speaking with Richard
7  and after speaking with the -- I believe this is MBM
8  sales channel.  So after speaking with Enrique
9  Alvarez [ph], Gerson Alvarez [ph], I think, and
10 Richard Booth, we all agreed that we're going to give
11 this guy a second chance or a third chance -- I'm not
12 quite sure how many chances he's got.
13    Q   So where was -- MBM's management, where are
14 they located geographically?
15    A   MBM's management is located in Houston,
16 Texas.
17    Q   Okay.  And this MBM3014, which is the sales
18 rep ID for Wendell Freeman?
19    A   Yes.
20    Q   Is that correct?
21    A   Yes.
22    Q   Okay.  That -- the MBM 3000 series, where
23 are those sales agents located?
24    A   From what I understand, they were located
25 somewhere in either Pennsylvania or Maryland.

Page 42

1     Q   Okay.
2     A   I think New Jersey?  At this point in time
3  it's difficult for me to tell you exactly without
4  looking at some additional information.
5     Q   Well, so these sales agents were a front for
6  telemarketers.  Do I understand that correctly?
7     A   That was our assumption, yes.
8     Q   Okay.  And where are the telemarketers from?
9     A   We don't know.  We assume it's probably
10 India -- Pakistan, maybe.
11    Q   Okay.  But you never spoke to any of the
12 telemarketers, you spoke to Wendell Freeman --
13    A   I spoke to Wendell Freeman, and I spoke to
14 his managers, which is the management of MBM.
15    Q   And Mr. Booth directed you to continue
16 selling --
17    A   Okay.  Let me rephrase that.
18    Q   Okay.  Let me rephrase that.
19        Mr. Booth directed you to permit Wendell
20 Freeman to continue selling?  Do I understand that
21 correctly?
22    A   Yes.
23    Q   Okay.  And that was based on the personal
24 relationship he had with MBM?
25    A   Yes.

Page 43

1     Q   Okay.  Do you know how they know each other?
2     A   Richard Booth was part of Frontier Utilities
3  several years -- or just prior to establishing Kiwi
4  Energy in New York.  And so Frontier Utilities was
5  a -- company providing electricity services in Texas.
6  And I believe the -- at the time the current
7  management of MBM was working for Richard Booth.
8     Q   Okay.  So he knew them from a prior job.  Do
9  you know roughly when they would have met?
10    A   Let's see.  I've been there for what,
11 12 years -- or about 14 years ago, I'd say.
12    Q   So 2010?
13    A   Just about.
14    Q   Okay.
15        Let's look at Exhibit 81.
16    A   Okay.  Let me go there.  Okay, I see it.
17    Q   Okay.  You see there's a -- the last
18 sentence of the -- the last couple of sentences of the
19 bottom -- the second paragraph, it says:  "Based on
20 the geolocation of the TPV, we are getting this
21 reading: [Distance from Customer to Sales Agent:
22 0 feet.  Distance from sales agent to service address
23 is: 109 feet.]  This sale is highlighted below in
24 turquoise."
25        Do you see that?

Page 44

1     A   Yes.
2     Q   What's happening there?  What happened
3  there?
4     A   One second.  Just give me a minute.
5        I'm assuming these are sales from Maryland.
6  Is that correct?
7     Q   It's not clear to me, but they look like
8  there's some Maryland area code.
9     A   So one of the things -- just at a first
10 glance at this, one of the things that we had a verbal
11 policy in the office that -- well, first of all, let
12 me maybe go back.
13        In the state of Maryland only the account
14 holder or the person named on the account is
15 authorized to enroll with an energy supplier.  Now, in
16 our case, our sales reps, it was difficult to find the
17 account holder.  So very often they would sign up the
18 spouse or whomever was in the household.
19        Now, our policy, our written policy, is to
20 cancel this enrollment.  Our verbal policy,
21 communicated by Richard Booth, is to keep them as long
22 as they're not causing trouble.  So if they're causing
23 trouble this is when we cancel those enrollments.  But
24 if they're not then we keep them.
25        And very often when we receive a regulatory

Page 45

1  complaint we will -- we will then basically -- it's
2  cheaper for us to -- it was cheaper for us to re-rate
3  those customers based on the utility rate than cancel,
4  you know, 1,000 enrollments, I guess.
5     Q   Sure.  So that verbal policy you described
6  was aimed at preserving plausible deniability?
7     A   Absolutely.
8     Q   All right.  I want to talk about -- we're
9  going to shift gear a bit -- we're going to start
10  talking about Endurance a bit.  But was Richard Booth
11  involved in onboarding different marketing vendors?
12     A   By onboarding -- yes, he was part of every
13  sales meeting, every quality assurance meeting.  He
14  was involved; he knew who we were onboarding and how
15  we were onboarding.  He might have not participated in
16  all of the onboarding phone calls, but at least he was
17  told, instructed, of what is happening and would even
18  provide direction on these calls.
19     Q   Okay.  And was he involved in onboarding
20  Endurance?
21     A   He was on the calls and discussions, and I
22  would have discussed with him onboarding Endurance.
23  And he was aware of Endurance.  And he was aware of
24  Brian Ream and Brian Ream's past and the gossip that
25  followed him.  So yes, he -- he was aware.  But he did
Page 46

1  not participate in physically onboarding the agents.
2     Q   Okay.  Okay.  No, he -- well, because he's
3  the CEO, essentially; correct?
4     A   Correct.  Yes.
5     Q   Okay.  So why was he involved at all in the
6  onboarding process?
7     A   Well, he wanted to be part of pretty much
8  everything.  So micromanaging -- maybe not
9  micromanaging, but just -- just for the optics, to be
10  involved in these QA meetings, sales meetings, and
11  everything else.  The only time he would raise any
12  concerns if it was a concern that would relate to the
13  longevity of the business.
14       For example, you know, onboarding customers
15  who may not be as clean as we would like them to be.
16  So then a decision -- discussion was made as to how to
17  handle these sort of customers without crossing the
18  line.
19     Q   So you had -- Defendants had a number of
20  problematic vendors that they onboarded.
21     A   Yes.
22     Q   And is it fair to say that Mr. Booth was
23  involved in onboarding those vendors to preserve -- to
24  ensure that plausible deniability was preserved?
25     A   Now that I look at this, yes.
Page 47

1     Q   Okay.  He was also kind of involved to
2  prevent liability to any of the defendants'
3  affiliates?  Is that fair to say?
4     A   Yes.
5     Q   Okay.  What information did Defendants use
6  in determining whether or not to onboard a particular
7  vendor, especially one that was problematic.
8     A   What information -- you mean like background
9  checks?
10     Q   No.  Well, let's focus on Mr. Ream.
11     A   Okay.
12     Q   So you indicated Mr. Ream had a reputation.
13  Is that fair to say?
14     A   Yes.
15     Q   Okay.
16     A   Mr. Ream --
17     Q   And what was that reputation?
18     A   Sure.  So as background, Mr. Ream used to
19  work for Rob Morris -- C-something-G company.  I don't
20  remember off the top of my head right now.  And there
21  were several -- from what Richard Booth and I know
22  from, you know, industry chatter, Rob Morris and Brian
23  Ream were involved in several different incidents
24  involving fraudulent sales, misrepresentations, et
25  cetera, et cetera.
Page 48

1       We knew that onboarding Brian Ream could be
2  problematic for us.  Nevertheless, at that time the
3  direction from the majority shareholders and Richard
4  Booth, the senior management, was "we need sales."  So
5  that's the reason we decided to onboard Brian Ream and
6  just maybe pay a little bit more attention to him than
7  others in the beginning.
8     Q   So you mentioned that Mr. -- you knew and
9  Mr. Booth knew that Brian Ream was associated with
10  fraudulent enrollments.  Is that fair to say?
11     A   Yes.
12     Q   Okay.  What kind of fraudulent enrollments?
13  How were the enrollments -- to be fraudulent?
14     A   So there were several ways.  The most
15  popular one was pretending that you were a door-to-
16  door agent and calling customers -- making those sales
17  from some sort of a call center.  That was the most
18  popular one.  Then it was just basically slamming the
19  customer.
20       So second one -- second popular one, a sales
21  rep comes into customer's house, says, "Oh, we're
22  going to give you a discount -- I'm from the utility,
23  we're going to get you discounts, but you're going to
24  have to answer a series of questions yes or no -- just
25  answer them yes with the exception of that one
Page 49

CONFIDENTIAL

1  question that you say no. And that no question is,
2  you know, whether you are receiving public assistance
3  from the government." And bam, you had a sale.
4      So those are the two main issues.
5      Q   Okay. And you were aware of
6  information -- rumors that Mr. Ream was associated
7  with those kind of fraudulent enrollments?
8      A   Yes.
9      Q   Do I understand that correctly?
10     A   Yes.
11     Q   And Mr. Booth was aware of those rumors as
12  well?
13     A   Yes. Remember that every contract that I
14  signed, I had to discuss it with Richard Booth. And
15  he was present on all of these phone calls. So
16  between anybody was on these calls, I'm sure there was
17  at least half a dozen jokes flying around of what to
18  expect from Brian Ream or any of the sales channels
19  that we were onboarding.
20     Q   Okay. So there's a very clear awareness of
21  what you're getting into bed with in terms of
22  Mr. Ream?
23     A   Yes.
24     Q   Okay. You mentioned a scheme to disguise
25  telemarketing calls as door-to-door sales?

Page 50

1      A   Yes.
2      Q   That sounds to me -- as an industry
3  outsider, that sounds like a very specific and
4  specialized kind of fraud. And I want to ask when you
5  became aware of that scheme.
6      MR. LECOURS: Objection to form. Move
7  to strike Counsel's statements.
8      You can answer the question.
9      THE WITNESS: We were aware of this
10  prior to entering into the agreement with Endurance.
11  We were aware of this through, again, industry
12  chatter, energy marketing conferences which dedicated,
13  you know, panels towards fraudulent sales and
14  telemarketing -- fraudulent telemarketing calls from
15  Asia. So we were aware for some time now.
16  BY MR. PRESTON:
17     Q   Okay. Would you say that you were aware
18  in 2020?
19     A   Yes.
20     Q   Would you say you were aware in 2018?
21     A   I'd say we probably were aware since 2016.
22     Q   Okay.
23     A   I'm guessing a little bit because it has
24  been quite some time.
25     Q   Sure. And you were aware of this. How do

Page 51

1  you know that Mr. Booth was aware of it?
2      A   Once again, we had -- I -- you know, had
3  lengthy discussion with Richard on a daily basis.
4  Richard participated in all of our QA calls. He has
5  heard every single one of our concerns. He has
6  participated in sales calls. Richard and I would work
7  together to make sure that -- that any sort of sales
8  campaign would at least meet the bare minimum
9  compliance requirements.
10     Q   Okay. And by "bare minimum," you mean not
11  necessarily complying with the law but protecting
12  defendants against liability --
13     A   Correct. Yes.
14     Q   Okay. Does Spring Power record -- when it
15  onboards new vendors, does it record the training
16  sessions?
17     A   I don't think so.
18     Q   Do you know why?
19     A   I don't. I don't think we ever thought
20  about it.
21     Q   Okay.
22     A   Now, I do have a comment on the onboarding
23  process. So when it comes to onboarding a sales
24  channel, particularly door to door, we sent them our
25  onboarding documents, and they -- and we have a call

Page 52

1  with the trainer.
2      Now, from that point on we don't know if
3  these agents are trained. Because based on the
4  complaints that we would receive from multiple
5  campaigns, you know, it sounds like the
6  representatives were never trained.
7      But then again, we had no proof that they
8  were or weren't. They did sign the document that they
9  have been trained, but --
10     Q   Wouldn't it be better -- if Defendants'
goal
11  were to prevent this kind of door-to-door
12  telemarketing scheme, wouldn't it be better to have a
13  video training where you could see the sales agents
14  and make sure that they matched the onboarding
15  documents, and record that training session?
16     A   Of course. I have made several proposals to
17  Richard Booth about beefing up our enrollment and
18  training processes. Richard Booth was rarely
19  available or rarely wanted to listen or would say,
20  "It's too expensive," or "Let's talk about it some
21  other day."
22      And those are generally discussions with
23  Richard. As soon as you would discuss some sort
24  of -- something of substance that requires him to
25  think, he will tell you, "Let's discuss it tomorrow,"

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

1  because he's already overwhelmed or perplexed or some
2  other things -- excuse my language.
3      Q   So you were aware of this scheme to disguise
4  telemarketing calls as door-to-door sales early on?
5      A   Yes.
6      Q   Before the -- okay.  So I have some, kind
7  of, practical questions about how that worked.
8          So that scheme requires a few things.
9  Presumably it requires the sales agents to spoof
10  appropriate GPS coordinates.  Is that correct?
11      A   Yes.
12      Q   Because they are -- when they're enrolling
13  customers via TPV, they need to have appropriate GPS
14  coordinates.
15      A   Yes.  Either that or they're hoping that
16  we're hopeless enough not to check.
17      Q   Well, nobody -- I mean, not even
18  Endurance's sales agents were that hopeless.
19          Where did they get the GPS data for those
20  enrollments?
21      A   You're referring to Defendants' agents?
22  Or -- or --
23      Q   Any sales agent that is performing this kind
24  of disguised -- telemarketing where it's disguised as
25  a door-to-door sales.

Page 54

1  that customer and say, "Hey, we've got a better plan
2  for you."  You know, "Now I'm going to transfer you to
3  a Spring representative so they can tell you all about
4  it."
5          So that's generally what we've seen happen.
6  So -- go ahead.
7      Q   Yeah.  I mean --
8      A   And we have been approached by different
9  sales channels that we even worked with in the past,
10  if we would want to purchase the customers that
11  they've enrolled in their previous campaigns.
12      Q   So they would essentially try to sell you
13  churned customers?
14      A   Or customers that would turn from whoever is
15  their current supplier to us.
16      Q   Right.  Stealing from their prior clients to
17  give to you?
18      A   Yeah.  Exactly.
19      Q   Yeah.  Did that work in both directions?  Do
20  you think that they stole your current customers to
21  sell their next client?
22      A   I wouldn't be surprised.  We have attempted
23  to monitor this for one of the sales channel in the
24  past.  But we didn't pick up anything unusual.
25          But then again, you know, a year later they

Page 56

1      A   It -- it's tough to determine.  I mean, I
2  don't know enough about I.T., but supposedly
3  it's -- there are even apps that will mask your IP
4  address that you can download onto your phone.  So
5  it's -- supposedly it's quite easy.
6      Q   Okay.  Where did they get the telephone
7  numbers for these --
8      A   In most cases what we've seen in the past --
9          THE OFFICER:  Sorry, you said "for
10  these" -- I didn't hear the last part of the question.
11  Sorry to interrupt.
12          MR. PRESTON:  Customers.
13          THE WITNESS:  Am I okay to answer?
14  BY MR. PRESTON:
15      Q   Yeah.
16      A   Okay.  So most cases these sales would have
17  been -- these sales would come -- the contact phone
18  numbers would come from previous campaigns.  In other
19  words, let's say as an example, MBM, it --
20  which -- let's just maybe focus on Endurance for a
21  second.
22          So let's assume that Endurance agents would
23  sell on a previous campaign.  And so they probably
24  retained all of that information of all the customers
25  that enrolled.  And so it's easier for them to call

Page 55

1  might have done the same thing, you know, so that we
2  didn't pay attention to.  But we were never able to
3  pick up on that.  Because we --
4      Q   Which sales channel was that?
5      A   That was -- that would have been Vinnie
6  Mac.  I don't remember -- he was -- he used to sell in
7  Maryland and Pennsylvania.  And the second one was
8  Jacob -- oh my god, again, I'm really bad with names.
9  So his first name is Jacob, and he was -- he
10  currently, I believe, owns a company called SunSea
11  Energy.
12          But both of -- both of those individuals
13  have sold for us as a door-to-door sales channels.
14  And both of them -- both of these individuals
15  were -- actually I think Jacob was fired because of
16  doing telemarketing and pretending to do door-to-door,
17  if I'm not mistaken.  I could be wrong.  And
18  Vinnie Mac was fired because his sales were just
19  fraudulent.
20      Q   Sorry, one more time?  I didn't hear that.
21      A   And then the second one, Vinnie Mac, was
22  fired because his sales were just fraudulent.
23      Q   So he's slamming?
24      A   Yes.
25      Q   Okay.

Page 57

15 (Pages 54 - 57)



**Page 58 (right column, lines 1-25):**

1  you learned through counsel.
2      But do you know why nobody tried to settle
3  this case if it's such a small company?
4      A  Well, Richard and I had these conversations
5  about providing we -- we both knew that it's a small
6  company.  And even Lisa Hawkins would say, "Well, if
7  we lose the case, I'm just going to bankrupt Spring
8  Power & Gas so no one is going to get anything out of
9  it."

                                              But Richard
14  and I have discussed providing financials of Spring
15  to -- to the plaintiff's counsel several times.
16      And I believe, you know, to my knowledge,
17  Richard had discussions with counsel, but that I don't
18  know about.
19      Q  Okay.  And I don't want to go too far down
20  that road.  But -- I think that this is not a case
21  that we should necessarily be blowing out the gaskets
22  for.
23      So I want to call your attention to
24  Exhibit 20.  Are you familiar with this document?
25      A  One second.  Exhibit -- it's an email

Page 60

**Page 59 (left column, lines 13-25):**

13      Q  Okay.  Okay.  That is a small company.  Do
14  you know if any effort to settle the Nock case has
15  ever been made?
16          MR. LECOURS:  Objection.
17      Ethan --
18          THE WITNESS:  I don't know.  Actually,
19  let me rephrase.  No.  I don't know of any efforts.
20  BY MR. PRESTON:
21      Q  Do you know why?
22          MR. LECOURS:  Objection to form.
23  Assert privilege.
24  BY MR. PRESTON:
25      Q  You should not provide any information that

Page 59

**Page 61 (right column):**

1  conversation from -- it's actually -- hold on one
2  second.  It's Orpheus and -- which is our previous
3  QA manager, sales manager, and Brian Ream.
4      Q  Okay.  And what are they discussing?
5      A  They are discussing these pretty much
6  fraudulent sales and the distance between United
7  States and Pakistan.
8      Q  So these are -- are these Endurance sales
9  agents?
10      A  Yes.
11      Q  Okay.  And these -- the email kind of
12  describes enrollment where the GPS data reflects
13  either a service address or a -- some of the GPS
14  coordinates indicate that somebody's in Pakistan;
15  correct?
16      A  Yes.  Yes.
17      Q  All right.  And --
18      A  Estimated distance between the sales agent
19  and the service address on the TPV call is
20  over 7,000 miles.
21      Q  Are you familiar -- like, did this
22  happen -- this kind of -- these kind of distance
23  issues where you're dealing with distances
24  over 2,000 miles or so --
25      A  Yeah.

Page 61

16 (Pages 58 - 61)

1     Q    Was this the only instance that you're aware
2  of?
3     A    No.
4     Q    Okay. What other instances were you aware
5  of?
6     A    There were instances with MBM, and then
7  there were some -- there were definitely several
8  others during the last few years.
9     Q    So did this happen with some regularity,
10  these kinds of distances in the GPS coordinates of
11  door-to-door sales?
12     A    There were two issues. One, in some cases
13  there was an issue with the TPV platform itself where
14  if I -- from what I hear -- and again, I don't -- I
15  never encountered this -- if an agent doesn't log out
16  correctly the previous day -- so you know, later on
17  the following day they can try to enroll somebody, you
18  know, from 200 miles away or, you know, they try to
19  enroll their uncle while on vacation in, let's say,
20  Florida. But those were far and few in between.
21        We have seen distance issues, and we
22  have -- the QA team was instructed to terminate
23  them -- terminate those sales. But I don't think any
24  other action was taken, to be honest. At least not
25  that I remember.

Page 62

1        But these were -- these were not super
2  regular, but they were frequent enough. I'd say a few
3  per month.
4     Q    Were there other instances where you'd have
5  distances of over 2,000 miles?
6     A    We definitely have had them. You know, I
7  cannot tell you which one and how and which sales
8  channel, but you know, I've pretty hands-on, so I do
9  remember seeing these frequently.
10     Q    Okay. But how frequently?
11     A    I'd say, at least, I was advised of two or
12  three in every given month.
13     Q    Okay. So there's two or three enrollments
14  where the -- excuse me, let me back up -- two to three
15  door-to-door enrollments where the GPS data shows a
16  distance between the sales agent and the service
17  address over 2,000 miles?
18     A    If not over 2,000 miles it was at least over
19  100 miles.
20     Q    Okay. And those kinds of incidents would
21  potentially reflect this scheme to disguise
22  telemarketing as a door-to-door sale?
23     A    Yes.
24     Q    Okay.
25        How are you feeling? Do you want to take a

Page 63

1  break? It's noon; it's lunchtime. People maybe want
2  to --
3     A    Up to you guys. I can probably go for
4  another hour before I need to take a break.
5        MR. LECOURS:  Maybe another half an
6  hour, Ethan, and then we take a lunch break? It's
7  1:00 here, so.
8        MR. PRESTON:  Yeah, that's fine. I
9  think that's great.
10  BY MR. PRESTON:
11     Q    All right. We've talked about slamming.
12  What's your understanding of the term "slamming" in
13  your industry?
14     A    In our industry slamming means that when a
15  sales representative hides the true details of the
16  product and sign up the customer under false
17  pretenses.
18     Q    So the scheme to disguise telemarketing as a
19  door-to-door sale, that's not slamming because you're
20  not lying to the customer about the nature of the
21  deal?
22     A    Right. That's even more severe. That's,
23  you know, fraud because, you know, we're responsible
24  for those -- we're responsible to comply with various
25  state regulations. We obviously have to comply with

Page 64

1  the DNC regulations. And it's a massive liability to
2  the business.
3     Q    Well, sure. And obviously you could have
4  somebody slamming during a door-to-door call, one of
5  these door-to-door telemarketing calls that would
6  misstate the nature of the deal.
7     A    Yes.
8     Q    Okay. But my understanding is
9  that -- well -- defendants tried to prevent slamming;
10  correct?
11     A    To a degree, yes.
12     Q    Okay. What about unauthorized enrollments
13  where the customer actually just never agreed to
14  this -- to enroll?
15     A    If the customer isn't complaining, we kept
16  the sale. So to a degree yes, we tried to comply.
17  But if there was no complaint then there was no harm
18  keeping the sale.
19     Q    Well, I'm going to reorient a little bit.
20  One of the things that Defendants have been consistent
21  with, and it shows in the documents that I've looked
22  at, Defendants really did try to ensure that customers
23  did not provide a non-fixed void telephone number
24  during the enrollment. Or if they did, they
25  definitely tried to make sure that they spoke with the

Page 65

17 (Pages 62 - 65)

1 customer. Is that right?
2    A   Yes.
3    Q   Why did they do that?
4    A   That was mainly to prevent slamming.
5 Because a lot of these sales reps, what they would
6 do -- the door-to-door sales reps -- they would just
7 create Google numbers.
8        Let's say, you know, they would create 10
9 or 15 phone numbers, phone number accounts, and then
10 if the customer said no, then they would go
11 outside -- they already had customer's details like
12 account number and address -- and then they would call
13 their buddy who would complete the TPV call and there
14 you -- you have a sale.
15    Q   So how did they get the customer's details?
16 Would that be during an attempted sale?
17    A   Well, they would -- yes. So there were two
18 types. In case of the actual door-to-door sales, they
19 would -- the customer would already provide them with
20 details. Or they would have details from a previous
21 campaign. And the same thing applied to the so-called
22 cross-selling, they would probably have the details
23 from a previous campaign.
24    Q   Okay. So some of these telemarketers
25 essentially kept records of prior enrollments. That

Page 66

1 see -- whenever a sale was blatantly obvious to be a
2 fraudulent sale or a slamming sale.
3    Q   Okay. Going back to Exhibit 20, do
4 you -- prior to this litigation did you have an
5 independent recollection of these events?
6    A   Yes.
7    Q   Okay. Did you look at this document to
8 prepare for this -- for the 30(b)(6) deposition?
9        MR. LECOURS: Objection.
10    A   I honestly don't remember.
11        MR. LECOURS: Objection to the extent
12 it's asking for things that were done in the presence
13 of counsel.
14        MR. PRESTON: Yeah, and I do want to be
15 careful here, because I don't want to traipse over the
16 attorney-client privilege that Defendants might be
17 asserting.
18        MR. LECOURS: It's also work product,
19 Ethan, I mean, to the extent you're asking what
20 documents he was shown.
21        MR. PRESTON: If you showed it to him.
22 If it's something that he looked at independently --
23        MR. LECOURS: Sure.
24        THE WITNESS: Just to answer your
25 question, yes, I'm familiar with this email.

Page 68

1 sounds like a sucker list to me.
2    A   Yes. Very often this happened in our cases,
3 as well. We would not deactivate vendors' profiles
4 for years after the campaign was over -- meaning the
5 TPV profile, so they had full access to their TPV
6 databases.
7        But you know, at the same time, they
8 received commission reports, and commission reports
9 included all of that information without the phone
10 numbers. So -- yeah, without the phone numbers.
11 So -- but the TPV records included the phone number.
12        I think at some stage I tried to limit the
13 information that -- the number of information that we
14 were sending off to sales channels, including limiting
15 the phone number. Some of them would complain,
16 so -- you know, threaten to quit sales. Others would,
17 you know, would just, you know, take it for what it
18 is.
19    Q   Did Defendants also compare the voice of the
20 customer during a QA call versus the verification
21 call?
22    A   Sometimes.
23    Q   Do you have a rough sense of how often that
24 happened?
25    A   I don't know. Whenever I would

Page 67

1 BY MR. PRESTON:
2    Q   Okay. So look at page 4. It's
3 the -- the 4 at the bottom, not the 4 in the PDF.
4    A   I see it.
5    Q   Okay. And so there's -- it's the third
6 paragraph from the bottom. "The second customer Cecil
7 Jerome was enrolled yesterday" --
8    A   Yes.
9    Q   You see that? Okay. And then it talks
10 about a follow-up call after the verification call.
11 And that -- my -- did Defendants make quality
12 assurance calls after the TPV verification process?
13    A   When permitted we would attempt, yes.
14    Q   Okay. Do you have a rough sense of how long
15 it took between the verification call and the QA call?
16    A   It could have been anywhere between three
17 hours and one week. It depends on staffing.
18    Q   Okay. And that would be based on your -- on
19 the defendants' workload at that time?
20    A   Yes.
21    Q   Okay. So look at the bottom paragraph.
22 There's a sentence that says "Our QA team has not
23 found any other agents with similar sales oddities ...
24 if other team members have conducted sales in a non-
25 compliant manner this should be halted immediately."

Page 69

18 (Pages 66 - 69)

CONFIDENTIAL

1     And so in that "similar sales oddities" is
2 she referencing the distances and the GPS coordinates?
3     A   Yes.
4     Q   Okay.  And do you know what other
5 enrollments that QA team looked at during this
6 process?
7     A   So I don't know, but I can tell you this,
8 that this language is language that I've created, and
9 it's generally used in response to every complaint.
10 In a response to complaint, particularly the
11 regulatory complaint, we use -- we have -- or we had,
12 I don't know what they do now -- you know, we had
13 certain templates that we used.
14     And one of the things that we would say is
15 that, you know, QA team has not found any other agents
16 with similar oddities, and that we were investigated
17 or have investigated or have audited.  But I honestly
18 don't believe these audits been done.
19     Q   Yeah, I want to show you a document, but
20 before I do I want to ask, so you -- this is canned
21 language that you developed over time?
22     A   Absolutely.
23     Q   Okay.  Where are those documents where
24 you've -- I mean, there's multiple drafts, I guess?
25     A   There will be multiple drafts.  There will

Page 70

1 be generally stored -- they should be stored in all
2 share drive -- I don't know -- I don't remember which
3 place.  But it would be in regulatory and compliance,
4 I believe.  And if not it would be under QA.
5     Q   Okay.  And this -- but the canned language
6 was really developed to deal with regulators --
7     A   Yes.
8     Q   Okay -- and not necessarily litigation?
9     A   Correct.
10     Q   Okay.  And so the -- this phrase -- the
11 second paragraph from the bottom it says "with the
12 information provided it seems clear that at least some
13 of this agent's door-to-door activity is not being
14 conducted at the customer residence, and as a result
15 his badge is now deactivated."  Is that also the
16 canned language that you had prepared?
17     A   Well, let's see.  I don't remember; to be
18 honest with you on this one.
19     Q   Okay.  How much of a distance in the GPS
20 coordinates should trigger a QA audit with the -- of
21 the policies that you're aware of --
22     A   At least 50 -- I think 50 meters and up.
23     Q   Okay.  Is that sort of an industry standard?
24     A   No.  That was our standard.
25     Q   Okay.  So the scheme to disguise door-to-

Page 71

1 door sales -- excuse me.  The scheme to disguise
2 telemarketing as door-to-door sales, that's an
3 industry-wide issue; correct?
4     A   Yes.
5     Q   All right.  And so you're -- this did not
6 start with Endurance; correct?
7         MR. LECOURS:  Objection to form.
8     A   Yes.
9     Q   Are other energy firms using this same sales
10 technique?
11     A   To my knowledge, yes.
12     Q   Okay.  So you would describe this, the
13 scheme to disguise telemarketing as door-to-door
14 sales, as sort of an open secret in the industry?
15         MR. LECOURS:  Objection.
16     A   Yes.  I believe so.
17     Q   And that was -- that's known to Defendants'
18 management prior to March 2021?
19         MR. LECOURS:  Objection.
20     A   Yes.
21     Q   Okay.  Do you know -- and maybe I asked this
22 already, but do you know which enrollments the
23 defendants -- the QA audit looked at respective of
24 this, that last paragraph on Exhibit 20?
25     A   I don't think they looked at anything, to be

Page 72

1 honest with you.  This is the standard language that
2 we used, and they might have found one or two and
3 then, you know, what they -- what they've done in the
4 past, and this is something that we have been
5 struggling with, is they write a lot of fluff that
6 means nothing in these emails, and they just send them
7 over.  So I don't think, honestly, anything was done
8 here.
9     Q   Okay.  I'm going to pull out in front of
10 you -- real briefly, if you can pull out Exhibit 21.
11     A   Sure, one sec.
12         MR. LECOURS:  Ethan, can we just agree
13 that my standard objection to use of attorney-made
14 exhibits applies?
15         MR. PRESTON:  Yeah.  And I mean, if
16 there's any question about -- so this is from a
17 distance report that you guys produced to us.  And
18 you'll see that the names -- it includes the names of
19 the customers that are in Exhibit 20, that email chain
20 that we were discussing previously.  And it just has a
21 sampling of that -- the distance report where you can
22 see the actual GPS coordinates and the distances
23 involved.
24 BY MR. PRESTON:
25     Q   Do you see that?

Page 73

19 (Pages 70 - 73)

1    A   Yes, I can.  I do.
2    Q   Okay.  Do you want to go look at
3  Exhibit 105, that's the distance report, and you can
4  compare it yourself and make sure that I've done it
5  correctly?
6    A   Hold on.
7       So yeah, I see.  Any -- yeah, looks -- looks
8  good to me.
9    Q   Okay.  Yeah, it -- my hope is that it's
10  entirely accurate, but you know.  So that's all fine.
11       Let's look at Exhibit 23.
12    A   Okay.  I see 23.
13    Q   Yeah, and so Exhibit 23 is a set of GPS
14  coordinates for a different set of customers.  And
15  you'll see these enrollments occur much earlier than
16  the enrollments referenced in -- or at least some of
17  them do -- the exhibit -- the enrollments in
18  Exhibit 23, some of them are much earlier than the
19  enrollments in Exhibit 21.
20    A   Yes.  Yes.
21       MR. LECOURS:  Objection to form.
22    I see that, yes.
23    Q   Okay.  And so if you go back to Exhibit 105
24  you can see there's a spate of enrollments with
25  distances of 7,000 miles that happened in, you know,

Page 74

1  March 29, 2021; right?
2       MR. LECOURS:  Objection to form.
3    A   Yes.
4    Q   Okay.  So if the defendants had looked at
5  the data or the enrollments for all of Endurance's
6  enrollments, they would have found these distances?
7    A   Yes.
8    Q   It suggests to me that -- those distances
9  suggest that these enrollments were done via
10  telemarketing; correct?
11    A   Yes.
12    Q   And they just didn't spoof the GPS
13  coordinates correctly?
14    A   That seems to be the case, yes.
15    Q   Do you know if they -- if the defendants
16  were aware of these -- the enrollments -- well, let me
17  rephrase.
18       Do you know if the defendants were aware of
19  the distances reflected in the enrollments shown on
20  Exhibit 23?  That spate of earlier enrollments with
21  the Pakistani GPS coordinates?
22       MR. LECOURS:  Objection to form.
23    A   I believe yes.
24    Q   Okay.  Who would they have been aware of all
25  that?

Page 75

1    A   Myself, QA people, Richard Booth, at least.
2    Q   Okay.  Were they aware at the time of the
3  enrollments?
4    A   They were not aware of Endurance's
5  intentions at the time of these particular
6  enrollments, but they were aware of it at least
7  48 hours afterwards.
8    Q   So some of these enrollments are on
9  March 29, 2021, and you're suggesting by
10  March 31, 2021, they were aware?
11    A   I would say so, or whatever the next
12  business day would have been.
13    Q   Okay.
14       MR. LECOURS:  Objection.
15  BY MR. PRESTON:
16    Q   So you know, one of my questions is why
17  didn't Defendants find the enrollments reflected in
18  Exhibit 23 during the QA process, and I think your
19  answer is they didn't actually look.  Is that right?
20    A   That would be my assessment, yes.
21    Q   Okay.  Would Defendants have terminated
22  Defendants -- excuse me.  Would Defendants have
23  terminated Endurance if they had known about the
24  enrollments and the distances in the GPS coordinates
25  for the enrollments in Exhibit 23?

Page 76

1    A   Probably not.
2    Q   And that's based on your interactions and
3  history with Mr. Booth and the general function of the
4  companies?
5    A   Yes.
6    Q   Okay.  All right.  So I want to play an
7  exhibit.  This is Exhibit 155.
8       (Audio played.)
9       All right.  So that sounds like a
10  verification call made by TPV --
11    A   It would appear so, yes.
12    Q   Somebody has been enrolled?
13    A   Yes.
14    Q   Okay.
15       (Audio played.)
16       So --
17       (Audio played.)
18       All right.  So the verifier from TPV.com
19  asks her whether or not the -- asks the customer
20  whether or not the sales agent was at her residence at
21  the time of the enrollment.  Did you hear that?
22    A   Yes.
23    Q   Okay.  And the customer responds, "Nope,
24  they weren't here."  Did you hear that?
25    A   Yes, I did.

Page 77

**Page 78**

1  Q   And then the verifier says, "We're going to
2  mark this call as customer needs clarification."  Did
3  you hear that?
4  A   Yes, I did.
5  Q   Okay.  Why is the call marked "customer
6  needs clarification"?
7  A   I don't know.  This call should have been
8  immediately escalated up the chain, and it should have
9  been brought to our attention immediately.
10     Also, there was scripting that we've
11 produced which was generally reviewed by me and
12 approved by Richard Booth or -- again, at the time I
13 didn't know Lindsay was an inside counsel or corporate
14 counsel, Lindsay's role was the regulatory manager, so
15 she would review and approve all scripting as well.
16 So Lindsay pretty much had the final say.
17     So there was language added that if there is
18 a suspicion of fraud these calls need to be canceled
19 immediately and forwarded to us for review.
20 Q   Okay.  So this suggests AnwerNet's involved
21 in -- by marking the call as "customer needs
22 clarification," it enables the sales agent to attempt
23 to reenroll the customer and have the customer
24 essentially state, "No, the person met with me in
25 person during the enrollment."

**Page 79**

1  A   Yes.
2      MR. LECOURS:  Objection to form.
3  BY MR. PRESTON:
4  Q   So by marking it as "customer needs
5  clarification," it enables the defendant -- or the
6  sales agent to multiple opportunities to coach the
7  customer through the verification process?
8      MR. LECOURS:  Objection to form.
9  A   Correct.  And if you look at the
10 records -- TPV records -- you will find that -- maybe
11 not in this case but in many other cases -- multiple
12 attempts would have been done for the customer to
13 actually finally say the right things or confirm the
14 right things.
15 Q   Okay.  So I want to open up Exhibit 181.
16 A   I'm sorry; which exhibit?
17 Q   181.
18 A   Sure.  It's slow.
19     MR. LECOURS:  What was the number,
20 Ethan?
21     MR. PRESTON:  181.
22     THE WITNESS:  I got it.
23 BY MR. PRESTON:
24 Q   Okay.  So this is a deposition -- a portion
25 of a deposition transcript from AnswerNet, which

**Page 80**

1  purchased TPV.  Do you know who AnswerNet is?
2  A   Yes.
3  Q   Okay.  What's AnswerNet's relationship to
4  TPV.com.
5  A   I believe they've acquired TPV.com, or they
6  could be their parent company at this point in time.
7  I don't -- I'm not quite sure which one applies, but
8  one of them does.
9  Q   Okay.  So a successor in interest to
10 TPV.com?
11 A   Correct.
12 Q   Okay.  So let's go to page 106 of the
13 deposition.
14 A   Okay.
15 Q   Sorry, 102 of the deposition.
16 A   Okay.
17 Q   And you'll scroll up -- so let me clarify.
18 So scroll up to page 100.  You'll see that I'm playing
19 Exhibit 155, so the same recording that you heard;
20 okay?  And then scroll down to page 102.
21 A   I see it.
22 Q   Okay.  And then on line 19 -- starting on
23 line 19 --
24 A   Yes.
25 Q   I asked "Why did she mark it as customer

**Page 81**

1  needs clarification?"  And Mr. Pudles testified "that
2  would've been the rule the client told us to do when
3  the door-to-door client -- the door-to-door person
4  wasn't there."  Do you see that?
5  A   I see it.
6  Q   Okay.  And do you know how that rule was
7  communicated to AnswerNet?
8  A   I don't know.  We had specific instructions
9  at the time that in case of a possible fraud they are
10 to communicate these things to us.  They should have
11 marked this as -- as no sale, tell the customer to
12 call the customer service team, and basically -- and
13 marked this as -- and flag it as fraud.
14 Q   Okay.  And they didn't, obviously, at
15 least in this case.
16 A   They didn't.
17 Q   Yeah.
18     MR. PRESTON:  All right.  I'm going to
19 mark a new exhibit, Exhibit 206.
20     (Exhibit 206 was marked for
21     identification.)
22 BY MR. PRESTON:
23 Q   I'm going to upload this, and you'll have
24 it in maybe 30 seconds.  Yeah, there it is.
25 A   Is it uploaded yet?

1    Q   Yeah.
2    A   Okay. Let me refresh.
3    Q   So --
4    A   Okay. I see it.
5    Q   This is an email from AnswerNet to myself
6  and Mr. Wilson. And it -- attached to that is an
7  Excel spreadsheet, which is reproduced in Exhibit 206.
8  Do you see that -- H4?
9    A   I see it.
10    Q   Okay. Do you recognize this spreadsheet?
11    A   Yes. That would have been document created
12  by AnswerNet that would transpose all of our TPV
13  requirements.
14    Q   Okay. And then go down to page 4, and
15  there's a code -- code 3. Do you see that? I'm
16  sorry, no, code 4.
17    A   Customer needs clarification. Okay.
18  "Customer does not understand or is unable to complete
19  the verification without questions being answered."
20  And "fraud indicator -- no." That should have been a
21  yes. And I'm pretty certain that the document that
22  I've reviewed and approved would have a yes right
23  here.
24    Q   So there's another document --
25    A   I believe Spring Power & Gas should have a

Page 82

1  copy of the document that was sent to -- was sent to
2  TPV.com or AnswerNet with, you know -- because our
3  documents look completely different.
4    Q   So there should be another document that
5  discusses the customer needs clarification?
6    A   Yes. Yes. Or maybe not another document
7  but should be a TPV document that was created by
8  Spring and forwarded over to TPV.com for
9  implementation.
10    Q   The description for the "customer needs
11  clarification" disposition that you just read does not
12  seem to cover, at least in my mind it doesn't cover, a
13  situation where the sales agent was not at the door.
14    A   Yes.
15    Q   So is there a document that exists that
16  expressly covers a situation where the sales agent is
17  not at the door under the "customer needs
18  clarification" disposition?
19    A   There should be a document that explains
20  when the verifier needs to raise the fraud indicator.
21  Maybe it's a different document from this. And it has
22  been created for RRH, both Kiwi and Spring, and should
23  be somewhere with the defendant.
24    Q   All right. So I want to scroll back up to
25  the very first -- sorry, the second page, because

Page 83

1  we've got an exhibit sheet on that. And you'll see
2  the attachments under the email header. Do you see
3  that?
4    A   Go to which -- the first page, you said?
5    Q   Yeah. Page 2 of the PDF where you can see
6  the header information, the from, to, date, subject,
7  attachment?
8    A   Yes, I see it. Okay.
9    Q   And then so the attachment name is Spring
10  Digital-RES-DTD-MD_PA_NJ, and then there's a date.
11  And then at the very, very end there's a 1 in
12  parenthesis. Do you see that?
13    A   Yes.
14    Q   And so that looks like --
15    A   Another version.
16    Q   Right. There's another version out there
17  that we don't have.
18    A   That would seem to be the case. The naming
19  convention is actually similar to what I would use.
20  But yeah, this -- again, I don't know what this is.
21  This is not document that I --
22    Q   This can't be the only document that covers
23  that "customer needs clarification" disposition;
24  correct?
25    A   Correct. There has to be more to it. I'm

Page 84

1  pretty sure of it. I mean, we have been very critical
2  of third-party verification and them making mistakes.
3  As a result there were several documents that I would
4  put together and ask to be implemented.
5    Q   Okay.
6    A   There were also ad hoc emails between us and
7  TPV.com regarding, you know -- regarding TPV
8  processes. We often would -- because they would not
9  follow our rules, so we often would run a sort of a
10  spot check by listening to a couple of verifications.
11    Q   Okay. What other documents do you think are
12  out there that would cover this "customer needs
13  clarification"?
14        MR. LECOURS: Objection.
15    A   I don't remember. But I do know that QA
16  would have processes of when, and documents outlining
17  processes of when, you know, there's a possibility of
18  a fraudulent sale, misleading or misrepresenting or
19  slamming.
20    Q   Okay.
21    A   There should be -- on that.
22        THE OFFICER: Sorry, "there should
23  be" --
24        THE WITNESS: A lot more
25  communications -- email communication on this.

Page 85

Page 86

BY MR. PRESTON:

1  BY MR. PRESTON:
2  Q   Do you know if the defendants ever collected
3  information about customers who had cognitive decline
4  or mental cognitive disabilities?
5  A   I don't think the defendants have collected
6  the information. But if an account -- if a customer
7  account would have an issue like that, a notation
8  would have been made on that particular account.
9  Q   What if a family member had intervened to
10 prevent an enrollment of an elderly potential
11 customer?
12 A   We would not -- there was no process that we
13 would store any of that information. Feedback would
14 be sent -- probably feedback would be sent to the
15 sales channel if the sales channel was still working
16 for us, and that was pretty much it.
17 Q   Okay. Can I have you look at Exhibit 56?
18 A   I have it.
19 Q   Okay. What is this document?
20 A   This is an auto-generated TPV confirmation.
21     MR. LECOURS: Ethan, what number are we
22 on? Sorry.
23     MR. PRESTON: Exhibit 56.
24     MR. LECOURS: Thanks.
25 //

Page 87

1  BY MR. PRESTON:
2  Q   Okay. So the customer's name is ████
3  ████?
4  A   Yes.
5  Q   Do you see that?
6  A   I do.
7  Q   Okay. And you see that service address is
8  ████████████?
9  A   Yes. Yes. Yes.
10     THE VIDEOGRAPHER: Hey Greg, you put
11 your cup in front of the camera.
12     THE WITNESS: Oh. Sorry about that.
13 BY MR. PRESTON:
14 Q   All right. So I'm going to play
15 Exhibit 195.
16     (Audio played.)
17     All right. And so you heard her give the
18 same number as it shows up in Exhibit 56?
19 A   Yes.
20 Q   Okay.
21     (Audio played.)
22     All right. And so that sounds like a
23 verification call to ████████ and she gave the
24 same address that shows up in the TPV record; correct?
25 A   Yes.

Page 88

1  Q   Okay. All right. So we're going to next
2  roll on -- make sure I got this -- Exhibit 196.
3     (Audio played.)
4     He says his name is Tevan [ph]; right? Did
5  you hear that?
6  A   Yes.
7  Q   It could be Kevin but maybe also Tevan [ph]?
8  Do you want to hear it again?
9  A   Sure. Yes please.
10    (Audio played.)
11 Q   All right. Did you hear it better that
12 time?
13 A   Still it was a little muffled. I'm not
14 quite sure -- something with Tevan [ph], Kevin --
15 Q   Yeah.
16    (Audio played.)
17    Hold on. I'm going to fast forward. Okay.
18 And then she provides the same address Exhibit 195;
19 correct?
20 A   Yes.
21 Q   Okay.
22 A   So it's pretty clear that the sales rep,
23 whoever -- you know, the Kevin person -- has got her
24 information from an old campaign. Because phone
25 number matches, the address didn't, so just corrected

Page 89

1  the address, and I'm assuming sent it off to
2  verification.
3  Q   Yeah. Yeah. I just -- I want you to listen
4  to the last part of this so we get her name.
5     (Audio played.)
6     All right. And so she gives the same name
7  as the prior recording, 195?
8  A   Yes.
9  Q   Okay. I'm going to fast forward a little
10 bit further on.
11    (Audio played.)
12    So he says he's calling from Pepco --
13 A   It's a slamming -- it was a slamming
14 indicator right in the very beginning of that call
15 when they said that -- to check eligibility. There's
16 no such thing as eligibility. That's a -- that's a
17 slamming technique that -- you know, that -- that
18 everybody uses.
19 Q   They're tricking them into thinking they've
20 been selected for something and that, like, no, this
21 is the same offer they're going to provide to
22 everybody.
23 A   Right. There's no such thing as
24 eligibility. The only person that is not eligible is
25 a person, I think, and it depends on the state, who is

23 (Pages 86 - 89)

1  receiving some sort of a public assistance.
2      Q    Okay.
3           (Audio played.)
4           All right.  So this a different voice on the
5  other end of the --
6      A    Yes.
7      Q    Right?  It's somebody younger, and she says
8  that she's -- identifies herself as Christine
9  Mcclanaham's daughter?
10     A    Yes.
11     Q    Okay.
12          (Audio played.)
13          So she's saying that the mother doesn't want
14  her company switched.  Did you hear that?
15     A    Yes, I did.
16     Q    Okay.
17          (Audio played.)
18          So it sounds like he's essentially vowing to
19  switch the account without --
20     A    Without her permission, yes.
21     Q    Yes.  All right.
22          THE VIDEOGRAPHER:  Also, I don't know
23  if you saw that chat, but if we can look for a break
24  when possible.
25          MR. PRESTON:  I think that's -- I have

Page 90

1  one more document to get in front of Mr. Hasiak before
2  we broke, but I can also go now.
3          THE VIDEOGRAPHER:  All right.  Okay,
4  let me get us off, and then we'll talk about it.
5          Time is 12:55 p.m.  We're off the
6  record.
7          (Off the record.)
8          THE VIDEOGRAPHER:  We're back on the
9  record.  Time is 12:56 p.m.
10 BY MR. PRESTON:
11     Q    I want you to look at Exhibit 156.
12     A    All right.
13     Q    So is a commission report.
14     A    156, okay, got it.
15     Q    Yeah.  All right.  So this is a
16  commission -- or a residual report; correct?
17     A    Hold on, maybe I'm --
18          MR. LECOURS:  156, I believe, is a
19  recording.
20          THE WITNESS:  A recording.
21          MR. PRESTON:  I am wrong.  You're
22  absolutely right.  It's Exhibit 136.
23 BY MR. PRESTON:
24     Q    Can we get that in front of you?
25     A    Okay.

Page 91

1      Q    Sorry.
2      A    Okay.  Yeah.
3      Q    All right.  So this is a residual report
4  that went to Endurance?
5      A    Yes.
6      Q    And so I want to call you down to page 3,
7  the last line.
8      A    Uh-huh.
9      Q    So this is as of -- based on this document
10  is it fair to say that as of October 31, 2021,
11  ███████ was still a paying customer of the
12  defendants?  Is that correct?
13     A    Yes.  Yes.
14     Q    Okay.  And Mr. Booth would have approved any
15  commission paid to Mr. Ream; correct?
16     A    Yes.  That would be -- he would have the
17  final approval, so yes.
18     Q    So this -- the residual that's being earned
19  here, which obviously isn't a lot --
20     A    Well, actually, if you -- if you take a
21  look, I mean, it's a negative balance which offsets
22  any cancellations or any claw backs that took place.
23     Q    Sure.  That's right.  There's a claw back.
24  But if you look at the top of page 2 it's a residual
25  commissions due $5 --

Page 92

1      A    That is correct.  So yes, 100 percent
2  correct.
3      Q    They're still earning a residual -- Mr. Ream
4  is still earning a residual on ███████ as
5  of October 31, 2021?
6      A    Yes.
7      Q    And Mr. Booth would have approved that
8  residual?
9      A    Yes.
10     Q    Okay.  That is the end of my discussion.  I
11  think we should break and circle back.  How long do
12  you need, Mr. Hasiak?
13     A    You guys, you tell me.  I've reserved all
14  day for this.
15     Q    As have I.  I don't mind if we do
16  30 minutes.  I don't mind if we do an hour.  We can't
17  go longer than an hour because I know people are on
18  the East Coast.
19          MR. LECOURS:  Unless people need more
20  time to get food, I mean, 30 minutes is usually
21  enough.
22          MR. PRESTON:  Okay.  Great.  Let's do
23  30 minutes.
24          THE WITNESS:  So 30 minutes.
25          MR. PRESTON:  1:30?

Page 93

24 (Pages 90 - 93)

1    MR. LECOURS:  Sounds good.
2    MR. PRESTON:  All right.
3    MR. LECOURS:  1:30 Central, yeah?
4    THE VIDEOGRAPHER:  Time is 1:10 --
5    (Off the record.)
6    THE VIDEOGRAPHER:  Back on the record.
7  Time is 1:39 p.m.
8  BY MR. PRESTON:
9    Q    All right.  Did Defendants have any rules
10  for filtering out enrollments that were in zip codes
11  that had not been provided to the local state
12  regulator?
13    A    They did, but I don't think they were
14  followed.
15    Q    Well, where were those rules?
16    A    -- three states, I think -- or maybe two.  I
17  don't remember right now.  I'm pretty sure Maryland,
18  state of Maryland has a rule that you're supposed to
19  provide ahead of time which zip codes you're going to
20  be soliciting.  And same thing applies to Ohio.  Maybe
21  Pennsylvania -- I don't know -- I don't remember right
22  now.
23    Q    Where was that policy written down?
24    A    When I originally implemented the policy
25  that policy was written on SharePoint.  But it is

1  possible that SharePoint was just -- not to repeat how
2  SharePoint operates, but very often some information
3  may be overwritten, although this shouldn't happen.
4    Q    Was it, like, a Word document or --
5    A    No.  It was an html, part of -- SharePoint
6  is sort of, like, a Microsoft application that will
7  allow you to -- sort of like -- almost, like, a data
8  bank with --
9    Q    Okay --
10    A    -- work as, you know, different policies,
11  different procedures would be stored there -- so for
12  easy access to the agents and the rest of the
13  management team.
14    Q    Okay.  Would you be surprised to
15  learn -- let me rephrase.
16    Are you aware of any instances where
17  Endurance enrollments were not in the areas disclosed
18  to the Maryland regulator?
19    A    I wouldn't be surprised, no.
20    Q    Okay.  Do you know what the phrase
21  "impossible travel" means?
22    A    No.
23    Q    Okay.  Were defendants aware of GPS spoofing
24  in 2021?
25    MR. LECOURS:  Objection to form.

1    A    I -- yes, they were.
2    Q    Okay.  I want to backfill a little bit to
3  address, I think, the objection.
4    What is GPS spoofing?
5    A    It's when the -- well, I don't want to say
6  perpetrator -- but when a party tries to disguise the
7  true IP address with the fake one.
8    Q    Well, that's IP spoofing.  I'm talking about
9  GPS spoofing.
10    A    Oh, yes, I apologize.  I'm sorry.  Pretty
11  much the same thing, where somebody is trying to
12  change the actual location of where they are located.
13    Q    Okay.  So it's -- they're falsifying GPS
14  data?
15    A    Correct.
16    Q    Okay.  And they -- Defendants were aware of
17  GPS spoofing in -- being a possible vulnerability in
18  the TPV records --
19    A    Yes.
20    MR. LECOURS:  Objection to form.
21  BY MR. PRESTON:
22    Q    In 2021?
23    MR. LECOURS:  Objection to form.
24    THE OFFICER:  Sorry, what was the
25  answer?  I didn't hear it.

1    THE WITNESS:  I'm sorry.
2    Ethan, can you repeat the last question
3  again?
4  BY MR. PRESTON:
5    Q    Sure.
6    A    I think you said something.
7    Q    Were Defendants aware of the possibility of
8  spoofing GPS data in TPV records by 2021?
9    MR. LECOURS:  Objection.
10    A    Yes.
11    MR. PRESTON:  Dan, what's the
12  objection?
13    MR. LECOURS:  You asked if Defendants
14  were aware.  He's a personal -- he's not a
15  representative of the company.  You can ask about what
16  his personal knowledge was.  You can ask about
17  information that he may have had that suggests another
18  person had knowledge.  But to ask him what the
19  defendants' knowledge were is not a proper question.
20    MR. PRESTON:  Okay.
21  BY MR. PRESTON:
22    Q    Was Richard Booth aware of GPS spoofing in
23  2021?
24    A    To my knowledge, yes.
25    Q    Okay.  How do you know that he was aware of

1  GPS spoofing?
2      A   Going back to previous discussions about
3  slamming, fraud, et cetera, this was a very common
4  subject during the energy marketing conferences,
5  internally, and you know, it wouldn't have been the
6  first incidents.  There were, here and there,
7  incidents that we've suspected GPS spoofing but maybe
8  were not able to prove it.
9      Q   Okay.
10         I'm going to need to join again because I
11  need to share a screen.  But I -- if you -- I can turn
12  your attention to Exhibit 68.
13     A   That's the Spring automated enrollment
14  confirmation; correct?
15     Q   Right.  So this is the -- it shows an
16  enrollment for a person named ████████
17     A   Yes.
18     Q   All right.  And then you see the IP address
19  there?
20     A   Yes.
21     Q   Okay.  Hopefully I can get in here.  All
22  right.  So I'm trying to join the meeting because I
23  want to share my screen with you on a small thing.  So
24  that IP address is 195.181.168.36.  Do you see that?
25     A   Yes.

Page 98

1      Q   Okay.  All right.  Okay.  So now I'm going.
2  So you can see I've got the screen up there.  Oh,
3  that's not going to work.
4         THE OFFICER:  There is an echo, sir.
5         MR. PRESTON:  Yeah, I know.  Okay.  So
6  that should work better.
7  BY MR. PRESTON:
8      Q   And now you can see the screen.  And I'm
9  going to take this IP address, and I'm going to run a
10  "who is" command on that IP address.
11         THE VIDEOGRAPHER:  Mr. Preston, as the
12  videographer, does this need to be recorded, this
13  screen share?
14         MR. PRESTON:  It would be nice.
15         THE VIDEOGRAPHER:  Okay.
16  BY MR. PRESTON:
17     Q   So I've run a "who is" on the IP address
18  used for the ████████ enrollment in Exhibit 68,
19  and it corresponds to DataCamp Limited in London.  Is
20  this an appropriate IP address for a door-to-door
21  enrollment in Maryland?
22         MR. LECOURS:  Objection to form.
23     A   No.
24     Q   What does this IP address suggest to you?
25     A   It suggests fraud.

Page 99

1      Q   What kind of fraud?
2      A   It suggest a telemarketing fraud.
3      Q   Why?
4      A   Because the customer's in Maryland, so we
5  would expect the IP address to be in Maryland.  Or at
6  the very least, somewhere in the United States.
7      Q   Right.  And so you would expect to see a
8  U.S. IP or ISP provider --
9      A   Correct.
10     Q   Maybe there, like, a Comcast which would
11  provide a hard line or maybe you'd see a cellular
12  carrier; right?
13     A   Right.  Yes.
14     Q   But instead it seems to show a --
15     A   The other issue with this enrollment is,
16  just by looking at it off, you know, glancing at it,
17  is the email address.  I mean, the email address is
18  most definitely fake.  Because no one has an email
19  address with 123456@hotmail.com, so.
20     Q   Yeah.  I'm also going to tell you -- and we
21  don't need to get into it because I've done it before,
22  but the service address is an office building.
23     A   Oh, okay.
24     Q   And so my suggestion to you is that this
25  person lied to the enrollment -- lied to the sales

Page 100

1  agent -- but this IP address, it shows a data center
2  in the UK; correct?
3         MR. LECOURS:  Objection to form.  Move
4  to strike Counsel's testimony.
5  BY MR. PRESTON:
6      Q   Does this IP address reflect a data center
7  in the United States?
8         MR. LECOURS:  Objection.
9      A   No.
10     Q   Does this IP address reflect a data center
11  in Europe?
12         MR. LECOURS:  Objection.
13     A   Yes.  In the United Kingdom.
14     Q   Does this look like a VPN to you?
15     A   Very possible.
16     Q   Did Defendants have any policies prohibiting
17  their sales agents from using VPNs during enrollment?
18     A   I don't know.
19     Q   Did Defendants have any policies prohibiting
20  the use -- prohibiting enrollments with the IP address
21  reflected of a possible VPN?
22     A   Yes.
23     Q   Okay.  What was that policy and when did
24  it --
25     A   We did have a general policy which dates

Page 101

26 (Pages 98 - 101)

1  back, I'd say, at least six years.  And since then it
2  was -- it was probably amended from time to time.
3  Again, I don't have the documents, or I wouldn't know
4  what it is right now.
5        One of the things that the policy talks
6  about is IP address.  So if the IP address does not
7  match, the sale needs to be canceled, the incident
8  needs to be reported immediately to management, and
9  the proper audit needs to be conducted.  Sales channel
10  needs to be suspended or canceled, depending on
11  severity.
12     Q   Okay.  What's the name of that -- the
13  document containing that policy?
14     A   I don't remember at this time.  It would be
15  part of our QA sales audit policies.
16     Q   Okay.  Do you know where it would have been
17  stored?
18     A   It would have been stored under sales
19  channel onboarding in the -- in the channel -- sales
20  channel folder.  Or possibly under regulatory and
21  compliance folder somewhere.
22     Q   So Defendants had a policy to screen for VPN
23  usage during enrollments as early as 2018?
24     A   You know, tough to say.  I don't remember.
25  But it was at least for a couple of years we

Page 102

1  not an IP address was a VPN?
2        MR. LECOURS:  Objection to form.
3     A   I believe yes.
4     Q   Okay.  I want to pull your attention to
5  Exhibit 207.
6        (Exhibit 207 was marked for
7            identification.)
8     A   One second.
9     Q   This is a historical Ekata webpage -- Pro
10  Insight -- did Defendants use Pro Insight to perform
11  the screening function?
12     A   I know we used Ekata, so we probably
13  used -- so whatever the functionalities were, we
14  probably have used them.
15     Q   Okay.  And if you look at the top of the
16  first -- the top of the second page -- there's a
17  screenshot of a template of a Ekata report.  And it
18  shows an analysis for an IP address?
19     A   Yes.
20     Q   And so it -- was this the service that
21  Defendants were using to screen for VPN address in
22  2021?
23     A   Yes.
24     Q   Okay.
25     A   I believe yes.  I don't remember

Page 104

1  have -- we were supposed to do this.
2     Q   Did defendants have a policy requiring them
3  to screen for VPN usage before 2021?
4     A   I'd say yes.
5     Q   Okay.  And there's a set of documents that
6  you would look at to see and confirm that answer?
7     A   Yes.
8     Q   Okay.  How were defendants supposed to
9  screen for VPN usage?
10     A   So as mentioned before, they -- we were
11  supposed to, at the time, any enrollment that came in,
12  let's say today, would be screened tomorrow before we
13  enrolled them into the system.  Whether that happened
14  or not I don't know.  There were -- from now what I
15  see is many, many times we did not follow the process.
16  I don't know what for reasons.
17     Q   Well, sure.  But what technology did the
18  defendants use --
19     A   Oh, sure.  So to my knowledge we used Ekata,
20  which would help us to identify anything from a -- the
21  IP address to phone number, email.  And I believe
22  later there was another system that we were using.  I
23  don't remember the name of it.
24     Q   Okay.  So in 2021 the defendants should have
25  been looking at Ekata reports to evaluate whether or

Page 103

1  exactly -- oh, wait.  I do remember that we might have
2  used -- or at least the -- one of the channel -- I
3  mean, the channel manager or QA manager had an access
4  to somebody else Ekata's login.  So maybe that was
5  used then.
6        But shortly after we've purchased a
7  membership.  I just don't remember the exact date.
8  Although it was --
9     Q   -- Ekata creates historical reports that you
10  can go back and look?
11     A   That, I don't know.  I don't know if it
12  creates historical reports.
13     Q   Okay.  So there was a policy to screen for
14  VPN usage?
15     A   Yes.
16     Q   In 2021?
17     A   Yes.
18     Q   Do you remember the name of the document
19  containing that policy?
20     A   I don't remember.  It was definitely a sales
21  audit or something related to sales audit.
22     Q   Okay.  And would it be in the all share?
23     A   It would be in the all shared drive, yes.
24     Q   Would it be, like, a Word document or --
25     A   It would have been -- in this case I'm

Page 105

27 (Pages 102 - 105)

1 pretty sure it would be a Word document.
2    Q   Okay.
3        Can we look at Exhibit 76?
4    A   I see it.
5    Q   Okay.  So this is an email chain between you
6 and Brian Ream and Amanda Miranda --
7    A   Yes.
8    Q   In December 2021; right?
9    A   Yes.
10    Q   And it looks like the defendants were in the
11 process of potentially rehiring Endurance in December
12 of 2021?
13    A   Correct.  Yes.
14    Q   Were Defendants really worried about the
15 events of the telemarketing disguised as door-to-door
16 sales as shown in Exhibit 20 if they were going to
17 rehire Endurance several months later?
18        MR. LECOURS:  Objection.  Objection.
19    A   Okay.  So even if -- let me phrase this
20 differently.
21        I -- even though we had some basic -- even
22 though I had basic communications with Endurance at
23 that point in time, I refused to give them a contract
24 based on what happened in the past.  And I
25 communicated similarly to -- similar in full to
Page 106

1 Richard Booth.  I believe there must be an email --
2    Q   So --
3    A   -- to that effect.
4    Q   So --
5        THE OFFICER:  "I believe" -- I didn't
6 hear the rest of it.
7        THE WITNESS:  I believe that there's
8 another email regarding this.
9 BY MR. PRESTON:
10    Q   Sure.  Let's look at Exhibit 146.
11    A   You said 146?
12    Q   I did.
13    A   All right.  I see it.
14    Q   So this is you asking if you -- if
15 Defendants wanted to bother rehiring Brian Ream.  And
16 it's dated January 2023.  Do you see that?
17    A   Yes.
18    Q   Why was Ream under consideration even?
19    A   He wasn't.  Or at least not with me.
20 Whenever a prospective sales channel or someone who
21 does sales reaches out to me, my job is to communicate
22 this with Richard Booth and then make a decision on
23 whether we want, you know -- again, whether we want
24 them to sell for us or whether we even want to have a
25 discussion.
Page 107

1    Q   Did Richard Booth want to rehire Endurance?
2    A   I didn't give him the opportunity to say yes
3 or no.  I told him I -- I pretty well remember that I
4 told him I would not rehire them.
5    Q   Okay.
6        Can we look at Exhibit 201?
7    A   Okay.  I see it.
8    Q   And the very last part of page 2.  So
9 this -- it looks like an email chain with MBM?
10    A   Yes.
11    Q   It reads -- part 1 of the email reads: "What
12 does the following rejection reason mean?  Rejection
13 Code: MAX-Description: Maximum number of
14 Enrollments/Drops reached."
15        Do you see that?
16    A   Yes.  It depends on the state.  But this
17 implies that we have sent too many transactions,
18 whether they were enrollments or drops, and pretty
19 much the utility system will not recognize any
20 additional -- any additional enrollments from us.
21        So we might have attempted to enroll a
22 customer three or four times, but before they
23 were -- but because they were already with another
24 supplier or the utility, that simply came back as a
25 rejection reason.  I mean, after X number of tries,
Page 108

1 you know, the system will say, you know, "That's it.
2 You're done."
3    Q   Do you have a sense of how many enrollments
4 in a billing cycle it would take for a consumer's
5 enrollment to get rejected for this reason?
6    A   So this would have -- this would have been
7 done over the course of about six weeks.  So I don't
8 know, but I'd say if it's probably more than five,
9 six -- this is when you're going to get that rejection
10 reason.
11    Q   If a customer's enrolling with five or six
12 different -- well, it doesn't have to be different
13 supply companies.  But if a customer enrolls five or
14 six times in the space of six weeks, does that suggest
15 that the customer might not be in charge of their
16 affairs?
17    A   That is correct.
18    Q   It's a sign of potential cognitive decline
19 of the client?
20        MR. LECOURS:  Objection.
21    A   Possibly.
22    Q   Okay.  So the defendants have produced a
23 series of internal Do Not Call lists to us.  Can you
24 explain the differences between those call lists or
25 where they came from?
Page 109

28 (Pages 106 - 109)

1    A    Would you mind showing me those documents?
2    Q    Okay. So I'm going to try to share my
3    screen. So the first one we got -- and I guess I'll
4    just start marking these because I'm going to be using
5    them.
6              MR. PRESTON: So this is Exhibit 208
7    which we got sometime in 2023.
8              (Exhibit 208 was marked for
9              identification.)
10   BY MR. PRESTON:
11   Q    Do you see that?
12   A    I do.
13   Q    I want to show you something that I'm trying
14   to understand. So we're going to sort by number, and
15   you'll see that some numbers show up multiple times.
16   I'm going to represent to you that although there's
17   about 1,100 entries in the list, that I don't know
18   that there's more than 400 telephone numbers in
19   this -- in Exhibit 208.
20   A    This doesn't look like the DNC list that we
21   would maintain. But at the same time -- okay. But at
22   the same time, we did a pretty sloppy job at
23   maintaining DNC list or lists.
24   Q    How many lists did Defendants have?
25   A    Well, there was -- at one point in time we

Page 110

1    wanted to have the entire DNC list in -- in
2    Orion [ph], the CRM. And I think the QA manager had
3    made a mistake and they were just uploading the entire
4    US Do Not Call list onto Orion [ph], for what reason I
5    don't know.
6              What we're looking at right now is not a
7    list that was generated by the system. It's a list
8    that was put together by probably a few different
9    people.
10   Q    So when was this list put together?
11   A    I'm assuming for the purposes of
12   this -- this action, at some time.
13   Q    How was it put together? Do you know?
14   A    Well, I would think probably looked at a
15   couple of different documents -- you know, just piled
16   the phone numbers together, and it was it.
17   Q    And so --
18   A    Removed, probably -- because we did have a
19   list that was sort of a combination of phone numbers
20   for both Kiwi Energy and Spring Power & Gas, so if we
21   are not seeing any 718 phone number or 212, that means
22   that those numbers were removed from this list.
23   Q    Okay. So this is an artificial list that
24   was created for the purposes of litigation?
25   A    Seems to me, yes.

Page 111

1    Q    Okay. Do you know who prepared this list?
2    A    I -- definitely wasn't me, so -- somebody
3    probably on the customer service side.
4    Q    Okay.
5    A    But who, I would be speculating. I don't
6    know.
7    Q    Okay.
8              Hold on. What's my exhibit number -- so
9    we're at 208. Upload another one -- this is the
10   production data.
11             MR. PRESTON: So Exhibit 209 I'm going
12   to mark, and this is the DAT file entry for
13   Exhibit 208 that was -- when it was produced to us.
14             (Exhibit 209 was marked for
15             identification.)
16   BY MR. PRESTON:
17   Q    Do you recognize this name, Stephen Goeghan?
18   A    Yes.
19   Q    Okay. Was he involved in Defendants' Do Not
20   Call list?
21   A    Stephen Goeghan was very critical of our
22   mishandling, so sometimes he would take on a project
23   to fix it or to improve it.
24   Q    Do you know why he would have put together
25   the internal Do Not Call list that we received?

Page 112

1    A    I'm assuming he was asked. Because whatever
2    was being produced looks like -- look like -- you
3    know, colloquially speaking, like garbage.
4    Q    So is it the case that telephone numbers
5    were removed from the internal Do Not Call list that
6    was produced to us?
7    A    Yes. Yes. Because it would have to contain
8    Kiwi Energy's phone numbers.
9    Q    And they don't?
10   A    It doesn't seem to me.
11   Q    Okay. All right. Do you know why Roland
12   Camunas's number isn't on any of the DNC lists that we
13   received?
14             MR. LECOURS: Objection, foundation.
15   A    I'm assuming because of our sloppiness.
16   Q    Can we look at Exhibit 49?
17   A    I wouldn't know what that means. Oh, "and
18   place QA cancel" -- that means to place a note that an
19   account was cancelled per Quality Assurance
20   instructions.
21   Q    Okay. What is the adult DNC?
22   A    Wouldn't know -- I truly wouldn't know what
23   it -- what this means. This seems like a little bit
24   of gibberish.
25   Q    Okay. So we've received a variety of

Page 113

29 (Pages 110 - 113)

**Page 114**

1 national Do Not Call lists from the defendants.
2 Meaning the calculation lists that are maintained by
3 the FTC. And there's been an ongoing dispute as to
4 which of those call lists is the correct one for the
5 time period in question. Do you know which DNC list
6 is correct?
7   A  I wouldn't know. Unfortunately, no.
8   Q  Did Defendants have a Do Not Call list in
9 2021 -- March 2021?
10   A  Since I was there at the time, we should
11 have had a -- DNC call list. But again, as far as -- it
12 appears it wasn't updated. Because there's always
13 somebody calling and wanting to be removed from our
14 calling list, whether it's an existing customer or
15 just a recycled phone number that we've accidentally
16 called.
17   Q  Okay. Do you know how you would go about
18 finding the correct Do Not Call lists?
19   A  I would start with -- I would start with
20 David Salazar's emails. Then -- or his local shared
21 files. Or Tom Sheehey would be the next person.
22 Again, with his emails or his file folders from his
23 computer.
24     That's what I would start looking, because I
25 do remember vaguely that we've had too many

**Page 115**

1 incomplete, or several incomplete, Do Not Call lists
2 here and there. So no one really knew which one was
3 right or correct one, at least from what I can
4 recollect.
5   Q  Okay. So there's some unclear record
6 keeping as to, you know --
7   A  Yes.
8     MR. PRESTON: Okay. Make sure -- I
9 don't have any more questions on direct. I may have
10 questions on re-direct. So I'll reserve some time
11 there, but I'm finished in the first instance.
12     MR. LECOURS: How about we take a five-
13 minute break, and I'll start.
14     MR. PRESTON: Okay.
15     THE VIDEOGRAPHER: Time is 2:21 p.m.
16 We are off the record.
17     (Off the record.)
18     THE VIDEOGRAPHER: Back on the record.
19 Time is 2:34 p.m.
20     EXAMINATION
21 BY MR. LECOURS:
22   Q  Good afternoon, Mr. Hasiak.
23   A  Good afternoon.
24   Q  We haven't had any conversations since your
25 employment ended with Defendants; right?

**Page 116**

1   A  Yes.
2   Q  Yes, you have not?
3   A  Yes, I have not.
4   Q  Okay. You recently resigned from your
5 employment with Spring Energy. Isn't that right?
6   A  That is not right.
[redacted]
11   Q  Okay. And is it your position that didn't
12 constitute a resignation?
13   A  That is -- that is my position.
14   Q  Okay. And you've also stated via telephone
15 with Richard Booth that you resigned. Is that
16 correct?
17   A  That is not correct.
18   Q  So you're denying that you said that?
19   A  Yes.
20   Q  Okay. In connection with your email,
21 whether it's a resignation or something else, isn't it
22 true that you made a number of demands of Defendants?
23   A  That is not true.
24   Q  How would you characterize it?
25   A  Can you define "demand"?

**Page 117**

1   Q  Well, if there's another word you're more
2 comfortable with in characterizing the items raised in
3 your email --
4   A  Well, I was discussing the fact that the
5 company owes me a ton of money and that Richard Booth
6 personally owes me money. Are -- are these the items
7 you'd like me to discuss?
8     Or do we want to go into further of how I
9 housed Richard when we had -- he had no place to stay
10 and when he was arrested for allegedly beating up on
11 his wife? So we can go that route if you'd like to.
12 I'm happy to.
13   Q  I'm just asking if you made requests or
14 demands or whatever you want to characterize it as in
15 that email. That's literally my only question for
16 you.
17   A  Okay. So --
18   Q  Yes or no?
19   A  I have asked for what is due to me. Now, if
20 you want to characterize this as demand, then sure,
21 that's your prerogative. But I'm going to say no.
22   Q  Okay. So you made requests, your phrase,
23 and isn't it right that at least some of those
24 requests were denied by Defendant?
25   A  Most of them, yes.

30 (Pages 114 - 117)

CONFIDENTIAL

1    Q   So I take it from your tone you're upset, at
2  the current moment, with Defendant?
3    A   Are we discussing the tone, or can we move
4  onto the actual merits of this?
5    Q   No, I'm asking you if you're currently upset
6  with Defendants and Richard Booth?
7    A   I'm a little upset.  Why would I be upset?
8  They're great people.
9    Q   Okay.  Have you verbalized any threats to
10 harm Defendants' business and Richard Booth?
11   A   Why would I do that?  I own part of the
12 company.
13   Q   Are you saying that you never said any sort
14 of verbal threats?
15   A   No.  Of course not.
16   Q   Okay.
17       What is Roundbox?
18   A   It's a call center that services RRH and
19 Arrow.
20   Q   Is that a company you formed or something
21 else?
22   A   Yes, at Richard's request.
23   Q   Isn't it true that Roundbox started doing
24 business for Defendants, and that you didn't disclose
25 your interest in the company?

Page 118

1    A   That is not true.
2    Q   Isn't it true that this dispute -- or
3  regarding Roundbox -- is one of the items that's been
4  discussed between you and Defendants since your
5  employment ended?
6    A   It is true.
7    Q   Okay.  Isn't it true that not one of the
8  issues you raised in any of your communications lists
9  any discomfort with serving as a class representative?
10   A   That is not true.
11   Q   When did you raise your discomfort at
12 serving as a class representative?
13   A   Several times before my termination.
14   Q   When and to whom?
15   A   Richard Booth.  I don't remember exact
16 dates.  You've got -- I mean the defendants have cut
17 out my access to my Teams and my email.
18   Q   Were those concerns raised?
19       MR. PRESTON:  I think I'm going to
20 object on foundation.
21 BY MR. LECOURS:
22   Q   Were those concerns raised --
23       MR. PRESTON:  I don't think -- he's not
24 here as a class rep.
25       MR. LECOURS:  Ethan, you asked about

Page 119

1  it, and he said -- he alleged that we suborned
2  perjury.  So we're going to respond and ask questions
3  about it.
4        MR. PRESTON:  Yeah, I understand that.
5  But he wasn't here as -- he's not here as a class rep.
6        MR. LECOURS:  You can state your
7  objection -- state your objection for the record, and
8  we're going to move on.
9        MR. PRESTON:  But there's no
10 foundation.
11       MR. LECOURS:  Okay.  Objection to form.
12 Let's move on.
13 BY MR. LECOURS:
14   Q   Question is when did you raise that concern?
15   A   As I said, several times verbally with
16 Richard Booth.  I don't remember exact time.
17   Q   Did you ever raise it in writing?  You've
18 mentioned not having Teams access or email access.
19 Did you raise it through those media?
20   A   I believe so.  I'd have to go and look.
21   Q   Okay.  So you don't have a specific
22 recollection of having it raised in those forms?
23   A   No specific date.
24   Q   Do you have any recollection of having
25 communicated those concerns via email or Teams

Page 120

1  message?
2    A   As you are aware -- or maybe that's a wrong
3  one, I'm sorry.  Richard's instructions were very
4  clear not to use any issues that potentially might
5  create liability to -- you know, to put them in a
6  traceable form, meaning email or Teams or anything
7  else, even though there were several instances where
8  certain information was communicated that way.  That
9  was extremely frowned upon.
10   Q   When was that communicated to you, not to
11 put things in writing?
12   A   When was what communicated to me?
13   Q   You said there was a -- that was Richard's
14 policy or --
15   A   Richard's policy was not to communicate
16 information that could potentially create a liability
17 for the company.  So this was one of those instances.
18 And except for very few instances, majority of it was
19 communicated verbally.
20   Q   Would you agree with me that there's none of
21 the writings or other communications that you've had
22 with Defendants or Richard Booth mention this
23 discomfort you allegedly had with testifying as a
24 class rep?
25   A   Again, I would not agree.  I don't have

Page 121

31 (Pages 118 - 121)

CONFIDENTIAL

1  access to my email. So yes, I'm not going to agree.
2  Q   I'm asking about the emails and
3  communications you've had since your employment ended.
4  A   There were other issues to discuss. So no,
5  we did not discuss this class action.
6  Q   You didn't bring that up. All right.
7  You were the director of operations at the
8  defendants' various companies as of 2021, 2022; right?
9  A   In title only, yes.
10  Q   You were the person responsible for the
11  sales channels. Isn't that right?
12  A   In title only.
13  Q   What does that mean?
14  A   That means that ultimately Richard Booth has
15  the final say on everything.
16  Q   You signed a contract with TIPS. Isn't that
17  right?
18  A   I signed many contracts. On -- you know,
19  based on Richard's blessing, for lack of a better
20  word.
21  Q   You were authorized to sign -- enter those
22  contracts by Richmond Road Holdings; correct?
23  A   That is correct.
24  Q   Are you familiar with the TIPS contract?
25  A   Vaguely.

Page 122

1  A   Repeat the question again?
2  Q   Strike it. Withdrawn.
3  Once TIPS stopped providing opt-in calls
4  they were terminated. Isn't that right?
5  A   No.
6  Q   When did the relationship with TIPS end?
7  A   About a year-plus after signing of the
8  agreement.
9  Q   Do you know the date?
10  A   I don't.
11  Q   And do you know when the agreement was
12  signed?
13  A   It must have been prior to the -- hold on
14  one second. Actually, I'm sorry; I don't remember.
15  It was around the same time as the Nock case. But no,
16  I don't remember the exact date.
17  Q   Okay. What was the reason TIPS was
18  terminated?
19  A   At my request. I refused to work with them,
20  and they have not -- we've received some complaints,
21  some final complaints. And they were very unwilling
22  to provide the actual opt-in records. I believe that
23  was the reason --
24  Q   No one stepped in your way -- you know, you
25  were allowed to act in your role as director of

Page 124

1  Q   Would you agree with me that the TIPS
2  contract provided for opt-in marketing?
3  A   I would agree.
4  Q   And I believe you earlier testified that
5  TIPS was required to keep the opt-in calls.
6  A   Yes.
7  Q   And they were required to provide those
8  regularly to Defendants and upon request?
9  A   Yes. Yes.
10  Q   Would you agree with me that there's not a
11  single document reflecting a concern that that the
12  opt-in calls received from TIPS were not legitimate?
13  A   I wouldn't agree because, again, I don't
14  have access to that information.
15  Q   Are you familiar with ever having seen a
16  single document that expressed that concern?
17  A   I'm sure have raised it, whether it's in
18  text message, Teams, or possibly even in an email.
19  Q   When?
20  A   I don't remember. I mean, as I said before,
21  I mean, you're asking me something that I don't have
22  access to. So how can I possibly tell you when?
23  Q   Okay. You think you may have mentioned that
24  these calls weren't legitimate, but you can't point to
25  any specific time or instance of a document?

Page 123

1  operations and make that decision to terminate that
2  agreement; correct?
3  A   Well, you'd be stupid to step in in my area
4  at that point in time.
5  Q   They didn't though; right?
6  A   No. Not in that particular moment, you're
7  right. He had no choice. We're talking about Richard
8  Booth.
9  Q   All right. Shifting gears to Endurance.
10  Are you familiar with the contract with Endurance?
11  A   Yes.
12  Q   Would you agree that Endurance was not
13  allowed to do any telemarketing?
14  A   I agree.
15  Q   And they weren't allowed to assign the
16  contract?
17  A   They weren't allowed what?
18  Q   They were not allowed to assign the contract
19  without consent of Defendants?
20  A   Well, let me take you on a little memory
21  lane --
22  Q   No, I'm asking -- Greg, with respect, my
23  question is did the contract provide that Endurance
24  was not allowed to assign the contract?
25  A   So was the other contract, yet they did.

Page 125

32 (Pages 122 - 125)

1    And we didn't do anything about it.
2        Q    And this was the only contract you ever had
3    with Endurance; right?
4        A    We only had one contract with Endurance to
5    my knowledge.
6        Q    Okay.  And Endurance was required to
7    supervise their agents under that contract; correct?
8        A    It was a boilerplate agreement, and that
9    same rule applied to everybody else.  And yes, it
10   applied to Endurance as well.
11       Q    Okay.  And did you ever know, during the
12   Endurance contract term, that Endurance sales and
13   marketing assigned any portion of their contract to
14   any other company or person?
15       A    We would assume they would.
16       Q    What does that mean?
17       A    That means that myself, Richard Booth, and
18   everybody in the company knew that every sales channel
19   would assign their contracts, yet we would put -- we
20   would have a -- what's the term called -- blind eye?
21   You know, and we would not pay too much attention.
22           What do you think MBM is doing?  They've got
23   a couple of subcontractors.  The company in Maryland
24   is -- I'm sorry, not in Maryland, in Ohio -- is not
25   really MBM.

Page 126

1        Q    Is there a difference in your mind between
2    sales teams and having a subcontracted separate
3    entity?
4        A    No -- well, I'm telling you that there's a
5    difference about having sales team because if a sales
6    team is under separate agreement with, for example,
7    TIPS or MBM and -- in that matter, that means they are
8    subcontracting and not telling us; right?  And you
9    knew about it.  I mean, I hope Richard showed you --
10       Q    Well, I just want to clarify.  So if you
11   have a door-to-door channel that has more than one
12   sales team and they -- and Defendants have consented
13   to them having more than one sales team, that's not an
14   assignment that's happening without authorization, is
15   it?
16       A    Right.  Unless they're paying different
17   entities, different corporate entities; right?
18       Q    Do you have any reason to believe that
19   there's different corporate entities involved?
20       A    When it comes to MBM, absolutely yes.
21   Because we were very intimately knowledgeable about
22   how they operate, including Richard Booth.
23       Q    Let's focus back on Endurance.  Have you
24   ever heard -- spoken to or heard of anyone associated
25   with Lonestar Marketing Group?

Page 127

1        A    No.  Not at all.  Actually, as a matter of
2    fact, Endurance -- we knew that they were going to
3    subcontract because that's the nature of how Brian
4    Ream operates.  But as long as they provide us sales
5    that we don't have to worry about, I mean, we didn't
6    care.
7        Q    Why bother putting this in the contract that
8    they're not allowed to assign?
9        A    Plausible deniability.
10       Q    So you didn't know about Lonestar.  Is that
11   your testimony?
12       A    I did not know, no.
13       Q    Okay.  How about Neil St. Louis, other than
14   the fact that he was, you know, an Endurance door-to-
15   door agent?  Did you have any other knowledge about
16   Neil St. Louis?
17       A    No, not me personally.  No.
18       Q    Okay.  Have you ever heard of an individual
19   named Mohsin Abdul Jabbar?
20       A    Yes.
21       Q    What's your knowledge of this person?
22       A    Oh, actually, no.  I -- I -- can I take it
23   back?  My previous -- Neil St. Louis, though, pretty
24   much energy sales crooks, that's the -- that's the
25   opinion the industry has about them.  And no one

Page 128

1    would --
2        Q    They're fraudsters; right?
3        A    Say it again?
4        Q    They're fraudsters; right?
5        A    Yes.
6        Q    So they defrauded Defendants; correct?
7        A    Yes.
8        Q    Upon learning that enrollments from
9    Endurance had GPS data that indicated the discrepancy
10   between the location of the sales agents, customer,
11   and service location, isn't it true that Defendants
12   did not simply sit by and allow Endurance to make
13   further enrollments?
14       A    That is not true.
15       Q    So when it was discovered isn't it true that
16   first Neil St. Louis was discontinued; correct?
17       A    Yes.
18       Q    Okay.  And sales were cancelled; correct?
19   That had --
20       A    I'm not sure if all sales were cancelled.
21   Some at least.
22       Q    I didn't ask you about all sales; I asked
23   you if sales were cancelled.
24       A    Some sales were cancelled.
25       Q    After Endurance sales agents were

Page 129

33 (Pages 126 - 129)

1 deactivated, they were never reactivated. Isn't that
2 right?
3    A   Yes.
4    Q   Subsequent to Neil St. Louis, the rest of
5 the team was deactivated; correct?
6    A   Eventually, yes.
7    Q   That was about approximately six weeks after
8 the campaign had begun?
9    A   Yes.
10    Q   And after that date isn't it true that
11 Endurance never did any more work for Defendants?
12    A   Yes.
13    Q   You testified earlier that Spring was aware
14 in early March 2021 of enrollments that had GPS
15 discrepancies. Do you remember that testimony?
16    A   Yes.
17    Q   What's the basis for that statement?
18    A   I was looking at an exhibit, if you recall,
19 and there were sales that were completed with the GPS
20 that was far away; right? Unless I'm talking about
21 something else.
22    Q   Are you aware of anyone, including yourself,
23 at Spring that looked at the transaction data that was
24 shown to you, you know, within a day or so of those
25 sales?

Page 130

1 responsibilities shared with Richard Booth.
2    Q   And what did you do to make sure that
3 happened?
4    A   Well, I wanted to hire more people but
5 obviously -- well, not obviously -- I wanted to hire
6 more people because we very often found ourselves
7 struggling, but money was not in the budget, so I was
8 denied adding additional staff.
9    Q   So sitting here today you talked a lot about
10 what the policy, in your mind, was. But can you
11 testify that anybody actually looked at those -- the
12 TPV data in late March 2021 and saw the GPS
13 discrepancy?
14    A   They should have been -- at least myself and
15 Richard were looking at them.
16    Q   Can you say that anybody actually looked at
17 it?
18    A   I don't know.
19    Q   All right. You testified earlier about
20 Millennium Brilliant Minds [ph]. Do you remember
21 that?
22    A   I do.
23    Q   Do you recall there being an issue that came
24 to the attention of Defendants just before July 4th
25 in 2022 where there was some similar GPS discrepancy

Page 132

1    A   We have a point of looking at transaction
2 data on a daily basis. On a daily basis there is a
3 report generated and has been. On the daily basis of
4 myself, Richard Booth, and pretty much everybody else
5 on the QA team or customer service team would have
6 been alerted to certain things.
7    Q   Who's the document generated by?
8    A   Oftentimes it was just a phone call, just a
9 Teams call or a conference call or -- or just regular
10 telephone call, or perhaps an email.
11    Q   You mentioned a report. I'm just asking you
12 who generated the report.
13    A   So when I say -- when I refer to a report, I
14 means that somebody either gave us a verbal report and
15 generally that information would come back from either
16 customer service or QA.
17    Q   Okay. Who was -- at what frequency was QA
18 downloading transaction data from TPV.com?
19    A   They were required to look at it live.
20    Q   When you say live what does that --
21    A   Meaning every few hours logging in to
22 TPV.com and just eyeballing the enrollments.
23    Q   And in your role were you ensuring that they
24 did live -- engage in those steps?
25    A   That would have been part of my

Page 131

1 that came up through the TPV process? Do you remember
2 that?
3    A   I do.
4    Q   And do you recall there being a group of
5 sales agents referred to as the 9,000 series -- the
6 8,000 series, rather?
7    A   Sure. Yes.
8    Q   And is that -- you know, 8,000 series, 2,000
9 series, is that how Defendants sometimes referred to
10 MBM's sales teams?
11    A   I don't know -- I don't know. But in this
12 case, it seems like yes.
13    Q   Okay. So you'd agree with me, when there's
14 documents that refer to the 8,000 series or the 3,000
15 series, they're talking about sales teams with MBM?
16    A   Yes.
17    Q   Okay. Would you agree with me that after
18 this issue came to a head, you know, and to Defendants
19 attention right before July 4, 2022, the entire 8,000
20 series was deactivated, and all of the sales were
21 cancelled?
22    A   I don't remember that one. But if you tell
23 me, then yes.
24    Q   I'm not telling you. I'm asking for your
25 memory.

Page 133

34 (Pages 130 - 133)

| | |
|---|---|
| 1    A   I don't remember. I'm sorry. | 1    understaffed QA team, with very minimal resources that |
| 2    Q   Is that a no? | 2    the management would not allow for, so I don't know |
| 3    A   I don't remember. | 3    how much of this was actually done the right way and |
| 4    Q   Okay. | 4    how much of it wasn't. |
| 5        You were asked questions about Wendell | 5    Q   But you don't know that there was an effort |
| 6    Freeman. Do you remember that? | 6    made to cancel -- investigate and cancel enrollments |
| 7    A   Yes. | 7    made by Wendell Freeman? |
| 8    Q   He was a sales agent for one of the MBM | 8    A   There was an effort made, yes. |
| 9    sales teams. Do you remember that? Is that right? | 9    Q   Are you aware of any evidence of GPS data |
| 10   A   Yes. | 10   showing call center agents, let's say over 2,000 miles |
| 11   Q   The issue raised regarding his enrollments | 11   away, were ever seen before Endurance by Defendants? |
| 12   was not that enrollments were being made via telephone | 12   A   Yes. |
| 13   call calls to customers. Is that right? | 13   Q   Who? |
| 14   A   Not necessarily, no. | 14   A   I don't know. I mean -- |
| 15   Q   You don't -- do you agree with me, or do you | 15   Q   Well -- |
| 16   think I stated it wrong or something else? | 16   A   We've had incidents like these happen on a |
| 17   A   I disagree with you. | 17   weekly and definitely monthly basis. And I'm saying |
| 18   Q   Okay. What was the issue in your mind? | 18   there were a lot of them. You know, there was a |
| 19   A   I don't remember right now. | 19   handful on a monthly basis. |
| 20   Q   Okay. But would you agree with me that the | 20   Q   It was a handful or it was every month? |
| 21   documents reflecting the contemporaneous complaints | 21   A   Handful on a monthly basis. |
| 22   are more accurate than your memory currently about | 22   Q   And to the extent those aren't reflected in |
| 23   that issue? | 23   any of your emails, do you have any explanation for |
| 24   A   All I remember about -- what's his | 24   that? |
| 25   name -- can you remind me the agent's name? | 25   A   I don't know. |
| Page 134 | Page 136 |

| | |
|---|---|
| 1    Q   Wendell Freeman. | 1    Q   So if there's no discussion of those |
| 2    A   Wendell Freeman. | 2    incidents in your emails would you think perhaps it |
| 3    Q   Wendell Freeman. | 3    happened either less frequently or maybe your memory's |
| 4    A   All I remember about Wendell Freeman that he | 4    incorrect? |
| 5    has conducted several sales which some of them were | 5    A   You're asking a really loaded question. If, |
| 6    where he was receiving $25 from somebody in Pakistan | 6    when, and how -- how the hell should I know? Okay. |
| 7    or splitting the money with. And as a result we | 7    Right now I'm telling you I don't remember, so take it |
| 8    wanted to cancel him. But Richard and -- Richard | 8    and move on to the next question. |
| 9    Booth and the management of MBM decided to give him | 9    Q   All right. Other than MBM and Endurance, |
| 10   another chance. Hence, I communicated to our team | 10   can you name any other vendors where this issue came |
| 11   that we were giving him another chance. | 11   up? |
| 12   Q   The thing you just said about Pakistan, is | 12   A   Oh, sure. First one would be Jacob whatever |
| 13   that something you've seen in any document? Or -- | 13   the guy's name is -- SunSea Energy. Second one would |
| 14   A   I don't know if it's Pakistan -- somewhere, | 14   be Vinnie Mac. And there probably was -- Watts |
| 15   you know, offshore. | 15   Marketing, I believe -- sounds familiar -- there might |
| 16   Q   So do you recall seeing any reference to any | 16   have been a couple of incidents that took place. But |
| 17   sort of offshore telemarketing -- Wendell Freeman? | 17   again, if you show me the list of all the vendors, I |
| 18   A   I don't remember. I'm sorry. | 18   can pretty much point you to which one to look at. |
| 19   Q   Isn't it true that the enrollments that | 19   Q   And when you say "this issue," I'm |
| 20   Wendell Freeman entered were investigated, and those | 20   specifically asking about GPS data over 2,000 miles. |
| 21   that were believed to be fraudulent were canceled? | 21   A   Right. So yes, so if you can show me list |
| 22   A   Possibly. | 22   of the vendors, I'll gladly point you to the ones |
| 23   Q   Do you have any reason to doubt that that's | 23   that -- |
| 24   the case? | 24   Q   Is it your testimony that those vendors |
| 25   A   We had a very sloppy QA team, an | 25   that -- had GPS data that you saw with agents 2,000 |
| Page 135 | Page 137 |

1 miles away from the customer?
2     A    Maybe it was 1,000 miles away, maybe it was
3 200 miles away.  But yes, the distance issue has been
4 a recurring issue.  And I believe right now we have
5 put some -- failsafes in places to make sure that, you
6 know, it -- every one of those instances being
7 alerted -- that an alert is sent to us.
8     Q    When you say "we" you mean Defendants;
9 correct?
10     A    Me as the customer service/QA team at the
11 time.
12     Q    All right.  Do you recall you were asked
13 questions about the "customer needs clarification"
14 code that TPV.com used?
15     A    Yes.
16     Q    And you said there were other versions of
17 the instructions that had used -- that had marked that
18 "customer needs clarification" code as a fraud
19 indicator.  Do you remember that testimony?
20     A    Yes.
21     Q    Would you be surprised to learn that in none
22 of the other documents was this code used as a fraud
23 indicator?
24     A    I would be very surprised, actually.
25     Q    Okay.

Page 138

1     A    And again, I'm not sure what documents
2 you're looking at.  So if you'd kindly point me to
3 those documents, I'll tell you who they belong to.
4     Q    We looked at one version of the document
5 that TPV.com's attorney had attached that had a list
6 of codes that could be used to designate particular
7 customer calls.  Do you remember that?
8     A    So I looked at a list that was
9 generated -- that produced by the third-party
10 verification TPV.com, yes.  But I --
11     Q    And you had testified, I believe, correct me
12 if I'm wrong, that the naming -- the nomenclature that
13 was used to name that file was similar to what you
14 would have named it?
15     A    Yes.
16     Q    Do you have any reason to believe that's not
17 the document that was provided to TPV.com by
18 Defendants?
19     A    Our documents had -- looked completely
20 different.  This looks like a document produced by the
21 TPV company -- at least it looks to me.
22     Q    Do you have any reason to believe that
23 TPV.com agents didn't just use the "customer need
24 clarification" code as a mistake?
25     A    I'm sure that's a possibility.

Page 139

1     Q    You said they made mistakes regularly;
2 correct?
3     A    Yes.  So it's a possibility.
4     Q    All right.  Prior to this deposition have
5 you had any communications with Plaintiff's counsel?
6     A    Yes.  Regarding scheduling.
7     Q    Anything else?
8     A    I mean, what would you like to know?
9     Q    How many times did you communicate with him?
10     A    We probably had a couple of emails -- a
11 couple of unrelated to this action.  And we were on
12 the phone twice or three times.
13     Q    How long were you on the phone?
14     A    Total time, I'd say under two hours.
15     Q    Two hours total or each call?
16     A    Total.
17     Q    Okay.  Did you -- did any of those
18 communications occur before your last day as an
19 employee at Defendants?
20     A    No.  Since Lisa Hawkins said that I owe
21 company about $60,000, so I've decided to send an
22 email copying Richard Booth to Plaintiff's counsel
23 requesting a deposition because I was worried that
24 Lisa Hawkins is going to charge me additional money
25 for scheduling of this deposition.

Page 140

1     Q    Did you ever exchange text messages with
2 Plaintiff's counsel?
3     A    Not that I remember.  Maybe about -- hold
4 on, I did ask -- maybe about scheduling a time or day
5 to call.  That's pretty much it that sticks -- text
6 messaging.
7     Q    What was the nature of what was
8 discussed -- you mentioned over those two-hour
9 calls -- two-hour call, rather?
10     A    We talked 25 minutes about elections.
11     Q    What did you discuss about either Defendants
12 or this case?
13     A    Very basic, actually.  Information.  I -- I
14 mean if you ask me a specific thing, I'm happy to tell
15 you, but nothing that would infringe on client-
16 attorney privilege.
17     Q    Did you discuss anything in advance of
18 Defendants' 30(b)(6) deposition that was being handled
19 by Richard Booth?
20     A    No.
21     Q    Did he ask you any sort of questions he
22 should ask?
23     A    No.
24     Q    Did you receive any documents from
25 Plaintiff's counsel?

Page 141

36 (Pages 138 - 141)

1    A   Yes.
2    Q   What documents?
3    A   I don't know.  Hold on, let me take a look.
4  Let me see -- the subpoena.  And I've received notice
5  of -- okay, I already said that.  I also received a
6  copy of Richard Booth's deposition.
7    Q   Were there any substantive discussions in
8  any of these emails?
9    A   Nothing of substance, no.
10    Q   All your substantive conversations happened
11  over telephone?
12    A   Not really.
13    Q   You had two hours of non-substantive
14  discussions?
15    A   Just like I told you, we talked about
16  25 minutes about politics -- or maybe less -- voting,
17  I should say, not politics --
18    Q   Interesting timing to make new friends.
19    A   Yeah.
20         MR. LECOURS:  All right.  I have no
21  further questions.
22         THE WITNESS:  Great.
23         MR. PRESTON:  We're going to need to
24  pause.  I think probably even give us 10-15 minutes.
25  I need to consult with my co-counsel and consider re-

Page 142

1  direct.  I hope everybody can stay on the line.  But
2  we're close.
3         Does that work for everybody?  We can
4  go off the record --
5         MR. LECOURS:  You need 15 minutes?
6  Really?  Let's just get this done, Ethan.
7         MR. PRESTON:  It might be less than
8  that, but I do need to talk to Jeremy.
9         MR. LECOURS:  All right.  I'll stay on
10  the screen.
11         MR. PRESTON:  Okay.
12         THE VIDEOGRAPHER:  Time is 3:06 p.m.
13  We're off the record.
14         (Off the record.)
15         THE VIDEOGRAPHER:  We're back on the
16  record.  Time is 3:17 p.m.
17         EXAMINATION
18  BY MR. PRESTON:
19    Q   Good afternoon, Mr. Hasiak.
20    A   Good afternoon.
21    Q   I just have two more questions.
22         You had said during your cross-examination
23  that Neil St. Louis was known as a fraudster in the
24  industry?
25    A   Yes.

Page 143

1    Q   What kind of fraud?
2    A   We didn't know exactly what kind of
3  fraud -- or I didn't know exactly what kind of fraud.
4  We knew that that individual would be -- submitted
5  fraudulent sales.  So we -- or at least I knew that
6  his sales are going to be bad news.
7    Q   Okay.  And you knew that at the time
8  Endurance was hired?
9    A   Yes.
10    Q   Did anybody else know that at that time?
11    A   Richard Booth knew about this because,
12  again, both of us would go to the same conferences,
13  meet the same people, so we would always discuss, you
14  know, various individuals.
15    Q   Okay.
16    A   There were several that -- you know, that we
17  were familiar with even -- but I guess not relevant to
18  this case.
19    Q   You discussed the "customer needs
20  clarification" disposition, and you sort of -- that
21  answer got used in the call that we played at
22  Exhibit 155.  And you said that might have been a
23  mistake.  Do you remember that?
24    A   That was a possibility.  Meaning, mistake on
25  the verifiers side or mistake on our side?

Page 144

1    Q   I think the verifier's side.
2    A   It's very much possible the verifier had
3  made a mistake, yes.  I -- I can't say with certainty,
4  though.
5    Q   What if I played another couple of exhibits
6  of audio recordings of verification calls where
7  something similar happened?
8    A   If something similar has happened over and
9  over that means it wasn't a mistake.  That means that
10  whatever communication went from Spring to TPV.com was
11  already incorrect.
12         MR. PRESTON:  Okay.  I don't have
13  anything else --
14         MR. LECOURS:  I have a couple of quick
15  follow ups if you're done.
16         MR. PRESTON:  Sure.
17         EXAMINATION
18  BY MR. LECOURS:
19    Q   You mentioned that you and Richard Booth
20  knew about Neil St. Louis before this case and before
21  he was an Endurance sales agent.  Did I get that
22  right?
23    A   I believe yes.
24    Q   And what's that belief based on?
25    A   Based on the many meetings that we went to,

Page 145

CONFIDENTIAL

1 many discussions that we had about different sort of
2 fraud, different individuals who have defrauded other
3 companies. That's what it's based on.
4     Q    And is it your testimony sitting here today
5 that you knew that and you didn't raise anything
6 having seen his name on a list of potential sales
7 agents?
8     A    It is my testimony, but it is also my
9 testimony that we have often hired questionable sales
10 channels just because we needed sales.
11     Q    Am I correct that that is, in fact, your
12 testimony?
13     A    That's what I just said.
14     Q    Okay. How can you explain discussions
15 between you and Mr. Booth during the context of this
16 case for which counsel was not present -- I'm not
17 asking about you about privileged communications in
18 sum or substance -- that neither of you had ever heard
19 of Neil St. Louis?
20     A    I'm sorry, repeat the question?
21     Q    How can you explain discussions that you had
22 with Richard Booth during the pendency of this case
23 that neither of you had either heard of Neil St. Louis
24 before this lawsuit?
25     A    No. We don't remember what we had for

1     MR. LECOURS: All right. No further
2 questions.
3     THE WITNESS: Thank you.
4     MR. LECOURS: Ethan, unless you have
5 any follow up, I think we're done; right?
6     MR. PRESTON: No. Everybody needs to
7 go home. Been a long day.
8     THE OFFICER: Okay. To confirm
9 transcript orders real quick.
10     Mr. Preston the standing order is
11 original transcript for ten business days delivery.
12 Is that still sufficient for you?
13     MR. PRESTON: Yeah, that's fine.
14     THE OFFICER: Mr. LeCours do you need
15 the read and sign? Or who do we send the read and
16 sign to?
17     MR. LECOURS: You'll send that to the
18 witness -- he can probably provide his direct contact
19 in the chat -- because he's not represented.
20     THE OFFICER: Okay. And would you like
21 to purchase a copy?
22     MR. LECOURS: I'll purchase a copy.
23 Can you have that expedited for five days? Is that an
24 option?
25     THE OFFICER: Yes, sir.

1 breakfast three days ago, so sometimes there are
2 certain individuals that we might have not remembered
3 until our memory was jogged with some other events.
4     Q    Okay. So were you lying now or were you
5 lying then? Like, which one?
6     A    Rephrase your question.
7     Q    No.
8     A    I'm not going to answer that one --
9     Q    So -- two different versions of your memory
10 about Neil St. Louis. One that's after you stopped
11 your employment and are upset with the --
12     MR. PRESTON: -- foundation -- what did
13 he lie about?
14     THE WITNESS: What did I lie about,
15 Dan? Come on. Do we have evidence that I lied? Show
16 it to me, then we can discuss. I did not lie.
17 BY MR. LECOURS:
18     Q    So if he said --
19     A    I remembered --
20     Q    You said you had no knowledge of Neil
21 St. Louis, and now you're saying you have perfect
22 knowledge of your memory of Neil St. Louis?
23     A    I don't have a perfect knowledge of
24 anything. I said I remembered --
25     MR. PRESTON: -- St. Louis --

1     And Mr. Preston, would you like to
2 expedite as well?
3     MR. PRESTON: Yeah, I guess so.
4     THE OFFICER: Okay. Thank you.
5     THE VIDEOGRAPHER: Counsel, let me know
6 about the video. Do you need a video? And if you do,
7 what format?
8     MR. LECOURS: I don't need the video.
9     THE VIDEOGRAPHER: All right.
10     Time is 3:23 p.m. We are off the
11 record.
12     (Signature reserved.)
13     (Whereupon, at 3:23 p.m., the
14     proceeding was concluded.)
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
800-336-4000

CERTIFICATE OF DEPOSITION OFFICER

1    CERTIFICATE OF DEPOSITION OFFICER
2      I, AMSALE MAXWELL, the officer before whom
3 the foregoing proceedings were taken, do hereby
4 certify that any witness(es) in the foregoing
5 proceedings, prior to testifying, were duly sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a qualified
8 transcriptionist; that said digital audio recording of
9 said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or att                     ies
15 hereto, nor financ                  I in the
16 outcome of this a

17      AMSALE MAXWELL
18    Notary Public in and for the
19      State of Texas
20
21 [X] Review of the transcript was requested.
22
23
24
25

Page 150

CERTIFICATE OF TRANSCRIBER

1    CERTIFICATE OF TRANSCRIBER
2      I, SUMNER SMITH, do hereby certify that this
3 transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said
5 transcript is a true and accurate record of the
6 proceedings to the best of my knowledge, skills, and
7 ability; that I am neither counsel for, related to,
8 nor employed by any of the parties to the action in
9 which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14
15      SUMNER SMITH
16
17
18
19
20
21
22
23
24
25

Page 151

1 Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
2 Gregory Hasiak Job No. 6957255
3      E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Gregory Hasiak              Date
25

Page 152

1 Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.
2 Gregory Hasiak 6957255
3    ACKNOWLEDGMENT OF DEPONENT
4      I, Gregory Hasiak, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____  _____
12 Gregory Hasiak              Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18     _____
19      NOTARY PUBLIC
20
21
22
23
24
25

Page 153

39 (Pages 150 - 153)

CONFIDENTIAL

1  greg@hasiak.com

2                October 31, 2024

3  RE: Nock, Robert, Et Al. v. Spring Energy RRH, LLC, Et Al.

4  DEPOSITION OF: Gregory  Hasiak 6957255

5     The above-referenced witness transcript is

6  available for read and sign.

7     Within the applicable timeframe, the witness

8  should read the testimony to verify its accuracy. If

9  there are any changes, the witness should note those

10  on the attached Errata Sheet.

11     The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14     According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18            Yours,

19            Veritext Legal Solutions

20

21

22

23

24

25

                                    Page 154

**[& - 3:06]**

**&**

**&**   1:10 2:18 3:4
5:8 60:8 82:25
111:20

**0**

**0**   44:22

**1**

**1**   84:11 108:11
**1,000**   46:4
138:2
**1,100**   110:17
**10**   66:8
**10-15**   142:24
**100**   63:19
80:18 93:1
**102**   80:15,20
**104**   4:12
**105**   74:3,23
**106**   80:12
**109**   44:23
**10:07**   1:19 5:5
**10:19**   13:16
**10:20**   13:20
**10:32**   19:19
**10:34**   19:22
**10:38**   21:23
**110**   4:14
**1101**   2:22
**112**   4:16
**11222**   8:11
**113**   37:22
**115**   4:4
**11:01**   22:2

**12**   33:21 44:11
**12207**   2:23
**123456**   100:19
**12:55**   91:5
**12:56**   91:9
**136**   91:22
**14**   44:11
**143**   4:5
**145**   4:6
**146**   107:10,11
**14th**   10:1
**15**   66:9 143:5
**155**   77:7 80:19
144:22
**156**   91:11,14,18
**181**   79:15,17,21
**187**   9:4,5 10:11
**19**   80:22,23
**191**   8:10
**195**   2:12 87:15
88:18 89:7
**195.181.168....**
98:24
**196**   88:2
**1:00**   64:7
**1:10**   94:4
**1:23-01042**   1:9
**1:30**   93:25 94:3
**1:39**   94:7

**2**

**2**   12:13 84:5
92:24 108:8
**2,000**   61:24
63:5,17,18
133:8 136:10

137:20,25
**20**   60:24 68:3
72:24 73:19
106:16 153:15
**200**   62:18
138:3
**2001**   87:8
**201**   108:6
**2010**   44:12
**2016**   51:21
**2018**   51:20
102:23
**2020**   51:18
**2021**   28:17,18
72:18 75:1
76:9,10 92:10
93:5 95:24
96:22 97:8,23
103:3,24
104:22 105:16
106:8,12 114:9
114:9 122:8
130:14 132:12
**2022**   122:8
132:25 133:19
**2023**   107:16
110:7
**2024**   1:18 5:9
116:8 154:2
**206**   4:10 81:19
81:20 82:7
**207**   4:11 104:5
104:6
**208**   4:13,16
110:6,8,19

112:9,13
**209**   4:15
112:11,14
**21**   73:10 74:19
**212**   111:21
**214**   2:15
**215**   20:23
**23**   74:11,12,13
74:18 75:20
76:18,25 116:8
**23rd**   32:1
**24**   1:18 5:9
**25**   135:6
141:10 142:16
**25759**   150:16
**29**   75:1 76:9
**29917**   151:14
**2:21**   115:15
**2:34**   115:19
**2nd**   32:9

**3**

**3**   82:15 92:6
**3,000**   133:14
**30**   9:13 10:7,14
10:15 13:23
68:8 81:24
93:16,20,23,24
141:18
**3000**   42:22
**31**   76:10 92:10
93:5 154:2
**310**   2:5
**36**   10:13
**3:06**   143:12

Page 1

**[3:17 - additional]**

| | | | |
|---|---|---|---|
| **3:17**  143:16 | **7** | **absent**  5:17 | **act**  124:25 |
| **3:23**  149:10,13 | **7,000**  61:20 | **absolutely** | **action**  1:8 |
| **4** | 74:25 | 32:17 46:7 | 18:19 62:24 |
| **4**  69:2,3,3 | **701-2749**  2:25 | 70:22 91:22 | 111:12 122:5 |
| 82:14,16 | **718**  111:21 | 127:20 | 140:11 150:12 |
| 133:19 | **75032**  2:13 | **access**  28:15 | 150:16 151:8 |
| **400**  110:18 | **75209**  2:6 | 32:4,24 67:5 | 151:12 |
| **4054**  2:5 | **76**  106:3 | 95:12 105:3 | **activating**  41:1 |
| **45**  58:16 | **77080**  1:21 | 119:17 120:18 | **activity**  71:13 |
| **457**  2:12 | **78**  20:1,3 | 120:18 122:1 | **actual**  66:18 |
| **48**  76:7 | **8** | 123:14,22 | 73:22 96:12 |
| **49**  113:16 | **8**  4:3 | **accessible** | 118:4 124:22 |
| **4th**  132:24 | **8,000**  133:6,8 | 24:24 | **actually**  37:19 |
| **5** | 133:14,19 | **accident**  34:12 | 57:15 59:18 |
| **5**  33:6 92:25 | **81**  4:10 44:15 | **accidentally** | 61:1 65:13 |
| **5,000**  33:23 | **82**  40:14 | 114:15 | 76:19 79:13 |
| **50**  71:22,22 | **9** | **account**  29:23 | 84:19 92:20 |
| **518**  2:25 | **9,000**  133:5 | 41:1 45:13,14 | 124:14 128:1 |
| **56**  86:17,23 | **92**  19:25 20:4,5 | 45:17 66:12 | 128:22 132:11 |
| 87:18 | 20:17 21:14 | 86:6,7,8 90:19 | 132:16 136:3 |
| **564-8340**  2:8 | **93**  21:11 22:8 | 113:19 | 138:24 141:13 |
| **6** | **972**  2:8 | **accounting** | **ad**  85:6 |
| **6**  9:13 10:7,14 | **a** | 17:7 | **adamant**  14:12 |
| 10:15 13:23 | **a.m.**  1:19 5:5 | **accounts**  29:24 | **added**  78:17 |
| 68:8 141:18 | 13:16,20 19:19 | 66:9 | **addendum** |
| **60,000**  140:21 | 19:22 21:23 | **accuracy**  154:8 | 34:19 35:2 |
| **662-8456**  2:15 | 22:2 | **accurate**  74:10 | **adding**  132:8 |
| **677**  2:22 | **abdul**  128:19 | 134:22 150:9 | **addition**  31:22 |
| **68**  98:12 99:18 | **ability**  150:10 | 151:5 | 31:23 |
| **6957255**  1:23 | 151:7 | **acknowledge...** | **additional** |
| 152:2 153:2 | **able**  16:5 27:1 | 153:3 | 17:22,23 34:9 |
| 154:4 | 57:2 98:8 | **acknowledg...** | 34:10 42:1 |
| **6th**  8:17 | **above**  153:7 | 5:14 | 43:4 108:20,20 |
| | 154:5 | **acquired**  80:5 | 132:8 140:24 |

**[additionally - appended]**

**additionally**
  5:17
**additions**  153:6
**address**  8:6,9
  8:20,24 19:15
  44:22 55:4
  61:13,19 63:17
  66:12 87:7,24
  88:18,25 89:1
  96:3,7 98:18
  98:24 99:9,10
  99:17,20,24
  100:5,17,17,19
  100:22 101:1,6
  101:10,20
  102:6,6 103:21
  104:1,18,21
**administer**
  5:14
**admitted**  41:3
  41:16,17
**adult**  113:21
**advance**  141:17
**advised**  63:11
**affairs**  109:16
**affiliated**  39:17
**affiliates**  40:9
  48:3
**afternoon**
  115:22,23
  143:19,20
**agent**  40:18
  44:21,22 49:16
  54:23 61:18
  62:15 63:16

77:20 78:22
79:6 83:13,16
101:1 128:15
134:8 145:21
**agent's**  71:13
  134:25
**agents**  41:10
  42:23 43:5
  47:1 53:3,13
  54:9,18,21
  55:22 61:9
  69:23 70:15
  95:12 101:17
  126:7 129:10
  129:25 133:5
  136:10 137:25
  139:23 146:7
**ago**  31:10
  44:11 147:1
**agr**  39:17,18
**agree**  5:15,19
  35:11 73:12
  121:20,25
  122:1 123:1,3
  123:10,13
  125:12,14
  133:13,17
  134:15,20
**agreed**  42:10
  65:13
**agreement**  35:2
  39:22 51:10
  124:8,11 125:2
  126:8 127:6

**agreements**
  40:4 154:14
**ahead**  8:1 56:6
  94:19
**aimed**  46:6
**al**  5:7,9 152:1,1
  153:1,1 154:3
  154:3
**albany**  2:23
**alert**  138:7
**alerted**  131:6
  138:7
**allegation**
  27:11
**alleged**  120:1
**allegedly**
  117:10 121:23
**allotted**  154:15
**allow**  27:12
  95:7 129:12
  136:2
**allowed**  40:3
  124:25 125:13
  125:15,17,18
  125:24 128:8
**allowing**  41:22
**alvarez**  42:9,9
**amanda**  20:19
  106:6
**amended**  102:2
**amount**  33:7
**amsale**  1:22 5:3
  150:2,17
**analysis**  104:18

**anne**  98:16
  99:18
**annual**  59:3
**answer**  12:3,22
  16:11 23:11
  38:18 49:24,25
  51:8 55:13
  58:22 68:24
  76:19 96:25
  103:6 144:21
  147:8
**answered**
  15:15 82:19
**answernet**  4:10
  79:25 80:1
  81:7 82:5,12
  83:2
**answernet's**
  80:3
**anwernet's**
  78:20
**anybody**  10:21
  18:2,4,9 20:12
  23:14,24 26:17
  50:16 132:11
  132:16 144:10
**apologize**  96:10
**apparent**  20:7
**appear**  77:11
**appearing**  6:15
  6:18
**appears**  114:12
**appended**
  153:7

Veritext Legal Solutions
800-336-4000

**[applicable - august]**

applicable 5:23
27:20 154:7,14
application
95:6
applied 66:21
126:9,10
applies 73:14
80:7 94:20
approach
14:10
approached
56:8
appropriate
54:10,13 99:20
approval 17:8
17:8 92:17
approve 17:2
78:15
approved
78:12 82:22
92:14 93:7
approving
17:11
approximately
130:7
apps 55:3
area 26:11 45:8
125:3
areas 95:17
arrangement
17:17,20 18:5
18:8
arrested
117:10

arrow 33:4,5
118:19
artificial
111:23
arundel 98:16
99:18
asia 13:11 41:9
51:15
aside 14:2
asked 10:3
15:20 23:19
24:2,6 27:2,4,7
27:16 72:21
80:25 97:13
113:1 117:19
119:25 129:22
134:5 138:12
asking 68:12,19
107:14 117:13
118:5 122:2
123:21 125:22
131:11 133:24
137:5,20
146:17
asks 77:19,19
assert 11:10
59:23
asserting 7:11
68:17
assessment
76:20
assets 58:4
assign 125:15
125:18,24
126:19 128:8

assigned 5:3
126:13
assignment
127:14
assistance 50:2
90:1
associated 49:9
50:6 127:24
associates 41:7
assume 24:15
43:9 55:22
126:15
assuming 45:5
89:1 111:11
113:1,15
assumption
17:25 43:7
assurance
46:13 69:12
113:19
at&t 15:8,9
17:17 18:5,8
23:8,14
attached 21:13
35:19 82:6
139:5 154:10
154:12
attachment
84:7,9
attachments
84:2
attempt 69:13
78:22
attempted
56:22 66:16

108:21
attempting
26:25
attempts 79:12
attendance 6:7
attention 37:6
37:21 49:6
57:2 60:23
78:9 98:12
104:4 126:21
132:24 133:19
attest 14:16
28:6
attorney 7:12
7:15 11:14,24
34:24 35:8,9
68:16 73:13
139:5 141:16
150:14 151:10
audio 13:14
18:21 19:15
21:16 22:9,13
77:8,15,17
87:16,21 88:3
88:10,16 89:5
89:11 90:3,12
90:17 145:6
150:8 151:3
audit 71:20
72:23 102:9,15
105:21,21
audited 70:17
audits 70:18
august 10:1

**[authorization - blatantly]**

**authorization**
29:20 38:25
127:14
**authorized**
5:13 39:2
45:15 122:21
**auto** 86:20
**automated**
98:13
**available** 53:19
154:6
**avenue** 2:5
**average** 58:23
**aware** 18:7
46:23,23,25
50:5,11 51:5,9
51:11,15,17,20
51:21,25 52:1
54:3 59:4 62:1
62:4 71:21
75:16,18,24
76:2,4,6,10
95:16,23 96:16
97:7,14,22,25
121:2 130:13
130:22 136:9
**awareness**
50:20

**b**

**b** 1:9 2:17 3:4
4:8 5:8 9:13
10:7,14,15
13:23 68:8
141:18

**back** 13:19
15:17 16:11
17:14 19:3,21
20:17 22:1,3
32:21 45:12
63:14 68:3
74:23 83:24
91:8 92:23
93:11 94:6
98:2 102:1
105:10 108:24
115:18 127:23
128:23 131:15
143:15
**backfill** 96:2
**background**
41:25 48:8,18
**backs** 34:9,10
92:22
**bad** 19:16 57:8
144:6
**badge** 71:15
**balance** 92:21
**bam** 50:3
**bank** 95:8
**bankrolled**
58:2
**bankrupt** 60:7
**bare** 25:15 26:2
37:13 52:8,10
**based** 28:1
35:25 43:23
44:19 46:3
53:3 69:18
77:2 92:9

106:24 122:19
145:24,25
146:3
**basic** 106:21,22
141:13
**basically** 46:1
49:18 81:12
**basis** 25:16
52:3 59:3
130:17 131:2,2
131:3 136:17
136:19,21
**beach** 2:21 6:21
**beating** 117:10
**bed** 50:21
**beefing** 53:17
**beginning**
18:10 25:17
36:11 49:7
89:14
**begun** 130:8
**behalf** 1:5,5 2:2
2:17 6:15,19
6:21 7:10
11:10 34:15
39:25
**behinds** 37:14
**belief** 145:24
**believe** 7:18 9:9
18:23 23:2,12
27:19,22 33:20
34:8,18 39:12
39:18 40:8,25
41:15 42:7
44:6 57:10

60:16 70:18
71:4 72:16
75:23 80:5
82:25 91:18
103:21 104:3
104:25 107:1,5
107:7 120:20
123:4 124:22
127:18 137:15
138:4 139:11
139:16,22
145:23
**believed** 33:21
135:21
**belong** 139:3
**best** 150:10
151:6
**better** 53:10,12
56:1 88:11
99:6 122:19
**biles** 2:11 6:18
**bileswilson.c...**
2:14
**billing** 109:4
**bit** 14:17 20:2
36:17 46:9,10
49:6 51:23
58:3 65:19
89:10 96:2
113:23
**biweekly** 30:9
30:10
**blatantly** 23:5
68:1

Page 5

[blessing - camunas]

**blessing** 122:19
**blind** 126:20
**blowing** 60:21
**blows** 58:14
**boilerplate**
  126:8
**booth** 9:20 10:4
  10:25 11:19
  14:3,11 15:20
  16:22 17:2,9
  17:11 20:11,16
  24:3 26:16,17
  30:8,17 31:11
  32:8 34:8
  39:21 41:19
  42:10 43:15,19
  44:2,7 45:21
  46:10 47:22
  48:21 49:4,9
  50:11,14 52:1
  53:17,18 76:1
  77:3 78:12
  92:14 93:7
  97:22 107:1,22
  108:1 116:15
  117:5 118:6,10
  119:15 120:16
  121:22 122:14
  125:8 126:17
  127:22 131:4
  132:1 135:9
  140:22 141:19
  144:11 145:19
  146:15,22

**booth's** 142:6
**bother** 107:15
  128:7
**bottom** 40:20
  44:19 69:3,6
  69:21 71:11
**bound** 34:20
  35:12
**braunfels** 5:11
**break** 64:1,4,6
  90:23 93:11
  115:13
**breakfast**
  147:1
**breaking** 19:7
  19:9
**brian** 46:24,24
  48:22 49:1,5,9
  50:18 61:3
  106:6 107:15
  128:3
**briefly** 73:10
**brilliant** 132:20
**bring** 122:6
**broadway** 2:22
**broke** 91:2
**brooklyn** 8:10
**brought** 78:9
**buddy** 66:13
**budget** 132:7
**building** 33:22
  100:22
**business** 22:17
  33:14 47:13
  65:2 76:12

118:10,24
148:11

**c**

**c** 2:1 3:1 5:1
  48:19
**calculation**
  114:2
**call** 4:13 15:16
  16:22 21:4,17
  22:14,20 30:2
  36:2,15,21
  37:2,3,9 39:3
  41:8,17 49:17
  52:25 55:25
  60:23 61:19
  65:4 66:12,13
  67:20,21 69:10
  69:10,15,15
  77:10 78:2,5,7
  78:21 81:12
  87:23 89:14
  92:6 109:23,24
  111:4 112:20
  112:25 113:5
  114:1,4,8,11,18
  115:1 118:18
  131:8,9,9,10
  134:13 136:10
  140:15 141:5,9
  144:21
**callaway** 87:8
**called** 7:4 18:25
  25:5 29:16,17
  30:1 57:10
  66:21 114:16

126:20
**calling** 18:3
  49:16 89:12
  114:13,14
**calls** 14:20 15:1
  15:9,15,16
  16:18 20:9
  22:22 24:16,18
  24:20 25:5,5
  25:16 29:2,18
  29:25 30:10,11
  36:1,12,13,14
  36:18,25 46:16
  46:18,21 50:15
  50:16,25 51:14
  52:4,6 54:4
  65:5 69:12
  78:18 123:5,12
  123:24 124:3
  134:13 139:7
  141:9 145:6
**camera** 87:11
**campaign**
  41:23 52:8
  55:23 66:21,23
  67:4 88:24
  130:8
**campaigns**
  53:5 55:18
  56:11
**camunas** 18:12
  18:15,18,25
  21:4 22:14
  29:14 30:4

Veritext Legal Solutions
800-336-4000

**[camunas's - clearly]**

| | | | |
|---|---|---|---|
| **camunas's** 18:22 21:1 113:12 | **cases** 55:8,16 62:12 67:2 79:11 | **chances** 42:12 | **checks** 48:9 |
| **cancel** 29:24 45:20,23 46:3 113:18 135:8 136:6,6 | **caught** 7:25 | **change** 7:20 96:12 152:4,7 152:10,13,16 152:19 | **cheesman** 11:1 14:4 33:20 |
| **canceled** 78:18 102:7,10 135:21 | **causing** 45:22 45:22 | **changes** 58:14 153:6 154:9 | **choice** 125:7 |
| | **cecil** 69:6 | **channel** 13:9 14:11,13 16:23 18:18 41:14,19 41:24 42:8 52:24 56:23 57:4 63:8 86:15,15 102:9 102:19,19,20 105:2,3 107:20 126:18 127:11 | **choose** 59:7 |
| **cancellations** 92:22 | **cellular** 100:11 | | **chose** 59:5 |
| | **center** 41:8 49:17 101:1,6 101:10 118:18 136:10 | | **christine** 87:2 90:8 93:4 |
| **cancelled** 28:16 113:19 129:18 129:20,23,24 133:21 | | | **churned** 56:13 |
| | **central** 5:5 94:3 | | **circle** 93:11 |
| | **ceo** 47:3 | | **civil** 1:8 |
| **canned** 70:20 71:5,16 | **certain** 70:13 82:21 121:8 131:6 147:2 | | **claimed** 21:5 |
| | | **channels** 50:18 56:9 57:13 67:14 122:11 146:10 | **clarification** 7:17,21 8:5 78:2,6,22 79:5 81:1 82:17 83:5,11,18 84:23 85:13 138:13,18 139:24 144:20 |
| **capacity** 7:19 | **certainly** 23:12 28:2 | | |
| **care** 128:6 | **certainty** 145:3 | | |
| **careful** 68:15 | **certificate** 150:1 151:1 | **characterize** 116:24 117:14 117:20 | |
| **carrier** 100:12 | | | |
| **case** 24:13,17 34:5,13,19 39:3 45:16 59:14 60:3,7 60:20 66:18 75:14 79:11 81:9,15 84:18 105:25 113:4 124:15 133:12 135:24 141:12 144:18 145:20 146:16,22 | **certified** 5:20 154:16 | | **clarify** 35:17 80:17 127:10 |
| | **certify** 150:4 151:2 | **characterizing** 117:2 | **class** 119:9,12 119:24 120:5 121:24 122:5 |
| | **cetera** 48:25,25 98:3 | **charge** 109:15 140:24 | |
| | **chain** 20:18 40:16 73:19 78:8 106:5 108:9 | **chat** 90:23 148:19 | **claw** 92:22,23 |
| | | **chatter** 48:22 51:12 | **clean** 47:15 |
| | **chance** 41:20 42:11,11 135:10,11 | **cheaper** 46:2,2 | **clear** 11:21 30:16 41:24 45:7 50:20 71:12 88:22 121:4 |
| | | **check** 54:16 85:10 89:15 | |
| | | | **clearly** 14:10 14:19 |

**[client - conducted]**

**client** 7:12,15
    56:21 68:16
    81:2,3 109:19
    141:15
**clients** 56:16
**close** 143:2
**coach** 79:6
**coast** 93:18
**code** 45:8 82:15
    82:15,16
    108:13 138:14
    138:18,22
    139:24
**codes** 94:10,19
    139:6
**cognitive** 86:3
    86:4 109:18
**cold** 18:2 37:2
**collect** 24:6
**collected** 23:25
    86:2,5
**colloquially**
    33:19 113:3
**combination**
    31:9 111:19
**comcast** 100:10
**come** 11:7
    55:17,18
    131:15 147:15
**comes** 32:23
    49:21 52:23
    127:20
**comfortable**
    117:2

**command**
    99:10
**comment** 52:22
**commission**
    17:5,11 67:8,8
    91:13,16 92:15
**commissions**
    17:2 92:25
**common** 98:3
**communicate**
    81:10 107:21
    121:15 140:9
**communicated**
    45:21 81:7
    106:25 120:25
    121:8,10,12,19
    135:10
**communicating**
    32:16
**communication**
    11:13 85:25
    145:10
**communicati...**
    7:13,16 8:7,24
    11:9,12,24
    85:25 106:22
    119:8 121:21
    122:3 140:5,18
    146:17
**companies** 1:13
    15:7 77:4
    109:13 122:8
    146:3
**company** 14:19
    32:15 33:10,12

33:22,22 39:2
    39:11,16,17
    44:5 48:19
    57:10 58:1,2
    58:25 59:11,13
    60:3,6,11 80:6
    90:14 97:15
    117:5 118:12
    118:20,25
    121:17 126:14
    126:18,23
    139:21 140:21
**compare** 67:19
    74:4
**complain** 67:15
**complaining**
    65:15
**complains**
    29:19
**complaint**
    18:22 23:3
    25:12 29:17
    46:1 65:17
    70:9,10,11
**complaints**
    18:18 22:23
    23:19 29:13,15
    29:16 30:1,6
    53:4 124:20,21
    134:21
**complete** 66:13
    82:18 153:8
**completed**
    130:19

**completely**
    39:12 83:3
    139:19
**compliance**
    7:23 52:9 71:3
    102:21
**compliant**
    69:25
**comply** 64:24
    64:25 65:16
**complying**
    52:11
**components**
    58:24
**computer**
    114:23
**concern** 14:9
    47:12 120:14
    123:11,16
**concerned** 16:2
    30:19
**concerning**
    40:17
**concerns** 31:10
    47:12 52:5
    119:18,22
    120:25
**concluded**
    149:14
**conditionally**
    41:22
**conducted**
    69:24 71:14
    102:9 135:5

**[conference - counsel's]**

| | | | |
|---|---|---|---|
| **conference** 131:9 | **constitute** 6:2 27:20 116:12 | **conversations** 12:21 28:2,8 | 101:2 106:13 109:17 114:4,6 |
| **conferences** 51:12 98:4 144:12 | **consult** 142:25 **consumer's** 109:4 | 30:25 60:4 115:24 142:10 **coordinates** | 114:18 115:3 116:16,17 122:22,23 |
| **confidence** 28:10 | **cont'd** 3:1 **contact** 42:1 | 54:10,14 61:14 62:10 70:2 | 125:2 126:7 129:6,16,18 |
| **confidential** 1:16 34:16 | 55:17 148:18 **contain** 113:7 | 71:20 73:22 74:14 75:13,21 | 130:5 138:9 139:11 140:2 |
| **confidentiality** 35:2 | **containing** 102:13 105:19 | 76:24 **copy** 35:1 83:1 | 146:11 153:8 **corrected** 88:25 |
| **confirm** 79:13 103:6 148:8 | **contemp180an...** 134:21 | 142:6 148:21 148:22 154:16 | **corrections** 153:6 |
| **confirmation** 86:20 98:14 | **content** 11:12 **context** 146:15 | **copying** 140:22 **corporate** | **correctly** 15:18 26:13 43:6,21 |
| **connection** 116:20 | **continue** 23:20 43:15,20 | 78:13 127:17 127:19 | 50:9 62:16 74:5 75:13 |
| **conscious** 29:4 **consent** 14:25 | **continued** 28:22 | **correct** 8:8,22 12:8 14:21 | **correspond** 25:11 |
| 15:5,5,14,16 16:4,17 21:4 | **contract** 16:25 18:11 38:7 | 15:1 17:13 22:15 23:22 | **corresponds** 99:19 |
| 22:14,19 25:5 25:8,13,16,20 | 40:5 50:13 106:23 122:16 | 25:1 26:14 29:10 30:15 | **counsel** 3:3 6:23 7:8,20 |
| 25:25 26:18 29:2 36:12,13 | 122:24 123:2 125:10,16,18 | 31:5 35:12 42:20 45:6 | 11:1,10,20 14:2 26:21 |
| 36:20 38:23 125:19 | 125:23,24,25 126:2,4,7,12,13 | 47:3,4 52:13 54:10 61:15 | 60:1,15,17 68:13 78:13,14 |
| **consented** 127:12 | 128:7 **contracts** 40:4 | 65:10 71:9 72:3,6 75:10 | 140:5,22 141:2 141:25 142:25 |
| **consider** 142:25 | 122:18,22 126:19 | 79:9 80:11 84:24,25 87:24 | 146:16 149:5 150:11,14 |
| **consideration** 107:18 | **convention** 84:19 | 88:19 91:16 92:12,15 93:1 | 151:7,10 **counsel's** 51:7 |
| **consistent** 65:20 | **conversation** 12:23 61:1 | 93:2 96:15 98:14 100:9 | 101:4 |

**[country - dealing]**

country  8:12
  8:16,20,25
couple  44:18
  85:10 102:25
  111:15 126:23
  137:16 140:10
  140:11 145:5
  145:14
course  10:21
  13:23 15:8
  53:16 109:7
  118:15
court  1:1 27:22
court's  35:19
cover  37:14
  83:12,12 85:12
covers  83:16
  84:22
create  37:8
  66:7,8 121:5
  121:16
created  70:8
  82:11 83:7,22
  111:24
creates  105:9
  105:12
crime  27:1
critical  85:1
  112:21
crm  111:2
crooks  128:24
cross  14:14
  15:9,22 17:16
  17:16,20 18:5
  18:8 20:8 23:8

66:22 143:22
crossing  47:17
cup  87:11
current  44:6
  56:15,20 118:2
currently  57:10
  118:5 134:22
customer  15:5
  15:6,8 29:16
  29:18,18 30:7
  37:1,3,6,8 39:1
  44:21 49:19
  56:1 64:16,20
  65:13,15 66:1
  66:10,19 67:20
  69:6 71:14
  77:19,23 78:2
  78:5,21,23,23
  79:4,7,12
  80:25 81:11,12
  82:17,18 83:5
  83:10,17 84:23
  85:12 86:6,11
  92:11 108:22
  109:13,15
  112:3 114:14
  129:10 131:5
  131:16 138:1
  138:10,13,18
  139:7,23
  144:19
customer's
  29:23 49:21
  66:11,15 87:2
  100:4 109:11

customers  15:9
  16:5 18:16
  29:5,9 35:25
  38:25 46:3
  47:14,17 49:16
  54:13 55:12,24
  56:10,13,14,20
  65:22 73:19
  74:14 86:3
  134:13
cut  36:16
  119:16
cutting  19:15
cycle  109:4

**d**

d  1:9 2:17 3:4
  4:1 5:1,8
daily  52:3
  131:2,2,3
dallas  2:6
damaging
  24:17
dan  11:14 12:1
  27:15 34:24
  97:11 147:15
daniel  2:20
  6:20
dat  4:15 112:12
data  54:19
  61:12 63:15
  75:5 95:7
  96:14 97:8
  101:1,6,10
  112:10 129:9
  130:23 131:2

131:18 132:12
  136:9 137:20
  137:25
databases  24:8
  67:6
datacamp
  99:19
date  1:18 9:25
  10:6,12 39:23
  84:6,10 105:7
  120:23 124:9
  124:16 130:10
  152:24 153:12
dated  107:16
dates  101:25
  119:16
daughter  90:9
david  42:2
  114:20
day  32:18,22
  53:21 62:16,17
  76:12 93:14
  116:8 130:24
  140:18 141:4
  148:7 153:15
days  147:1
  148:11,23
deactivate  67:3
deactivated
  71:15 130:1,5
  133:20
deal  64:21 65:6
  71:6
dealing  61:23

**[dealings - differences]**

| | | | |
|---|---|---|---|
| **dealings**  33:13 | 47:19 48:2,5 | 100:18 105:20 | 10:19,22 11:7 |
| **december** | 52:12 53:10 | 112:2 136:17 | 12:14 13:3,24 |
| 106:8,11 | 54:21 58:1,2 | **defrauded** | 14:8 31:1,19 |
| **decided**  32:23 | 65:9,20,22 | 129:6 146:2 | 68:8 79:24,25 |
| 39:9,20 49:5 | 67:19 68:16 | **degree**  65:11 | 80:13,15 140:4 |
| 58:25 135:9 | 69:11,19 72:17 | 65:16 | 140:23,25 |
| 140:21 | 72:23 75:4,15 | **delaware**  1:12 | 141:18 142:6 |
| **decision**  20:6 | 75:18 76:17,21 | **delivery**  148:11 | 150:1 154:4 |
| 20:12 29:4 | 76:22,22 86:2 | **demand**  116:25 | **derived**  29:9 |
| 47:16 107:22 | 86:5 92:12 | 117:20 | **describe**  72:12 |
| 125:1 | 94:9 95:23 | **demands** | **described**  46:5 |
| **declare**  153:4 | 96:16 97:7,13 | 116:22 117:14 | **describes**  61:12 |
| **decline**  86:3 | 97:19 101:16 | **demonstrate** | **description**  4:9 |
| 109:18 | 101:19 102:22 | 22:19 | 21:7 83:10 |
| **dedicated** | 103:2,8,18,24 | **deniability** | 108:13 |
| 51:12 | 104:10,21 | 23:22 30:19 | **designate**  139:6 |
| **deemed**  153:6 | 106:10,14 | 36:9,10 37:8 | **designated** |
| **defendant**  7:19 | 107:15 109:22 | 37:17 46:6 | 9:17,20 10:2 |
| 22:12 79:5 | 110:24 112:19 | 47:24 128:9 | **designating** |
| 83:23 117:24 | 114:1,8 115:25 | **denied**  117:24 | 34:15 |
| 118:2 | 116:22 118:6 | 132:8 | **designed**  37:7 |
| **defendants** | 118:10,24 | **deny**  30:21 | **details**  11:16 |
| 1:14 2:17 4:13 | 119:4,16 | 36:1 | 12:25 64:15 |
| 6:21,23 7:11 | 121:22 122:8 | **denying**  116:18 | 66:11,15,20,20 |
| 7:11,14 11:10 | 123:8 125:19 | **depending** | 66:22 |
| 11:25 13:4 | 127:12 129:6 | 102:10 | **determine**  55:1 |
| 14:24 15:4,17 | 129:11 130:11 | **depends**  58:14 | **determining** |
| 18:4,7 20:18 | 132:24 133:9 | 69:17 89:25 | 48:6 |
| 22:10,17 23:25 | 133:18 136:11 | 108:16 | **developed** |
| 24:19,25 25:23 | 138:8 139:18 | **deponent**  153:3 | 70:21 71:6 |
| 29:1,6,8,12 | 140:19 141:11 | **deposed**  10:5,6 | **difference** |
| 30:18 31:5,18 | 141:18 | 10:9,13,17 | 127:1,5 |
| 31:25 34:15 | **define**  116:25 | **deposition**  1:16 | **differences** |
| 36:1,9 38:12 | **definitely**  62:7 | 5:6,25 9:13,18 | 109:24 |
| 38:23 40:10 | 63:6 65:25 | 9:18,25 10:10 | |

Veritext Legal Solutions
800-336-4000

**[different - documents]**

| | | | |
|---|---|---|---|
| **different** 24:8 | **disabilities** | 144:19 | **distances** 61:23 |
| 26:11 31:12 | 86:4 | **discusses** 83:5 | 62:10 63:5 |
| 38:4 46:11 | **disagree** | **discussing** 13:3 | 70:2 73:22 |
| 48:23 56:8 | 134:17 | 32:12 61:4,5 | 74:25 75:6,8 |
| 58:24 74:14 | **disagreement** | 73:20 117:4 | 75:19 76:24 |
| 83:3,21 90:4 | 31:14 | 118:3 | **district** 1:1,2 |
| 95:10,11 | **disagreements** | **discussion** | **dividend** 58:24 |
| 109:12,12 | 31:12 | 16:23 47:16 | 59:2 |
| 111:8,15 | **disclose** 118:24 | 52:3 93:10 | **dividends** |
| 127:16,17,19 | **disclosed** 95:17 | 107:25 137:1 | 58:19 59:1,5,7 |
| 139:20 146:1,2 | **discomfort** | **discussions** | **dlecours** 2:24 |
| 147:9 | 119:9,11 | 11:18 12:4,24 | **dnc** 65:1 |
| **differently** | 121:23 | 14:6 33:4 | 110:20,23 |
| 106:20 | **discontinued** | 35:18 46:21 | 111:1 113:12 |
| **difficult** 24:7 | 129:16 | 53:22 60:17 | 113:21 114:5 |
| 24:11,12,14 | **discount** 49:22 | 98:2 142:7,14 | 114:11 |
| 25:9 26:6 | **discounts** 49:23 | 146:1,14,21 | **document** 9:6,8 |
| 36:20 43:3 | **discovered** | **disguise** 50:24 | 11:5,15,19 |
| 45:16 | 129:15 | 54:3 63:21 | 41:22 53:8 |
| **digital** 84:10 | **discrepancies** | 64:18 71:25 | 60:24 68:7 |
| 150:8 151:3 | 130:15 | 72:1,13 96:6 | 70:19 82:11,21 |
| **direct** 37:21 | **discrepancy** | **disguised** 54:24 | 82:24 83:1,4,6 |
| 115:9,10 143:1 | 129:9 132:13 | 54:24 106:15 | 83:7,15,19,21 |
| 148:18 | 132:25 | **disposition** | 84:21,22 86:19 |
| **directed** 43:15 | **discuss** 11:16 | 83:11,18 84:23 | 91:1 92:9 95:4 |
| 43:19 | 13:2,22 14:1 | 144:20 | 102:13 105:18 |
| **direction** 41:20 | 37:16 50:14 | **dispute** 114:3 | 105:24 106:1 |
| 42:5 46:18 | 53:23,25 117:7 | 119:2 | 123:11,16,25 |
| 49:3 | 122:4,5 141:11 | **distance** 44:21 | 131:7 135:13 |
| **directions** | 141:17 144:13 | 44:22 61:6,18 | 139:4,17,20 |
| 56:19 | 147:16 | 61:22 62:21 | **documented** |
| **directive** 30:16 | **discussed** 11:15 | 63:16 71:19 | 29:22,22 |
| **directly** 42:2 | 14:2 30:9 | 73:17,21 74:3 | **documents** |
| **director** 7:23 | 46:22 60:14 | 138:3 | 52:25 53:15 |
| 122:7 124:25 | 119:4 141:8 | | 65:21 68:20 |

**[documents - ended]**

70:23 83:3
85:3,11,16
102:3 103:5
110:1 111:15
133:14 134:21
138:22 139:1,3
139:19 141:24
142:2
**doing** 14:15
23:6 25:17
57:16 118:23
126:22
**dollars** 59:3
**donald** 11:1
14:4 33:20
**door** 41:9,9,12
41:13,13,13
49:15,16 50:25
50:25 52:24,24
53:11,11 54:4
54:4,25,25
57:13,13,16,16
62:11,11 63:15
63:15,22,22
64:19,19 65:4
65:4,5,5 66:6,6
66:18,18 71:13
71:13,25 72:1
72:2,2,13,13
81:3,3,3,3
83:13,17 99:20
99:20 106:15
106:15 127:11
127:11 128:14
128:15

**doubt** 135:23
**download** 55:4
**downloading**
131:18
**dozen** 50:17
**drafts** 70:24,25
**drive** 2:12 9:4
24:21 38:5
71:2 105:23
**drops** 108:14
108:18
**dtd** 84:10
**due** 92:25
117:19
**duly** 7:4 150:5
**duration** 28:25

**e**

**e** 2:1,1 3:1,1 4:1
4:8 5:1,1 8:10
152:3,3,3
**earlier** 8:6
37:18 74:15,18
75:20 123:4
130:13 132:19
**early** 54:4
102:23 130:14
**earned** 92:18
**earning** 93:3,4
**easier** 38:3
55:25
**east** 93:18
**easy** 55:5 95:12
**echo** 99:4
**edit** 36:18

**effect** 36:8
107:3
**effort** 59:14
136:5,8
**efforts** 33:9,11
59:19
**eight** 31:10
**either** 12:5 17:8
17:10 34:10
42:25 54:15
61:13 131:14
131:15 137:3
141:11 146:23
**ekata** 4:11
103:19,25
104:9,12,17
105:9
**ekata's** 105:4
**elderly** 86:10
**elections**
141:10
**electricity** 44:5
**eligibility** 89:15
89:16,24
**eligible** 89:24
**eliminate** 39:5
**email** 4:10
20:18 21:7,12
32:3,5,21,25
33:20 40:16,20
41:21 60:25
61:11 68:25
73:19 82:5
84:2 85:25
100:17,17,18

103:21 106:5
107:1,8 108:9
108:11 116:10
116:20 117:3
117:15 119:17
120:18,25
121:6 122:1
123:18 131:10
140:22
**emailed** 9:9
**emails** 73:6
85:6 114:20,22
122:2 136:23
137:2 140:10
142:8
**employed** 16:6
24:19 150:11
150:14 151:8
151:11
**employee** 7:14
9:12 31:4,8
140:19 150:13
151:10
**employees** 11:2
11:3
**employment**
115:25 116:5
119:5 122:3
147:11
**enables** 78:22
79:5
**encountered**
62:15
**ended** 28:21
115:25 119:5

**[ended - evidence]**

122:3
**endurance**
46:10,20,22,23
51:10 55:20,22
61:8 72:6
76:23 92:4
95:17 106:11
106:17,22
108:1 125:9,10
125:12,23
126:3,4,6,10,12
126:12 127:23
128:2,14 129:9
129:12,25
130:11 136:11
137:9 144:8
145:21
**endurance's**
54:18 75:5
76:4
**energy** 1:9,10
2:17,18 3:4,5
5:8 15:10 33:5
33:6 36:24
44:4 45:15
51:12 57:11
58:3,5,8 72:9
98:4 111:20
116:5 128:24
137:13 152:1
153:1 154:3
**energy's** 113:8
**engage** 131:24
**enrique** 42:8

**enroll** 38:25
45:15 62:17,19
65:14 108:21
**enrolled** 18:16
18:17 29:5,19
38:23 55:25
56:11 69:7
77:12 103:13
**enrolling** 40:10
54:12 109:11
**enrollment**
29:10 45:20
53:17 61:12
65:24 77:21
78:25 86:10
98:13,16 99:18
99:21 100:15
100:25 101:17
103:11 109:5
**enrollments**
26:1,2 41:13
45:23 46:4
49:10,12,13
50:7 54:20
63:13,15 65:12
66:25 70:5
72:22 74:15,16
74:17,19,24
75:5,6,9,16,19
75:20 76:3,6,8
76:17,24,25
94:10 95:17
101:20 102:23
108:14,18,20
109:3 129:8,13

130:14 131:22
134:11,12
135:19 136:6
**enrolls** 109:13
**ensure** 47:24
65:22
**ensuring**
131:23
**enter** 39:21
122:21
**entered** 135:20
**entering** 51:10
**entire** 28:24
30:7 34:15
36:14 111:1,3
133:19
**entirely** 74:10
**entities** 127:17
127:17,19
**entity** 127:3
**entries** 110:17
**entry** 4:15
112:12
**environment**
24:21
**ep** 2:7
**eplaw.us** 2:7
**equal** 34:4
**errata** 154:10
154:12,13
**es** 150:4
**escalated** 78:8
**especially** 48:7
**esquire** 2:3,10
2:20 3:3

**essentially**
15:13,16 31:17
47:3 56:12
66:25 78:24
90:18
**establish** 38:25
**establishing**
44:3
**estimated**
58:10 61:18
**et** 5:7,8 48:24
48:25 98:3
152:1,1 153:1
153:1 154:3,3
**ethan** 2:3 6:9
6:14 8:1 59:17
64:6 68:19
73:12 79:20
86:21 97:2
119:25 143:6
148:4
**europe** 101:11
**evaluate**
103:25
**events** 68:5
106:15 147:3
**eventually**
59:10 130:6
**everybody** 7:24
18:3 89:18,22
126:9,18 131:4
143:1,3 148:6
**evidence** 14:15
22:14 25:13,20
25:25 33:18

**[evidence - find]**

136:9 147:15
**evident** 17:15
**evidentiary**
5:24
**exact** 105:7
119:15 120:16
124:16
**exactly** 15:24
28:4 43:3
56:18 105:1
144:2,3
**examination**
4:2 8:3 115:20
143:17,22
145:17
**examined** 7:6
**example** 47:14
55:19 127:6
**excel** 82:7
**excellent** 35:22
**except** 25:4,4
36:9 121:18
**exception** 27:1
49:25
**exchange** 21:3
141:1
**excluding**
12:11
**excuse** 54:2
58:14 63:14
72:1 76:22
**exhibit** 4:10,11
4:13,15,16 9:4
9:5 10:11
19:25 20:3,17

21:11,14 22:8
37:22 38:6
40:14 44:15
60:24,25 68:3
72:24 73:10,19
74:3,11,13,17
74:18,19,23
75:20 76:18,25
77:7,7 79:15
79:16 80:19
81:19,19,20
82:7 84:1
86:17,23 87:15
87:18 88:2,18
91:11,22 98:12
99:18 104:5,6
106:3,16
107:10 108:6
110:6,8,19
112:8,11,13,14
113:16 130:18
144:22
**exhibits** 37:24
38:2,5 73:14
145:5
**exist** 25:8
**existing** 114:14
**exists** 83:15
**exit** 32:12
**expect** 50:18
100:5,7
**expedite** 149:2
**expedited**
148:23

**expensive**
53:20
**explain** 109:24
146:14,21
**explains** 83:19
**explanation**
136:23
**expressed**
123:16
**expressly** 83:16
**extent** 11:8
26:24 27:10,21
68:11,19
136:22
**extremely**
121:9
**eye** 126:20
**eyeballing**
131:22

**f**

**fact** 27:18
32:14 41:6
117:4 128:2,14
146:11
**facts** 14:6
15:21
**fails** 154:15
**failsafes** 138:5
**fair** 21:7 47:22
48:3,13 49:10
92:10
**fake** 23:13 96:7
100:18
**false** 27:19,25
64:16

**falsely** 27:3,7
27:16
**falsifying** 96:13
**familiar** 60:24
61:21 68:25
122:24 123:15
125:10 137:15
144:17
**family** 86:9
**far** 60:19 62:20
114:11 130:20
**fast** 88:17 89:9
**feedback** 86:13
86:14
**feeling** 63:25
**feet** 44:22,23
**fictitious** 23:9
**file** 4:15 112:12
114:22 139:13
**filed** 18:18
**files** 114:21
**fills** 28:9
**filtering** 94:10
**final** 17:8 78:16
92:17 122:15
124:21
**finally** 79:13
**financially**
150:15 151:11
**financials**
60:14
**find** 21:4 32:7
45:16 76:17
79:10

**[finding - general]**

**finding** 114:18
**fine** 12:3 64:8
    74:10 148:13
**finished** 115:11
**fired** 57:15,18
    57:22
**firms** 72:9
**first** 7:4 9:8
    12:1 17:4 37:2
    39:3 40:20
    45:9,11 57:9
    83:25 84:4
    98:6 104:16
    110:3 115:11
    129:16 137:12
**five** 32:25
    109:8,11,13
    115:12 148:23
**fix** 112:23
**fixed** 65:23
**flag** 81:13
**florida** 62:20
**fluff** 73:5
**flying** 50:17
**focus** 48:10
    55:20 127:23
**folder** 24:23
    25:1,6 26:5
    102:20,21
**folders** 114:22
**follow** 69:10
    85:9 103:15
    145:15 148:5
**followed** 46:25
    94:14

**following** 62:17
    108:12
**follows** 7:6
**food** 93:20
**foregoing**
    150:3,4 151:4
    153:5
**form** 14:22
    16:1,20 20:10
    23:10 36:4
    38:16 40:7,11
    51:6 59:22
    72:7 74:21
    75:2,22 79:2,8
    95:25 96:20,23
    99:22 101:3
    104:2 120:11
    121:6
**format** 149:7
**formed** 118:20
**forms** 120:22
**forward** 88:17
    89:9
**forwarded**
    78:19 83:8
**found** 34:11
    69:23 70:15
    73:2 75:6
    132:6
**foundation**
    16:21 27:8,9
    27:11,13,17
    113:14 119:20
    120:10 147:12

**four** 41:3
    108:22
**fraud** 27:1 39:6
    51:4 64:23
    78:18 81:9,13
    82:20 83:20
    98:3 99:25
    100:1,2 138:18
    138:22 144:1,3
    144:3 146:2
**fraudster**
    143:23
**fraudsters**
    129:2,4
**fraudulent**
    41:4 48:24
    49:10,12,13
    50:7 51:13,14
    57:19,22 61:6
    68:2 85:18
    135:21 144:5
**freeman** 40:18
    41:7 42:18
    43:12,13,20
    134:6 135:1,2
    135:3,4,17,20
    136:7
**frequency**
    131:17
**frequent** 63:2
**frequently** 63:9
    63:10 137:3
**friends** 142:18
**front** 19:25
    23:13 43:5

    73:9 87:11
    91:1,24
**frontier** 44:2,4
**frowned** 121:9
**frustrating**
    30:23,24
**frustration**
    32:2
**ftc** 114:3
**full** 67:5 106:25
**function** 77:3
    104:11
**functionalities**
    104:13
**funneling**
    59:10
**further** 20:14
    89:10 117:8
    129:13 142:21
    148:1 150:13
    151:9

**g**

**g** 5:1 48:19
**gained** 15:5
**garbage** 113:3
**gas** 1:10 2:18
    3:4 5:8 60:8
    82:25 111:20
**gaskets** 60:21
**gayle** 11:3 14:3
**gear** 46:9
**gears** 125:9
**general** 12:24
    77:3 101:25

Page 16

**[generally - happen]**

| | | | |
|---|---|---|---|
| **generally** 53:22 | 17:14 19:14,24 | 110:2,4,14,16 | **gregory** 1:17 |
| 56:5 59:2 70:9 | 20:14,17 21:11 | 112:11 117:21 | 5:6 6:8,12 7:3 |
| 71:1 78:11 | 44:16 45:12 | 119:19 120:2,8 | 152:2,24 153:2 |
| 131:15 | 56:6 60:19 | 122:1 128:2 | 153:4,12 154:4 |
| **generated** | 64:3 66:10 | 140:24 142:23 | **gross** 58:12,15 |
| 86:20 111:7 | 74:2,23 80:12 | 144:6 147:8 | **grounds** 33:23 |
| 131:3,7,12 | 82:14 84:4 | **good** 5:2 8:20 | **group** 127:25 |
| 139:9 | 91:2 93:17 | 74:8 94:1 | 133:4 |
| **genuine** 26:18 | 105:10 114:17 | 115:22,23 | **guess** 6:13 25:9 |
| **geographically** | 117:8,11 | 143:19,20 | 27:6 35:3 |
| 42:14 | 120:20 143:4 | **google** 9:4 38:5 | 37:14 46:4 |
| **geolocation** | 144:12 148:7 | 66:7 | 59:10 70:24 |
| 44:20 | **goal** 53:10 | **gossip** 46:24 | 110:3 144:17 |
| **gerson** 42:9 | **god** 19:11 57:8 | **government** | 149:3 |
| **getting** 34:9 | **goeghan** | 50:3 | **guessing** 51:23 |
| 44:20 50:21 | 112:17,21 | **gps** 54:10,13,19 | **guy** 41:20 |
| **gibberish** | **going** 8:20 9:17 | 61:12,13 62:10 | 42:11 |
| 113:24 | 10:9 11:15 | 63:15 70:2 | **guy's** 137:13 |
| **give** 8:9 33:23 | 12:25 14:9 | 71:19 73:22 | **guys** 35:7 64:3 |
| 41:25 42:10 | 20:21,25 26:23 | 74:13 75:12,21 | 73:17 93:13 |
| 45:4 49:22 | 27:21,22 30:20 | 76:24 95:23 | |
| 56:17 87:17 | 31:18 32:6,14 | 96:4,9,13,17 | **h** |
| 106:23 108:2 | 32:22 37:19 | 97:8,22 98:1,7 | |
| 135:9 142:24 | 39:21 42:10 | 129:9 130:14 | **h** 4:8 152:3 |
| **given** 63:12 | 46:9,9 49:22 | 130:19 132:12 | **h4** 82:8 |
| 153:9 | 49:23,23 56:2 | 132:25 136:9 | **hac** 2:11 |
| **gives** 89:6 | 60:7,8,13 | 137:20,25 | **half** 33:7 50:17 |
| **giving** 135:11 | 65:19 68:3 | **great** 8:19 12:9 | 60:13 64:5 |
| **gladly** 137:22 | 73:9 78:1 | 28:9 64:9 | **halted** 69:25 |
| **glance** 45:10 | 81:18,23 87:14 | 93:22 118:8 | **hand** 7:1 |
| **glancing** | 88:1,17 89:9 | 142:22 | **handful** 136:19 |
| 100:16 | 89:21 94:19 | **greg** 30:20 | 136:20,21 |
| **go** 6:11 8:1 | 98:2,10 99:1,3 | 34:22 87:10 | **handle** 47:17 |
| 11:5 12:12,16 | 99:9,9 100:20 | 125:22 154:1 | **handled** 141:18 |
| 13:15 17:1,1 | 106:16 109:9 | | **hands** 63:8 |
| | | | **happen** 56:5 |
| | | | 61:22 62:9 |

**[happen - implemented]**

95:3 136:16
**happened** 9:23
12:23 22:25
31:7 45:2 67:2
67:24 74:25
103:13 106:24
132:3 137:3
142:10 145:7,8
**happening**
17:24 45:2
46:17 127:14
**happy** 32:13,13
32:14 37:15
41:25 117:12
141:14
**hard** 100:11
**harm** 65:17
118:10
**harris** 2:21
6:21
**harrisbeach.c...**
2:24
**hasiak** 1:17 5:7
6:8,8,10,12,12
7:3,13 8:12
13:22 22:8
91:1 93:12
115:22 143:19
152:2,24 153:2
153:4,12 154:4
**hasiak's** 27:25
**hasiak.com**
154:1
**hawkins** 11:1
14:4 17:9,10

31:11 34:9
60:6 140:20,24
**head** 48:20
133:18
**header** 84:2,6
**hear** 12:1 19:6
55:10 57:20
62:14 77:21,24
78:3 88:5,8,11
90:14 96:25
107:6
**heard** 37:4 52:5
80:19 87:17
127:24,24
128:18 146:18
146:23
**hearing** 6:24
**heath** 2:13
**hell** 137:6
**help** 10:1
103:20
**hereto** 150:15
151:11 153:7
**hey** 29:19 56:1
87:10
**hide** 34:2
**hides** 64:15
**hiding** 32:15
33:1,9,11
**highlighted**
44:23
**hire** 132:4,5
**hired** 144:8
146:9

**historical** 4:11
104:9 105:9,12
**history** 77:3
**hoc** 85:6
**hold** 38:6 61:1
74:6 88:17
91:17 112:8
124:13 141:3
142:3
**holder** 45:14,17
**holdings** 1:12
2:19 3:6 38:10
39:25 40:6
122:22
**home** 32:17
148:7
**honest** 33:13
62:24 71:18
73:1
**honestly** 68:10
70:17 73:7
**hope** 74:9
127:9 143:1
**hopefully** 98:21
**hopeless** 54:16
54:18
**hoping** 54:15
**hopkins** 3:7 6:5
**hosted** 24:22
**hot** 32:20
**hotmail.com**
100:19
**hour** 64:4,6
93:16,17 141:8
141:9

**hours** 69:17
76:7 131:21
140:14,15
142:13
**house** 3:3 6:22
26:21 49:21
**housed** 117:9
**household**
45:18
**houston** 1:21
5:12 34:12
42:15
**hr** 32:23
**html** 95:5
**huh** 92:8

**i**

**i.t.** 55:2
**idea** 24:14
**identification**
81:21 104:7
110:9 112:15
**identified**
18:25
**identifies** 90:8
**identify** 6:7
103:20
**ignore** 23:19
**immediately**
32:24 69:25
78:8,9,19
102:8
**implementati...**
83:9
**implemented**
85:4 94:24

Page 18

**[implies - ip]**

| | | | |
|---|---|---|---|
| **implies** 108:17 | **india** 13:10 | **informations** | **interesting** |
| **impossible** | 43:10 | 17:22 | 142:18 |
| 16:24 36:19 | **indicate** 61:14 | **infringe** 141:15 | **internal** 4:13 |
| 95:21 | **indicated** 15:4 | **inquire** 27:21 | 32:23 109:23 |
| **impression** | 48:12 129:9 | **inquiry** 25:12 | 112:25 113:5 |
| 10:16 | **indicator** 82:20 | 27:12 | **internally** 98:5 |
| **improve** | 83:20 89:14 | **inside** 7:20 | **interpose** 38:17 |
| 112:23 | 138:19,23 | 40:17 78:13 | **interrupt** 19:5 |
| **inbound** 15:6 | **individual** 1:4 | **insight** 4:11 | 55:11 |
| 15:15 | 128:18 144:4 | 104:10,10 | **intervened** |
| **incident** 102:7 | **individuals** | **instance** 62:1 | 86:9 |
| **incidents** 48:23 | 57:12,14 | 115:11 123:25 | **intimately** |
| 63:20 98:6,7 | 144:14 146:2 | **instances** 62:4 | 127:21 |
| 136:16 137:2 | 147:2 | 62:6 63:4 | **investigate** |
| 137:16 | **industry** 17:25 | 95:16 121:7,17 | 17:19 136:6 |
| **included** 67:9 | 36:23,24 48:22 | 121:18 138:6 | **investigated** |
| 67:11 | 51:2,11 64:13 | **instruct** 7:14 | 70:16,17 |
| **includes** 7:13 | 64:14 71:23 | 11:11 | 135:20 |
| 73:18 | 72:3,14 128:25 | **instructed** | **involve** 11:10 |
| **including** 15:7 | 143:24 | 46:17 62:22 | 12:4 |
| 20:19 67:14 | **inevitable** | **instructions** | **involved** 40:10 |
| 127:22 130:22 | 31:24 | 41:24 81:8 | 46:11,14,19 |
| **income** 58:10 | **information** | 113:20 121:3 | 47:5,10,23 |
| 58:13 | 12:4 17:23 | 138:17 | 48:1,23 73:23 |
| **incomplete** | 28:14,16 32:15 | **integrated** | 78:20 112:19 |
| 115:1,1 | 33:1 42:1 43:4 | 35:24 | 127:19 |
| **incorrect** 137:4 | 48:5,8 50:6 | **intended** 5:22 | **involving** 48:24 |
| 145:11 | 55:24 59:25 | **intent** 38:21 | **ip** 55:3 96:7,8 |
| **incorrectly** | 67:9,13,13 | **intentions** 76:5 | 98:18,24 99:9 |
| 59:12 | 71:12 84:6 | **interactions** | 99:10,17,20,24 |
| **independent** | 86:3,6,13 | 77:2 | 100:5,8 101:1 |
| 38:22 68:5 | 88:24 95:2 | **interest** 80:9 | 101:6,10,20 |
| **independently** | 97:17 121:8,16 | 118:25 | 102:6,6 103:21 |
| 68:22 | 123:14 131:15 | **interested** | 104:1,18 |
| | 141:13 | 150:15 151:12 | |

**[isp - know]**

isp  100:8
issue  19:15
  62:13 72:3
  86:7 100:15
  132:23 133:18
  134:11,18,23
  137:10,19
  138:3,4
issues  30:15
  31:9,12,13
  50:4 61:23
  62:12,21 119:8
  121:4 122:4
items  30:8
  117:2,6 119:3

**j**

jabbar  128:19
jacob  57:8,9,15
  137:12
january  107:16
jason  3:7 6:5
jeremy  2:10,14
  6:17 143:8
jerome  69:7
jersey  43:2
jhr  1:9
job  1:23 44:8
  107:21 110:22
  152:2
jogged  147:3
join  98:10,22
joke  30:20
  37:19
jokes  50:17

judgment  38:4
july  132:24
  133:19
jumbo  35:7

**k**

k  8:10
keep  19:7 20:6
  29:5 33:5
  36:22 45:21,24
  123:5
keeping  38:3
  65:18 115:6
kent  8:10
kept  65:15
  66:25
kevin  88:7,14
  88:23
kick  34:9,10
kind  48:1 49:12
  50:7 51:4
  53:11 54:6,23
  61:11,22,22
  100:1 144:1,2
  144:3
kindly  139:2
kinds  39:5
  62:10 63:20
kingdom
  101:13
kiwi  9:12 44:3
  58:3,5,8 83:22
  111:20 113:8
knew  16:17
  27:2,4,6 29:1
  30:6 36:13

44:8 46:14
49:1,8,9 60:5
60:10 115:2
126:18 127:9
128:2 144:4,5
144:7,11
145:20 146:5
know  12:12,24
  13:5 15:6
  16:18,25 17:18
  18:12 20:8,15
  23:19 26:17,21
  27:12 30:21
  32:16,17 33:12
  33:21,23 34:4
  34:6,6 35:4,6,8
  35:11 36:16,18
  36:20 37:3
  39:1,2,2 41:4,9
  42:6 43:9 44:1
  44:1,9 46:4
  47:14 48:21,22
  50:2 51:13
  52:1,2,18 53:2
  53:5 55:2 56:2
  56:25 57:1
  58:1 59:14,18
  59:19,21 60:2
  60:12,16,18
  62:16,18,18
  63:6,8 64:23
  64:23 66:8
  67:7,16,17,17
  67:25 70:4,7
  70:12,12,15

71:2 72:21,22
73:3 74:10,25
75:15,18 76:16
78:7,13 80:1
81:6,8 83:2
84:20 85:7,15
85:17 86:2
88:23 89:17
90:22 93:17
94:21 95:10,20
97:25 98:5
99:5 100:16
101:18 102:3
102:16,24
103:14,16
104:12 105:11
105:11 107:23
109:1,1,8
110:17 111:5
111:13,15
112:1,6,24
113:3,11,17,22
113:22 114:5,7
114:17 115:6
121:5 122:18
124:9,11,24
126:11,21
128:10,12,14
130:24 132:18
133:8,11,11,18
135:14,15
136:2,5,14,18
136:25 137:6
138:6 140:8
142:3 144:2,3

**[know - litigation]**

144:10,14,16
149:5
**knowing** 17:24
36:1
**knowledge**
18:6 30:13
60:16 72:11
97:16,18,19,24
103:19 126:5
128:15,21
147:20,22,23
150:10 151:6
**knowledgeable**
127:21
**known** 72:17
76:23 143:23
**konrad** 11:1
14:3 40:21
**kosher** 37:10
**kozieja** 11:2
14:3 40:22,23
40:25
**kreppel** 3:3
6:22,22 7:22
10:25 12:5,8
12:18

---

**l**

**lack** 122:19
**lacks** 16:20
**lane** 125:21
**language** 54:2
70:8,8,21 71:5
71:16 73:1
78:17

**late** 132:12
**laurence** 2:12
**law** 2:4 6:15
52:11
**laws** 5:24
**lawsuit** 146:24
**learn** 95:15
138:21
**learned** 60:1
**learning** 129:8
**leave** 8:12,15
8:19
**lecours** 2:20
4:4,6 6:20,20
7:9 8:1 11:8,23
12:5,17 14:22
16:1,20 19:7
20:10 21:19
23:10 27:8,18
28:1,5 34:13
35:1,10,14
36:4 38:16
40:7,11 51:6
58:20 59:16,22
64:5 68:9,11
68:18,23 72:7
72:15,19 73:12
74:21 75:2,22
76:14 79:2,8
79:19 85:14
86:21,24 91:18
93:19 94:1,3
95:25 96:20,23
97:9,13 99:22
101:3,8,12

104:2 106:18
109:20 113:14
115:12,21
119:21,25
120:6,11,13
142:20 143:5,9
145:14,18
147:17 148:1,4
148:14,17,22
149:8
**legal** 18:19
35:6 154:19
**legitimate**
123:12,24
**lengthy** 52:3
**level** 29:17
**liability** 1:13
38:13,15 40:6
48:2 52:12
65:1 121:5,16
**lie** 31:18
147:13,14,16
**lied** 100:25,25
147:15
**likely** 11:6
**limit** 12:3 67:12
**limited** 1:12
18:24 99:19
**limiting** 67:14
**lindsay** 3:3
6:22 7:18
10:25 11:19
26:20 78:13,16
**lindsay's** 78:14

**line** 20:22
29:18 47:18
80:22,23 92:7
100:11 143:1
152:4,7,10,13
152:16,19
**lines** 18:20
**lisa** 11:1 14:4
17:9,10 31:11
34:9 37:14
60:6 140:20,24
**list** 4:14 30:2
67:1 110:17,20
110:23 111:1,4
111:7,7,10,19
111:22,23
112:1,20,25
113:5 114:5,8
114:11,14
137:17,21
139:5,8 146:6
**listed** 36:2
**listen** 53:19
89:3
**listened** 22:8
**listening** 85:10
**lists** 109:23,24
110:23,24
113:12 114:1,2
114:4,18 115:1
119:8
**literally** 117:15
**litigation** 59:6
59:8 68:4 71:8
111:24

**[little - manager]**

| little 14:17 20:2 | longer 24:10 | lose 60:7 | maintain |
|---|---|---|---|
| 32:7,18 49:6 | 31:4,7 93:17 | lost 13:13 | 110:21 |
| 51:23 58:3 | longevity 47:13 | 16:10 21:19 | maintained |
| 60:11 65:19 | look 9:3,4,25 | lot 22:18 34:7 | 114:2 |
| 88:13 89:9 | 12:13 15:4,14 | 35:6 66:5 73:5 | maintaining |
| 96:2 113:23 | 40:14 44:15 | 85:24 92:19 | 110:23 |
| 118:7 125:20 | 45:7 47:25 | 132:9 136:18 | major 23:19 |
| live 131:19,20 | 68:7 69:2,21 | louis 128:13,16 | majority 49:3 |
| 131:24 | 74:2,11 76:19 | 128:23 129:16 | 121:18 |
| llc 1:9,11,12 | 79:9 83:3 | 130:4 143:23 | make 7:10 |
| 2:17,18,19 3:4 | 86:17 90:23 | 145:20 146:19 | 14:25 16:18 |
| 3:5,6 5:8 152:1 | 91:11 92:21,24 | 146:23 147:10 | 20:12 21:14 |
| 153:1 154:3 | 101:14 103:6 | 147:21,22,25 | 22:20 52:7 |
| load 20:2 | 104:15 105:10 | low 29:17,17 | 53:14 65:25 |
| loaded 137:5 | 106:3 107:10 | lunch 64:6 | 69:11 74:4 |
| local 94:11 | 108:6 110:20 | lunchtime 64:1 | 88:2 107:22 |
| 114:20 | 113:2,16 | lying 31:15 | 115:8 125:1 |
| locate 26:6 38:4 | 120:20 131:19 | 64:20 147:4,5 | 129:12 132:2 |
| located 5:10,11 | 137:18 142:3 | **m** | 138:5 142:18 |
| 26:12 42:14,15 | looked 65:21 | | making 20:8 |
| 42:23,24 96:12 | 68:22 70:5 | mac 57:6,18,21 | 27:11 49:16 |
| location 1:20 | 72:23,25 75:4 | 137:14 | 85:2 |
| 96:12 129:10 | 111:14 130:23 | made 11:21 | man 39:15 |
| 129:11 | 132:11,16 | 14:19 15:15 | management |
| log 62:15 | 139:4,8,19 | 20:6 28:7 29:4 | 30:10,11,18,19 |
| logging 131:21 | looking 10:10 | 47:16 53:16 | 37:16,19 42:13 |
| login 105:4 | 43:4 100:16 | 59:15 73:13 | 42:15 43:14 |
| london 99:19 | 103:25 111:6 | 77:10 86:8 | 44:7 49:4 |
| lonestar 127:25 | 114:24 130:18 | 111:3 116:22 | 72:18 95:13 |
| 128:10 | 131:1 132:15 | 117:13,22 | 102:8 135:9 |
| long 18:7 19:3 | 139:2 | 134:12 136:6,7 | 136:2 |
| 37:13 45:21 | looks 74:7,7 | 136:8 140:1 | manager 7:19 |
| 69:14 93:11 | 84:14 106:10 | 145:3 153:5 | 11:21 61:3,3 |
| 128:4 140:13 | 108:9 113:2 | mail 8:21 | 78:14 105:3,3 |
| 148:7 | 139:20,21 | main 50:4 | 111:2 |

**[managers - million]**

managers
  43:14
managing  9:12
manner  5:25
  69:25
march  72:18
  75:1 76:9,10
  114:9 130:14
  132:12
mark  78:2
  80:25 81:19
  112:12
marked  37:24
  38:1 78:5
  81:11,13,20
  104:6 110:8
  112:14 138:17
marketing
  46:11 51:12
  98:4 123:2
  126:13 127:25
  137:15
marking  78:21
  79:4 110:4
maryland
  42:25 45:5,8
  45:13 57:7
  94:17,18 95:18
  99:21 100:4,5
  126:23,24
mask  55:3
massive  65:1
match  102:7
matched  53:14

matches  88:25
matter  5:7 11:6
  127:7 128:1
matters  7:16
  8:5
max  108:13
maximum
  108:13
maxwell  1:22
  5:3 150:2,17
mbm  18:17
  40:17 42:7,22
  43:14,24 44:7
  55:19 62:6
  108:9 126:22
  126:25 127:7
  127:20 133:15
  134:8 135:9
  137:9
mbm's  42:13
  42:15 133:10
mbm3014
  42:17
mcclanaham
  87:3,23 92:11
  93:4
mcclanaham's
  90:9
mckinney  2:5
md  84:10
mean  29:17
  35:6 48:8
  52:10 54:17
  55:1 56:7
  68:19 70:24

73:15 85:1
92:21 93:20
100:17 105:3
108:12,25
119:16 122:13
123:20,21
126:16 127:9
128:5 136:14
138:8 140:8
141:14
meaning  39:20
  67:4 114:2
  121:6 131:21
  144:24
means  6:1
  34:24 64:14
  73:6 95:21
  111:21 113:17
  113:18,23
  122:14 126:17
  127:7 131:14
  145:9,9
media  120:19
meet  52:8
  144:13
meeting  34:12
  46:13,13 98:22
meetings  37:19
  47:10,10
  145:25
member  86:9
members  69:24
membership
  105:7

memory  125:20
  133:25 134:22
  147:3,9,22
memory's
  137:3
mental  86:4
mention  26:22
  121:22
mentioned
  37:18 49:8
  50:24 103:10
  120:18 123:23
  131:11 141:8
  145:19
merits  118:4
message  121:1
  123:18
messages  141:1
messaging
  141:6
met  44:9 78:24
meters  71:22
micromanagi...
  47:8,9
microsoft  95:6
miles  61:20,24
  62:18 63:5,17
  63:18,19 74:25
  136:10 137:20
  138:1,2,3
millennium
  132:20
million  58:16
  59:3 60:13

**[mind - never]**

| | | n | |
|---|---|---|---|

**mind** 19:24
33:5 36:22
83:12 93:15,16
110:1 127:1
132:10 134:18
**minds** 132:20
**minimal** 136:1
**minimum**
25:15 26:3
37:13 52:8,10
**minute** 45:4
115:13
**minutes** 30:12
32:25 93:16,20
93:23,24
141:10 142:16
142:24 143:5
**miranda** 20:19
106:6
**mishandling**
112:22
**mislead** 37:7
**misleading**
85:18
**mispronounce**
12:6
**misrepresent...**
48:24
**misrepresenti...**
85:18
**misspeak** 12:6
**misstate** 65:6
**mistake** 111:3
139:24 144:23
144:24,25

145:3,9
**mistaken** 24:20
57:17 58:17
**mistakes** 85:2
140:1
**mohsin** 128:19
**moment** 118:2
125:6
**money** 29:9
59:11 117:5,6
132:7 135:7
140:24
**monitor** 56:23
**month** 63:3,12
136:20
**monthly**
136:17,19,21
**months** 31:10
106:17
**morning** 5:2
**morris** 48:19
48:22
**mother** 90:13
**move** 51:6
101:3 118:3
120:8,12 137:8
**moved** 24:9
**muffled** 88:13
**multiple** 53:4
70:24,25 79:6
79:11 110:15
**mumbo** 35:6

**n**

**n** 2:1 3:1 4:1
5:1 8:10
**name** 5:2 6:9
6:14,17 12:5,7
39:16,18 40:21
57:9 84:9 87:2
88:4 89:4,6
102:12 103:23
105:18 112:17
134:25,25
137:10,13
139:13 146:6
**named** 40:18
45:14 98:16
128:19 139:14
**names** 57:8
73:18,18
**naming** 84:18
139:12
**national** 114:1
**nature** 14:5
33:13,14 64:20
65:6 128:3
141:7
**nda** 35:19
**necessarily**
35:8 52:11
60:21 71:8
134:14
**necessary**
153:6
**need** 13:15
22:19 25:13
26:24 27:17,22

35:4 42:1 49:4
54:13 64:4
78:18 93:12,19
98:10,11 99:12
100:21 139:23
142:23,25
143:5,8 148:14
149:6,8
**needed** 14:7
146:10
**needs** 78:2,6,21
79:4 81:1
82:17 83:5,10
83:17,20 84:23
85:12 102:7,8
102:9,10
138:13,18
144:19 148:6
**negative** 92:21
**negotiated**
16:25
**neil** 128:13,16
128:23 129:16
130:4 143:23
145:20 146:19
146:23 147:10
147:20,22
**neither** 146:18
146:23 150:11
151:7
**net** 60:12
**nevada** 39:17
**never** 29:19,20
37:6 43:11
53:6 57:2

**[never - okay]**

62:15 65:13
118:13 130:1
130:11
**nevertheless**
49:2
**new** 1:2 5:10
8:6,11 34:11
37:15 39:21
43:2 44:4
52:15 81:19
142:18
**news** 144:6
**nice** 34:7 99:14
**nj** 84:10
**nock** 1:4 2:2
5:7 31:13
59:14 124:15
152:1 153:1
154:3
**nomenclature**
139:12
**non** 65:23
69:24 142:13
**noon** 64:1
**nope** 77:23
**norval** 11:2
14:3
**notarize** 154:11
**notary** 5:13
150:18 153:13
153:19
**notation** 86:7
**note** 113:18
154:9

**noted** 153:7
**notice** 9:14,19
10:10 142:4
**november** 8:17
**number** 20:23
20:23 21:1,1
47:19 58:13
60:12 65:23
66:9,12 67:11
67:13,15 79:19
86:21 87:18
88:25 103:21
108:13,25
110:14 111:21
112:8 113:12
114:15 116:22
**numbers** 30:1
36:2 55:7,18
66:7,9 67:10
67:10 110:15
110:18 111:16
111:19,22
113:4,8
**ny** 2:23

**o**

**o** 5:1
**oaths** 5:14
**object** 119:20
**objection** 5:17
6:25 11:8
14:22 16:1,20
20:10 23:10
27:8 36:4
38:16,17 40:7
40:11 51:6

59:16,22 68:9
68:11 72:7,15
72:19 73:13
74:21 75:2,22
76:14 79:2,8
85:14 95:25
96:3,20,23
97:9,12 99:22
101:3,8,12
104:2 106:18
106:18 109:20
113:14 120:7,7
120:11
**obtaining** 41:8
**obvious** 23:5
68:1
**obviously** 34:6
60:10 64:25
65:3 81:14
92:19 132:5,5
**occur** 74:15
140:18
**occurred** 31:1
**october** 1:18
5:9 32:9 92:10
93:5 154:2
**oddities** 69:23
70:1,16
**offer** 89:21
**office** 37:10
45:11 100:22
**officer** 5:2 6:24
7:7 13:13
16:12,14 19:5
19:14 37:23

55:9 85:22
96:24 99:4
107:5 148:8,14
148:20,25
149:4 150:1,2
**offices** 2:4 6:15
**official** 7:22
**officiated** 1:22
**offsets** 92:21
**offshore** 135:15
135:17
**oftentimes**
131:8
**oh** 19:11 20:5
37:9 39:15
41:11 49:21
57:8 87:12
96:10 99:2
100:23 103:19
105:1 113:17
128:22 137:12
**ohio** 94:20
126:24
**okay** 7:24 8:15
8:19,23 9:2,5
9:10,13,16,22
11:4 12:3,9,16
13:1,7,12 14:5
15:3,13,20
16:10 17:10,12
18:15,21 19:17
20:6,12,17,21
20:25 21:2,9
22:3,6,13,17,22
23:7 24:2,4,11

**[okay - outlining]**

24:18,24 25:7
25:11,19,25
26:4,9,15,23
28:12 29:4,8
29:12,25 30:6
30:11,14,18,25
31:4,7,17 32:4
33:9 34:1
35:10,14,15,22
36:8 37:12,16
37:21 38:6,10
39:9,24 40:2,9
40:13,16,20,25
41:11,16,21
42:17,22 43:1
43:8,11,18,23
44:1,8,14,16,16
44:17 46:19
47:2,2,5 48:1,5
48:11,15 49:12
50:5,20,24
51:17,22 52:10
52:14,21 54:6
55:6,13,16
57:25 58:8,10
58:18 59:13,13
60:19 61:4,11
62:4 63:10,13
63:20,24 65:8
65:12 66:24
68:3,7 69:2,5,9
69:14,18,21
70:4,23 71:5,8
71:10,19,23,25
72:12,21 73:9

74:2,9,12,23
75:4,24 76:2
76:13,21 77:6
77:14,23 78:5
78:20 79:15,24
80:3,9,12,14,16
80:20,22 81:6
81:14 82:2,4
82:10,14,17
84:8 85:5,11
85:20 86:17,19
87:2,7,20 88:1
88:17,21 89:9
90:2,11,16
91:3,14,25
92:2,14 93:10
93:22 95:9,14
95:20,23 96:2
96:13,16 97:20
97:25 98:9,21
99:1,1,5,15
100:23 101:23
102:12,16
103:5,8,24
104:4,15,24
105:13,22
106:2,5,19
108:5,7 109:22
110:2,21
111:23 112:1,4
112:7,19
113:11,21,25
114:17 115:5,8
115:14 116:4
116:11,14,20

117:17,22
118:9,16 119:7
120:11,21
123:23 124:17
126:6,11
128:13,18
129:18 131:17
133:13,17
134:4,18,20
137:6 138:25
140:17 142:5
143:11 144:7
144:15 145:12
146:14 147:4
148:8,20 149:4
**old** 88:24
**onboard** 48:6
49:5
**onboarded**
16:24 47:20
**onboarding**
46:11,12,14,15
46:16,19,22
47:1,6,14,23
49:1 50:19
52:22,23,25
53:14 102:19
**onboards** 52:15
**once** 36:11 37:3
52:2 124:3
**ones** 137:22
**ongoing** 114:3
**open** 9:3 16:3
72:14 79:15

**operate** 127:22
**operates** 95:2
128:4
**operating**
13:10
**operations**
122:7 125:1
**opinion** 128:25
**opportunities**
79:6
**opportunity**
108:2
**opt** 123:2,5,12
124:3,22
**optics** 47:9
59:9
**option** 148:24
**order** 27:22
34:17,19 35:20
38:3 148:10
**orders** 148:9
**original** 148:11
**originally**
94:24
**orion** 111:2,4
**orpheus** 61:2
**outbound**
14:19,25 16:18
20:9
**outcome**
150:16 151:12
**outdated** 39:13
**outgoing** 29:2
**outlining** 85:16

**[outside - ph]**

outside  8:24
  41:2 66:11
outsider  51:3
overheard
  59:12
overwhelmed
  54:1
overwritten
  95:3
owe  140:20
owes  117:5,6
own  1:5 7:21
  118:11
owns  57:10
  58:8

**p**

p  2:1,1 3:1,1
  5:1
p.m.  91:5,9
  94:7 115:15,19
  143:12,16
  149:10,13
pa  84:10
page  4:2,9 10:1
  12:13 69:2
  80:12,18,20
  82:14 83:25
  84:4,5 92:6,24
  104:16 108:8
  152:4,7,10,13
  152:16,19
pages  154:12
paid  92:15
pakistan  13:10
  43:10 61:7,14

  135:6,12,14
pakistani  75:21
panels  51:13
paragraph
  44:19 69:6,21
  71:11 72:24
paragraphs
  12:13
parent  80:6
parenthesis
  84:12
part  16:22
  22:11 36:15
  44:2 46:12
  47:7 55:10
  89:4 95:5
  102:15 108:8
  108:11 118:11
  131:25
participate
  47:1
participated
  46:15 52:4,6
particular
  33:17 41:19
  48:6 76:5 86:8
  125:6 139:6
particularly
  14:11 52:24
  70:10
parties  5:15,18
  150:12,14
  151:8,11
partner  34:5

party  25:4 28:3
  28:8 85:2 96:6
  139:9
past  46:24 55:8
  56:9,24 73:4
  106:24
pause  26:23
  142:24
pay  49:6 57:2
  58:19,25 59:5
  59:7 126:21
paying  92:11
  127:16
payments
  17:12
pays  37:6
pdf  69:3 84:5
pendency
  146:22
pending  59:5,8
pennsylvania
  42:25 57:7
  94:21
people  12:11,17
  15:14 26:24
  40:17 64:1
  76:1 93:17,19
  111:9 118:8
  132:4,6 144:13
pepco  89:12
percent  33:6,7
  93:1
percentages
  34:10

perfect  147:21
  147:23
perform  104:10
performing
  54:23
period  114:5
perjury  26:25
  120:2
permission
  90:20
permit  42:4
  43:19
permitted  5:22
  69:13
perpetrator
  96:6
perplexed  54:1
person  9:17
  42:4 45:14
  78:24,25 81:3
  88:23 89:24,25
  97:18 98:16
  100:25 114:21
  122:10 126:14
  128:21
personal  41:18
  43:23 97:14,16
personally
  117:6 128:17
perspective
  14:18
pertinent  14:6
ph  9:12 42:9,9
  88:4,7,14
  111:2,4 132:20

**[phantom - preston]**

**phantom** 33:7
**phone** 36:14,15
  36:18,21,25
  37:2 41:17
  46:16 50:15
  55:4,17 66:9,9
  67:9,10,11,15
  88:24 103:21
  111:16,19,21
  113:8 114:15
  131:8 140:12
  140:13
**phrase** 71:10
  95:20 106:19
  117:22
**physically** 47:1
**pick** 56:24 57:3
**piled** 111:15
**pitch** 37:4
**place** 8:20 24:9
  39:4 71:3
  92:22 113:18
  113:18 117:9
  137:16
**places** 138:5
**plaintiff** 1:7 2:2
  6:16,19 24:12
  24:15
**plaintiff's**
  60:15 140:5,22
  141:2,25
**plan** 8:12,15
  33:18 56:1
**platform** 39:22
  62:13

**plausible** 23:22
  30:19 36:9,10
  37:8,17 46:6
  47:24 128:9
**play** 77:6 87:14
**played** 21:16
  77:8,15,17
  87:16,21 88:3
  88:10,16 89:5
  89:11 90:3,12
  90:17 144:21
  145:5
**playing** 80:18
**please** 6:7 7:1
  16:12 42:1
  88:9
**pllc** 2:11,21
  6:18,21
**plus** 11:16
  28:23 33:21
  124:7
**point** 10:4 23:5
  29:19,23 36:10
  43:2 53:2 80:6
  106:23 110:25
  123:24 125:4
  131:1 137:18
  137:22 139:2
**policies** 71:21
  95:10 101:16
  101:19 102:15
**policy** 32:23
  45:11,19,19,20
  46:5 94:23,24
  94:25 101:23

101:25 102:5
102:13,22
103:2 105:13
105:19 121:14
121:15 132:10
**polish** 40:23
**politics** 142:16
  142:17
**popular** 36:23
  49:15,18,20
**portion** 79:24
  126:13
**position** 116:11
  116:13
**possession**
  18:24
**possibility**
  85:17 97:7
  139:25 140:3
  144:24
**possible** 81:9
  90:24 95:1
  96:17 101:15
  101:21 145:2
**possibly** 102:20
  109:21 123:18
  123:22 135:22
**potential** 35:25
  86:10 109:18
  146:6
**potentially**
  31:15 63:21
  106:11 121:4
  121:16

**power** 1:10
  2:18 3:4 5:8
  39:3 52:14
  60:8 82:25
  111:20
**practical** 54:7
**prematurely**
  41:1
**preparation**
  31:1
**prepare** 10:18
  13:2 68:8
**prepared** 17:5
  30:12 71:16
  112:1 151:3
**preparing**
  10:22 13:23
  14:7 28:15
**prerogative**
  117:21
**presence** 68:12
**present** 3:2
  12:20 50:15
  146:16
**preserve** 47:23
**preserved**
  47:24
**preserving**
  46:6
**preston** 2:3,4
  4:3,5 6:9,11,14
  6:14,15 7:24
  8:2,4 12:2,9,10
  13:13,21 14:23
  16:8,10,16

**[preston - protecting]**

19:8,11,12,17
19:23 22:3,6,7
23:16 27:15,24
28:9,11 34:21
35:3,15,16
36:5 37:23
38:1,8,20
51:16 55:12,14
58:21 59:20,24
64:8,10 68:14
68:21 69:1
73:15,24 76:15
79:3,21,23
81:18,22 86:1
86:23 87:1,13
90:25 91:10,21
91:23 93:22,25
94:2,8 96:21
97:4,11,20,21
99:5,7,11,14,16
101:5 107:9
110:6,10
112:11,16
115:8,14
119:19,23
120:4,9 142:23
143:7,11,18
145:12,16
147:12,25
148:6,10,13
149:1,3
**presumably**
54:9
**pretending**
41:9 49:15

57:16
**pretenses** 64:17
**pretext** 23:21
35:25
**pretty** 16:23
47:7 61:5 63:8
78:16 82:21
85:1 86:16
88:22 94:17
96:10 106:1
108:3,18
110:22 128:23
131:4 137:18
141:5
**prevent** 48:2
53:11 65:9
66:4 86:10
**previous** 55:18
55:23 56:11
61:2 62:16
66:20,23 98:2
128:23
**previously** 32:9
73:20
**prior** 10:15
38:17 44:3,8
51:10 56:16
66:25 68:4
72:18 89:7
124:13 140:4
150:5
**privilege** 7:12
11:11 27:9,14
59:23 68:16
141:16

**privileged** 7:16
11:12,13
146:17
**pro** 2:11 4:11
104:9,10
**probably** 18:1
43:9 51:21
55:23 64:3
66:22 77:1
86:14 102:2
104:12,14
109:8 111:8,14
111:18 112:3
137:14 140:10
142:24 148:18
**problem** 25:19
**problematic**
18:1 47:20
48:7 49:2
**procedural**
5:23
**procedures**
95:11
**proceed** 7:8,25
**proceeding**
1:20 5:4,21 6:4
9:21 11:22
149:14 151:4
**proceedings**
150:3,5,6,9
151:6
**process** 17:4
37:7 38:12,22
38:24 47:6
52:23 69:12

70:6 76:18
79:7 86:12
103:15 106:11
133:1
**processes** 16:6
53:18 85:8,16
85:17
**produce** 24:12
24:15
**produced** 5:20
73:17 78:11
109:22 112:13
113:2,6 139:9
139:20
**product** 64:16
68:18
**production**
112:10
**profile** 67:5
**profiles** 67:3
**prohibiting**
101:16,19,20
**project** 112:22
**proof** 53:7
**proper** 97:19
102:9
**proposals**
53:16
**prospective**
107:20
**protect** 38:12
38:15 40:5,9
**protecting**
52:11

[protective - reason]

**protective**
34:16,19 35:20
**protects** 39:6
**prove** 98:8
**provide** 14:14
15:5 17:23
18:21 22:23
23:21 36:20
46:18 59:25
65:23 66:19
89:21 94:19
100:11 123:7
124:22 125:23
128:4 148:18
**provided** 22:9
22:12,18,21
35:1,23,24
36:9 71:12
94:11 123:2
139:17
**provider** 15:10
100:8
**providers**
24:22
**provides** 88:18
**providing**
25:20 36:6
39:13 44:5
60:5,14 124:3
**public** 50:2
90:1 150:18
153:19
**pudles** 81:1
**pull** 73:9,10
104:4

**purchase** 56:10
148:21,22
**purchased** 80:1
105:6
**pure** 23:6
**purposes**
111:11,24
**pursuant** 34:16
**put** 30:17 34:25
85:4 87:10
111:8,10,13
112:24 121:5
121:11 126:19
138:5
**putting** 128:7

**q**

**qa** 16:6,22 30:7
47:10 52:4
61:3 62:22
67:20 69:15,22
70:5,15 71:4
71:20 72:23
76:1,18 85:15
102:15 105:3
111:2 113:18
131:5,16,17
135:25 136:1
138:10
**qualified** 150:7
**quality** 46:13
69:11 113:19
**question** 11:9
27:5 38:17
50:1,1 51:8
55:10 68:25

73:16 97:2,19
114:5 117:15
120:14 124:1
125:23 137:5,8
146:20 147:6
**questionable**
146:9
**questions** 49:24
54:7 76:16
82:19 115:9,10
120:2 134:5
138:13 141:21
142:21 143:21
148:2
**quick** 145:14
148:9
**quit** 67:16
**quite** 36:17
42:12 51:24
55:5 80:7
88:14
**quote** 36:12

**r**

**r** 2:1,10 3:1 5:1
152:3,3
**raise** 7:1 47:11
83:20 119:11
120:14,17,19
146:5
**raised** 30:15
117:2 119:8,18
119:22 120:22
123:17 134:11
**random** 37:5

**rarely** 53:18,19
**rate** 46:2,3
**rather** 133:6
141:9
**reached** 108:14
**reaches** 107:21
**reactivated**
130:1
**read** 16:11
83:11 148:15
148:15 153:5
154:6,8
**reading** 44:21
**reads** 108:11
108:11
**real** 73:10
148:9
**really** 20:8
26:21 27:6
30:23 57:8
65:22 71:6
106:14 115:2
126:25 137:5
142:12 143:6
**ream** 46:24
48:10,12,16,18
48:23 49:1,5,9
50:6,18,22
61:3 92:15
93:3 106:6
107:15,18
128:4
**ream's** 46:24
**reason** 49:5
108:12,25

[reason - relevance]

109:5,10 111:4
124:17,23
127:18 135:23
139:16,22
152:6,9,12,15
152:18,21
**reasonably**
39:23
**reasoning**
24:16
**reasons**  103:16
**reassert**  27:9
**recall**  9:16
35:22 130:18
132:23 133:4
135:16 138:12
**receive**  8:7
29:12 45:25
53:4 141:24
**received**  16:4
23:3 41:24
67:8 112:25
113:13,25
123:12 124:20
142:4,5
**receiving**  36:12
50:2 90:1
135:6
**recently**  116:4
**recognize**  9:6
82:10 108:19
112:17
**recollect**  115:4
**recollection**
10:2 68:5

120:22,24
**record**  5:4,5,18
6:7 7:10 13:16
13:17,18,20
16:8,14 19:15
19:20,22 21:24
21:25 22:2,4
30:14 38:22
52:14,15 53:15
87:24 91:6,7,9
94:5,6 115:5
115:16,17,18
120:7 143:4,13
143:14,16
149:11 150:9
151:5
**recorded**  5:25
6:4 30:12
99:12 150:6
**recording**  5:20
18:21 21:13
22:9,11,13
80:19 89:7
91:19,20 150:8
151:4
**recordings**
22:18,21,23
23:4,21,25
24:7 25:8 26:7
26:11 145:6
**records**  18:24
66:25 67:11
79:10,10 96:18
97:8 124:22

**recurring**
138:4
**recycled**
114:15
**reduced**  150:7
**reenroll**  78:23
**refer**  131:13
133:14
**reference**
135:16
**referenced**
74:16 154:5
**referencing**
37:25 70:2
**referred**  133:5
133:9
**referring**  54:21
**reflect**  63:21
101:6,10
**reflected**  75:19
76:17 101:21
136:22
**reflecting**
123:11 134:21
**reflects**  61:12
**refresh**  82:2
**refused**  16:7
106:23 124:19
**regarding**  85:7
85:7 107:8
119:3 134:11
140:6
**regards**  11:19
**regular**  63:2
131:9

**regularity**  62:9
**regularly**  123:8
140:1
**regulations**
64:25 65:1
**regulator**  94:12
95:18
**regulators**  71:6
**regulatory**  7:19
7:23 11:20
45:25 70:11
71:3 78:14
102:20
**rehire**  106:17
108:1,4
**rehiring**  106:11
107:15
**rejected**  109:5
**rejection**
108:12,12,25
109:9
**relate**  47:12
**related**  105:21
150:11 151:7
**relating**  4:15
**relationship**
13:3 18:2 19:2
23:8,14,20
28:12,25 31:16
41:18 43:24
80:3 124:6
**relative**  150:13
151:10
**relevance**
58:20

**[relevant - reveal]**

| | | | |
|---|---|---|---|
| **relevant** 144:17 | **reorient** 65:19 | **represented** | 93:3,4,8 |
| **remember** 9:10 | **rep** 41:3,22 | 148:19 | **resignation** |
| 9:11,22,24 | 42:18 49:21 | **reproduced** | 116:12,21 |
| 11:4,17 23:2 | 88:22 119:24 | 82:7 | **resigned** 32:9 |
| 30:9 39:16,18 | 120:5 121:24 | **reps** 45:16 66:5 | 116:4,15 |
| 48:20 50:13 | **repeat** 19:10 | 66:6 | **resources** |
| 57:6 62:25 | 27:5 95:1 97:2 | **reputation** | 136:1 |
| 63:9 68:10 | 124:1 146:20 | 48:12,17 | **respect** 9:18 |
| 71:2,17 85:15 | **repeated** 16:14 | **request** 118:22 | 10:9 15:21,22 |
| 94:17,21 | **rephrase** 13:4 | 123:8 124:19 | 125:22 |
| 102:14,24 | 43:18 59:19 | **requested** | **respective** |
| 103:23 104:25 | 75:17 95:15 | 16:15 23:3 | 72:23 |
| 105:1,7,18,20 | 147:6 | 150:21 | **respond** 120:2 |
| 108:3 114:25 | **replied** 32:2 | **requesting** | **responding** |
| 119:15 120:16 | **report** 73:17,21 | 140:23 | 23:4 |
| 123:20 124:14 | 74:3 91:13,16 | **requests** | **responds** 77:23 |
| 124:16 130:15 | 92:3 104:17 | 117:13,22,24 | **response** 18:22 |
| 132:20 133:1 | 131:3,11,12,13 | **required** 25:14 | 41:21 70:9,10 |
| 133:22 134:1,3 | 131:14 | 25:15,21 26:1 | **responsibilities** |
| 134:6,9,19,24 | **reported** 102:8 | 123:5,7 126:6 | 132:1 |
| 135:4,18 137:7 | **reporter** 5:3,10 | 131:19 153:13 | **responsible** |
| 138:19 139:7 | **reports** 67:8,8 | **requirements** | 64:23,24 |
| 141:3 144:23 | 103:25 105:9 | 52:9 82:13 | 122:10 |
| 146:25 | 105:12 | **requires** 53:24 | **rest** 95:12 |
| **remembered** | **represent** | 54:8,9 | 107:6 130:4 |
| 147:2,19,24 | 20:21,25 28:7 | **requiring** | **result** 71:14 |
| **remind** 34:20 | 110:16 | 103:2 | 85:3 135:7 |
| 134:25 | **representations** | **res** 84:10 | **retained** 29:8 |
| **reminded** 34:3 | 28:7 | **reserve** 115:10 | 41:23 42:5 |
| **remote** 1:20 | **representative** | **reserved** 93:13 | 55:24 |
| **remotely** 5:16 | 56:3 64:15 | 149:12 | **return** 41:23 |
| **removed** | 97:15 119:9,12 | **residence** 71:14 | 154:12 |
| 111:18,22 | **representatives** | 77:20 | **reusing** 38:2 |
| 113:5 114:13 | 15:7 53:6 | **residual** 91:16 | **reveal** 7:15 |
| | | 92:3,18,24 | 11:12 |

[revenue - sale]

**revenue** 58:12
58:15 60:11
**review** 17:1
35:9 78:15,19
150:21
**reviewed** 17:6
78:11 82:22
**richard** 9:20
10:3,25 11:19
14:3,11 16:22
17:1,9,10
20:11,16 24:3
26:16,17 30:8
30:17 31:11
34:8 37:14
39:21 41:18
42:6,10 44:2,7
45:21 46:10
48:21 49:3
50:14 52:3,4,6
53:17,18,23
60:4,13,17
76:1 78:12
97:22 107:1,22
108:1 116:15
117:5,9 118:6
118:10 119:15
120:16 121:22
122:14 125:7
126:17 127:9
127:22 131:4
132:1,15 135:8
135:8 140:22
141:19 142:6
144:11 145:19

146:22
**richard's** 24:16
41:20 42:5
118:22 121:3
121:13,15
122:19
**richmond** 1:11
2:19 3:5 38:10
39:25 40:5
122:22
**right** 7:1 8:2,23
9:6 10:18 12:6
13:22 19:2,18
19:24 21:11,17
21:23 22:10
28:19,20 29:6
31:2 36:6
38:23,24 39:5
39:7 46:8
48:20 56:16
58:6 61:17
64:11,22 66:1
72:5 75:1
76:19 77:6,9
77:18 79:13,14
81:18 82:22
83:24 84:16
87:14,17,22
88:1,4,11 89:6
89:14,23 90:4
90:7,21 91:3
91:12,15,22
92:3,23 94:2,9
94:17,21 98:15
98:18,22 99:1

100:7,12,13
102:4 106:8
107:13 111:6
113:11 115:3
115:25 116:5,6
116:9 117:23
122:6,8,11,17
124:4 125:5,7
125:9 126:3
127:8,16,17
129:2,4 130:2
130:20 132:19
133:19 134:9
134:13,19
136:3 137:7,9
137:21 138:4
138:12 140:4
142:20 143:9
145:22 148:1,5
149:9
**road** 1:11 2:19
3:5 38:10
39:25 40:5
60:20 122:22
**rob** 48:19,22
**robert** 1:4 2:2
5:7 152:1
153:1 154:3
**roland** 18:12
18:15,18,22,25
113:11
**role** 78:14
124:25 131:23
**roll** 88:2

**rough** 25:7
67:23 69:14
**roughly** 28:22
28:24 44:9
**roundbox**
118:17,23
119:3
**route** 117:11
**rrh** 1:9,10 2:17
2:18 3:4,5 5:8
33:4,8 40:17
58:5,8,11,19
83:22 118:18
152:1 153:1
154:3
**rule** 9:13 10:7
81:2,6 94:18
126:9
**rules** 5:24 85:9
94:9,15 154:14
**rumors** 50:6,11
**run** 85:9 99:9
99:17

**s**

**s** 2:1 3:1 4:8 5:1
152:3
**safeguards**
39:13
**salazar's**
114:20
**sale** 33:4 34:1
44:23 50:3
63:22 64:19
65:16,18 66:14
66:16 68:1,2,2

Veritext Legal Solutions
800-336-4000

**[sale - selling]**

81:11 85:18
102:7
**sales**  13:9
  16:23 18:18
  23:20 40:18
  41:3,8,19 42:8
  42:17,23 43:5
  44:21,22 45:5
  45:16 46:13
  47:10 48:24
  49:4,16,20
  50:18,25 51:13
  52:6,7,23
  53:13 54:4,9
  54:18,23,25
  55:16,17 56:9
  56:23 57:4,13
  57:18,22 61:3
  61:6,8,18
  62:11,23 63:7
  63:16 64:15
  66:5,6,18
  67:14,16 69:23
  69:24 70:1
  72:1,2,9,14
  77:20 78:22
  79:6 83:13,16
  86:15,15 88:22
  100:25 101:17
  102:9,15,18,19
  105:20,21
  106:16 107:20
  107:21 122:11
  126:12,18
  127:2,5,5,12,13

128:4,24
129:10,18,20
129:22,23,24
129:25 130:19
130:25 133:5
133:10,15,20
134:8,9 135:5
144:5,6 145:21
146:6,9,10
**sampling**  73:21
**sarcasm**  58:15
**saw**  90:23
  132:12 137:25
**saying**  14:12
  27:24 31:15
  32:21 37:9
  90:13 118:13
  136:17 147:21
**says**  12:13
  40:25 41:2,16
  41:22 44:19
  49:21 69:22
  71:11 78:1
  88:4 89:12
  90:7
**scattered**  26:11
**schedule**  12:14
**scheduling**
  140:6,25 141:4
**scheme**  50:24
  51:5 53:12
  54:3,8 63:21
  64:18 71:25
  72:1,13

**screen**  98:11,23
  99:2,8,13
  102:22 103:3,9
  104:21 105:13
  110:3 143:10
**screened**
  103:12
**screening**
  104:11
**screenshot**
  104:17
**screw**  33:19
**scripting**  78:10
  78:15
**scroll**  80:17,18
  80:20 83:24
**scrolling**  20:1
**sec**  73:11
**second**  9:5
  21:22 38:7
  40:15 42:11
  44:19 45:4
  49:20,20 55:21
  57:7,21 60:25
  61:2 69:6
  71:11 83:25
  104:8,16
  124:14 137:13
**seconds**  81:24
**secret**  72:14
**see**  9:8,14
  12:14 20:19,23
  21:5 34:25
  39:24 40:18
  44:10,16,17,25

53:13 68:1
69:4,9 71:17
73:18,22,25
74:7,12,15,22
74:24 80:18,21
81:4,5 82:4,8,9
82:15 84:1,2,5
84:8,12 87:5,7
98:18,24 99:2
99:8 100:7,11
103:6,15 106:4
107:13,16
108:7,15
110:11,15
142:4
**seeing**  63:9
  111:21 135:16
**seeking**  11:9
**seem**  83:12
  84:18 113:10
**seems**  35:23
  71:12 75:14
  100:14 111:25
  113:23 133:12
**seen**  55:8 56:5
  62:21 123:15
  135:13 136:11
  146:6
**selected**  89:20
**sell**  15:9 33:9
  33:11 55:23
  56:12,21 57:6
  107:24
**selling**  14:14
  15:22 17:16,16

**[selling - situated]**

17:20 18:5,8
20:8 23:8
43:16,20 66:22
**send** 8:21 25:14
25:15 34:24
73:6 140:21
148:15,17
**sending** 32:25
67:14
**senior** 49:4
**sense** 21:14
25:7 28:21
58:18 67:23
69:14 109:3
**sent** 17:6 32:20
52:24 83:1,1
86:14,14 89:1
108:17 138:7
**sentence** 44:18
69:22
**sentences** 44:18
**separate** 127:2
127:6
**september**
28:18 32:1
116:8
**sequential** 38:3
**series** 42:22
49:24 109:23
133:5,6,8,9,14
133:15,20
**serves** 11:24
26:20
**service** 15:6,6,8
29:18 30:8

33:22 35:24
44:22 61:13,19
63:16 81:12
87:7 100:22
104:20 112:3
129:11 131:5
131:16 138:10
**services** 1:11
2:18 3:5 14:14
15:17 39:1
44:5 118:18
**serving** 119:9
119:12
**session** 53:15
**sessions** 52:16
**set** 74:13,14
103:5
**settle** 18:20
59:14 60:2
**several** 29:15
31:12 33:3,4
44:3 48:21,23
49:14 53:16
60:15 62:7
85:3 106:17
115:1 119:13
120:15 121:7
135:5 144:16
**severe** 64:22
**severity** 102:11
**share** 17:23
71:2 98:11,23
99:13 105:22
110:2

**shared** 24:21
105:23 114:20
132:1
**shareholder**
33:5
**shareholders**
37:15 49:3
**sharepoint**
94:25 95:1,2,5
**shares** 33:6,7
**sheehey** 114:21
**sheet** 84:1
154:10
**shift** 46:9
**shifting** 125:9
**shortly** 105:6
**show** 70:19
100:14 110:13
110:15 137:17
137:21 147:15
**showed** 68:21
127:9
**showing** 110:1
136:10
**shown** 68:20
75:19 106:16
130:24
**shows** 63:15
65:21 87:18,24
98:15 101:1
104:18
**shut** 32:24
**side** 112:3
144:25,25
145:1

**sign** 30:21 35:3
35:5,18 45:17
53:8 59:10
64:16 109:18
122:21 148:15
148:16 154:6
154:11
**signature**
149:12 150:16
151:14
**signed** 34:18
35:2,10,12
39:25 50:14
122:16,18
124:12 154:17
**signing** 124:7
**similar** 69:23
70:1,16 84:19
106:25 132:25
139:13 145:7,8
**similarly** 1:6
106:25
**simply** 32:16
108:24 129:12
**single** 52:5
123:11,16
**sir** 16:12 19:15
38:9 99:4
148:25
**sit** 32:17
129:12
**sitting** 132:9
146:4
**situated** 1:6

**[situation - start]**

| | | | |
|---|---|---|---|
| **situation**  15:18 41:12 83:13,16 | 112:2 114:13 131:14 135:6 | **sounds**  28:20 30:23 51:2,3 | **spreadsheet** 4:10 82:7,10 |
| **situations** 22:25 25:11 | **somebody's** 61:14 | 53:5 67:1 77:9 87:22 90:18 | **spring**  1:9,10 2:17,18 3:4,4 |
| **six**  31:10 102:1 109:7,9,11,14 109:14 130:7 | **somewhat** 38:14 | 94:1 137:15 **southern**  1:2 | 5:8,8 6:23 31:13,16 39:3 |
| **skills**  150:10 151:6 | **soon**  8:13 53:23 **sorry**  6:10 8:17 | **space**  109:14 **spate**  74:24 | 52:14 56:3 60:7,10,14 |
| **slamming**  39:6 39:14 40:6 | 10:8,13 19:5 19:14 20:1,5 | 75:20 **speak**  10:21,24 | 82:25 83:8,22 84:9 98:13 |
| 41:11 49:18 57:23 64:11,12 | 21:12 27:5 55:9,11 57:20 | 28:2 58:12 **speaking**  33:19 | 111:20 116:5 130:13,23 |
| 64:14,19 65:4 65:9 66:4 68:2 | 79:16 80:15 82:16 83:25 | 42:6,7,8 113:3 **specialized** | 145:10 152:1 153:1 154:3 |
| 85:19 89:13,13 89:17 98:3 | 85:22 86:22 87:12 92:1 | 51:4 **specific**  51:3 | **spring's**  10:25 **st**  128:13,16,23 |
| **sloppiness** 113:15 | 96:10,24 97:1 121:3 124:14 | 81:8 120:21,23 123:25 141:14 | 129:16 130:4 143:23 145:20 |
| **sloppy**  110:22 135:25 | 126:24 134:1 135:18 146:20 | **specifically** 24:5 137:20 | 146:19,23 147:10,21,22 |
| **slow**  79:18 **small**  58:1,2 | **sort**  14:18 17:20 27:13,20 | **speculating** 112:5 | 147:25 **staff**  132:8 |
| 59:13 60:3,5 60:11 98:23 | 28:18 35:23 37:4 47:17 | **splitting**  135:7 **spoke**  11:4 | **staffing**  69:17 **stage**  67:12 |
| **smith**  151:2,15 **sold**  33:15 | 49:17 52:7 53:23 71:23 | 43:11,12,13,13 65:25 | **stand**  16:12 **standard**  71:23 |
| 57:13 **soliciting**  94:20 | 72:14 85:9 90:1 95:6,7 | **spoken**  127:24 **spoof**  54:9 | 71:24 73:1,13 **standing** |
| **solutions** 154:19 | 110:14 111:19 118:13 135:17 | 75:12 **spoofing**  95:23 | 148:10 **start**  28:13 |
| **somebody** 62:17 65:4 | 141:21 144:20 146:1 | 96:4,8,9,17 97:8,22 98:1,7 | 46:9 72:6 110:4 114:19 |
| 77:12 90:7 96:11 105:4 | **sound**  28:18 **sounded**  21:17 | **spot**  85:10 **spouse**  45:18 | 114:19,24 115:13 |

**[started - surprised]**

| | | | |
|---|---|---|---|
| **started** 7:9 | **stopped** 23:4 | **subpoena** | **super** 63:1 |
| 10:20 31:10 | 25:18,20 32:16 | 142:4 | **supervise** 126:7 |
| 36:12 118:23 | 36:10 124:3 | **subscribed** | **supplier** 45:15 |
| **starting** 80:22 | 147:10 | 153:14 | 56:15 108:24 |
| **state** 45:13 | **store** 86:13 | **subsequent** | **supply** 109:13 |
| 64:25 78:24 | **stored** 24:18,21 | 130:4 | **support** 27:10 |
| 89:25 94:11,18 | 24:22 25:1,6 | **substance** 34:7 | **supposed** 14:13 |
| 108:16 120:6,7 | 26:4 71:1,1 | 53:24 142:9 | 22:13 94:18 |
| 150:19 | 95:11 102:17 | 146:18 | 103:1,8,11 |
| **stated** 116:7,14 | 102:18 | **substantive** | **supposedly** |
| 134:16 | **street** 8:10 87:8 | 142:7,10,13 | 55:2,5 58:13 |
| **statement** 7:10 | **strike** 51:7 | **substantively** | **sure** 7:21 8:10 |
| 27:19 130:17 | 101:4 124:2 | 35:18 | 18:4 19:17 |
| **statements** | **strongly** 40:25 | **successor** 80:9 | 34:23 42:12 |
| 51:7 | **struggling** | **sucker** 67:1 | 46:5 48:18 |
| **states** 1:1 61:7 | 39:19 73:5 | **sufficient** | 50:16 51:25 |
| 94:16 100:6 | 132:7 | 148:12 | 52:7 53:14 |
| 101:7 | **stuff** 37:5 | **suggest** 75:9 | 58:23 65:3,25 |
| **stay** 117:9 | **stupid** 125:3 | 99:24 100:2 | 68:23 73:11 |
| 143:1,9 | **subcontract** | 109:14 | 74:4 79:18 |
| **staying** 31:14 | 128:3 | **suggesting** | 80:7 85:1 88:2 |
| **stealing** 56:16 | **subcontracted** | 27:14 76:9 | 88:9,14 92:23 |
| **stenographic** | 127:2 | **suggestion** | 94:17 97:5 |
| 6:1 | **subcontracting** | 100:24 | 103:17,19 |
| **step** 125:3 | 127:8 | **suggests** 75:8 | 106:1 107:10 |
| **stephen** 112:17 | **subcontractors** | 78:20 97:17 | 115:8 117:20 |
| 112:21 | 126:23 | 99:25 | 123:17 129:20 |
| **stepped** 124:24 | **subject** 11:6 | **suite** 2:5,12,22 | 132:2 133:7 |
| **steps** 131:24 | 20:22 27:21 | **sum** 146:18 | 137:12 138:5 |
| **sticks** 141:5 | 84:6 98:4 | **summary** 38:4 | 139:1,25 |
| **stipulated** | **submitted** | **sumner** 151:2 | 145:16 |
| 35:19 | 144:4 | 151:15 | **surprised** |
| **stipulation** 6:2 | **suborn** 26:25 | **sunsea** 57:10 | 56:22 95:14,19 |
| **stole** 56:20 | **suborned** 120:1 | 137:13 | 138:21,24 |

**[suspected - text]**

| | | | |
|---|---|---|---|
| **suspected** 98:7 | **talked** 64:11 | 14:19 20:9 | **terminate** |
| **suspended** | 132:9 141:10 | 23:6,7 29:1,13 | 31:25 32:24 |
| 102:10 | 142:15 | 35:24 37:2 | 62:22,23 125:1 |
| **suspicion** 78:18 | **talking** 41:4,6 | 50:25 51:14,14 | **terminated** |
| **swear** 5:15 | 46:10 96:8 | 53:12 54:4,24 | 31:21 76:21,23 |
| 6:25 | 125:7 130:20 | 57:16 63:22 | 124:4,18 |
| **switch** 15:10,17 | 133:15 | 64:18 65:5 | **termination** |
| 90:19 | **talks** 41:2 69:9 | 72:2,13 75:10 | 31:24 119:13 |
| **switched** 37:1 | 102:5 | 100:2 106:15 | **terms** 14:7 |
| 90:14 | **tampered** | 125:13 135:17 | 33:14 34:1 |
| **sworn** 5:18 7:4 | 36:15 | **telephone** | 50:21 |
| 150:5 153:14 | **team** 17:5,7 | 16:18 20:22,23 | **testified** 7:6 |
| **system** 103:13 | 27:23 30:7,8 | 21:1 30:1 55:6 | 32:8 81:1 |
| 103:22 108:19 | 62:22 69:22,24 | 65:23 110:18 | 123:4 130:13 |
| 109:1 111:7 | 70:5,15 81:12 | 113:4 116:14 | 132:19 139:11 |
| **t** | 95:13 127:5,6 | 131:10 134:12 | **testify** 15:21 |
| | 127:12,13 | 142:11 | 23:24 26:5,10 |
| **t** 4:8 8:10 152:3 | 130:5 131:5,5 | **tell** 7:5 15:24 | 26:18 27:2,3,7 |
| 152:3 | 135:10,25 | 43:3 53:25 | 27:16 28:5 |
| **take** 5:4,13 9:3 | 136:1 138:10 | 56:3 63:7 70:7 | 132:11 |
| 32:6 63:25 | **teams** 119:17 | 81:11 93:13 | **testifying** |
| 64:4,6 67:17 | 120:18,25 | 100:20 123:22 | 121:23 150:5 |
| 92:20 99:9 | 121:6 123:18 | 133:22 139:3 | **testimony** |
| 109:4 112:22 | 127:2 131:9 | 141:14 | 27:25 101:4 |
| 115:12 118:1 | 133:10,15 | **telling** 26:18 | 128:11 130:15 |
| 125:20 128:22 | 134:9 | 127:4,8 133:24 | 137:24 138:19 |
| 137:7 142:3 | **technique** | 137:7 | 146:4,8,9,12 |
| **taken** 5:7 9:18 | 72:10 89:17 | **template** | 153:8 154:8 |
| 62:24 150:3,12 | **technology** 6:5 | 104:17 | **tevan** 88:4,7,14 |
| 151:9 | 39:19 103:17 | **templates** | **texas** 5:11,12 |
| **takes** 20:2 | **telemarketers** | 70:13 | 5:14 34:12 |
| 36:17 | 43:6,8,12 | **ten** 148:11 | 42:16 44:5 |
| **talk** 11:5 12:12 | 66:24 | **term** 37:10 | 150:19 |
| 46:8 53:20 | **telemarketing** | 64:12 126:12 | **text** 123:18 |
| 91:4 143:8 | 13:9 14:10,13 | 126:20 | 141:1,5 |

**[thank - tom]**

| | | | |
|---|---|---|---|
| **thank** 6:24 7:7 | 148:5 | 70:21 76:2,5 | 18:7,12,17,21 |
| 35:14 148:3 | **thinking** 89:19 | 77:21 78:12 | 18:23 19:1,3 |
| 149:4 | **third** 25:4 | 80:6 81:9 | 19:13 20:6,18 |
| **thanks** 86:24 | 42:11 69:5 | 88:12 91:5,9 | 21:5 22:9,11 |
| **thing** 23:14 | 85:2 139:9 | 93:20 94:4,7 | 22:14,17 23:20 |
| 57:1 66:21 | **thought** 52:19 | 94:19 102:2,2 | 23:25 24:23,25 |
| 89:16,23 94:20 | **thoughts** 34:25 | 102:14 103:11 | 25:1,6,14,19 |
| 96:11 98:23 | **thousand** 25:10 | 106:23 110:21 | 26:6,18 27:3,7 |
| 135:12 141:14 | **threaten** 67:16 | 110:22,25 | 28:12,25 29:1 |
| **things** 31:22,23 | **threatening** | 111:12 114:5 | 29:5,9,12,13,25 |
| 32:13 36:6 | 18:19 | 114:10 115:10 | 30:1 31:16 |
| 45:9,10 54:2,8 | **threats** 118:9 | 115:15,19 | 35:23 36:8,19 |
| 65:20 68:12 | 118:14 | 120:16 123:25 | 122:16,24 |
| 70:14 79:13,14 | **three** 36:25 | 124:15 125:4 | 123:1,5,12 |
| 81:10 102:5 | 59:3 63:12,13 | 138:11 140:14 | 124:3,6,17 |
| 121:11 131:6 | 63:14 69:16 | 141:4 143:12 | 127:7 |
| **think** 11:16,20 | 94:16 108:22 | 143:16 144:7 | **title** 7:22 122:9 |
| 21:19 26:24 | 140:12 147:1 | 144:10 149:10 | 122:12 |
| 27:13,17 32:9 | **throwing** 35:7 | 154:15 | **today** 26:20 |
| 42:9 43:2 | **thursday** 1:18 | **timeframe** | 32:5 103:12 |
| 52:17,19 53:25 | 5:9 | 154:7 | 116:8 132:9 |
| 56:20 57:15 | **time** 1:19 5:5 | **times** 11:21,21 | 146:4 |
| 58:3 60:20 | 6:6 8:13 13:16 | 14:25 59:4 | **today's** 32:22 |
| 62:23 64:9 | 13:20 19:18,22 | 60:15 103:15 | **together** 52:7 |
| 67:12 71:22 | 20:2 21:23 | 108:22 109:14 | 85:4 111:8,10 |
| 72:25 73:7 | 22:2 23:3,5 | 110:15 119:13 | 111:13,16 |
| 76:18 85:11 | 28:25 29:20,23 | 120:15 140:9 | 112:24 |
| 86:5 89:25 | 30:7 32:19 | 140:12 | **told** 10:3,6,8,12 |
| 90:25 93:11 | 34:4,4 36:17 | **timing** 142:18 | 14:24 15:4 |
| 94:13,16 96:3 | 36:23 37:20,20 | **tips** 13:4,5,7,8 | 26:5,10,15 |
| 97:6 111:2,14 | 39:10,10,11 | 13:9,23 14:1 | 31:17 46:17 |
| 119:19,23 | 43:2 44:6 | 14:10,18,24 | 59:9 81:2 |
| 123:23 126:22 | 47:11 49:2 | 15:3,13,22 | 108:3,4 142:15 |
| 134:16 137:2 | 51:15,24 57:20 | 16:2,17 17:14 | **tom** 114:21 |
| 142:24 145:1 | 67:7 69:19 | 17:14,15,16,22 | |

**[tomorrow - understand]**

| | | | |
|---|---|---|---|
| **tomorrow** | **tpv.com's** | **tries**  96:6 | 94:16 140:14 |
| 53:25 103:12 | 139:5 | 108:25 | 140:15 141:8,9 |
| **ton**   117:5 | **tpv.com.**  80:4 | **trigger**  71:20 | 142:13 143:21 |
| **tone**  118:1,3 | **traceable**  121:6 | **trouble**  45:22 | 147:9 |
| **took**  69:15 | **trained**  53:3,6 | 45:23 | **tx**  1:21 2:4,6,13 |
| 92:22 137:16 | 53:9 | **true**  14:16 | 154:13 |
| **top**  48:20 92:24 | **trainer**  53:1 | 15:21,25 16:7 | **types**  66:18 |
| 104:15,16 | **training**  52:15 | 24:8 64:15 | **typewriting** |
| **topics**  11:6 | 53:13,15,18 | 96:7 116:22,23 | 150:7 |
| 12:14,17 | **traipse**  68:15 | 118:23 119:1,2 | |
| **total**  58:10 | **transaction** | 119:6,7,10 | **u** |
| 140:14,15,16 | 130:23 131:1 | 129:11,14,15 | **u.s.**  100:8 |
| **tough**  55:1 | 131:18 | 130:10 135:19 | **uh**  92:8 |
| 102:24 | **transactions** | 150:9 151:5 | **uk**  101:2 |
| **towards**  51:13 | 17:5 108:17 | 153:8 | **ultimately** |
| **tpv**  38:12,21,24 | **transcriber** | **truly**  113:22 | 20:15 122:14 |
| 39:12 40:5 | 151:1 | **trusted**  39:12 | **unable**  82:18 |
| 44:20 54:13 | **transcript**  5:20 | **truth**  7:5,5,6 | **unauthorized** |
| 61:19 62:13 | 34:16 79:25 | 37:11 | 65:12 |
| 66:13 67:5,5 | 148:9,11 | **try**  56:12 62:17 | **uncle**  62:19 |
| 67:11 69:12 | 150:21 151:3,5 | 62:18 65:22 | **unclear**  115:5 |
| 77:10 79:10 | 153:5,8 154:5 | 110:2 | **under**  5:23 |
| 80:1 82:12 | 154:16 | **trying**  21:4 | 10:6,13,15,16 |
| 83:7 85:7 | **transcriptionist** | 34:2 96:11 | 17:25 24:23,25 |
| 86:20 87:24 | 150:8 | 98:22 110:13 | 25:1 41:13 |
| 96:18 97:8 | **transfer**  37:5 | **tuesday**  32:1 | 58:5 64:16 |
| 132:12 133:1 | 56:2 | **turn**  56:14 | 71:4 83:17 |
| 139:21 | **transpose** | 98:11 | 84:2 102:18,20 |
| **tpv.com**  38:7 | 82:12 | **turquoise** | 107:18 126:7 |
| 39:9,22 77:18 | **travel**  95:21 | 44:24 | 127:6 140:14 |
| 80:5,10 83:2,8 | **trial**  38:4 | **twice**  140:12 | **understaffed** |
| 85:7 131:18,22 | **tricking**  89:19 | **two**  12:11 50:4 | 136:1 |
| 138:14 139:10 | **tried**  17:21,21 | 59:2 62:12 | **understand** |
| 139:17,23 | 60:2 65:9,16 | 63:11,13,14 | 5:19 14:7 |
| 145:10 | 65:25 67:12 | 66:17 73:2 | 26:12 33:18 |
| | | | 36:19 42:24 |

Page 40

**[understand – vpn]**

43:6,20 50:9
82:18 110:14
120:4
**understanding**
14:18 15:3,11
15:18 26:20
33:16 40:12
64:12 65:8
**understood**
34:3
**unfortunately**
114:7
**united**  1:1 61:6
100:6 101:7,13
**unpack**  14:17
**unquote**  36:12
**unrelated**
140:11
**unusual**  56:24
**unwilling**
124:21
**updated**  114:12
**upload**  81:23
112:9
**uploaded**  81:25
**uploading**
111:3
**ups**  145:15
**upset**  118:1,5,7
118:7 147:11
**usage**  102:23
103:3,9 105:14
**use**  38:21 39:9
48:5 70:11
73:13 84:19

101:20 103:18
104:10 121:4
139:23
**used**  37:10
48:18 57:6
70:9,13 73:2
99:18 103:19
104:12,13,14
105:2,5 138:14
138:17,22
139:6,13
144:21 154:16
**uses**  5:22 89:18
**using**  39:11
72:9 101:17
103:22 104:21
110:4
**usually**  93:20
**utilities**  44:2,4
**utility**  46:3
49:22 108:19
108:24

**v**

**v**  1:8 152:1
153:1 154:3
**vacation**  62:19
**vaguely**  114:25
122:25
**varies**  58:23
**variety**  15:7
113:25
**various**  14:24
17:3 64:24
122:8 144:14

**vendor**  48:7
**vendors**  17:3
17:12 46:11
47:20,23 52:15
67:3 137:10,17
137:22,24
**venture**  34:11
**verbal**  45:10,20
46:5 118:14
131:14
**verbalized**
118:9
**verbally**  120:15
121:19
**verification**
25:5 67:20
69:10,12,15
77:10 79:7
82:19 85:2
87:23 89:2
139:10 145:6
**verifications**
85:10
**verifier**  77:18
78:1 83:20
145:2
**verifier's**  145:1
**verifiers**
144:25
**verify**  16:5
154:8
**veritext**  5:3
154:12,19
**veritext.com.**
154:13

**version**  84:15
84:16 139:4
**versions**  138:16
147:9
**versus**  67:20
**vice**  2:11
**video**  6:5 13:14
53:13 149:6,6
149:8
**videoconfere...**
2:3,10,20 3:6,7
**videographer**
3:7 13:15,19
16:9 19:18,21
21:22 22:1,5
87:10 90:22
91:3,8 94:4,6
99:11,12,15
115:15,18
143:12,15
149:5,9
**videotaped**
1:16
**vinnie**  57:5,18
57:21 137:14
**virtually**  5:21
**voice**  21:13
67:19 90:4
**voiced**  32:2
**voicing**  31:10
**void**  65:23
**voting**  142:16
**vowing**  90:18
**vpn**  101:14,21
102:22 103:3,9

Page 41

**[vpn - yeah]**

104:1,21
105:14
**vpns** 101:17
**vs** 5:7 31:13
**vulnerability**
96:17

---

**w**

---

**wait** 105:1
**waiver** 27:14
27:20
**waiving** 7:12
**want** 12:6
35:17 37:21
46:8 51:4
56:10 60:19,23
63:25 64:1
68:14,15 70:19
70:20 74:2
77:6 79:15
83:24 88:8
89:3 90:13
91:11 92:6
96:2,5 98:23
104:4 107:23
107:23,24
108:1 110:13
117:8,14,20
127:10
**wanted** 14:16
15:24 16:3
47:7 53:19
107:15 111:1
132:4,5 135:8
**wanting** 114:13

**watts** 137:14
**way** 17:15
30:21 40:8
58:14 121:8
124:24 136:3
**ways** 49:14
**we've** 16:4,6,24
37:9 55:8 56:1
56:5 64:11
78:10 84:1
98:7 105:6
113:25 114:15
114:25 124:20
136:16
**webpage** 4:12
104:9
**week** 69:17
**weekly** 25:16
30:10 136:17
**weeks** 109:7,14
130:7
**wendell** 40:18
41:7 42:18
43:12,13,19
134:5 135:1,2
135:3,4,17,20
136:7
**went** 17:3 92:4
145:10,25
**wide** 72:3
**wife** 117:11
**wilson** 2:10,11
6:17,17,18
82:6

**wind** 58:14
**withdrawn**
124:2
**witness** 5:11,15
5:18,19 6:12
6:25 7:4,15,17
10:17 11:11,13
12:1 19:9
21:21 23:12
28:4 34:18,23
35:5,13 38:6
38:19 51:9
55:13 59:18
68:24 79:22
85:24 87:12
91:20 93:24
97:1 107:7
142:22 147:14
148:3,18 150:4
154:5,7,9,11,15
**word** 95:4
105:24 106:1
117:1 122:20
**words** 34:7
55:19
**work** 48:19
52:6 56:19
68:18 95:10
99:3,6 124:19
130:11 143:3
**worked** 54:7
56:9
**working** 7:18
44:7 86:15

**workload**
69:19
**worms** 16:3
**worried** 106:14
140:23
**worry** 128:5
**would've** 81:2
**wow** 33:1
**write** 73:5
**writing** 30:17
116:7 120:17
121:11
**writings** 121:21
**written** 6:2
45:19 94:23,25
**wrong** 57:17
59:11 91:21
121:2 134:16
139:12

---

**x**

---

**x** 4:1,8 108:25
150:21

---

**y**

---

**yeah** 19:8 20:2
21:21 28:20
33:25 35:13,17
37:9 40:23
55:15 56:7,18
56:19 61:25
64:8 67:10
68:14 70:19
73:15 74:7,7,9
74:13 81:17,24
82:1 84:5,20

Veritext Legal Solutions
800-336-4000

**[yeah - zip]**

88:15 89:3,3
91:15 92:2
94:3 99:5
100:20 120:4
142:19 148:13
149:3
**year** 8:18 28:22
28:22,24 56:25
58:16 124:7
**years** 33:21
44:3,11,11
62:8 67:4
102:1,25
**yesterday** 69:7
**yikes** 33:24
**york** 1:2 8:6,11
44:4
**younger** 90:7

**z**

**zealand** 37:15
**zip** 94:10,19

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.