# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| ROBERT NOCK, et al.<br><br>*Plaintiff,*<br><br>v.<br><br>PALMCO ADMINISTRATION, LLC, d/b/a Indra Energy, et al.,  and PALMCO ENERGY MD, LLC, d/b/a Indra Energy, 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202<br><br>*Defendants.* | No. 1:24-00662<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Robert Nock ("Plaintiff" or "Nock") individually, and on behalf of all others similarly situated, brings this action against (1) PalmCo Administration, LLC ("Indra Admin"), and (2) PalmCo Power MD, LLC, (3) Palmco Energy MD LLC (together with PalmCo Power MD, LLC, "Indra MD," and together with Indra Admin, "Indra" or "Defendants") for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. as well as the Maryland Telephone Consumer Protection Act, Md. Com. Law § 14-3201, *et seq*. ("Maryland TCPA"). In support of this Amended Complaint, Nock asserts as follows:

### BACKGROUND ON
### TELEMARKETING AND THE TCPA

1.     In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the TCPA into law, to protect consumers' privacy rights. Specifically, the TCPA protects consumers' right to be left alone from unwanted telemarketing calls.

2.     A leading sponsor of the TCPA described telemarketing "robocalls" as the "scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

3.      The TCPA, through the accompanying FCC regulations, 47 C.F.R. § 64.1200(c) *et seq.*, affords special protections for "residential subscribers" who register their phone numbers on the National Do Not Call Registry.

4.      Since 2003, persons who register cell phone numbers on the Do Not Call registry have been considered to be "residential subscribers" for the purpose of 227(c)(5) and the Do Not Call registry. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers'").

5.      47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c) provide that each person who receives more than one call within a 12-month period, where that called party did not provide express written consent upon a clear and conspicuous disclosure from the telemarketer, after the phone number was registered on the National Do Not Call Registry for more than 31 days is entitled to recover $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated.

6.      Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

7.      In fact, in 2021 alone, there were over ***five million complaints*** from Americans to the FTC about unwanted telemarketing calls. Federal Trade Comm'n, *FTC Issues Biennial Report to Congress on the National Do Not Call Registry* (Jan. 5, 2022), *available* at: https://www.ftc.gov/news-events/news/press-releases2022/01/ftc-issues-biennial-report-congress-national-do-not-call-registry.

8.      The private right of enforcement of the TCPA is critical to stopping the

proliferation of these unwanted telemarketing calls. For example, while the Federal

Communications Commission levied over $200 million in penalties against telemarketers

between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC*

*Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March

28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-

6-790-11553770803.

9.      The TCPA reflects Congress's intent to preserve the social norms that Americans

answer calls to their telephone numbers. Abusive and deceptive robocalls like those used by

Defendants are a scourge on modern society, and represent an increasing threat to American's

continued use of the telephone system, which relies on the custom that people generally answer

telephone calls to their telephone number. The TCPA's legislative history recognized the

continued proliferation of telemarketing, left unchecked, would undermine that custom.

"Unwanted calls are tainting the wanted ones and make us cringe at the thought of answering the

telephone at night. . . .[I]t's a classic case of the bad apples spoiling the whole barrel." 137 Cong.

Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper); 137 Cong. Rec. H11,310

(daily ed. Nov. 26, 1991) (statement of Rep. Markey) (TCPA intended to protect privacy "before

our home telephones become the receptacles of junk calls in the same way that junk mail often

inundates our mailboxes"). Without enforcement of the TCPA, Americans will permanently

acclimate to the telephone call as a fundamentally untrustworthy medium of speech, and stop

answering unidentified telephone calls, frustrating the legislative intent behind the TCPA.

## THE PARTIES

10.     Mr. Nock is a natural person, who at all times relevant hereto, resided in

Maryland.

11.     Plaintiff is a "person" as that term is defined by 47 U.S.C. § 153(39).

12.     Defendant Palmco Administration, LLC ("Indra Admin") is a New York limited liability company with its principal place of business located at 8751 18th Avenue, Brooklyn, New York 11214.

13.     Indra Admin is an energy services management company that operates several different energy and gas providers across several states as alleged below. It operates under the assumed name of Indra Energy, and all of its corporate affiliates alleged below do business using the same name.

14.     Defendants Palmco Power MD LLC and Palmco Energy MD LLC (together, "Indra MD") are Maryland limited liability companies which list their principal place of business with the Maryland Public Service Commission as 7 St. Paul Street, Suite 820, Baltimore, Maryland 212021.

15.     In fact, the 7 St. Paul Street address is the address for Indra MD's agent for service of process, Corporation Service Company. On information and belief, Indra MD does not have a genuine office at the 7 St. Paul Street address (or anywhere else), and Indra Admin operates Indra MD (and its own business) from Indra Admin's office in Brooklyn.

16.     Since 2010, Indra MD has maintained licenses from the Maryland Public Service Commission to sell electricity and gas directly to consumers, which commodities are physically supplied by the consumers' local utilities.

17.     Indra MD is licensed to provide retail electricity and natural gas in the state of Maryland, and operates Indra's business in Maryland. Indra MD has affiliates licensed to provide gas and/or electricity in Connecticut, the District of Columbia, Delaware, Illinois, New Jersey, Massachusetts, Pennsylvania, and Virginia, all of which do business as "Indra Energy," and all of which are operated by Indra Admin from its office in Brooklyn.

18.     Plaintiff alleges Defendants acted in concert and as a joint enterprise at all times

relevant to this matter.

19.     Each Defendant is a "person" as that term is defined by 47 U.S.C. §153(39).

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal question subject matter jurisdiction to hear private civil suits under the TCPA).

21.     This Court has personal jurisdiction over the Defendants because Defendants transact business and perform work and services in Maryland, and caused tortious injury in Maryland. *Cf.* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b).

22.     Robert Vincent Palmese is the principal of each Indra Defendant. Palmese averred that he is Indra Admin's CEO, and that Indra Admin is "an administrative company that provides administrative services to its affiliates, including co-defendant" Indra MD. (ECF No. 20-2 ¶6.)

23.     As alleged below, the "administrative services" Indra Admin provides to Indra MD include marketing to consumers and enrolling consumers with Maryland service addresses with Indra MD for gas and electricity, including making, arranging, or procuring telemarketing campaigns for Indra MD's benefit.

24.     Indra Admin caused tortious injury in Maryland through these telemarketing calls. Specifically, Defendants purposefully and knowingly called Nock (or caused him to be called) on his "410" and "443" area code phone numbers, which are associated with the State of Maryland.

25.     Indra Admin regularly does or solicits business in Maryland and engages in a persistent course of conduct in Maryland by providing from the "administrative services" that

Indra Admin sells to Indra MD, such that the Court has personal jurisdiction over Indra Admin under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4).

26.     Indra Admin derived substantial profits from the gas and electricity sold in Maryland by Indra MD, and from the "administrative services" that Indra Admin sells to Indra MD, such that the Court has personal jurisdiction over Indra Admin under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(4).

27.     Because one or more Defendant is headquartered in this District and a substantial portion of the events and occurrences underlying this action occurred within this District, venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

28.     On information and belief, Indra Admin employs, controls, and supplies the individual natural persons—the officers, employees, and agents—who actually operate and control Indra MD's day-to-day business, including executing contracts or regulatory certifications for Indra MD, enrollment and verification, billing, financing and accounting, operations and database solutions (including interfacing with the utilities that physically supply the electricity and gas that Indra sells to consumers), marketing and public relations strategy (including managing its telemarketing and other sales channels), financial forecasting and budgeting, procurement, risk management, and every other function of Indra MD.

29.     On information and belief, Indra MD and these other licensed Indra affiliates are simply corporate shells used to (1) hold and maintain their gas and electricity licenses; (2) collect customer payments; and (3) trade energy supplies.

30.     Indra MD has no employees of its own. Palmese did not deny Nock's allegation that Indra Admin supplies all of Indra MD's personnel. (*Cf.* ECF No. 1 ¶¶17-18.)

31.     In the alternative, Indra MD has few employees of its own, and they are not responsible for the conduct alleged in this complaint.

32.     Indra Admin's employees and agents (and specifically including Robert Palmese, Indra Admin's CEO) are responsible for the conduct alleged in this complaint.

33.     Palmese makes all the decisions concerning Indra MD, and is Indra MD's managing member and only officer.

34.     While making decisions for Indra MD and operating Indra MD's business, Palmese is employed by and acts as Indra Admin's agent.

35.     Because Indra Admin and Indra MD are owned and operated by the same people (including Palmese), it is not possible to attribute the actions of these individuals to Indra Admin or Indra MD without also attributing them to each other.

36.     Indra Admin's telemarketers enrolled customers with Maryland service addresses with Indra MD. Indra MD also compensates Indra Admin for the "administrative services" it uses in procuring and managing such operating the website at indraenergy.com, and Indra Admin derived substantial revenue from such services.

37.     In public, Indra MD, Indra Admin, and their affiliates hold themselves out as a joint enterprise operating under the common name "Indra Energy."

38.     Indra Admin owns and operates website at https://indraenergy.com. The "terms of use" for the Indra website (attached to this Complaint as Exhibit 1) states "Indra Energy is sometimes referred to herein as 'Indra' or 'we,' 'us' or 'our' and refers to Palmco Administration, LLC d/b/a Indra Administration and its affiliates."

39.     Indra does not maintain individual websites for the individual Indra affiliates. Rather, indraenergy.com (i.e., Indra Admin's website) is the only website where consumers can enroll with Indra.

40.     Indra Admin affirmatively takes the steps necessary to enroll Indra MD customers for utility services for Maryland addresses at indraenergy.com and thereby receives revenue from

indraenergy.com.

41.    Indra MD compensates Indra Admin for the "administrative services" it uses in owning and operating the website at indraenergy.com, and Indra Admin derives substantial revenue from such services.

42.    Indra MD is listed on the Maryland Public Service Commission's lists of suppliers authorized to operate in Maryland at https://www.mdelectricchoice.com/shop/suppliers and https://www.mdgaschoice.com/shop/suppliers (attached to this Complaint as Exhibit 2). Indra MD (again, using Indra Admin personnel) provided this information to the Maryland Public Service Commission, including a link to indraenergy.com.

43.    Hence, Indra Admin used the Maryland Public Service Commission's websites to refer potential Indra MD customers to Indra Admin's indraenergy.com website, where could enroll with Indra MD. Hence, the indraenergy.com website is one of the through lines that connect Maryland consumers, Indra MD, and Indra Admin.

44.    By sending the Indra Admin webpage to the Maryland Public Services Commission for the purpose of enrolling Maryland customers, Indra Admin knowingly and purposefully availed itself to the State of Maryland.

45.    Defendants acted through their agents (including third party telemarketers), employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers. These individuals were and are at all relevant times, acting as Defendants' actual agents, ostensible agents, conspirators, partners and/or joint venturers and employees, and the acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of Defendants. Each of these allegations are "alternative" theories of liability whenever not doing

so would result in a contradiction with the other allegations.

## FACTUAL ALLEGATIONS SPECIFIC TO NOCK

46.     Nock has two residential telephone numbers: a cell phone, (443) 523-XXXX

("443 Number") and a landline, (410) 289-XXXX ("410 Number").

47.     Nock registered both his 443 Number and 410 Number on the National Do Not

Call Registry years prior to the relevant time period of this lawsuit.

48.     At all times relevant to this action, Nock used both of those telephone numbers

for residential purposes, such as speaking with friends and family.

49.     Nock never provided his telephone numbers to Defendants or their agents for any

purpose whatsoever as he never had a business relationship with them.

50.     Defendants and their agents did not otherwise obtain Nock's prior express written

consent to make telemarketing calls to his telephone numbers. Nock was not a business

associate, customer, or other person having an established relationship with Defendants.

51.     During May of 2021, Defendants placed a series of unwanted telemarketing calls

to both of Plaintiff's numbers.

52.     In many of those calls, a pre-recorded message played which stated "this is an

apology call from your utility" and proclaimed Nock had been "overcharged" on his energy bill.

53.     Nock could tell the messages at the beginning of the calls were pre-recorded

because the tone, cadence, and language were identical in each of the various calls.

54.     Further, the voice in the recording at the beginning of the calls was non-

interactive and did not pause when Nock spoke.

55.     For those reasons, Nock understands and therefore alleges that the message at the

outset of the call included a pre-recorded voice.

56.     On May 18, 2021, after receiving a call from Indra, Plaintiff stated to the Indra

agent in no uncertain terms, *inter alia*, "don't ever call me again."

57.     Despite that clear and unequivocal instruction, Indra called Plaintiff on several subsequent instances.

58.     In order to ascertain the identity of the party to parties calling him, on several instances, Nock stayed on the line and engaged with the calling party.

59.     After doing so, the calling party disclosed it was calling from "Indra Energy," a trade name for Indra Admin and Indra MD.

60.     During the call of May 27, 2021, Defendants' representative stated repeatedly his company was "Indra Energy."

61.     The call Plaintiff received the day prior came from the same number, and also sought to solicit energy services.

62.     On information and belief, Defendants called Plaintiff on instances including but not limited to:

| Date/Time | Nock's called number | Caller ID of Calling Party |
|---|---|---|
| 05/18/2021 at 12:40 pm EST | (443) 523-XXXX | 443-555-7977 |
| 05/26/2021 at 12:05 pm EST | (410) 289-XXXX | 713-942-6547 |
| 05/27/2023 at 6:04 pm EST | (410) 289-XXXX | 713-942-6547 |

63.     Each of those calls were "solicitations" as defined by the TCPA, as they made as part of a campaign to encourage the purchase Indra's energy services.

64.     The FTC's Consumer Sentinel database reflects one Maryland consumer complained about receiving Indra's telemarketing calls from Indra very close in time to the calls that Nock received (May 21, 2021). (*See* Exhibit 3.) This is other evidence of the same telemarketing campaign that called Nock.

65.     Defendants used misleading or inaccurate caller identification information, including "spoofed" telephone numbers with local area codes (that is, replacing the actual

originating number displayed to recipients' caller ID systems—which could be used to reliably

identify the vendors' calls—with a falsified ostensible outgoing telephone number). Defendants'

use of spoofing entices recipients to answer telephone calls that they would not otherwise

answer, and makes it difficult to attribute particular calls to Defendants. These practices allow

Defendants to evade accountability for their telemarketing activities, and make it difficult for call

recipients to avoid or otherwise respond to Defendants' calls (for instance, asking to be placed on

Defendants' own Do Not Call list). Call recipients are only able to avoid Defendants' unwanted

calls if they risk missing wanted calls, and cannot identify which companies they have instructed

not to call them.

66.     The actions described herein were in violation of the TCPA.

67.     The communications from Defendants were irritating, distracting and an invasion

of Plaintiff's privacy.

## DIRECT AND VICARIOUS LIABILITY

68.     Defendants hired, encouraged, permitted, and enjoyed the benefits of mass

telemarketing. As alleged above, the administrative services Indra Admin provides to Indra MD

(and other Indra affiliates) include conducting, procuring, and/or managing telemarketing

campaigns that enroll subscribers on Indra MD's behalf. Either Indra is directly liable for the

unsolicited calls because Indra directly made these calls, or Indra is vicariously liable for calls

that were made by third parties on its behalf.

69.     On May 9, 2013, the FCC issued a Declaratory Ruling that held that sellers may

not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing
> activities to unsupervised third parties would leave consumers in many cases
> without an effective remedy for telemarketing intrusions. This would particularly
> be so if the telemarketers were judgment proof, unidentifiable, or located outside
> of the United States, as is often the case. Even where third-party telemarketers are

identifiable, solvent, and amenable to judgment limiting liability to the
telemarketer that physically places the call would make enforcement in many
cases substantially more expensive and less efficient, since consumers (or law
enforcement agencies) would be required to sue each marketer separately in order
to obtain relief. As the FTC noted, because "[s]ellers may have thousands of
"independent" marketers, suing one or a few of them is unlikely to make a
substantive difference for consumer privacy.

*In re Dish Network, LLC,* 28 FCC Rcd 6574, 6588 (F.C.C. May 9, 2013) (internal citations
omitted).

70.     This FCC ruling rejected a narrow view of TCPA liability, including the assertion
that a seller's liability requires a finding of formal actual agency and immediate direction and
control over third parties who place a telemarketing call. *Id.* at 6587 n. 107. The evidence of
circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient
to place upon the seller the burden of demonstrating that a reasonable consumer would not
sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593.

71.     There is no material distinction between telemarketing calls made by Defendants
and/or by telemarketers who are technically third parties. The FCC's regulations "generally
establish that the party on whose behalf a solicitation is made bears ultimate responsibility for
any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot.
Act of 1991*, 10 FCC Rcd. 12391, 12397, ¶13 (1995). *See Campbell-Ewald Co. v. Gomez*, 577
U.S. 153, 168 (2016) ("no cause to question" precept that "under federal common-law principles
of agency, there is vicarious liability for TCPA violations"); *Jones v. Mutual of Omaha Ins. Co.*,
639 F. Supp. 3d 537, 551 (D. Md. 2022) ("'vicarious liability under the TCPA is governed by the
federal common law of agency,' under which an agency relationship may be established by way
of (1) actual authority; (2) apparent authority; or (3) ratification," quoting *Hodgin v. UTC Fire &
Sec. Am. Corp., Inc.*, 885 F.3d 243, 252 (4th Cir. 2018)).

72.     Maryland law requires Defendants to closely manage all their marketing channels.

Maryland law permits Indra to use employees or third parties as its sales agent, but only on the condition that they are ultimately responsible for any fraudulent, deceptive, or other unlawful marketing acts committed by such agents in the conduct of marketing or sales activities on their behalf. Code of Maryland Regulation §§ 20.53.01.02(B)(1)(b), 20.53.10.02. By law, Defendants are responsible for developing standards and qualifications for individuals they have chosen to hire as their sales agents, training those sales agents, and operating quality assurance programs to identify problems in their marketing process. Code of Maryland Regulation §§ 20.53.10.03(A); 20.53.10.04(E).

73.    Defendants are legally responsible for ensuring they and/or any third-party telemarketers complied with the TCPA, even if they themselves did not itself make the calls. Defendants are vicariously liable for their agents' TCPA violations

74.    On information and belief, Defendants are closely involved with monitoring, controlling, and managing Indra's telemarketing campaigns. Defendants operate, manage, monitor, and/or control these telemarketing campaigns through the data collected about the telemarketing campaigns, and the feedback Indra gives to the telemarketers (including, ultimately, the commissions Palmese approves and Indra pays to Defendants' telemarketers).

75.    Defendants not only controlled the result of the work, but also the manner and means by which it was accomplished through interim instructions.

76.    In particular, Indra Admin also supplies personnel who are responsible for developing standards and qualifications for Indra's sales agents, training those sales agents, and operating quality assurance programs to identify problems in Indra's marketing process. During its quality control processes, Indra Admin develops, records, and reviews a substantial amount of evidence about Indra enrollments (including enrollments with Indra MD) before it decides to pay commission to Indra's sales agents for those enrollments. Hence, Indra Admin's quality control

process provides it control over its sales agents from enrollment to enrollment.

77.     Defendants ratified their sales agents' conduct by accepting the benefits of their

telemarketing, including but not limited to enrolling customers generated by this telemarketing

into Indra's contracts, despite being aware (or consciously avoiding knowledge) that these calls

were unsolicited and made in violation of the TCPA.

78.     Before the events alleged in this complaint, Defendants had actual knowledge of

the kinds of potential vulnerabilities and weaknesses in their regulatory compliance programs

that put them on notice of the type of TCPA violations alleged herein. Indra's Pennsylvania

affiliate settled a TCPA class action in 2020. (*See Abramson v. PALMco Energy PA LLC*, No.

2:19-cv-1675 (W.D. Pa. Sept. 2, 2020), ECF No. 49-1.)

79.     As it relates to Indra's compliance practices, Indra's former counsel summarized

Indra's regulatory history this way:

> [Between 2010 and 2016] and up to the present, the various [Indra] entities have
> been investigated, fined, and otherwise penalized by attorneys general and
> regulators in at least 7 states throughout the country. These attorneys and
> regulators allege a severe pattern of fraudulent and improper marketing and sales
> behaviors perpetrated against some of the most vulnerable citizens. For example,
> there are allegations that [Indra] sales and marketing personnel impersonated
> employees of local utility companies, signed up customers without their
> knowledge or consent, entering customer homes under false pretenses, stole from
> customers, and even threatened customers with worse rates if they did not sign up
> with [Indra].

(Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment,

*PalmCo Energy NJ, LLC, et al. v. Cullen and Dykman LLP, et al.*, No. ESX-L-4491-18 (N.J.

Sup. Ct., Essex Cty., Nov. 5, 2021), Trans ID LCV20212583926, at 1.)

80.     Palmese has personally authorized multiple settlements for widespread consumer

law violations arising from Indra's marketing, and had actual notice of the prevalence of TCPA

violations in Indra's marketing channels (such as the complaints in Exhibit 3).

81.    On information and belief, Indra Admin has—for years—used a vendor named Neil St. Louis (and his company, NSL Marketing, LLC (together, "NSL")) to procure telemarketers and telemarketing campaigns for Indra, including Indra MD. On information and belief, at least some of these telemarketing campaigns procured by NSL—including the calls to Nock alleged below—were disguised as door-to-door sales activity.

82.    In this scheme, Indra Admin ostensibly hired NSL to procure "door-to-door" sales agents. In fact, NSL procured telemarketers who disguised their telemarketing as door-to-door sales activity. These telemarketers called potential customers from call centers instead of visiting them in person. When consumers agreed to enroll, these telemarketers arranged subsequent verification calls from a third-party verifier ("TPV"), in order to create an independent record of consumers' ostensible consent to enroll with Indra (including Indra MD) required by, e.g., Maryland law. These telemarketers coached consumers to state that they met with Indra's agent at their doorstep during these recorded verification calls.

83.    A different supplier implicated NSL in this scheme less than a month before the first call to Nock alleged above. (*See* Exhibit B to Letter Brief, *Nock v. Spring Energy RRH, LLC*, No. 1:23-cv-0104 (S.D.N.Y. Jan. 12, 2024), ECF No. 55-2 at 5, attached to this Complaint as Exhibit 4 (email dated April 21, 2024 "our Quality Assurance team has escalated this agent NSL after review of recent sales activity [based on] TPV entries which showed GPS locational tracking placing [him] in a city in Pakistan," including "customer [who] indicated that he did NOT recall a recent door-to-door visit but did recall a phone call [] and []  was connected to the verification call shortly after").)

84.    On information and belief, NSL simply continued this same scheme using the same telemarketers over to his next customer: Indra.

85.    By disguising these telemarketing campaigns as door-to-door sales activity,

Defendants cultivated plausible deniability that they had notice of the TCPA violations committed by the ostensible "door-to-door" sales agents on their behalf and/or for their benefit, and circumvented important consumer protections specific to telemarketing.

86.     On information and belief, Defendants are closely involved with monitoring, controlling, and managing their all marketing channels, and are responsible for developing standards and qualifications for their agents, training those agents, and operating quality assurance programs to identify problems in their marketing process.

87.     Palmese is the one who is responsible for Indra MD's operations.

88.     When Palmese operates Indra MD's business, he is rendering "administrative services" to Indra MD on Indra Admin's behalf. Again, Indra MD's only personnel are supplied by Indra Admin.

89.     In the alternative, Palmese has consciously avoided knowing about Indra Admin's telemarketing practices.

90.     Defendants feign efforts at complying with the TCPA and other laws. These efforts are not in good faith, but rather are intended to benefit from increasing expanding the number of such violations, while still avoiding liability—but not to actually prevent these violations in the first place.

91.     If Defendants genuinely wanted to prevent TCPA violations, they would behave very differently. Defendants do not (1) thoroughly investigate Indra's marketing channels, and verify that their vendors are likely to comply with the TCPA before they hire them; (2) adequately monitor their enrollment processes to detect TCPA violations (like continuously recording door-to-door sales agents' GPS coordinates in between enrollments); or (3) fully investigate evidence of TCPA (or other consumer law) violations, and terminate and/or discipline vendors and/or Indra personnel (rather than performatively terminating individual

third-party sales agents).

92.    For instance, Defendants could readily detect (and thereby prevent) telemarketers

disguising their telemarketing as "door-to-door marketing."

93.    Defendants could require their door-to-door sales agent to continuously record

their GPS coordinates while engaged on Defendants' app (including by means of an app on their

mobile device).

94.    However, on information and belief, Defendants do not track sales agents' GPS

coordinates—but instead only use the TPV process to capture GPS coordinates at the time of

enrollment, which the telemarketers can fabricate much more easily.

95.    If Indra genuinely wanted to eliminate TCPA violations, it would terminate,

discipline, or counsel the Indra employees who were responsible for monitoring and controlling

the marketing channels involved, including the telemarketers disguised as door-to-door sales

agents who called Nock.

96.    Instead, Indra affirmatively promoted these Indra Admin personnel.

97.    Accordingly, Plaintiff alleges Defendants acted in concert and as a joint enterprise

at all times relevant to this matter.

## CLASS ALLEGATIONS

98.    Plaintiff brings this claim on behalf of six classes, pursuant to Federal Rule of

Civil Procedure 23. Plaintiff seeks to represent the following classes:

**NDNC Class:**

All persons in the United States who received two or more calls to their
residential wireline or cellular telephone numbers, within any 12-month period by
or on behalf of Defendants, in connection with the sale of its energy services,
from four years prior to the date of Plaintiff's original complaint through the date
the Court certifies the class.

**IDNC Class:**

All persons in the United States who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class, during which time(s) Defendants had not instituted or maintained the procedures or minimum standards required under 47 C.F.R. § 64.1200(d).

### Pre-Recorded Call Class:

All persons in the United States who received one or more telephone calls to a residential telephone number using an artificial voice or pre-recorded voice to deliver a message, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

### Maryland NDNC Class:

All persons who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class, who are identified by Defendants' records as residing in the State of Maryland at the time of the call(s).

### Maryland IDNC Class:

All persons who received two or more telemarketing calls to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class, during which time(s) Defendants had not instituted or maintained the procedures or minimum standards required under 47 C.F.R. § 64.1200(d), who are identified by Defendants' records as residing in the State of Maryland at the time of the call(s).

### Maryland Pre-Recorded Call Class:

All persons who received one or more telephone calls to a residential telephone number using an artificial voice or pre-recorded voice to deliver a message, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class, who are identified by Defendants' records as residing in the State of Maryland at the time of the call(s).

Excluded from the Classes are any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' owners, affiliates, agents, legal representatives, predecessors, successors, assigns, and employees. Also excluded are the judge

and staff to whom this case is assigned, and any member of the judge's immediate family. Plaintiff reserves the right to revise and amend these class definitions based on facts learned during discovery.

99.     Plaintiff reserves the right to amend or modify the class definitions consistent with the record.

100.     The putative class members' identities are readily ascertainable from Defendants' records or records within Defendants' control.

101.     Plaintiff's claims are typical of the class members, as all are based on the same facts and legal theories.

102.     Plaintiff will fairly and adequately protect the interests of the Class defined herein. Plaintiff has retained counsel with experience in handling consumer lawsuits, complex legal issues, and class actions.

103.     Neither Plaintiff nor his attorneys have any interests which might cause them not to vigorously pursue this action.

104.     This action has been brought, and may properly be maintained, as a class action pursuant to the provisions of Rule 23 of the Federal Rules Civil Procedure because there is a well-defined community interest in the litigation.

105.     Class Members are so numerous that their individual joinder is impracticable. There are no likely difficulties to be encountered in managing this case as a class action.

106.     Common questions of law and fact exist to all Class Members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to the following:

     a.   Whether Defendants, or someone operating on their behalf, placed prerecorded voice calls to the cell phones of Plaintiff and the putative class members;

b.  Whether the voice technology used by Defendants (or on their behalf) qualifies as a "pre-recorded voice" under 47 U.S.C. § 227(b)(1);

c.  Whether Defendants' calls were "solicitations" as defined by the TCPA;

d.  If the calls were made by a third-party vendor of Defendants, whether an agency relationship existed between Defendants and any such third-party;

e.  If the calls were made by a third-party vendors of Defendants, whether Defendants "ratified" any violations; and

f.  Whether Plaintiff and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

107.    Plaintiff and the putative class members have claims arising out of Defendants'

uniform course of conduct, namely improperly placing prerecorded voice calls to the Plaintiff

and the putative class members.

108.    Plaintiff will fairly and adequately protect the interests of the class members

insofar and Plaintiff has no interests that are averse to the absent class members. Plaintiff is

committed to vigorously litigating this matter. Plaintiff has also retained counsel experienced in

handling consumer lawsuits, complex legal issues, and class actions. Neither the Plaintiff nor his

counsel have any interests which might cause them not to vigorously pursue this class action

lawsuit.

109.    The class action mechanism is superior to other available means for the fair and

efficient adjudication of this case. Each individual class member may lack the resources to

undergo the burden and expense of individual prosecution of the complex and extensive

litigation necessary to establish Defendants' liability. Individualized litigation increases the delay

and expense to all parties and multiplies the burden on the judicial system presented by the

complex legal and factual issues of this case. Individualized litigation also presents a potential

for inconsistent and contradictory judgements. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

110.    Based on discovery and further investigation, Plaintiff may, in addition to moving for class certification, use modified definitions of the class, class claims, and the class period, and/or seek class certification only as to particular issues as permitted under Rule 23. Such modified definitions may be more expansive to include consumers excluded from the foregoing definitions.

## FIRST CAUSE OF ACTION
**(Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(c) Against All Defendants By Plaintiff, Individually, and on Behalf of the NDNC Class)**

111.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

112.    The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action for injunctive relief and statutory damages of $500 per violation. 47 U.S.C. § 227(c)(5). Where "the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection," it "may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount [otherwise] available . . ." *Id.*

113.    The FCC's TCPA regulation provides that "[n]o person or entity shall initiate any telephone solicitation" to a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive

telephone solicitations that is maintained by the Federal Government." 47 C.F.R. §

64.1200(c)(2). This prohibition also applies to wireless telephone numbers. 47 C.F.R. §

64.1200(e).

114. On information and belief, Defendants and/or their agents routinely make

outgoing calls to residential and cellular telephones in the regular course of their telemarketing

campaigns alleged above. Defendants violated 47 C.F.R. § 64.1200(c) by initiating telephone

solicitations to wireless and landline residential telephone subscribers such as Plaintiff and the

other Class members.

115. Defendants and/or their agents made more than one unsolicited telephone call to

Plaintiff and DNC Class members within a 12-month period without their legally effective

consent to receive such calls. Plaintiff and DNC Class members never provided any form of

consent to receive telephone calls from Defendants, and Defendants do not have legally valid

evidence of such consent. Defendants did not have an established business relationship with

Plaintiff and the other DNC Class members.

116. Defendants' violations are willful because Defendants knew or should have

known that Plaintiff and DNC Class members had not given prior express consent to receive

telemarketing calls made to telephone numbers placed on the Do Not Call List and that

Defendants (or their agents) called such telephone numbers. Because Defendants' violations

were willful, the Court should treble the amount of statutory damages recoverable by the

Plaintiffs and the other Class members.

117. Plaintiff, on his own behalf, and on behalf of the other DNC Class members,

seeks to recover statutory damages (including treble damages for willful violation of the TCPA),

as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Defendants.

//

## SECOND CAUSE OF ACTION
### (Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(d) Against All Defendants By Plaintiff, Individually, and on Behalf of the IDNC Class)

118.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

119.    The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action for injunctive relief and statutory damages of $500 per violation. 47 U.S.C. § 227(c)(5). The FCC regulation also provides that

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> (1)    Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2)    Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
>
> ....
>
> (4)    Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges

47 C.F.R. § 64.1200(d). Again, this regulation also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

120.    On information and belief, Defendants and/or their agents also violated 47 C.F.R. § 64.1200(d)(1) and/or (2) by failing to maintain a written policy for maintaining a do-not-call

list and/or informing and training all personnel engaged in any aspect of telemarketing in the existence and use of the do-not-call list. If Defendants had maintained a do-not-call list and training relevant personnel in the existence and use of the do-not-call list in a manner that complied with 47 C.F.R. § 64.1200(d)(1), Plaintiff would not have received Defendants' telephone calls.

121.    On information and belief, Defendants and/or their agents also violated 47 C.F.R. § 64.1200(d)(4) by failing to disclose the name of the individual caller, their name, and a telephone number or address at which Defendants could be contacted. Defendants also spoofed the outgoing telephone numbers used to call Nock and DNC Class members, and/or their telemarketers failed to identify Defendants. If Defendants had complied with 47 C.F.R. § 64.1200(d)(4), they would have been exposed to significant TCPA liability because they would have been readily identifiable as the caller, and that exposure would have deterred Defendants from calling Plaintiff.

122.    Defendants and/or their agents made more than one unsolicited telephone call to Plaintiff and DNC Class members within a 12-month period without their legally effective consent to receive such calls. Plaintiff and DNC Class members never provided any form of consent to receive telephone calls from Defendants, and Defendants do not have legally valid evidence of such consent. Defendants did not have an established business relationship with Plaintiff and the other DNC Class members.

123.    Defendants' violations are willful because Defendants knew or should have known that they failed to institute or maintain procedures and minimum standards required under 47 C.F.R. § 64.1200(d) in the manner alleged above, but still engaged in telemarketing as alleged above. Because Defendants' violations were willful, the Court should treble the amount of statutory damages recoverable by the Plaintiffs and the other Class members.

124.    Plaintiff, on his own behalf, and on behalf of the other DNC Class members,

seeks to recover statutory damages (including treble damages for willful violation of the TCPA),

as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Defendants.

### THIRD CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 227(b)(1)(B) Against All Defendants
### by Plaintiff, Individually, and on Behalf of the Pre-Recorded Call Class

125.    Plaintiff hereby incorporates by reference the allegations contained in all

preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the

members of the Pre-Recorded Call Class.

126.    The TCPA prohibits certain uses of telecommunication equipment that would

interfere with telephone service subscribers' privacy and/or property rights with respect to their

telephone. In particular, the TPCA makes it unlawful for any person:

> to initiate any telephone call to any residential telephone line using an artificial or
> prerecorded voice to deliver a message without the prior express consent of the
> called party, unless the call is initiated for emergency purposes or is exempted by
> rule or order by the Commission under paragraph (2)(B).

47 U.S.C. § 227(b)(1)(B).

127.    The TCPA provides telephone service subscribers a private right of action for

injunctive relief and statutory damages for violations of 47 U.S.C. § 227(b) or "regulations

prescribed under" 47 U.S.C. § 227(b) "to enjoin such a violation" and/or to recover actual

damages or "$500 in damages for each such violation," as well as treble damages where the

"court finds that the defendant willfully or knowingly violated [47 U.S.C. § 227(b)]." 47 U.S.C.

§ 227(b)(3).

128.    Defendants and their agents also utilized artificial and/or prerecorded voice

messages in calls to residential telephones of Plaintiffs and Pre-Recorded Call Class members.

129.    Defendants and their agents do not and did not obtain legally effective prior

express consent to call the Pre-Recorded Call Class members' residential telephone numbers. Defendants and their agents violated 47 U.S.C. § 227(b)(1)(B) by placing telephone calls to the residential telephone numbers of Plaintiffs and the other members of the Pre-Recorded Call Class using an artificial or prerecorded voice without their prior express written consent. Defendants willfully violated 47 U.S.C. § 227(b)(1)(B) because they knew that Plaintiff and the other Pre-Recorded Call Class members had not given prior express consent to receive calls made using an artificial, and/or prerecorded voice and that Defendants and their agents used these methods to call the residential telephone numbers of Plaintiff and the other Pre-Recorded Call Class members. Because Defendants' violations were willful, the Court should treble the amount of statutory damages recoverable by the Plaintiffs and the other Class members.

130.    Plaintiff, individually, and on behalf of the other members of the Pre-Recorded Call Class, seek to recover statutory damages (including treble damages for willful violations), as well as injunctive and equitable relief under 47 U.S.C. § 227(b)(3) against Defendants.

**FOURTH CLAIM FOR RELIEF**
**Violation of Md. Code, Com. Law, § 14-3201 Against All Defendants**
**by Plaintiff, Individually, and on Behalf of the Maryland NDNC Class**

131.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the members of the Maryland NDNC Class.

132.    Maryland law provides that a person may not violate the Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L). *See* Md. Code, Com. Law, § 14-3201(2).

133.    Maryland law provides that an individual who is affected by a violation of Md. Code, Com. Law, § 14-3201 may bring an action against a person that violates this subtitle to

recover: "(1) Reasonable attorney's fees; and (2) Damages in the amount of the greater of: (i) $500 for each violation; or (ii) Actual damages sustained as a result of the violation." Md. Code, Com. Law, § 14-3202. Maryland law further provides that each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation. *Id*.

134.    For each violation set forth in Plaintiff's First Claim for Relief, Plaintiff asserts a claim for statutory damages and reasonable attorneys' fees on behalf of the Maryland NDNC Class for a corresponding violation of Md. Code, Com. Law, § 14-3201.

**FIFTH CLAIM FOR RELIEF**
**Violation of Md. Code, Com. Law, § 14-3201 Against All Defendants**
**by Plaintiff, Individually, and on Behalf of the Maryland IDNC Class**

135.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the members of the Maryland IDNC Class.

136.    Maryland law provides that a person may not violate the Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L). *See* Md. Code, Com. Law, § 14-3201(2).

137.    Maryland law provides that an individual who is affected by a violation of Md. Code, Com. Law, § 14-3201 may bring an action against a person that violates this subtitle to recover: "(1) Reasonable attorney's fees; and (2) Damages in the amount of the greater of: (i) $500 for each violation; or (ii) Actual damages sustained as a result of the violation." Md. Code, Com. Law, § 14-3202. Maryland law further provides that each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation. *Id*.

138.    For each violation set forth in Plaintiff's Second Claim for Relief, Plaintiff asserts a claim for statutory damages and reasonable attorneys' fees on behalf of the Maryland IDNC

Class for a corresponding violation of Md. Code, Com. Law, § 14-3201.

## SIXTH CLAIM FOR RELIEF
### Violation of Md. Code, Com. Law, § 14-3201 Against All Defendants
### by Plaintiff, Individually, and on Behalf of the Maryland Pre-Recorded Call Class

131.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the members of the Maryland Pre-Recorded Call Class.

132.    Maryland law provides that a person may not violate the Telephone Consumer Protection Act, 47 U.S.C. § 227, as implemented by the Federal Communications Commission in the Restrictions on Telemarketing and Telephone Solicitations Rule (47 C.F.R. Part 64, Subpart L). See Md. Code, Com. Law, § 14-3201(2).

133.    Maryland law provides that an individual who is affected by a violation of Md. Code, Com. Law, § 14-3201 may bring an action against a person that violates this subtitle to recover: "(1) Reasonable attorney's fees; and (2) Damages in the amount of the greater of: (i) $500 for each violation; or (ii) Actual damages sustained as a result of the violation." Md. Code, Com. Law, § 14-3202. Maryland law further provides that each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation. *Id.*

134.    For each violation set forth in Plaintiff's Third Claim for Relief, Plaintiff asserts a claim for statutory damages and reasonable attorneys' fees on behalf of the Maryland Pre-Recorded Call Class for a corresponding violation of Md. Code, Com. Law, § 14-3201.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Robert Nock prays that the Court enter judgment and orders in their favor and against Defendant as follows:

a.    An order certifying the proposed Classes, directing that this case proceed as a class action, and appointing Plaintiff and his counsel to represent the Classes;

b.  Statutory damages as provided under 47 U.S.C. § 227(c)(5), including trebled damages for willful and knowing violations, against Defendants in favor of Plaintiff and the NDNC and IDNC Classes;

c.  Statutory damages as provided under 47 U.S.C. § 227(b)(3), including trebled damages for willful and knowing violations, against Defendants in favor of Plaintiff and the Pre-Recorded Call Class;

a.  Statutory damages as provided under Md. Code, Com. Law, § 14-3202, including trebled damages for willful and knowing violations, against Defendants in favor of Plaintiff and the Maryland NDNC, Maryland INDC, and Maryland Pre-Recorded Call Classes;

e.  Injunctive relief against Defendants in favor of Plaintiff and the members of the Classes, under 47 U.S.C. § 227(b)(3) and/or § 227(c)(5); and

f.  Such other and further relief as this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

PLEASE TAKE NOTICE, ROBERT NOCK, demands a jury trial in this case.

Dated: June 10, 2024

By: __s/Ethan Preston_____
Ethan Preston (30836)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

Jacob U. Ginsburg, Esq. (*pro hac vice*)
jginsburg@creditlaw.com
teamkimmel@creditlaw.com
KIMMEL & SILVERMAN, P.C.
30 East Butler Avenue
Ambler, Pennsylvania 19002
Phone: (267) 468-5374
Facsimile: (877) 788-2864

*Attorneys for Plaintiff Robert Nock, on his own behalf, and behalf of all others similarly situated*