**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT NOCK, an individual, on his own behalf and on behalf of all others similarly situated,<br><br>                         Plaintiff,<br><br>v.<br><br>SPRING ENERGY RRH, LLC d/b/a SPRING POWER & GAS, RRH ENERGY SERVICES LLC d/b/a RICHMOND ROAD HOLDINGS, LLC, and RICHMOND ROAD HOLDINGS, LLC, Delaware limited liability companies,<br><br>                         Defendants. | Case No.: 1:23-cv-01042-JHR-RWL<br><br>**DEFENDANTS' RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE** |
| SPRING ENERGY RRH, LLC d/b/a SPRING POWER & GAS, RRH ENERGY SERVICES LLC d/b/a RICHMOND ROAD HOLDINGS, LLC, and RICHMOND ROAD HOLDINGS, LLC,<br><br>                         Third-Party Plaintiffs,<br><br>v.<br><br>ENDURANCE SALES & MARKETING, LLC,<br><br>                         Third-Party Defendant. | |

Defendants, Spring Energy RRH, LLC d/b/a Spring Power & Gas ("Spring Energy"); RRH Energy Services, LLC ("RRH"); and Richmond Road Holdings, LLC ("Richmond Road Holdings" and collectively with Spring Energy and RRH, "Defendants"), state, pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, that there is no genuine dispute with regard to the following material facts.

1. Defendant Spring Energy is an energy service company that buys and sells electricity and gas to consumers in Maryland, Pennsylvania, and New Jersey. Ex. 1 (Booth Dep.) at 6:10-16; Booth Decl. ¶ 1.

2. Defendant RRH is a separate company that was formed to be the employer for certain staff of Spring Energy and affiliate, Kiwi Energy NY LLC.  However, RRH was never used for any purpose and has never had any assets or employees. Ex. 2 (30(b)(6) Dep.) at 9:11-25.

3. Defendant Richmond Road Holdings is a holding company that owns Spring Energy and RRH.  Richmond Road Holdings is an entirely passive holding company—it has no employees and does not conduct business except through Spring Energy and Kiwi Energy. Ex. 2 (30(b)(6) Dep.) at 10:3-8; Ex. 1 (Booth Dep.) at 5:17-20; 7:14-19; 9:3-8.

4. The managers of Richmond Road Holdings oversee the financials and major corporate decisions of its subsidiaries, including Spring Energy, via meetings of the managers of Richmond Road Holdings on an as-needed basis. Booth Decl. ¶ 7.

5. There is no evidence whatsoever in the discovery record that Spring Energy is undercapitalized or insolvent.

6. In fact, the only evidence in the record shows that Richmond Road Holdings does, in fact, observe corporate formalities of its subsidiary companies, as is reflected in Spring Energy's formation and organizational documents, which are publicly filed with regulators in Pennsylvania, New Jersey, and Maryland where it operates. *See* Ex. 24 (Pennsylvania regulatory application).

7. Likewise, there is no evidence whatsoever in the discovery record that Richmond Road Holdings ever siphoned funds or assets away from Spring Energy.

8. Except for certain contracts that benefit both Spring Energy and Kiwi Energy NY, LLC, contracts are typically entered on the company levels – *i.e.*, with Spring Energy or Kiwi

Energy NY LLC, not Richmond Road Holdings. Ex. 1 (Booth Dep.) at 7:19-8:7; Ex. 2 (30(b)(6) Dep.) at 29:21-30:21.

9. To market its energy services, Spring Energy primarily utilizes door-to-door marketing vendors. Ex. 1 (Booth Dep.) at 37:10-38:17.

10. On January 6, 2021, Spring Energy entered into a Master Services Agreement with Endurance Sales and Marketing LLC ("Endurance"). *See* Ex. 25 (Master Services Agreement).

11. The first and only Statement of Work entered pursuant to the Master Services Agreement between Spring Energy and Endurance was entered on the same date. *See id.* at p. 14 (Statement of Work).

12. Neither RRH, nor Richmond Road Holdings, is a party to the contract with Endurance. *See id.*

13. The Master Services Agreement provides that "[Spring Energy] shall have no actual or apparent authority to conduct any services which are not expressly set forth in this Agreement and any Statements of Work, including but not limited to with regard to the authorized territory or the manner in which services are performed under this agreement." *Id.* at p. 1 (§ 1).

14. The Statement of Work only authorizes Endurance to perform door-to-door marketing. *Id.* at p. 14 (Statement of Work §§ 1.01, 1.07).

15. "Target Markets" is defined in the Statement of Work for the Master Services Agreement to include door-to-door marketing for customers of certain listed utilities in Pennsylvania, Maryland, and New Jersey. *Id.* at p. 14 (Statement of Work § 1.07).

16. "Customer Segment" is defined in the Statement of Work for the Master Services Agreement to mean "residential customers of retail electricity and retail natural gas acquired through door-to-door marketing and/or telemarketing." *Id.* at p. 14 (Statement of Work § 1.06).

17. Under the Master Services Agreement, an agreement in writing was required "to add additional Target Markets and Customer Segments through additional Statements of Work." *Id.* at p. 14 (Statement of Work § 1.07).

18. Additionally, the Master Services Agreement expressly provides that "Vendors that are contracted to acquire customers through door-to-door marketing are not permitted to do any telemarketing. Any Vendor performing telemarketing must have the express written consent from [Spring Energy]." *Id.* at p. 14 (Statement of Work § 1.06).

19. The Master Services Agreement specifies that Endurance was an independent contractor of Spring Energy and that Endurance's personnel utilized to perform services thereunder are not employees of Spring Energy. Further, Endurance alone was responsible for "hiring, supervising, disciplining, and terminating" the personnel utilized by Endurance to provide services under the Master Services Agreement. *Id.* at p. 3 (§ 4).

20. Under the Master Services Agreement, Endurance was required to train all or its sales agents with regard to Spring Energy's policies and procedures relating to sales practices and enrollment procedures. *Id.* at p. 15 (Statement of Work § 3.01).

21. Under the Master Services Agreement, Endurance was also required to perform regular quality control checks to ensure adherence to sale practice requirements and to comply with all applicable laws. *Id.* at pp. 1 (§ 2) and 15 (Statement of Work § 3.05).

22. Under the Master Services Agreement, Endurance was not allowed to subcontract any of the responsibilities thereunder "without the prior express written authorization of [Spring Energy]." *Id.* at pp. 2-3 (§ 3).

23. Notwithstanding that subcontracting was not allowed, Endurance utilized a subcontractor, Lonestar Marketing Group, to locate and engage the individual sales agents used to

4

perform under the Master Services Agreement. Ex. 3 (Ream Dep.) at 229: 22-23; 231:12-21; 244:24-245:11.

24. Endurance did not obtain written consent regarding the involvement of Lonestar as a subcontractor. Ex. 3 (Ream Dep.) at 232:13-22. Spring Energy did not learn about Lonestar's involvement until discovery in this action. Booth Decl. ¶ 11;

25. Lonestar, in turn, engaged a team of five agents, the leader of which was Neil St. Louis. Ex. 3 (Ream Dep.) at 244:24-245:11; 248:14-24; 94:14-16.

26. Brian Ream provided Spring Energy with the names of the five potential sales agents, including Neil St. Louis, along with the required documentation via email. *See* Ex. 26 (March 23, 2021 email), Ex. 27 (March 26, 2021 email chain).

27. Since the required documentation was provided for all five agents, including a satisfactory background check, Spring Energy approved the agents proposed by Endurance. Ex. 3 (Ream Dep.) at 246:6-247:5.

28. Endurance did not inform Spring Energy that Neil St. Louis was the team leader of the Endurance door-to-door sales team. *See*, e.g., Ex. 26 (March 23, 2021 email), Ex. 27 (March 26, 2021 email chain).

29. The only information provided concerning Neil St. Louis and the other Endurance team members was the background check results, identification, and other onboarding documentation required under the Master Services Agreement. *See* Ex. 4 (Miranda Dep.) at 105:9-16; 161:2-162:14; Ex. 25 (Master Services Agreement), at p. 15 (§§ 3.03, 3.04); Ex. 29 (onboarding documentation for Neil St. Louis).

30. Spring Energy conducted a training session for Endurance sales agents via a videoconference meeting on March 26, 2021. Ex. 3 (Ream Dep.) at 83:25-84:11.

5

31. Spring Energy also provided written training materials, which were discussed during the training session. *See* Ex. 28 (training materials).

32. The training materials describe the proper protocol for a door-to-door marketing encounter with a potential customer, which, notably, does not include making or arranging a telephone call to the customer. *See* Ex. 28 (training materials), at p. 36-37.

33. Aside from the training provided by Spring Energy, there is no evidence that Spring Energy ever directly communicated with Neil St. Louis or the other Endurance sales agents, except to send marketing materials to the address provided by Endurance.

34. The first attempted enrollment of a customer by Endurance for Spring Energy occurred on March 29, 2021. *See* Ex. 30 (Prospect Load Report from TPV.com).

35. Thereafter, from March 29, 2021 through May 11, 2021, there were 177 total attempted enrollments originating from Endurance's marketing efforts. *Id.*

36. Of these 177 attempted enrollments, 79 customer accounts enrolled with Spring Energy involving 55 unique customers (24 customers enrolled with separate gas and electric accounts). *Id.*

37. Many of these enrollments were either cancelled at the outset or shortly thereafter or otherwise failed to result in a long-term customer relationship for Spring Energy. *See* Ex. 33 (report showing that 36 of the enrollees were customers for 30 days or less).

38. After a successful third-party verification call culminated in a completed enrollment, Spring Energy conducted quality assurance checks to determine whether the sales and associated marketing efforts were conducted in compliance with Spring Energy's policies and procedures. This quality assurance included using software to evaluate information provided for

the customer, including the phone number, reviewing geolocation data provided by the third-party verification company, and performing email validation. Ex. 5 (Kozieja Dep.) at 32:4-33:4.

39. Spring Energy also conducted a "welcome call" shortly after the enrollment was conducted "to inquire about [the customer's] sales experience, reconfirm their understanding of [Spring Energy's] services, to answer any additional questions they may have, and to identify whether there are any areas for improvement in each sales representative's presentation." Ex. 28 (training materials); *see also* Ex. 5 (Kozieja Dep.) at 32:4-33:18.

40. On April 22, 2021, Spring Energy Sales & Operations Associate, Amanda Miranda, contacted Endurance principal, Brian Ream, via email to notify him that Spring Energy's Quality Assurance team had noticed discrepancies with sales attributed to Endurance sales agent, Neil St. Louis. Specifically, GPS data received from the third-party verification company utilized by Spring Energy, TPV.com, indicated that there were two customer encounters—the first, an incomplete sale on April 14, 2021, and the second, an enrollment on April 21, 2021—for which GPS coordinates placed Neil St. Louis overseas and not at the customer's residence. *See* Ex. 31 (April 22, 2021 – May 11, 2021 email chain).

41. Spring Energy deactivated Neil St. Louis as a sales agent on April 22, 2021. *Id.*; *see also* Booth Decl. ¶ 12.

42. In response, Brian Ream promised to commence an investigation immediately and report back to Spring Energy. *See* Ex. 31 (April 22, 2021 – May 11, 2021 email chain)

43. On May 11, 2021, Orpheus Crague, Spring Energy's Quality Assurance Manager, emailed Mr. Ream to notify him of quality assurance concerns related to four enrollments, three with GPS data discrepancies occurring from May 6-7, 2021, and a fourth, occurring on April 26,

7

2021, where there were no obvious GPS discrepancies, but a subsequent call with the customer suggested that the sales agent called the customer to obtain the enrollment. *Id.*

44. At this time, Spring Energy deactivated each of the four other Endurance sales agents. Ex. 5 (Kozieja Dep.) at 120:2-11; Ex. 2 (30(b)(6) Dep.) at 124:14-125:15.

45. The five Endurance sales agents were never reactivated by Spring Energy. Booth Decl. ¶ 14.

46. Endurance later learned that Neil St. Louis was generating leads door-to-door but then utilizing a "service" to complete the sales. Ex. 3 (Ream Dep.) at 90:24-92:20.

47. Endurance was not informed by Neil St. Louis regarding the nature of the "service" utilized to complete the sales. Ex. 3 (Ream Dep.) at 92:14-20.

48. Spring Energy itself did not make any telemarketing calls since the only outbound telephone calls to consumers Spring Energy performs are customer service and quality assurance calls to its customers. Ex. 2 (30(b)(6) Dep.) at 206:21-207:11; 208:21-209:12; Booth Decl. ¶ 16.

49. Endurance itself did not make any telemarketing calls. Ex. 3 (Ream Dep.) at 14:2-9; 197:18-198:4; 253:16-22.

50. There is no evidence that Neil St. Louis himself made telephone calls to any customers.

51. Geolocation data obtained from TPV.com suggests that certain enrollments, including those which triggered Spring Energy's deactivation of the Endurance sales agents, may have involved actions by individuals located in Pakistan. *See* Ex. 31 (April 22, 2021 – May 11, 2021 email chain).

52. Spring Energy did not authorize any person or entity in Pakistan to conduct telemarketing disguised as door-to-door marketing. Ex. 2 (30(b)(6) Dep.) at 199:23-200:12; 205:9-24; Ex. 1 (Booth Tr.) at 11:25-112:14.

53. Aside from the geolocation data, Spring Energy had no knowledge of any actions being performed from Pakistan related to Endurance's marketing efforts. Booth Decl. ¶ 15.

54. The final attempted enrollment arising from an Endurance's marketing activity was on May 11, 2021 at 3:09 p.m. Ex. 30 (Prospect Load Report from TPV.com).

55. Endurance engaged in no marketing activity pursuant to the Master Services Agreement after May 11, 2021. Ex. 3 (Ream Dep.) at 38:11-14, 117:7-22, 159:4-9, 237:3-14.

56. On November 15, 2021, Spring Energy formally terminated the Master Services Agreement with Endurance. Ex. 32 (termination letter).

57. Spring Energy has not subsequently contracted with Endurance. Ex. 3 (Ream Dep.) at 31:16-32:8; Ex. 1 (Booth Dep.) at 123:8-24.

**Telephone Calls Allegedly Received by Plaintiff**

58. Plaintiff has a mobile telephone number with area code 443, which is associated with Plaintiff's business located in Salisbury, Maryland. Ex. 6 (Nock Dep.) at 21:24-22:20.

59. Plaintiff alleges that he received telemarketing calls on his 443 area code mobile telephone made on behalf of Spring Energy from April 1, 2021 through April 30, 2021. *See* Ex. 7 (Plaintiff's Interrogatory Responses), at p. 40.

60. These calls were not made by Spring Energy itself. Booth Decl. ¶¶ 16-17; *see also* Booth Dep. at 110:13-25.

61. These calls were also not made by Endurance. Ex. 3 (Ream Dep.) at 253:26-254:9.

62. There is no evidence these calls were made by Neil St. Louis himself.

63. Plaintiff is uncertain regarding which calls listed on his telephone bill for the 443 number correspond to calls made on behalf of Spring Energy. *See* Ex. 7 (Plaintiff's Interrogatory Responses), at p. 40.

64. Plaintiff has a landline telephone number with area code 410, which is associated with Plaintiff's residence located in Ocean City, Maryland. Ex. 6 (Nock Dep.) at 18:3-19:16.

65. Plaintiff alleged that he received at least two telemarketing calls on his 410 area code landline telephone made on behalf of Spring Energy between April 22, 2021 through April 27, 2021. *See* Ex. 7 (Plaintiff's Interrogatory Responses), at 41.

66. These calls were not made by Spring Energy itself. Booth Decl. ¶¶ 16-17; *see also* Booth Dep. at 110:13-25.

67. These calls were also not made by Endurance. Ex. 3 (Ream Dep.) at 253:26-254:9.

68. There is no evidence these calls were made by Neil St. Louis himself.

69. Plaintiff alleges that the subject telephone calls all began with a pre-recorded message, which, in sum or substance, stated: "This is an apology call from your electric company. You have been overcharged, and we're sending you a rebate, and you're getting a 30 percent reduction in your rate. Press 1 if you would like this rebate and reduction." Ex. 6 (Nock Dep.) at 38: 7-17; 40:14-41:3.

70. According to Plaintiff, none of the prerecorded messages mentioned Spring Energy. Ex. 6 (Nock Dep.) at 41:4-8. In fact, Plaintiff pressed 1 to find out who was calling. Ex. 6 (Nock Dep.) at 41:25-42:14.

71. During the recording identified by Bates-number NOCK 0005 and Exhibit F at Plaintiff's deposition, the caller does not indicate that she is calling on behalf of Spring Energy. Ex. 6 (Nock Dep.) at 79:18-80:3; *see also* Ex. 8.

72. During the recording identified by Bates-number NOCK 0008 and Exhibit G at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy. Ex. 6 (Nock Dep.) at 80:19-25; *see also* Ex. 9.

73. During the recording identified by Bates-number NOCK 0015 and Exhibit H at Plaintiff's deposition, the only thing said during the entire call was Plaintiff saying "hello". Ex. 6 (Nock Dep.) at 81:9-18; *see also* Ex. 10.

74. During the recording identified by Bates-number NOCK 0011 and Exhibit I at Plaintiff's deposition, the caller does not indicate that she is calling on behalf of Spring Energy. Ex. 6 (Nock Dep.) at 82:22-25; *see also* Ex. 11.

75. During the recording identified by Bates-number NOCK 0007 and Exhibit J at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy, but rather that he is calling from "your electric and gas company". Ex. 6 (Nock Dep.) at 83:17-84:14; *see also* Ex. 12.

76. During the recording identified by Bates-number NOCK 0014 and Exhibit K at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy. *See* Ex. 13.

77. During the recording identified by Bates-number NOCK 0010 and Exhibit L at Plaintiff's deposition, the caller does not indicate that she is calling on behalf of Spring Energy, but rather that she is calling from "Baltimore Gas and Electric". Ex. 6 (Nock Dep.) at 86:10-14; *see also* Ex. 14.

78. During the recording identified by Bates-number NOCK 0016 and Exhibit M at Plaintiff's deposition, the caller does not indicate that she is calling on behalf of Spring Energy. Ex. 6 (Nock Dep.) at 87:3-8; *see also* Ex. 15.

79. During the recording identified by Bates-number NOCK 0006 and Exhibit N at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy. Ex. 6 (Nock Dep.) at 87:18-21; *see also* Ex. 16.

80. During the recording identified by Bates-number NOCK 0009 and Exhibit O at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy, but rather that he is calling from "electric and gas billing department" and "BG & E". Ex. 6 (Nock Dep.) at 88:9-14; *see also* Ex. 17.

81. During the recording identified by Bates-number NOCK 0017 and Exhibit P at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy. Ex. 6 (Nock Dep.) at 88:25-89:4; *see also* Ex. 18.

82. During the recording identified by Bates-number NOCK 0018 and Exhibit Q at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy, but rather that he is calling from "your electric and gas company". Ex. 6 (Nock Dep.) at 89:15-18; *see also* Ex. 19.

83. During the recording identified by Bates-number NOCK 0012 and Exhibit R at Plaintiff's deposition, the caller stated that he was calling on behalf of "Supreme Power" or "Spring Power". Ex. 6 (Nock Dep.) at 90:5-17; *see also* Ex. 20.

84. During the recording identified by Bates-number NOCK 0013 and Exhibit S at Plaintiff's deposition, the caller stated that she was calling on behalf of "Supreme Energy" or "Supreme." Ex. 6 (Nock Dep.) at 93:22-94:7; *see also* Ex. 21.

85. During the recording identified by Bates-number NOCK 0004 and Exhibit T at Plaintiff's deposition, the caller does not indicate that he is calling on behalf of Spring Energy, but

rather that he is calling from "your electric and gas billing department". Ex. 6 (Nock Dep.) at 94:17-20; *see also* Ex. 22.

86. Plaintiff's gas and electric utility is, and always was, Delmarva Power & Light. Ex. 6 (Nock Dep.) at 19:17-19; 20:8-11; 23:3-22.

87. Spring Energy does not provide and has never provided energy or gas supply to Delmarva Power & Light customers. Booth Decl. ¶ 4; *see also* Ex. 25 (Master Services Agreement) at pp. 14-15 (Statement of Work).

88. During this same period—May and June 2021, Plaintiff also allegedly received telemarketing calls, also allegedly arranged by Neil St. Louis, on behalf of Indra Energy, which is unaffiliated with Defendants. *See* Ex. 23, at ¶¶ 81-84 (Palmco Complaint).


Dated:  Albany, New York
        February 5, 2025                 Respectfully submitted,

                                         **HARRIS BEACH MURTHA CULLINA PLLC**


                                         */s/ Daniel R. LeCours*
                                         Elliot A. Hallak
                                         Daniel R. LeCours
                                         Deana J. DiBenedetto
                                         677 Broadway, Suite 1101
                                         Albany, NY 12207
                                         T: 518.701.2748
                                         F: 518.427.0235
                                         ehallak@harrisbeachmurtha.com
                                         dlecours@harrisbeachmurtha.com
                                         ddibenedetto@harrisbeachmurtha.com

                                         *Attorneys for Defendants*

13